IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| VANESSA DUNDON, JADE KALIKOLEHUAOKALANI WOOL, CRYSTAL WILSON, DAVID DEMO, GUY DULLKNIFE III, MARIAH MARIE BRUCE, FRANK FINAN, ISRAEL HOAGLAND-LYNN, and NOAH MICHAEL TREANOR, <br><br> on behalf of themselves and all similarly-situated persons, <br><br> Plaintiffs, <br><br> v. <br><br> KYLE KIRCHMEIER, MORTON COUNTY, CITY OF MANDAN, JASON ZIEGLER, STUTSMAN COUNTY, CHAD KAISER, and DOES 1-100, <br><br> Defendants. | No. 1:16-cv-406 <br><br> **CIVIL RIGHTS CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     This is a civil rights class action for damages and injunctive relief arising from

Defendants' curtailment of Plaintiffs' First and Fourth Amendment rights by using highly

dangerous Specialty Impact Munitions (SIM), explosive teargas grenades, teargas canisters, and

a water cannon spraying high pressure water, as a means of dispersing protests and prayer

ceremonies associated with opposition to the Dakota Access Pipeline (DAPL).  Plaintiffs are

Native Americans and other concerned citizens, known as "water protectors," who have

protested and wish to continue protesting against DAPL.

*Dundon v. Kirchmeier* CIVIL RIGHTS CLASS ACTION COMPLAINT          1

2.      On November 20, 2016, water protectors gathered to pray and to peacefully protest the continued construction of DAPL and the ongoing blockage of the public highway 1806.  At Backwater Bridge, a bridge on Highway 1806, they were met by Defendants, a joint force of police officers from the Morton County Sheriff's Department, City of Mandan Police Department, and Stutsman County Sheriff's Department.  Several of these officers arrived in military vehicles and deployed an arsenal of dangerous implements and devices, including SIM, explosive teargas grenades, and teargas canisters. The Stutsman County Sheriff's Department brought an armored vehicle with a water cannon mounted on top, which was used to spray water on Plaintiffs and others despite the subfreezing temperature.  No orders to disperse, or warnings were given before deployment of these high levels of force against the unarmed water protectors. On this night, over 200 water protectors, including Plaintiffs, were injured by excessive police force, some of them very seriously.

3.      This is not the first time Defendants attacked water protectors who were praying and peacefully exercising their right to protest under the First Amendment to the U.S. Constitution. Defendants' attack represented the most brutal of an increasingly violent campaign by Defendants to suppress and chill Plaintiffs' constitutionally protected rights.  Accordingly, Plaintiffs seek an immediate court order to curtail the unlawful use of excessive force.  The use of SIM, explosive grenades, chemical agents, and water cannons or hoses, as means of crowd dispersal should be prohibited.

## JURISDICTION AND VENUE

4.      This action seeks damages and injunctive relief under 42 U.S.C. §§ 1981 & 1983.  This court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.  It has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.  This court also has

jurisdiction under the provisions of 28 U.S.C. § 2201 as this action is filed to obtain declaratory

relief regarding the constitutionality of the actions and policies of local government.

5.      Venue properly lies within this District under 28 U.S.C. § 1391(b).  The named

defendants perform their official duties in this District, and the events and omissions giving rise

to plaintiffs' claims occurred in this District. Intradistrict venue is proper in the Western Division

of the District of North Dakota pursuant to D.N.D. Civ. L.R. 3.1 and Gen. L.R. 1.1 because the

claims asserted herein arise from acts and/or omissions which occurred in Morton County, North

Dakota.

## PARTIES

6.      Plaintiff VANESSA DUNDON is a United States Citizen and an enrolled member of the

Navajo Nation.  She came to North Dakota to support the peaceful protest by the water

protectors and the people of the Oceti Šakowiŋ (the Seven Council Fires) in opposition to the

construction of DAPL, which is desecrating their ancestral land and burial sites and threatening

the environment and water.  (Ex. U, Dundon Decl.)

7.      Plaintiff JADE KALIKOLEHUAOKALANI WOOL is a United States Citizen of Native

Hawaiian and Oglala Lakota heritage.  The Lakota is one of the seven nations, the Seven Council

Fires, that compose the Oceti Šakowiŋ, also known as the Great Sioux Nation.  She came to

North Dakota to support the peaceful protest by the water protectors and the people of the Oceti

Šakowiŋ  in opposition to the construction of DAPL, which is desecrating their sacred ancestral

land and burial sites and threatening the environment and water.  (Ex. E, Wool Decl.)

8.      Plaintiff CRYSTAL WILSON is a United States Citizen of Blackfoot and Afro-

indigenous heritage.  She came to North Dakota to support the peaceful protest by the water

protectors and the people of the Oceti Šakowiŋ  in opposition to the construction of DAPL,

which is desecrating their sacred ancestral land and burial sites and threatening the environment and water.  (Ex. Q, Wilson Decl.)

9.      Plaintiff DAVID DEMO is a United States Citizen of Penobscot heritage.  He came to North Dakota to support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ  in opposition to the construction of DAPL, which is desecrating their ancestral land and burial sites and threatening the environment and water supply.  (Ex. S, Demo Decl.)

10.      Plaintiff GUY DULLKNIFE III is a United States Citizen and member of the Oglala Lakota Sioux Tribe.  He came to North Dakota to support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ  in opposition to the construction of DAPL, which is desecrating their ancestral land and burial sites and threatening the environment and water supply.  (Ex. M, Dullknife Decl.)

11.      Plaintiff MARIAH MARIE BRUCE is a United States citizen.  She came to North Dakota to support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ in opposition to the construction of DAPL, which is desecrating their ancestral land and burial sites and threatening the environment and water.  (Ex. I, Bruce Decl.)

12.      Plaintiff FRANK FINAN is a United States citizen.  He came to North Dakota to support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ  in opposition to the construction of DAPL, which is desecrating their sacred ancestral land and burial sites and threatening the environment and water.  (Ex. O, Finan Decl.)

13.      Plaintiff ISRAEL HOAGLAND-LYNN is a United States citizen.  He came to North Dakota to support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ in opposition to the construction of DAPL, which is desecrating their sacred ancestral land and burial sites and threatening the environment and water.  (Ex. H, Hoagland-Lynn Decl.)

14.     Plaintiff NOAH MICHAEL TREANOR is a United States citizen. He came to North Dakota to support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ in opposition to the construction of DAPL, which is desecrating their ancestral land and burial sites and threatening the environment and water supply.  (Ex. G, Treanor Decl.)

15.     Defendant MORTON COUNTY is a body corporate for civil purposes and subject to suit pursuant to N.D. Cent. Code § 11-10-01.

16.     Defendant KYLE KIRCHMEIER is a law enforcement officer, the Sheriff and an authorized policymaker of Defendant MORTON COUNTY, and is being sued in his individual capacity.

17.     Defendant CITY OF MANDAN is a body corporate for civil purposes and subject to suit pursuant to N.D. Cent. Code § 40-01-02.

18.     Defendant JASON ZIEGLER is a law enforcement officer, the Chief of Police, and an authorized policymaker of defendant CITY OF MANDAN, and is being sued in his individual capacity.

19.     Defendant STUTSMAN COUNTY is a body corporate for civil purposes and subject to suit pursuant to N.D. Cent. Code § 40-01-02.

20.     Defendant CHAD KAISER is a law enforcement officer, the Sheriff, and an authorized policymaker of defendant STUTSMAN COUNTY, and is being sued in his individual capacity.

21.     Plaintiffs are ignorant of the true names and/or capacities of defendants sued herein as DOES 1 through 100, inclusive, and therefore initiate suit against said defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. The DOE defendants include other individuals who supervised and/or participated in the conduct complained of herein. Plaintiff is informed and believes and therefore

*Dundon v. Kirchmeier*  CIVIL RIGHTS CLASS ACTION COMPLAINT                                              5

alleges that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth, and that each of said defendants proximately caused said incidents, injuries and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control or upon any other act or omission. Plaintiffs will ask leave to amend this complaint to insert further charging allegations when such facts are ascertained.

In doing the acts alleged herein, defendants, and each of them, acted within the course and scope of their employment.

22.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under color of law.

23.     In doing the acts and/or omissions alleged herein, defendants, and each of them, acted as the agent, servant, employee and/or in concert with each of said other defendants.

## **GENERAL ALLEGATIONS**

24.     Plaintiffs VANESSA DUNDON, JADE KALIKOLEHUAOKALANI WOOL, CRYSTAL WILSON, DAVID DEMO, GUY DULLKNIFE III, MARIAH MARIE BRUCE, FRANK FINAN, ISRAEL HOAGLAND-LYNN, NOAH MICHAEL TREANOR, and all other similarly situated persons are herein referred to collectively as "Plaintiffs." Defendants MORTON COUNTY, KYLE KIRCHMEIER, CITY OF MANDAN, JASON ZIEGLER, STUTSMAN COUNTY, CHAD KAISER, and DOES 1 to 100 are herein referred to collectively as "Defendants."

## **BACKGROUND**

25.     Energy Transfer Partners has proposed to construct a 1,172-mile long Dakota Access Pipeline (hereinafter DAPL) to carry 570,000 barrels a day of highly volatile fracked crude oil from the Bakken oil fields in North Dakota to Illinois.  The pipeline was originally planned to cross the Missouri River, referred to as Mni Šoše by the Lakota people, north of Bismarck, but due to concerns and public outcry about contamination to the water supply, the pipeline company, Dakota Access LLC, rerouted the pipeline.  As of the last census data available, Bismarck had a population of 55,532 and of that, 94.78% are white. http://bismark.areaconnect.com.  The current pipeline route now crosses the Missouri River at Lake Oahe, the primary drinking water source for the Standing Rock and Cheyenne River Sioux Tribes, as well as thousands of other people who live in this area.  The Missouri River is sacred to the Oceti Šakowiŋ people and central to their lifeways and culture.  Lake Oahe is also an area of great cultural, historic, religious, and spiritual significance to the Standing Rock Sioux Tribe, the Cheyenne River Sioux Tribe, and other members of the Oceti Šakowiŋ..

26.     DAPL's path runs through Lakota ancestral and treaty lands.  Lakota ancestral territories include all of the Dakotas and others.  The 1851 Treaty of Fort Laramie (1851 Treaty) entered into by the United States and the Great Sioux Nation recognized all lands west of the Missouri River in current day North and South Dakota as territory of the Oceti Šakowiŋ.  11 Stat. 749 (Sept. 17, 1851).  The 1851 Treaty encompass lands through which the DAPL is being and is to be constructed.  In 1868, the United States entered into a second treaty with the leaders of the Great Sioux Nation (1868 Treaty) by which the United States again recognized the territory of the Oceti Šakowiŋ and guaranteed the territory against intrusions by the United States and outsiders.  15 Stat. 635 (Apr. 29, 1868).  The DAPL's planned path if allowed will violate the 1851 Treaty.

27.     DAPL threatens their environment, fish and wildlife, sacred ceremonial and burial sites, and vital water supply.  The Pipeline and Hazardous Materials Safety Administration (PHMSA) has reported more than 3,300 incidents of leaks and ruptures at oil and gas pipelines since 2010.

28.     In April 2016, Standing Rock and Cheyenne River Tribe members and other concerned citizens, known as "water protectors," began protesting the DAPL.  Despite objections from the Tribes, construction began in August, 2016, and water protectors gathered in increasing numbers in spiritually based protest camps near Highway 1806.

29.     On or about September 3, Standing Rock tribal officials informed the federal government and DAPL construction managers that the proposed pipeline construction was in direct conflice with traditional sacred areas and burial grounds.  DAPL declined to suspend construction and instead accelerated the destruction of these known areas.  Indigenous leaders and water protectors went to this location to pray in ceremony and to attempt to halt the permanent destruction and desecration of these graves and sacred areas.  DAPL security employees attacked water protectors protesting the bulldozing of sacred sites and burial sites with dogs and pepper spray. A number of protesters suffered injuries, including dog bites. Law enforcement, including MORTON COUNTY Sheriff personnel stood by and made several false arrests of water protectors and members of the media. See http://www.nytimes.com.

30.     Shortly after this incident, and in response to overwhelming tribal and public outcry, on September 9, the U.S. Army Corps of Engineers ("Army Corps") withdrew an easement to drill and install a pipeline under Lake Oahe and requested that DAPL cease all construction within 20 miles of Lake Oahe.  Dakota Access, LLC ignored this request - which has since been repeated by the Army Corps twice. The company has now completed all planned construction in North Dakota other than the area directly under Lake Oahe, where it has set up its drilling equipment

and has announced that drilling is imminent despite the federal order. The proposed tunneling under the Lake and river pose the greatest threat to the tribes and others who rely on these freshwater bodies for their livelihoods.

31.     At the same time, rather than defending the public interest and halting DAPLs illegal construction, Defendants increased their use of force and arrests of water protectors, responding to nonviolent First Amendment expression in an increasingly militarized and violent fashion. On multiple occasions in October, Defendants conducted indiscriminate and unlawful mass arrests of people who were exercising their First Amendment rights to voice their opposition to the proposed pipeline, accompanied by unjustified violence against nonviolent protesters. For example, on October 22, Defendants surrounded a peaceful prayer march and arrested more than one hundred people without any warning or opportunity to disperse. Ex. I, Decl. Bruce. On October 27, Defendants responded to a demonstration near highway 1806 in Humvees and helicopters, and unleashed a Long Range Acoustic Device (LRAD) sound weapon, SIM, and chemical agents on peaceful water protectors, and arrested more than 100 people, many of whom were engaged in prayer ceremonies.

32.     When the arbitrary mass arrests in October failed to deter protesters from exercising their First Amendment rights, Defendants resorted to even more violent tactics. On November 2, hundreds of protesters, including indigenous elders, held a prayer ceremony across a river from the pipeline construction site. When a few protesters entered the frigid river, Defendants bombarded the entire group with tear gas and SIM, endangering their safety and health.

33.     Defendants responded to a November 15 DAPL protest on a public roadway near a DAPL construction yard with widespread and indiscriminate use of chemical agents and stun guns. Ex. I.

*Dundon v. Kirchmeier*  CIVIL RIGHTS CLASS ACTION COMPLAINT                                      9

34.     Defendants' November 20, 2016, response to the water protectors was the most violent

yet, resulting in many serious injuries including at least one critical injury which has left a 21

year-old woman permanently disabled.

### VANESSA DUNDON

35.     Vanessa Dundon is an enrolled member of the Navajo Nation and a supporter of the

movement to stop the Dakota Access Pipeline.  Dundon came to the water protectors' camp

September 11, 2016, to stop the pipeline's desecration of ancestral, sacred and burial sites and its

threat to the environment and water supply.  She also came to stand up for indigenous peoples'

rights.  (Ex. U, Dundon Decl.)

36.     On Sunday, November 20, 2016 at sundown around 7:00 or 8:00PM (CT) Dundon went

to Backwater Bridge immediately north of Oceti Šakowiŋ camp on Highway 1806 to peacefully

protect the water and to stop the pipeline from going through the Missouri River.  It was very

cold outside.  She was one of the first people to arrive at the bridge.  When she arrived at the

bridge, other water protectors were using tow equipment in an attempt to move one of the burned

out trucks from the bridge so emergency vehicles could reach camp.  Army Corps had promised

to remove the vehicles that had been placed there by law enforcement, but they never did, so

people in camp mobilized to remove the vehicles for health and safety reasons as well as in the

public interest.  After the first truck was removed, a group of water protectors began to remove

the second truck and Dundon saw a woman standing by herself across the razorwire barricade

and in front of a line of law enforcement. The woman appeared to be a member of the media.

Out of concern for the woman's safety, Dundon told her to move out of the way and the woman

moved to the side of the road.  At that moment, she and Dundon were the closest people to the

line of law enforcement officers.  As Dundon watched her move to the side of the road, Dundon

*Dundon v. Kirchmeier*  CIVIL RIGHTS CLASS ACTION COMPLAINT                                    10

heard a tear gas cannon go off. Dundon tried to see where the tear gas cannon was being shot and saw that it was coming straight for her face. She did not have time to move to avoid being hit by the canister. Dundon saw the tear gas canister was on fire or burning and was about a foot from her face. She instinctively closed her eyes and was struck in the face and right eye by a canister. (Ex. U, Dundon Decl.)

37.     After Dundon was shot in the eye, she fell to the ground and grabbed her bandana to cover her eye and turned around to run away. She was then shot in the back of her left leg right below her butt with a rubber bullet. The shot with the bullet caused her to fall down. Dundon couldn't see well and was in pain so she called out for help. At that point two water protectors grabbed her arms and they ran away from the frontline until they reached a minivan. Dundon could still not see at this point and was trying to open her eye. Her eye was bleeding so much that she could not see and she was worried her eyeball had been dislodged from its socket. (Ex. U, Dundon Decl.)

38.     Dundon was one of the first people on the bridge, and thus no ambulances had been summoned to Oceti Šakowiŋ yet so had to be transported by a camp medic minivan. In the minivan a male EMT from camp helped clean her face and told Dundon. At the medic yurt at Oceti Šakowiŋ, emergency triage was performed and butterfly sutures were placed on her eye to stop the bleeding. (Ex. U, Dundon Decl.)

39.     Dundon was then transported to the Emergency Room at Sanford Hospital in Bismarck, North Dakota. At Sanford Hospital, she was seen by an ophthalmologist who put several stitches in her eye and she was kept overnight in the ER. She was also given an MRI of her right eye while she was there. At 8:30AM (CT) the next morning on November 21, 2016, Dundon was awoken by hospital staff and told that she had a follow up appointment at 1:30pm that day and

she should leave the hospital and come back.  She was alone and was walked to the lobby and was very dizzy and almost passed out.  Once she got to the lobby, she laid down to wait for her cousin to come pick her up and was approached by hospital security.  She told security that she was still dizzy and could not stand long, she was subsequently readmitted to the hospital. Dundon then saw a doctor and told him everything that had happened.  He called Social Services and they discharged Dundon at about 10:30AM (CT) but she did not have a ride yet so she was sent to the doctor's office for her afternoon appointment by taxi.  (Ex. U, Dundon Decl.)

40.    The opthamologist advised Dundon to see a retina specialist for the damage she sustained to her eye.  A water protector from camp picked Dundon up from the doctor's office and drove her to Grubes Retina Clinic in Mandan, North Dakota.  When Dundon arrived at Grubes Retina Clinic they refused to treat her.  To the best of her knowledge and belief, they refused to treat her because they knew she was a water protector from Standing Rock.  (Ex. U, Dundon Decl.)

41.    The next day, Dundon was taken to the Emergency Room in Acensia Hospital in Fargo, North Dakota.  In Acensia, she was given an ultrasound of her right eye and told that there was so much bleeding and hemorrhaging that it was difficult to determine the extent of damage.  She was told there was a possibility that her retina was detached and there was likely damage to her cornea.  She was advised to see a retina specialist the next day.  (Ex. U, Dundon Decl.)

42.    The next day, November 23, 2016, she went to see Dr. Baggins, another ophthalmologist, in Fargo.  Dr. Baggins told her the injury was very serious and said more likely than not, her retina was detached.  He also said that even if it wasn't yet detached, it likely would detach in the near future because of the extent of her injury, and that her eye would take several months to heal in order to determine the full extent of the permanent damage sustained.  He said she needed to be seen by a specialist in Minnesota for further treatment.  He set an appointment for her to

see Dr. Robert Mittra in Plymouth, Minnesota on November 25, 2016.  On November 25, 2016,

Dundon was seen by Dr. Mittra.  Dr. Mittra did another ultrasound of her right eye and put

ointment on it and bandaged it so the swelling could go down.  Dr. Mittra told her that she had a

cut on her eyeball and the swelling needed to go down before she could receive further

treatment.  Dr. Mittra said treatment for her eye will take months and several follow up

appointments.  He advised that Dundon not return home to Arizona because of the elevation

difference, which could harm her eye.  Dr. Mitta also told her not to lift anything, cough too hard

or otherwise put pressure on her eye.  The doctor said the trauma to her eye will likely affect her

vision for the rest of her life and it is unclear at this time if she will be able to see out of her right

eye again.  Dundon's eye is in severe pain and causes pain on the right side of her face.  She has

difficulty sleeping because of the pain.  There is an almost constant throbbing and pressure in her

eye.  (Ex. U, Dundon Decl.)  She worries about the ongoing effects to her health as a result of the

injuries she sustained by the police.

43.     As a result of these events, she worries that she will be subjected to further police abuse if

she continues to participate in First Amendment expression to protect the water in Morton

County.  As a result of the actions of the Morton County Sheriff and assisting agencies, she is

afraid and nervous about participating in further First Amendment activity in opposition to the

Dakota Access Pipeline in Morton County, even thought she wants to gather and assemble

peacefully with others who share her views.  (Ex. U, Dundon Decl.)

### JADE KALIKOLEHUAOKALANI WOOL

44.     Jade Kalikolehuaokalani Wool is of Native Hawaiian and Oglala Lakota Sioux Tribe

heritage.  Wool came to the water protector camp in August 2016 after finding out about the

situation in Standing Rock.  As an indigenous woman, she believes she needs to be at the camp

in solidarity with the water protectors and to uphold tribal sovereignty rights.  (Ex. E, Wool

Decl.)

45.     On Sunday, November 20, 2016 in the evening, Wool went to the bridge immediately

north of the Oceti Šakowiŋ camp on Highway 1806 to peacefully gather with other water

protectors to protest construction of the pipeline underneath the Missouri River.  It was very cold

and windy, with temperatures below freezing that night..  (Ex. E, Wool Decl.)

46.     Wool could see a lot of law enforcement officers or security officers and lots of military

vehicles on the other side of the bridge behind significant barricades.  The officers and their

vehicles were on the opposite side of a razor-wire fence.  When she arrived at the bridge, she

could hear people screaming and could see flashes from explosions.  A few minutes after she

arrived at the bridge, a grenade loudly exploded in the air right above her head.  When that

grenade went off, Wool was in the middle of a crowd of water protectors and for a few minutes

she was dazed and could not really hear because of the noise of the explosion.  (Ex. E, Wool

Decl.)

47.     Wool was also hit directly by a water cannon that the officers were using on the water

protectors.  When she got hit, the force of the torrent of water pushed her backward and she was

completely soaked by the water cannon, even her boots were filled.  The officers sprayed the

crowd of water protectors with the water canon for about ten minutes at a time in the freezing

night air.  Officers would stop for a few minutes and then start again.  This went on for the entire

hour that Wool was on the bridge.  (Ex. E, Wool Decl.)

48.     She saw a water protector who looked like he was injured and was crawling on the

ground.  Other water protectors tried to pull him away from the water cannon and while they

were doing this, an officer kept firing the water cannon at the injured man.  Wool located a

plastic lid from a storage tote, and she moved near the injured man and tried to shield him from the water cannon. She was close enough to see the face of the officer intentionally shooting the water cannon at specific targeted people. She could see the officer looking at her before the officer hit her again with the water. At one point, the force of the water cannon knocked the plastic lid into her head. (Ex. E, Wool Decl.)

49.    Soon after the injured man was moved away by the water protectors, another grenade exploded in front of Wool's face. Pieces of the grenade hit Wool's face in several places. The grenade burned her face and knocked her to the ground. After the grenade hit her, she was in shock and could not talk or respond to others around her. She remembers being put in a truck and being taken to the medical tent at Oceti Šakowiŋ camp. She was transported to the hospital in Bismarck. The doctors had to cut off her clothes and hook her up to an IV. Her body ached, and her head hurt. (Ex. E, Wool Decl.)

50.    Wool feels very shaken up by what happened that night. She still feels nauseated and has not been able to eat well for a few days. She still has a headache. She feels very nervous and anxious and cannot sit still very long or sleep through the night. She still feels cold all the time as a result of hypothermia or exposure caused by the repeated drenchings. (Ex. E, Wool Decl.)

51.    As a result of these events, she worries that she will be subject to other abuses in the future if she participates in further peaceful prayer and protests in support of the water protectors in Morton County. Because of the actions of the Morton County police, she is nervous about participating in further First Amendment activities in opposition to the pipeline in Morton County even though she wishes to gather and assemble peacefully with others who share her views. (Ex. E, Wool Decl.)

### CRYSTAL WILSON

52.     Crystal Wilson is of Blackfoot and Afro-indigenous heritage.  She is a member of the movement to stop DAPL.  She came to the water protectors' camp in late September 2016 to gather with other indigenous people. Since she has been in the camp, she has been volunteering and participating in peaceful, prayerful actions.  (Ex. Q, Wilson Decl.)

53.     On Sunday, November 20, 2016 in the evening around 7:00PM (CT), Wilson went to the bridge immediately north of Oceti Šakowiŋ camp on Highway 1806 to peacefully gather with other water protectors to stop the pipeline from going through the river and polluting the Missouri River.  She was praying with the other water protectors while she was there.  It was very cold and windy.  During the first hour, she and others were peacefully praying, unarmed, and not threatening police.  Still, police were shooting a high-powered water cannon, tear gas canisters and flash-bang grenades at her.  She left for a rest and returned to the bridge with more appropriate winter clothing.  (Ex. Q, Wilson Decl.)

54.     After she returned, a native elder was singing an indigenous song with his arm outstretched on either side, and the police were soaking him with the water cannon, even though it was very cold outside.  Wilson held a piece of plastic up to shield others.  Then, she heard a bang and felt an impact on her chest.  She grabbed an aluminum sheet to protect herself and others.  Then she walked back away from the police line.  She noticed at the time she was covered with ice on her hair and back from the water canon.  (Ex. Q, Wilson Decl.)

55.     On November 20th, Wilson did not hear any request to disperse from the police throughout the entire night: when she was on the bridge, before or after she was shot, gassed, and soaked by the water cannon.  (Ex. Q, Wilson Decl.)

56.     As a result of these events, Wilson worries that she will be subjected to other abuses if she participates in further peaceful protest and prayer in support of the water protectors in

Morton County. Because of the actions of the Morton County Sheriff and assisting agencies, she is very nervous about participating in further First Amendment activity in opposition to the pipeline in Morton County even though she wishes to gather and assemble peacefully with others who share her views.  (Ex. Q, Wilson Decl.)

## DAVID DEMO

57.     David Demo is of Penobscot heritage.  Demo is a supporter of the movement to stop DAPL.  He came to the water protectors' camp mid-August 2016, to protest the pipeline's desecration of ancestral sacred and burial sites and its threat to the environment and water supply.  (Ex. S, Demo Decl.)

58.     On Sunday, November 20, 2016 at 8:30PM or 9:00PM (CT), he went to the bridge immediately north of Oceti Šakowiŋ camp on Highway 1806 to peacefully protest and pray to stop the pipeline from going through the river and polluting the Missouri River. (Ex. S, Demo Decl.)

59.     It was a cold night and below freezing.  As he approached the bridge, and the line of police, he was holding a "GoPro" camera on a stick, filming the police behind the razor wire.  He was there to observe what was going on, and continue protesting the pipeline. Within five minutes, he was targeted with the water cannon and was thoroughly soaked for about thirty seconds, even though he was not threatening the police or barricade in any way.  He never heard warnings issued to get off the bridge, or that he would be assaulted with the water canon, or that projectiles would be fired against him.  At the end of the approximately thirty seconds, one of the officers shot him with what seems to be a rubber bullet hitting him on the middle finger of his right hand, which was holding the video camera on a stick. (Ex. S, Demo Decl.)

60.    After he was hit by the rubber bullet, he went back behind the bridge to receive first aid treatment from the medics. He drove back to Sacred Stone camp to put on dry clothes, and he returned to the bridge to join the protest. He was able to keep himself from getting soaked while on the bridge by using a board or tarp to protect himself. He stayed there until approximately 5am. (Ex. S, Demo Decl.)

61.    He went to the Indian Health Service hospital in Fort Yates at approximately 6:30am and received treatment for his hand where he was shot. The doctors told him he had several broken knuckle bones, and he was informed that he would need reconstructive surgery. (Ex. S, Demo Decl.)

62.    He never heard an order to disperse while he was on the bridge on the night of November 20, 2016. Officers only said to get away from the razor wire barricade. He did step back from the razor wire when the officers requested it, but he still was targeted with the water cannon and munitions. (Ex. S, Demo Decl.)

63.    The events of November 20 were very traumatic. It was shocking for Demo to observe and experience such brutal, cruel, excessive force by public officers. (Ex. S, Demo Decl.)

64.    As a result of these events, Demo worries that he will be subjected to other abuses if he participates in further peaceful protest and prayer in support of the water protectors in Morton County. Because of the actions of the Morton County Sheriff and assisting agencies, he is very nervous about participating in further First Amendment activity in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share his views. (Ex. S, Demo Decl.)

## GUY DULLKNIFE III

65.    Guy Dullknife III is a member of the Oglala Lakota Sioux Tribe and resident of the Pine Ridge Indian Reservation in South Dakota.  He comes from a Reservation where the community depends on water from the Missouri River as its sole water resource.  The Pine Ridge Indian Reservation is within the poorest county in the United States, and the tribal community there would not be able to afford to buy water to replace their sole water source.  He came to peacefully protest the building of the pipeline which may in the future leak and cause harm to his community.  (Ex. M, Dullknife Decl.)

66.    On the evening of November 20, 2016 at around 10 or 11pm, Dullknife went to the bridge over the Cannonball River on highway 1806 north of Oceti Šakowiŋ camp to observe the prayer assembly.  The temperature was below freezing.  When he got there, he saw that the police were using water cannons to soak water protectors.  He also saw a woman kneeling about 12-to-14 feet from the barbed wire the police had placed on the bridge.  He saw the police officer firing the water cannon point directly at the woman.  The police officer aimed the water cannon at her, and she was knocked down.  The police continued spraying the woman while she was on the ground even though she posed no threat to the police.  Another person helped Dullknife hold up a board to protect the woman from the water while she prayed.  (Ex. M, Dullknife Decl.)

67.    Dullknife was hit in the chest, stomach, and leg by what he believes were shotgun-fired beanbags.  One bean bag hit him in the chest, and he caught it with his hand.  He now has pain and bruising from those injuries.  (Ex. M, Dullknife Decl.)

68.    While at the bridge, he observed three trucks brought in filled with water so they could continue to soak the protesters.  One of the trucks was a fire engine.  He observed the police shoot and injure many people that night with beanbags, rubber bullets, tear gas, flash-bangs, and

grenades. He even overheard highly unprofessional police officers laughing and celebrating after they hit people with projectiles. (Ex. M, Dullknife Decl.)

69.     As a result of these events, Dullknife worries that he will be subjected to other abuses if he participates in further peaceful protest and prayer in support of the water protectors in Morton County. Because of these actions of the Morton County Sheriff and assisting agencies, he is very concerned about participating in further First Amendment activity in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share his views. (Ex. M, Dullknife Decl.)

## MARIAH MARIE BRUCE

70.     Mariah Marie Bruce has been present at several protests since arriving at Oceti Šakowiŋ camp in mid-October, 2016. She has protested and wishes to continue protesting the desecration of ancestral sacred and burial sites and DAPL's threat to the environment and water supply. On Saturday, October 22, 2016, the police had batons and knocked people to the ground so hard she could hear the bodies hit the ground. On November 15, 2016, the police response was even more aggressive than what she had seen previously. The police used batons, guns, loud sound machines, and pepper spray on peaceful protesters. She was concerned for two tribal elders that day, whom she tried to protect because the police used so much pepper spray on them. (Ex. I, Bruce Decl.)

71.     On November 20, 2016 at about 6:30pm, Bruce went to the bridge immediately north of the Oceti Šakowiŋ camp. She went there to peaceably protest DAPL. It was a very cold night, and the temperature was below freezing. When Bruce got near the bridge, she saw a barb wire fence across the bridge with the police lined up behind the barb wire. She then walked to the front and was sprayed by police officers with a powerful stream of water from a cannon.

Throughout the entire time she was peaceably protesting at the bridge she was sprayed with water from the water cannon.  Her two inner jackets were wet, and her most outer jacket was frozen.  Her skirt was frozen, and she had no gloves.  At the end of the night she had trouble moving her hands.  Her hair was also frozen, and she saw another girl with icicles in her hair. (Ex. I, Bruce Decl.)

72.     There were flood lights on the protestors, and Bruce couldn't see without taking her goggles off because of the light, which left her eyes vulnerable to the tear gas being deployed by the police officers.  It was hard for her to breathe because the cloud of tear gas was so thick.  The tear gas burned her eyes.  She tried not to breathe because breathing the tear gas hurt her lungs and burned her nose.  (Ex. I, Bruce Decl.)

73.     Bruce bent down to grab a lid to a plastic container to use as a shield, and while she was bent over a police officer hit her in the vagina with an explosive teargas blast grenade, which exploded on her body.  After Bruce was hit, she did not feel any immediate physical pain, but she thought about how glad she was that she was not pregnant because the impact and explosion could have caused her to miscarry.  (Ex. I, Bruce Decl.)

74.     Bruce remained near the front of the protests for another 20-30 minutes, but the tear gas was so overpowering that she eventually had to leave the front and seek medical attention.  The medics near the front line put milk of magnesia in her eyes to help with the burning from the tear gas.  She was then taken to the medics at Oceti Šakowiŋ camp and was given tea to help her body warm-up, as she was very cold.  As her body began to warm, she started to feel pain in her vagina and abdomen.  The pain suddenly worsened and she began vomiting.  The medics became very concerned.  Bruce was put into an ambulance and taken to Sanford Hospital in Bismarck, North Dakota. (Ex. I, Bruce Decl.).

75.     As of November 22, 2016, she is still in a lot of pain and needs assistance from others to move around.  When she stands, it feels like her insides are falling out.  She is also concerned about how this injury could impact her ability to have children in the future.  (Ex. I, Bruce Decl.)

76.     Bruce has seen how the police response is becoming more aggressive and violent over the past few months.  The police response was the most aggressive yet on November 20, 2016.  Because of these events, she worries that she will be subjected to other abuses if she participates in further peaceful protests in support of the water protectors in Morton County.  As a result of the actions of Morton County and assisting agencies, she is afraid about participating in further First Amendment activity in opposition to the pipeline in Morton County even though she wishes to gather and assemble peacefully with other who shares her views.  (Ex. I, Bruce Decl.)

## FRANK FINAN

77.     Frank Finan came to North Dakota to document DAPL's desecration of ancestral sacred and burial sites.  Finan also came because he is concerned about environmental injustice.  On November 20, 2016 in the evening, he went to the bridge north of Oceti Šakowiŋ to peacefully gather with other water protectors to stop the DAPL from going through the river and polluting the Missouri River.  It was a very cold and below freezing that night.  On the other side of the bridge, there were police officers and lots of military vehicles.  From the bridge, he could see water from a water cannon being aimed at water protectors.  There were two small campfires along the side of the highway, which were well controlled. He saw water protectors being carried away from the bridge by medics because they were soaking wet.  There was a constant flow of water protectors being removed from the bridge and carried away by medics.  He saw smoke canisters being thrown by the police, and he heard sounds like gunshots.  (Ex. O, Finan Decl.)

78.     While on the bridge, he was sprayed with a cloud of something that burned his eyes badly

and made him cough.  He then left the bridge to get away from the gas and to get his camera.

When he got back to the bridge, he began taking photos.  While taking photos, he was shot near

his waistline by a police officer with what he assumes was a rubber bullet.  The shot was so

forceful that he was knocked to the ground.  He fell and slid backwards because of the ice on the

bridge.  Some water protectors helped him to get up, and he was taken to see medics.  He still

experiences pain whenever he tries to stand-up or sit-down.  (Ex. O, Finan Decl.)

79.     As a result of these events, Finan worries that he will be subjected to other abuses if he

participates in further peaceful demonstrations with the water protectors in Morton County, or if

he takes more photos of what is happening in Morton County.  Because of the actions of the

Morton County Sheriff and assisting agencies, he is very nervous about participating in further

First Amendment activity in opposition to the pipeline in Morton County even though he wishes

to gather and assemble peacefully with others who share his views, and to document and

communicate what is happening to others.  (Ex. O, Finan Decl.)

## ISRAEL HOAGLAND-LYNN

80.     On November 20, 2016 at 8:00pm, Israel Hoagland-Lynn went to the bridge over

Highway 1806 north of Oceti Šakowiŋ camp to peacefully protest the DAPL.  When he got

there, he was 200 feet from the front line of the protests on the bridge.  It was cold and below

freezing.  Eventually he moved closer to the front of the protest, at which point he was sprayed

with water from a water cannon being operated by police officers.  He left the bridge to warm–

up.  On his way back to the bridge, he saw two Native Americans crouching on the ground and

was asked to help shield those individuals with plywood to protect them from getting shot by the

water cannon and rubber bullets.  While holding the plywood to shield the Native Americans,

Hoagland-Lynn was continually being shot with the water cannon. The police were also shooting rubber bullets in his direction. A water protector next to him was shot in the finger by a rubber bullet. Hoagland-Lynn reached over to help the water protector when Hoagland-Lynn was shot in the back by a rubber bullet. He knew it was a rubber bullet because he saw it when it fell to the ground. (Ex. H, Hoagland-Lynn Decl.)

81.      Hoagland-Lynn then looked up and saw a police officer pointing a gun at him. He curled his head down and shielded his body with the plywood. He was then hit by a rubber bullet in the top of his head. He dropped to the ground and lost consciousness. When he regained consciousness, he felt a hole in his head. He was in severe pain. He was taken to the clinic at the Oceti Šakowiŋ camp where the medics tried to stop his bleeding. He was then transferred by ambulance to St. Alexius hospital in Bismarck. At the hospital, he was diagnosed with a laceration on his head, a chest wall contusion from falling after being shot, and a large bruise on his back where he was shot with the first rubber bullet. His head wound required 17 staples to close the laceration. He still has pain in his head and back. (Ex. H, Hoagland-Lynn Decl.)

82.      As a result of these events, Hoagland-Lynn worries that he will be subjected to other abuses if he participates in further peaceful protest in support of the water protectors in Morton County. Because of the actions of the Morton County Sheriff and assisting agencies, he is very nervous about participating in further First Amendment activity in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share his views. (Ex. H, Hoagland-Lynn Decl.)

## NOAH MICHAEL TREANOR

83.      On Sunday, November 20, 2016 at about 7:00pm, Noah Michael Treanor went to a bridge immediately north of the Oceti Šakowiŋ camp on Highway 1806. He went there to

peacefully protest and to pray to stop DAPL. It was a very cold night and the temperature was below freezing. Treanor walked near the front of the bridge. He stood there praying for about a half hour when police officers started shooting at him with the water cannon and SIM. Treanor stayed on the bridge in the same spot for at least two hours while being shot by the police with the water cannon and SIM. (Ex. G, Treanor Decl.)

84.     Later, Treanor bent down on one knee to pray. This time the police shot at him at a closer range with water, so he turned around. The police then started firing rubber bullets, and he was hit in the back of his legs. He then turned around facing the police again and kneeled and prayed for another hour. Police officers again shot at him with the water cannon and SIM while he prayed. (Ex. G, Treanor Decl.)

85.     The police then began using two water hoses on Treanor at the same time. He rolled on to the grass at the side of the bridge and tried to shield himself. He was then shot in the head by police . He had a laceration to his head, and he was bleeding profusely. Water protectors then put him on the back of a truck and transported him to Oceti Šakowiŋ camp. There, he was immediately put into an ambulance and transported to Sanford Hospital in Bismarck. At the hospital, his head wound was stapled together. As of November 22, 2016, Treanor still has many bruises on his body, and it hurts to open his eyes and look around. He still gets dizzy and has headaches. His body is achy and sore. (Ex. G, Treanor Decl.)

86.     As a result of these events, he worries that he will be subjected to other abuses in the future if he participates in further peaceful prayer and protests in support of the water protectors in Morton County. Because of the actions of the Defendants, he is nervous about participating in further First Amendment activities in opposition to the pipeline in Morton County even though

he wishes to gather and assemble peacefully with others who share his views.  (Ex. G, Treanor Decl.)

87.    At no time did any of the Plaintiffs or class members present a threat or do anything to justify Defendant's use of force on them.

## CLASS ALLEGATIONS

88.    The treatment to which Plaintiffs, and the class they represent, have and will be subjected—being shot or injured with SIM, explosive grenades, chemical agents, and water cannons or hoses while engaging in First Amendment activities—were all performed pursuant to policies, customs, and/or practices of Defendants.

89.    Plaintiffs, on behalf of themselves and of the class of similarly situated persons, seek an order declaring that Defendants' treatment of Plaintiffs pursuant to these polices, customs, and/or practices is unlawful.

90.    Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated, pursuant to Federal Rule of Civil Procedure 23 (b)(3). Plaintiffs seek certification of a class defined as follows:  All persons who were shot or harmed by water, SIM, chemical agent, or grenades on November 20, 2016.

91.    Pursuant to Federal Rule of Civil Procedure 23(a), the members of the class are so numerous that joinder of all members is impractical. Plaintiffs do not know the exact number of class members. Plaintiffs are informed and believe, and thereupon allege that there are more than 100 persons in the class defined above.

92.    Pursuant to Federal Rule of Civil Procedure 23(a), Plaintiffs are informed and believe, and thereupon allege, that there are questions of law and fact common to the class, including but not limited to:

- Whether the use of SIM, water, chemical agents, and explosive grenades on the Plaintiff class constituted excessive force under the Fourth Amendment;

- Whether Defendants used SIM, water, chemical agents, and explosive grenades to harm the Plaintiff class and chill their freedom of speech and association and free exercise of religion in violation of the First Amendment;

- Whether Defendants are liable for violating the First and Fourth Amendment rights of the Plaintiff class;

- Whether Defendants should be enjoined from continuing to use these weapons indiscriminately, for purposes of crowd dispersal.

93.     Pursuant to Federal Rules of Civil Procedure 23(a), Plaintiffs' claims are typical of the class they seek to represent. Plaintiffs and the class they seek to represent were all subjected to excessive force while being shot at or injured by SIM, explosive grenades, chemical agents, and water cannons or hoses intended to prevent them from exercising their right to peacefully protest and/or pray. Plaintiffs have the same interests and have suffered the same type of injuries as the proposed class. Each proposed class member suffered actual damages as a result of the challenged conduct. Plaintiffs' claims arose because of Defendants' policies, customs, and/or practices. Plaintiffs' claims are based upon the same legal theories as the claims of the proposed class members.

94.     Plaintiffs' counsel has the resources, experience, and expertise to successfully prosecute this action against Defendants. Counsel knows of no conflicts among any members of the class, or between counsel and any members of the class.

95.     Pursuant to Federal Rules of Evidence 23(b)(3), upon certification, class members must be furnished with the best notice practicable under the circumstances, including individual notice

to all members who can be identified through reasonable effort. If this action is certified as a class action, Plaintiffs contemplate that individual notice will be given to class members, at such last known address by first class mail, as well as notice by publication informing them of the following:

    i.     The pendency of the class action and the issues common to the class;

    ii.    The nature of the action;

    iii.   Their right to "opt-out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action:

    iv.   Their right to "opt-out" to be represented by their own counsel and to enter an appearance in the case; otherwise they will be represented by the named class plaintiffs and their counsel; and

    v.    Their right, if they do not "opt-out" to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues adverse to the class.

## EQUITABLE ALLEGATIONS

96.    In violation of State and Federal Constitutional and Statutory provisions, Defendants, and their agents and employees, including Defendants DOES 1 to 100, have, and unless enjoined, will continue to subject the Plaintiff class to excessive force and injury that will cause Plaintiffs and the other class members harm, as well as to be fearful of exercising their right to peacefully pray and protest DAPL.

## FIRST CLAIM

### Retaliation

**(First, Fourth & Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)**

97.   The First Claim is asserted by Plaintiffs and the proposed class against all Defendants.

98.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs to the extent relevant, as if fully set forth herein.

99.   Plaintiffs were engaging in constitutional-protected activity when Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, caused Plaintiffs to suffer injuries that would chill a person of ordinary firmness from continuing to engage in that activity, and Defendants' adverse actions were substantially motivated by a desire to retaliate against Plaintiffs' exercise of constitutionally-protected conduct.

100.   Defendants' retaliation was motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First, Fourth and Fourteenth Amendment rights secured by the United States Constitution, and/or was wantonly or oppressively done.

101.   As a direct and proximate result of Defendants' actions, Plaintiffs suffered injuries entitling them to recover compensatory and punitive damages and declaratory and injunctive relief against the individual defendants.

WHEREFORE, Plaintiffs pray for relief as hereunder appears.

## SECOND CLAIM

### Unreasonable Use of Force

### (Fourth & Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)

102.   The second claim is asserted by Plaintiffs and the proposed class against all Defendants.

103.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs to the extent relevant, as if fully set forth herein.

104.   Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, used unreasonable force in dispersing Plaintiffs. The unreasonable force to

which Plaintiffs were subjected included Defendants' shooting at them with SIM, explosive

teargas grenades, teargas canisters, and water cannons in a subfreezing temperature while shining

blinding lights upon them from behind razor wire barricades.

105.    Defendants' unreasonable use of force was motivated by evil motive or intent, involved

reckless or callous indifference to Plaintiffs' Fourth and Fourteenth Amendment rights secured

by the U.S. Constitution, and/or were wantonly or oppressively done.

106.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered injuries

entitling them to compensatory damages and declaratory and injunctive relief against

Defendants.

WHEREFORE, Plaintiffs pray for relief as hereunder appears.

## THIRD CLAIM

### Policies, Customs, or Practices

### (First, Fourth & Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)

107.    The Third Claim is asserted by Plaintiffs and the proposed Class against all Defendants.

108.    Plaintiffs reallege and incorporate the allegations of the proceeding paragraphs to the

extent relevant, as if fully set forth in this Claim.

109.    MORTON COUNTY, Sheriff KYLE KIRCHMEIER, CITY OF MANDAN, Chief of

Police JASON ZIEGLER, STUTSMAN COUNTY, and Sheriff CHAD KAISER acting under

the color of state law, maintain policies, customs, or practices that permit or are deliberately

indifferent to violations of Plaintiffs' First, Fourth and Fourteenth Amendment rights secured by

the U.S. Constitution.  These include but are not limited to policies, customs and practices which

authorize, encourage, condone, and/or acquiesce in the use of excessive force against protesters,

and/or other customs, policies and/or practices. Such policies, customs, or practices are the moving force behind the violation of plaintiffs' First, Fourth and Fourteenth Amendment rights.

110.    Defendants, acting under the color of state law, maintain inadequate policies, customs, or practices, in reckless disregard or deliberate indifference to Plaintiffs' First, Fourth and Fourteenth Amendment rights secured by the U.S. Constitution.  The inadequacy of the policies, customs, or practices, and the need for such adequate policies, customs, or practices, are patently obvious and foreseeably likely to result in the violation of persons' Fourth and Fourteenth Amendment rights secured by the U.S. Constitution.

111.    The policies, customs and practices of defendants posed a substantial risk of causing substantial harm to Plaintiffs, and defendants were aware of the risk.

112.    KYLE KIRCHMEIER, JASON ZIEGLER, CHAD KAISER and DOES' actions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First, Fourth and Fourteenth Amendment rights secured by the U.S. Constitution, or were wantonly or oppressively done.

113.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against Defendants, and punitive damages against KIRCHMEIER, ZIEGLER, KAISER and DOES 1 to 100.

WHEREFORE, Plaintiffs pray for relief as hereunder appears.

## FOURTH CLAIM

### Training, Supervision, or Discipline

### (First, Fourth & Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)

114.    The Fourth Claim is asserted by Plaintiffs and the proposed Class against all Defendants.

115.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs to the extent relevant, as fully set forth in this Claim.

116.    Defendants MORTON COUNTY, KIRCHMEIER, CITY OF MANDAN, ZIEGLER, STUTSMAN COUNTY, KAISER, and DOES, acting under the color of law, maintain hiring, training, supervision, and/or discipline that permit or are in reckless disregard or deliberately indifferent to the violations of Plaintiffs' First, Fourth and Fourteenth Amendment rights secured by the U.S. Constitution.  Such hiring, training, supervision, and/or discipline was the moving force behind the violation of plaintiffs' First, Fourth and Fourteenth Amendment rights.

117.    The inadequacy of the hiring, training, supervision, and/or discipline and the need for adequate hiring, training, supervision, or discipline, is patently obvious and foreseeably likely to result in the violation of persons' First, Fourth and Fourteenth Amendment rights secured by the U.S. Constitution.

118.    Defendants KIRCHMEIER, ZIEGLER, KAISER, and DOES' actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First, Fourth and Fourteenth Amendment rights secured by the U.S. Constitution, or were wantonly or oppressively done.

119.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs' suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against Defendants, and damages against the individual defendants.

WHEREFORE, Plaintiffs pray for relief as hereunder appears.

## FIFTH CLAIM

### Unequal Protection of the Law

120.    The Fifth Claim is asserted by Plaintiffs and the proposed Class against all Defendants.

121.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs.

122.   Defendants, acting under the color of state law are subjecting Plaintiffs to unequal protection of the law in violation of Plaintiffs' constitutional rights. The unequal treatment to which Plaintiffs are subject includes the use of excessive force including deployment of an arsenal of dangerous implements and devices, including SIM, explosive teargas grenades, teargas canisters, and water cannons spraying high pressure water on Plaintiffs and others despite the subfreezing temperature.

123.   Defendants KIRCHMEIER, ZIEGLER, KAISER, and DOES's actions and inactions were motivated by evil motive or intent, involved reckless or callous indifference to Plaintiffs' First, Fourth and Fourteenth Amendment rights secured by the U.S. Constitution, or were wantonly or oppressively done.

124.   As a direct and proximate result of Defendants' actions or inactions, Plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against Defendants, and punitive damages against the individual defendants.

WHEREFORE, Plaintiffs pray for relief as hereupon appears.

## Sixth Claim

### Declaratory Relief

### (28 U.S.C. § 2201)

125.   The Sixth Claim is asserted by Plaintiffs and the proposed Class against all Defendants.

126.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs to the extent relevant, as fully set forth in this Claim.

127.   There presently exists an actual controversy within this Court's jurisdiction regarding whether or not Defendants' actions and inactions described are lawful, pursuant to the First and

Fourth and Fourteenth Amendments of the U.S. Constitution. Plaintiffs are interested parties because they were subject to actions and inactions described and, accordingly, seek a declaration of their rights concerning the legality of those actions and inactions to which they were subject.

128.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs suffered injuries entitling them to receive declaratory and injunctive relief against Defendants.

WHEREFORE, Plaintiffs pray for relief as hereunder appears.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek Judgment as follows:

1.  For declaratory and injunctive relief declaring defendants' actions unlawful, and enjoining preliminarily and permanently, from usage of dangerous implements and devices, including SIM, explosive teargas grenades, teargas canisters, and water cannons and hoses as means of crowd dispersal.

2.  For compensatory, general, and special damages for Plaintiffs, and for each proposed member of the class, according to proof at trial.

3.  For an award of exemplary/punitive damages against Defendants KIRCHMEIER, ZIEGLER, KAISER and DOE individual defendants, in an amount sufficient to deter and to make an example of them, because their actions and/or inactions, as alleged, were motivated by evil motive or intent, involved reckless or callous indifference to the federally protected rights, or were wantonly or oppressively done;

4.  For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, and any other statute or law as may be applicable; and

5.  For an award of any other further relief, as the Court deem fair, just, and equitable.


## JURY TRIAL DEMAND

A jury trial is demanded on behalf of Plaintiffs VANESSA DUNDON, JADE

KALIKOLEHUAOKALANI WOOL, CRYSTAL WILSON, DAVID DEMO, GUY

DULLKNIFE III, MARIAH MARIE BRUCE, FRANK FINAN, ISRAEL HOAGLAND-LYNN,

and NOAH MICHAEL TREANOR, and all persons similarly situated.

Dated:  November 25, 2016

                                        Respectfully Submitted,

                                        _/s/_ Rachel Lederman_____
                                        By: RACHEL LEDERMAN, CA SBN 130192
                                        Rachel Lederman & Alexsis C. Beach, Attorneys
                                        558 Capp Street
                                        San Francisco, CA 94110
                                        (415) 282-9300
                                        Fax (510) 520-5296
                                        rachel@bllaw.info

                                        LAUREN REGAN, Oregon SBN 970878
                                        Civil Liberties Defense Center
                                        783 Grant Street, Suite 200
                                        Eugene, OR 97402
                                        (541) 687-9180
                                        Fax (541) 804-7391
                                        lregan@cldc.org

                                        JEFFREY HAAS, Attorney
                                        NM State Bar No. 15587
                                        1433 Seville Rd
                                        Santa Fe, NM 87505
                                        505-469-0714
                                        Fax (505) 995-9866
                                        JeffreyHaas42@gmail.com

                                        JAMES R. FENNERTY
                                        James R. Fennerty & Associates, L.L.C. 36
                                        South Wabash Avenue, Suite 1310
                                        Chicago, IL 60603
                                        312-345-1704
                                        312-422-0708 FAX

                                        Attorneys for Plaintiffs