IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

VANESSA DUNDON, JADE
KALIKOLEHUAOKALANI WOOL,
CRYSTAL WILSON, DAVID DEMO, GUY
DULLKNIFE III, MARIAH MARIE
BRUCE, FRANK FINAN, ISRAEL
HOAGLAND-LYNN, and NOAH
MICHAEL TREANOR,

on behalf of themselves and all similarly-
situated persons,

Plaintiffs,

v.

KYLE KIRCHMEIER, MORTON
COUNTY, CITY OF MANDAN, JASON
ZIEGLER, STUTSMAN COUNTY, CHAD
KAISER, and DOES 1-100,

Defendants.

No. 1:16-cv-406

**PLAINTIFFS' MEMORANDUM IN
SUPPORT OF TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

    A.  The initial protests.................................................................................................3

    B.  Defendants' escalating violence ...........................................................................5

    C.  Defendants' attacks on November 20, 2016 ........................................................7

ARGUMENT ......................................................................................................................10

    I.        Legal standard................................................................................................10

    II.      Plaintiffs are likely to succeed on the merits of their argument that
             Defendants' actions violated Plaintiffs' First and Fourth
             Amendment rights and impose continued and ongoing threat to
             plaintiffs and others who wish to protest the construction of DAPL
             on its current route. ......................................................................................11

             A.  Defendants' repeated use of excessive force constitutes a custom.................11

             B.  Indiscriminate use of SIM, water, and chemical agents to suppress peaceful
                 protests violates plaintiffs' first amendment rights.........................................12

             C.  The indiscriminate use of SIM, water, and chemical agents constitutes
                 excessive force in violation of the fourth amendment ....................................14

    III.    Plaintiffs will suffer irreparable harm if Defendants' excessive force is not
             enjoined........................................................................................................20

    IV.    The balance of harms favors enjoining Defendants' use of excessive force. ........22

    V.     The public interest favors enjoining Defendants' use of excessive force.............23

    VI.    Plaintiffs request a waiver of the bond. ...............................................................24

CONCLUSION...................................................................................................................24

# TABLE OF AUTHORITIES

Page

**Cases**

*American Federation of Teachers v. Kanawha County Bd. Of Educ.*
  592 F.Supp.2d 883 (S.D.W.Va. 2009) ............................................................21

*Barham v. Ramsey*
  434 F.3d 565 (D.C. Cir. 2006) ………...………………………………………...23

*Boyd v. Benton County*
  374 F.3d 773 (9th Cir. 2004) .........................................................................17

*Buck v. City of Albuquerque*
  549 F.3d 1269 (10th Cir. 2008) .................................................................13, 15

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*
  690 F.3d 996 (8th Cir. 2012) .......................................................................23

*Collin v. Chicago Park District*
  460 F.2d 746, 754 (7th Cir.1972) ……………………………………………….23

*Collins v. Jordan*
  110 F.3d 1363, 1371 (9th Cir. 1996)………………………………………..12-13, 23

*Cottonreader v. Johnson*
  252 F.Supp. 492 (D. Ala. 1966).....................................................................24

*Deorle v. Rutherford*
  272 F.3d 1272, 1285 (9th Cir. 2001) ……………………………………………15

*Easyriders Freedom F.I.G.H.T. v. Hannigan*
  92 F.3d 1486 (9th Cir. 1996) .......................................................................21

*Edwards v. South Carolina*
  372 U.S. 229 (1963)....................................................................... 12-13

*Elrod v. Burns*
  427 U.S. 347 (1976)....................................................................................21

*Eminth v. Jaeger*
  901 F. Supp. 2d 1138 (D.N.D. 2012)..............................................................21

*Ford v. City of Yakima*
  706 F.3d 1188 (9th Cir. 2013) .....................................................................20

*Frisby v. Schultz*
    487 U.S. 474 (1988)..............................................................................13

*Glenn v. Washington County*
    673 F.3d 864, 872 (9th Cir. 2011)…………………………………………………15

*Headwaters Forest Def. v. Cty. of Humboldt*
    240 F.3d 1185 (9th Cir. 2000) .......................................................14

*Houser v. Hill*
    278 F.Supp. 920 (D.Ala. 1968).................................................23-24

*Johnson v. Douglas Cnty. Med. Dep't*
    725 F.3d 825 (8th Cir.2013) ..........................................................11

*Keating v. City of Miami*
    598 10 F.3d 753 (11th Cir. 2010) ..................................................13

*Kohl by Kohl v. Woodhaven Learning Cntr.*
    865 F.2d 930 (8th Cir. 1989) .........................................................10

*Kunz v. New York*
    340 U.S. 290, 294 (1951) ...…………………………………………………23

*Lamb v. City of Decatur*
    947 F.Supp. 1261 (C.D.Ill. 1996) ..................................................14

*Long Beach Area Peace Network v. City of Long Beach*
    574 F.3d 1011 (9th Cir. 2009) .......................................................12

*Marchwinski v. Howard*
    113 F.Supp.2d 1134 (E.D. Mich. 2000)........................................23

*McCullen v. Coakley*
    134 S. Ct. 2518 (2014).....................................................................13

*Mills v. District of Columbia*
    571 F.3d 1304 (D.C. Cir. 2009) .....................................................21

*MKB Mgm't Corp. v. Burdick*
    954 F. Supp. 2d 900 (D.N.D. 2013)..............................................21

*Monell v. Dep't of Soc. Servs.*
    436 U.S. 658, 690 (1978).................................................................11

*NAACP v. Claiborne Hardware*
 458 U.S. 886 (1982)............................................................................22

*NAACP v. Patterson*
 357 U.S. 449 (1958)............................................................................13

*NAACP Western Region v. City of Richmond*
 743 F.2d 1346 (9th Cir.1984) ............................................................13

*Phelps-Roper v. Nixon*
 545 F.3d 685 (8th Cir. 2008) ..............................................................21

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*
 558 F.2d 861 (8th Cir. 1977) ..............................................................21

*Planned Parenthood Minn., N.D., S.D. v. Rounds*
 530 F.3d 724 (8th Cir. 2008) ..............................................................10

*Rathmann Group v. Tanenbaum*
 889 F.2d 787 (8th Cir. 1989) ..............................................................24

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*
 826 F.3d 1030 (8th Cir. 2016) .....................................................10, 24

*Spain v. Procunier*
 600 F.2d 189 (9th Cir. 1979) ..............................................................18

*Templeton v. Dotson*
 E.D. Mo. Case No. 4:14-cv-02019 CEJ................................................23

*United States v. Baugh*
 187 F.3d 1037 (9th Cir. 1999) ............................................................12

*Washington Mobilization Comm. v. Cullinane,*
 566 F.2d 107 (D.C. Cir. 1977) …………………………………….......23

*Zurcher v. Stanford Daily*
 436 U.S. 547 (1978)............................................................................14

**INTRODUCTION**

Plaintiffs seek an emergency order enjoining Defendants from curtailing their First and Fourth Amendment rights by using highly dangerous weaponry, including Specialty Impact Munitions (SIM, also known as Kinetic Impact Projectiles or KIP), explosive "blast" grenades, other chemical agent devices, and a water cannon and water hoses in freezing temperatures, to quell protests and prayer ceremonies associated with opposition to the Dakota Access Pipeline (DAPL).

DAPL is being built immediately north of the Standing Rock Sioux Reservation and is planned to traverse the Missouri River at Lake Oahe. On November 20, 2016, the Plaintiffs were peacefully and legally in the area of Backwater Bridge on Route 1806 near the Standing Rock reservation. Defendants unleashed a violent, unjustified, and unprovoked physical attack on Plaintiffs and others, without warning or opportunity to disperse. As a direct result of Defendants' illegal use of force, Plaintiffs suffered severe injuries, including a 21-year-old woman whose arm was nearly torn off by an explosive grenade and is currently undergoing multiple surgeries and facing permanent disability, and another woman who was shot in the eye causing a serious eye injury with ongoing severe pain and possible permanent blindness in that eye. Defendants deployed an arsenal of dangerous implements and devices, including SIM (such as lead-filled, shotgun-fired 'beanbags' and high-velocity plastic and foam rubber 'sponge rounds'); explosive flashbang-like grenades such as "Instantaneous Blast CS grenades" and Stinger grenades; other chemical agent devices; and a high pressure water cannon and fire hoses, despite the subfreezing temperature. See Ex. W, video.

Defendants' attack represented the latest in an escalating, violent campaign by Defendants to suppress Plaintiff's constitutionally protected rights. Accordingly, Plaintiffs seek

an immediate court order to prohibit the unlawful use of excessive force, including the use of SIM, explosive grenades, chemical agents, directed energy devices, sound cannons, and water cannons or hoses.

## FACTUAL BACKGROUND

DAPL is projected to carry 570,000 barrels a day of highly volatile fracked crude oil from the Bakken oil fields in North Dakota to Illinois. The pipeline was originally planned to cross the Missouri River north of Bismarck, but due to concerns about contamination of the city's water supply, it was rerouted to cross the Missouri River at Lake Oahe, the sole water supply for the Standing Rock and Cheyenne River Sioux Tribes, as well as thousands of other people. Amy Dalrymple, *Pipeline route plan first called for crossing north of Bismarck*, Bismarck Tribune (Aug. 18, 2016), http://bismarcktribune.com/news/state-and-regional/pipeline-route-plan-first-called-for-crossing-north-of-bismarck/article_64d053e4-8a1a-5198-a1dd-498d386c933c.html. The area around Lake Oahe is also of great cultural, historic, and spiritual significance to the Cheyenne River and Standing Rock Sioux, as well as other members of the Oceti Šakowiŋ (Seven Council Fires, also known as the Great Sioux Nation). Jack Healy, *North Dakota Oil Pipeline Battle: Who's Fighting and Why*, New York Times (Aug. 26, 2016), http://nyti.ms/2e9GTih. DAPL threatens the environment, fish and wildlife, burial and other scared sites, and a vital water supply. *Id.* This threat is not just hypothetical—the Pipeline and Hazardous Materials Safety Administration (PHMSA) has reported more than 3,300 leaks and ruptures of oil and gas pipelines since 2010. Justin Worland, *What to Know About the Dakota Access Pipeline Protests* (Oct. 28, 2016), http://time.com/4548566/dakota-access-pipeline-standing-rock-sioux/.

A. **The Initial Protests.**

In April 2016, Standing Rock and Cheyenne River tribe members and other concerned citizens, known as "water protectors," began protesting the rerouted DAPL. Alene Tchekmedyian & Melissa Etehad, *2 years of opposition, 1,172 miles of pipe, 1.3 million Facebook check-ins. The numbers to know about the Standing Rock protests*, Los Angeles Times (Nov. 1, 2016), http://www.latimes.com/nation/la-na-standing-rock-numbers-20161101-story.html. But despite these protests, construction began in August 2016, and increasing numbers of Native water protectors and supporters gathered in protest camps near Highway 1806. *Id.* At this point, Defendants began making unlawful arrests and using improper force against peaceful water protectors.

Tensions rose in early September, after Native archeological expert Tim Mentz identified more than 27 burial and other sacred or culturally important features directly in the path of the planned pipeline construction. Samantha-Jo Roth, *Attorneys with Standing Rock Sioux Tribe, Army Corps of Engineers, Energy Transfer Partners agree to cease construction on parts of Dakota Access Pipeline*, KFYRTV Fox News (Sept. 6, 2016), http://www.kfyrtv.com/content/news/Attorneys-with-Standing-Rock-Sioux-Tribe-Army-Corps-of-Engineers-Energy-Transfer-Partners-agree-to-cease-construction-on-parts-of-Dakota-Access-Pipeline-392493561.html. On September 3, the Saturday of Labor Day weekend and the day after the Standing Rock and Cheyenne River Sioux Tribes moved for an injunction to stop destruction of these sacred sites, Dakota Access, LLC, started bulldozing those sites, irreparably destroying artifacts and burials of significant cultural and religious importance to the Lakota/Dakota people. *Id.* When water protectors holding a peaceful prayer march on the roadside nearby saw the bulldozers desecrating sacred sites and burial sites, they approached to

protest and attempt to peacefully convince the workers to stop bulldozing. They were confronted by DAPL security guards with attack dogs. Amy Dalrymple, *Use of dogs at North Dakota pipeline protest criticized*, Duluth News Tribune (Sept. 6, 2016), http://www.duluthnewstribune.com/news/4109496-use-dogs-north-dakota-pipeline-protest-criticized. North Dakota law enforcement officers allowed the security guards to attack peaceful protesters with dogs and pepper spray. *Id.* A number of protesters were bitten or suffered other injuries. *Id.*

Shortly after this incident, the U.S. Army Corps of Engineers ("Army Corps") withdrew an easement to drill and install a pipeline under Lake Oahe and renewed DAPL protesters' permit to demonstrate on federal lands managed by the agency. Jack Healy & John Schwartz, *U.S. Suspends Construction on Part of North Dakota Pipeline*, New York Times (Sept. 9, 2016), http://nyti.ms/2crr3mi. On September 9, 2016, the Army Corps, along with the Department of Justice ("DOJ") and the Department of the Interior ("DOI"), issued a formal request that all pipeline construction within 20 miles of Lake Oahe cease. *Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers* (Sept. 9, 2016), https://www.justice.gov/opa/pr/joint-statement-department-justice-department-army-and-department-interior-regarding-standing.

Dakota Access, LLC, continues to ignore this request and has now completed all planned construction in North Dakota other than the area under Lake Oahe. Blake Nicholson, *Army Corps wants more cooperation from Dakota Access company*, Bismarck Tribune (Nov. 10, 2016), http://bismarcktribune.com/news/state-and-regional/army-corps-wants-more-cooperation-from-dakotaaccess-company/article_3aae4a8c-8ba0-5835-b117-cf4f4364daf1.html.

B. **Defendants' Escalating Violence.**

By October, Defendants had become militarized, routinely appearing at demonstrations in Humvees and riot gear. *See e.g.,* Ralph Ellis & Emanuella Grinberg, *Drone shot, road reopens at Dakota Access Pipeline Protest*, CNN (Oct. 24, 2016), www.cnn.com/2016/10/22/us/dakota-access-pipeline-arrests. On multiple occasions in October, Defendants conducted indiscriminate mass arrests of people who were exercising their First Amendment rights to voice their opposition to the proposed pipeline. Typically, the arrests were accompanied by violent and unjustified actions against nonviolent protestors. For example, on October 22, Defendants surrounded a peaceful prayer march and arrested more than one hundred people, including two attorneys who were acting as National Lawyers Guild Legal Observers, without any warning or opportunity to disperse. *Id.*; Ex. I, Decl. Bruce. On October 27, Defendants responded to a demonstration near highway 1806 in Humvees and helicopters, and unleashed a Long Range Acoustic Device (LRAD) sound weapon, SIM, and chemical agents on peaceful water protectors, including some who were engaged in prayer. Sandy Tolan, *Dakota Access oil pipeline protesters cleared from camp, sheriff says; more than 140 arrested*, Los Angeles Times (Nov. 27, 2016), http://www.latimes.com/nation/nationnow/la-na-north-dakota-pipeline-protesters-20161027-story.html. Defendants arrested more than 100 nonviolent protesters, charging all of them with felonies. *Id.* On November 17, 2016, the Presiding Judge of the Morton County District Court, South Central Division, the Honorable Cynthia Feland, dismissed all felony charges (conspiracy to recklessly endanger by fire or explosion) against the arrestees before her on the grounds that the State had presented no evidence of any felony activity by any particular individual. Caroline Grueskin*, North Dakota judge throws out some charges against pipeline protesters*, Rapid City Journal (Nov. 18, 2016), http://rapidcityjournal.com/news/local/north-

dakota-judge-throws-out-some-charges-against-pipeline-protesters/article_b030022d-43e3-5474-9857-b2f4b326803c.html.

When the arbitrary mass arrests in October failed to deter protesters from exercising their First Amendment rights, Defendants resorted to even more violent tactics. On November 2, hundreds of protesters, including indigenous elders, held a prayer session across a river from a pipeline construction site. Sam Levin & Nicky Woolf, *Dakota Access pipeline: police fire rubber bullets and mace activists during water protest*, The Guardian (Nov. 3, 2016), https://www.theguardian.com/us-news/2016/nov/02/dakota-access-pipeline-protest-arrests-standing-rock. Defendants arrived in riot gear. *Id.* When a few protesters entered the river, Defendants bombarded the entire group with tear gas and SIM. Chiara Sottile, *Police Fire Rubber Bullets as Pipeline Protesters try to Protect Sacred Site*, NBC News (Nov. 3, 2016), http://www.nbcnews.com/storyline/dakota-pipeline-protests/police-fire-rubber-bullets-pipeline-protesters-seek-protect-burial-site-n677051. A journalist, Eric Schrode, was hit at point-blank range with SIM while covering the protest. *Id.*

On November 12, Dakota Access, LLC announced that it had completed all DAPL construction in North Dakota except for the area directly under Lake Oahe, for which it still needs an easement from the Army Corps. David Hunn, *Dakota Access pipeline owner says approval 'imminent,'* Houston Chronicle (Nov. 10, 2016), http://www.houstonchronicle.com/business/article/Dakota-Access-pipeline-owner-says-approval-10607255.php. Despite not having this easement and repeated requests from the Army Corps to stop pipeline construction until the cultural and environmental impacts of the pipeline can be more thoroughly assessed, Dakota Access, LLC announced that it was moving underwater drilling equipment to Lake Oahe and that drilling under the lake was "imminent." *Id.*

Defendants responded to a November 15 DAPL protest with widespread and indiscriminate use of chemical agents and stun guns. (Ex. I.)

   C.  **Defendants' Attacks on November 20, 2016**.

   Defendants' unjustifiable use of violent, excessive, military-style force against peaceful protesters came to a head on the evening of November 20, when more than 400 water protectors came to a bridge on Highway 1806 across from an inactive DAPL construction site less than a mile from the Oceti Šakowiŋ Camp. Derek Hawkins, *Police, citing 'ongoing riot,' use water cannons on Dakota Access protesters in freezing weather*, Washington Post (Nov. 21, 2016), https://www.washingtonpost.com/news/morning-mix/wp/2016/11/21/police-citing-ongoing-riot-use-water-cannons-on-dakota-access-protesters-in-freezing-weather/. The nonviolent water protectors sought to protest the blocking of the bridge and remove partially destroyed vehicles to facilitate the flow of supplies and emergency services to the camp and the Standing Rock Sioux reservation. *Id.*; Ex. U. There had been numerous requests by Standing Rock Sioux Tribe officials to permit this.  The unnecessary closure of the bridge also required travelers to undertake a 1-hour detour, which exacerbated tensions between local residents and water protectors and jeopardized the well-being of persons requiring emergency medical care by removing their most direct route to care providers.  Law enforcement continues to falsely attempt to blame water protectors for this closure in the public media.

   Dozens of Morton County officers, City of Mandan police officers, and other assisting law enforcement officers arrived at the bridge in riot gear along with City of Mandan fire trucks and a Stutsman County Sheriff's Department armored vehicle with a water cannon mounted on top. *Id.* Despite sub-freezing temperatures and a barbed-wire fence separating the water protectors from the police and the construction site, Defendants used water cannon and fire hoses

on the water protectors. *Id.* Defendants also attacked the water protectors with chemical agents, explosive grenades, and SIM.  *Id.*; Exs. C-S. See generally, Ex. W, video.

Defendants' conduct caused serious injuries to numerous water protectors. (*See* Exs. C, D, E, F, G, H, I, M, N, O, T, U.) Eyewitnesses reported that Defendants aimed highly dangerous SIM at protesters' heads and fired at close range. (Exs. C, D, E, F, H, J, K, N, Q, S, U.) One woman was shot in her genitals. (Exs. I, Q.) Defendants shot some water protectors squarely in the head, sending them to the hospital for CT scans or to have head wounds closed with stitches or staples. (Exs. G, H.) Defendants' SIM and tear gas canisters struck water protectors Exs. C, F, H, J, M, N, O, S, knocking some of them unconscious (Exs. H, C, N). Some water protectors hit with these munitions vomited blood or suffered seizures. (Exs. C, I, N, P). Water protectors, including the elderly, went into shock and risked hypothermia after being sprayed by water hoses in freezing temperatures. (Exs. C, E, F, G, J, M, N, O, P). Medical responders confirmed a wide number of significant injuries. (Exs. C, F.)

Most of the plaintiffs heard no warning or order to disperse before Defendants began shooting at them with the freezing water, chemical agents, SIM, and grenades. (Exs. J, K, L, Q, S.) As more officers and law enforcement vehicles arrived, they formed a semicircle along the north side of the bridge, trapping some water protectors between the mainland and the barbed-wire fence so that they were separated from medical care and could not escape the unrelenting bombardment of SIM, chemical agents, and high-pressure water. (Exs. K, M.) The water protectors were peaceful, and the officers were behind a barricade. (Exs. G, I, J, N, Q, S.)  The water cannon appeared to reach 30-50 feet thus drenching people who were a considerable distance from the officers. (Exs. F, J, K, N, P, Q.)

Medical personnel on the scene treated dozens of people who had been sprayed in the face with chemical agents, including an individual who had to be placed on a nebulizer because of respiratory injury. (Exs. C, F, L.) More than two dozen people have been hospitalized as a result of injuries sustained on this night. Derek Hawkins, *Police, citing 'ongoing riot,' use water cannons on Dakota Access protesters in freezing weather*, Washington Post (Nov. 21, 2016). A young woman named Sophia Wilansky sustained severe damage to her arm from an explosive grenade. *Id.* She had to be airlifted to a hospital in Minneapolis, where she is in serious condition and is undergoing multiple surgeries in an attempt to save her arm. *Id.*; Ex. T; Mr. Wilansky's interview on Democracy Now, November 23, 2016: http://m.democracynow.org/stories/16855 (accessed Nov. 25, 2016.) Another woman, Vanessa Dundon, was shot in the eye, resulting in likely detachment of her retina and possible permanent blindness in that eye. (Ex. U.) Defendants employed these munitions and chemical agents as punishment for the exercise of constitutionally protected activity, and without ever declaring an unlawful assembly or giving notice and opportunity to disperse. (Ex. K.) There was no public safety concern from a peaceful demonstration well removed from any business or home. Exs. I, K, N, Q.

Earlier in the week preceding the November 20 attacks, Morton County Sheriff Kyle Kirschmeier issued a public statement warning those encamped near Standing Rock of the dangers of hypothermia in sub-freezing weather. (Ex. B.) Indeed, on the evening of November 20, temperatures were well below freezing. (*See* Exs. C-S.) There were elders on or near the bridge.  Nevertheless, Sheriff Kirchmeier and the other defendants deliberately caused the people on and near the bridge to be repeatedly sprayed at high pressure with water. (*See* Exs. C-S.) There was no warning, and many of the victims of the water spray had no opportunity to disperse before being drenched repeatedly. . (Exs. C, F, J, M, N, Q.)

Sheriff Kirchmeier and the other defendants were well aware that their actions were likely to cause great bodily harm and constituted intentional and reckless use of excessive force. However, the next day, Defendants Kirchmeier and Mandan Police Chief Jason Ziegler publicly defended use of the water and indicated that they would do it again. (Ex. A.)

Defendants' tactics—including the use of chemical agents, explosive chemical agents grenades, water cannons and hoses in sub-freezing temperature, and SIM—violated the Plaintiffs' First and Fourth Amendment rights.  Because Defendants have indicated they will use these tactics again, plaintiffs respectfully request a Temporary Restraining Order and Preliminary Injunction barring the use of SIM, "blast" grenades, chemical agents, Directed Energy Devices, sound cannons, and water spray as means of crowd dispersal.

## ARGUMENT

## I.     LEGAL STANDARD

Injunctive relief is "an equitable remedy shaped to right an ongoing wrong." *Kohl by Kohl v. Woodhaven Learning Cntr.*, 865 F.2d 930, 934 (8th Cir. 1989).  In determining whether to issue a temporary restraining order or preliminary injunction, the Court must consider:  "(1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1036 (8th Cir. 2016) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 729 n.3 (8th Cir. 2008) (en banc)).

Injunctive relief is necessary because Plaintiffs risk immediate personal harm as well as curtailment of future First Amendment activity as a result of Defendants' actions. Plaintiffs have

no remedy at law. They will continue to suffer irreparable harm unless Defendants' actions are enjoined. The balance of interests demonstrates that the harm to Plaintiffs from the chilling effect on free speech and physical injury outweighs any harm that this injunction would inflict on Defendants. Plaintiffs have a likelihood of success on the merits, and a preliminary injunction, and an emergency temporary restraining order in the interim, serves the public interest.

## II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT DEFENDANTS' ACTIONS VIOLATED PLAINTIFFS' FIRST AND FOURTH AMENDMENT RIGHTS AND IMPOSE A CONTINUED AND ONGOING THREAT TO PLAINTIFFS AND OTHERS WHO WISH TO PROTEST THE CONSTRUCTION OF DAPL.

On November 20, Defendants committed egregious violations of Plaintiff's constitutional rights by retaliating against Plaintiffs' exercise of their First Amendment rights and by employing unreasonable force to extinguish the protest in violation of Plaintiffs' Fourth Amendment rights. In doing so, Defendants were acting pursuant to policies or customs for responding to peaceful protests. As a result, Plaintiffs are likely to prevail on their claims against Defendants.

### A.  Defendants' Repeated Use of Excessive Force Constitutes a Custom.

In *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities may be liable for monetary, declaratory or injunctive relief under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipality. Liability for a "custom" will lie where there is: (1) a continuing, widespread, and persistent pattern of unconstitutional conduct, (2) deliberate indifference or tacit authorization of such conduct by policymaking officials after notice of the conduct, and (3) that the custom caused the violation of Plaintiffs' constitutional rights. *See, Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir.2013).

In a practice and pattern stretching over a period of months, Defendants have repeatedly subjected the water protectors to unnecessary and objectively unreasonable violence as retribution for asserting their First Amendment rights to peaceful protest.  Braving the elements, these protesters have been camping for months to express their views on the impact of DAPL. Their very presence is a peaceful protest. They also have organized protest marches and prayer ceremonies. Defendants have responded with heavy-handed, dangerous tactics exposing the water protectors to risk of grave harm. Defendants' consistent use of violence reflects a pattern of activity consistent with a policy, rather than *ad hoc* law enforcement. Defendants persist in such activity despite repeated outcries in public fora by the protesters who are both victimized by and witnesses to Defendants' aggression. Critical media attention has not deterred the Defendants.[1]   Defendants' behavior constitutes an actionable "custom" and pattern and practice under the prevailing case law.

### B.   Indiscriminate Use of SIM, Water, and Chemical Agents to Suppress Peaceful Protests Violates Plaintiffs' First Amendment Rights.

"Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment." *Edwards v. South Carolina, 372 U.S. 229 (1963); Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). "Political speech," such as a protest, "is core First Amendment speech, critical to the functioning of our democratic system." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009); *Edwards*, 372 U.S. at 235. For this reason, the First Amendment "applies with particular force" to a "march and other protest activities." *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999).  In this case, the Plaintiffs conducted their demonstrations on public property, including roads and

---

1 Police deploy water hoses, tear gas against Standing Rock protesters, PBS, November 20, 2016.

bridges, that constitutes traditional public fora.  *See, e.g.*, *Edwards*, 372 U.S. at 235; *Collins*, 110 F.3d at 1371; *Frisby v. Schultz*, 487 U.S. 474, 480 (1988).

"Consistent with the traditionally open character of public streets," the Supreme Court has held that the government's ability to restrict speech in these locations is very limited. *McCullen v. Coakley,* 134 S.Ct. 2518, 2529 (2014); *NAACP W. Region v. City of Richmond*, 743 F.2d 1346, 1355 (9th Cir.1984) (restrictions on First Amendment activities in public fora are "subject to a particularly high degree of scrutiny.").  Government actions that "directly suppress" or have "the practical effect of discouraging" protests "can be justified only upon some overriding valid interest of the State." *NAACP v. Patterson*, 357 U.S. 449, 460-461 (1958). Courts have therefore repeatedly found a viable claim of First Amendment violations where, as here, there is evidence the government uses force to break-up peaceful protests. *Keating v. City of Miami*, 598 F.3d 753, 767 (11th Cir. 2010); *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008).

Here, Defendants' ruthless and bloody attacks on Plaintiffs on November 20 did not just incidentally affect protected First Amendment activities; rather, the practices were intended to crush that evening's protest and deter further potential participants like Plaintiffs.  The protesters had gathered on that frigid evening on a public road that Defendants had blockaded.  While exercising their right to peaceful protest, Defendants doused them with water from water hoses, aimed and shot SIM directly at their heads, and launched grenades at them, causing serious injuries as described above.

During the course of these demonstrations, Plaintiffs and others both experienced and witnessed numerous incidents in which Defendants implemented policies designed to punish demonstrators in order to deter them from continuing speech and assembly activities. Many of

the water protectors received no warning, and/or had no opportunity to disperse in advance of deploying these. Defendants' actions advanced no legitimate law enforcement objective, and were designed to cause distress.

Based on Defendants' conduct to date, Plaintiffs have good grounds to fear that they will be harmed by Defendants if Plaintiffs continue to engage in their protests and gatherings. Plaintiffs wish to continue their First Amendment activity and are fearful that they will be forced to either forego exercising their rights or else risk physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, and anxiety.

### C. The Indiscriminate Use of SIM, Water, and Chemical Agents Constitutes Excessive Force in Violation of the Fourth Amendment.

Even if the police determine that a demonstration or gathering is an unlawful assembly and must disperse, the Fourth Amendment prohibits the police from using excessive—meaning unreasonable or unnecessary—force. When force is used against protesters or others exercising their First Amendment rights, this prohibition "must be applied with scrupulous exactitude." *Lamb v. City of Decatur*, 947 F.Supp. 1261, 1263 (C.D. Ill. 1996) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978)).

"[W]here there is no need for force, *any* force used is constitutionally unreasonable." *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000), *judgment vacated on other grounds*, 534 U.S. 801 (2001) (emphasis in original, internal quotations omitted). There is no justification for use of force against nonviolent protesters who present no threat and have not been given an opportunity to disperse.

Even where there is a need for some force, "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289 (10th Cir. 2008) (excessive force at protest).

Here, the sheriff and police employed a variety of weapons against the protesters that constitute intermediate force, which is excessive force absent a strong governmental need. With regard to one type of SIM that was used by law enforcement on November 20, the Ninth Circuit Court of Appeals observed:

> Every police officer should know that it is objectively unreasonable to shoot –
> even with lead shot wrapped in a cloth case – an unarmed man who has
> committed no serious offense, … has been given no warning of the imminent use
> of such a significant degree of force, poses no risk of flight, and presents no
> objectively reasonable threat to the safety of the officer or other individuals.

*Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001). "Beanbags" are one type of SIM or KIP. They are not beanbags at all, but lead birdshot wrapped in fabric and fired from a 12 gauge shotgun. The Ninth Circuit has noted that these munitions are extremely dangerous and can kill a person who is shot in the head at a range of under fifty feet. *Id*; *see Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011).  Indeed, in Oakland, California, in 2011, a young Iraq war veteran was critically injured and sustained permanent brain damage after being accidentally struck in the head at close range with a "beanbag" targeted for someone behind him. East Bay Express (Mar. 21, 2014),

http://www.eastbayexpress.com/SevenDays/archives/2014/03/21/oakland-to-pay-45-million-to-iraq-war-vet-scott-olsen.

Physicians for Human Rights and the International Network of Civil Liberties Organizations recently released a comprehensive report on the use of crowd-control weapons in response to protests worldwide. (Ex. V.) The report found that "close-range firing of a [SIM]

results in injury patterns similar to those seen with live ammunition, causing severe injuries and

disabilities. It is important to note that while factors such as a large surface area may reduce the

risk of skin penetration, they increase the inaccuracy of the weapon. KIPs, therefore, are not only

likely to be lethal at close range, but are likely to be inaccurate and indiscriminate at longer

ranges, even those recommended by manufacturers for safety." *Id.* at 24. Moreover, "[t]he

medical literature documenting injuries from KIPs suggests that deployment of these projectiles

often occurs from distances much closer than those deemed safe." *Id*. at 31.

> While KIPs are touted as causing minor blunt injuries, the medical literature
> identifies many severe and often penetrative injuries requiring professional
> medical care and management. The location where the projectile hits the body is
> directly related to the severity of the injury. Despite guidelines calling for
> weapons to be aimed at lower extremities, the medical literature identifies many
> major injuries throughout the body, including to the head and trunk. Injuries
> above the legs have the capacity to cause severe internal injuries, including
> ruptured solid organs, penetration to the abdomen or thorax, heart and lung
> injuries, injuries to the major vessels and nerves, and lethal head and neck
> injuries. *Id*. at 31.

Thus, "while KIPs are sometimes described as 'less lethal' than conventional

ammunition, the number of deaths, serious injuries, and permanent disabilities that they can

cause in a crowd-control setting is of serious concern." *Id*. at 35.

In addition to "beanbags", SIM include the "eXact iMpact" rounds, also known as

"sponge rounds", used on November 20. "Sponge round" is another euphemism that may evoke

images of something one might use to remove makeup, but actually refers to a high-speed

projectile with a hard plastic body and a foam rubber nose that is fired from a 40mm launcher.

Just like "beanbags", "sponge rounds" can cause serious injuries or death if a person is struck in

the wrong place or at too close a range. And as with "beanbags," officers are trained to shoot

multiple "sponge rounds" at a subject in rapid succession, in order to make sure the person flees

or is incapacitated. While "sponge rounds" are sometimes touted as safer than "beanbags," a 21

year old college student, Victoria Snelgrove, lost her life in 2004 as a result of being struck with

a similar plastic SIM, like the sponge round fired from a gas powered launcher rather than a

shotgun - the "FN303." Ms. Snelgrove was a Red Sox fan out celebrating the team's pennant

victory in a large crowd when an officer, who was aiming at another person in the crowd who

was throwing objects, accidentally hit Ms. Snelgrove in the eye, shattering the bone and

damaging her brain, and killing her. *See* District Attorney's Investigation Letter (Sept. 12, 2005),

[http://www.suffolkdistrictattorney.com/wp-content/uploads/2014/01/Snelgrove-Victoria-Police-](http://www.suffolkdistrictattorney.com/wp-content/uploads/2014/01/Snelgrove-Victoria-Police-)

[Shooting-of-DA-Letter-to-PC-9.12.05.pdf.](http://www.suffolkdistrictattorney.com/wp-content/uploads/2014/01/Snelgrove-Victoria-Police-Shooting-of-DA-Letter-to-PC-9.12.05.pdf) This shows the heightened danger of using these

types of munitions in crowds, particularly in conjunction with chemical agents and explosive

grenades that are designed to cause panic. The grenades and chemical agent cause people to run

and move unpredictably, and if impact munitions are then shot into the crowd, it is inevitable that

innocent people will be injured—and that they will be shot at closer range than recommended or

in non-target areas such as the head and groin. Thus, there is a high risk of permanent or fatal

injuries when SIM are used for crowd dispersal in conjunction with chemical agents and "blast"

type grenades, as Defendants did on November 20.

    Defendants also used "Instantaneous Blast CS grenades", a small explosive which emits

teargas (CS), and "Stinger CS Rubber Ball Grenades", another small explosive which emits a

loud bang, flash of light, and rubber pellets which spraying out in all directions. These types of

devices are "inherently dangerous". *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004).

The International Network of Civil Liberties Organizations and Physicians for Human Rights

March, 2016 study discusses "stun grenades", of which the munitions used on November 20 are

a type, finding that these weapons "typically result in panic and serious injuries. Recent reports

document more than 50 cases of severe injuries and deaths from the use of these weapons, and

highlight the risks of ... use in dense crowds. . . . . The weapons are made of both metal and

plastic parts that may fragment during the explosion and act as shrapnel. Blast injuries from close

proximity explosions can lead to amputation, fractures, and degloving injuries (extensive skin

removal that exposes underlying tissue)..." (Ex. V at 65.) Shrapnel from such a grenade partially

blinded a student in 2012, and many other serious injuries have been documented. (*Id*. at 66, 68.)

The INCLO and PHR concluded:

> [t]he use of stun grenades for crowd control is an example of the inappropiate
> andinadequate use of military weapons for crowd management. While the stated
> objective of stun grenades is to cause disorientation and a sense of panic, the
> potential for blast injuries caused by the pressure of the blast or by shrapnel from
> the fragmentation of plastic and metal constituents of the grenade is
> disproportionately high and it could even lead to death – as has been documented.
> Therefore, these weapons have no place in effective crowd management,
> intervention, and control.

> (*Id*. at 68.)

Defendants also used profligate amounts of tear gas, which "can be extremely

dangerous." *Spain v. Procunier*, 600 F.2d 189, 195-196 (9th Cir. 1979). Chemical agent dispersal

is indiscriminate, and individuals exposed to high concentrations of chemical agents for extended

amounts of time can suffer serious health consequences and even death. (Ex. V at 43.)

> The prevailing premise for the widespread use of these chemical agents is that
> they cause minimal and transient irritation to the skin and eyes, but are generally
> safe for use on diverse populations. However, the review of these studies found
> that, by design or by inappropriate use, chemical irritants can cause significant
> injuries, permanent disability, and death.

(*Id*. at 51.) The PHR / INCLO report identified 5,131 people who suffered injuries or died

as a result.of crowd control chemical agent exposure, generally CS (teargas) or OC

(pepperspray). (*Id*. at 44, 48.)

Defendants also used profligate amounts... The use of water cannons in riot control contexts also can lead to injury or death.

Potential health effects include hypothermia and frostbite, particularly if appropriate medical and

warming services are not easily accessible. High-pressure water can cause both direct and

indirect injuries. Direct injuries may include trauma directly to the body or internal injuries from

the force of the water stream. Eye damage resulting in blindness as well as facial bone fractures

and serious head injuries have been documented.  Ex. V at 59; Anna Feifenbaum, *White-washing*

*the water cannon: salesmen, scientific experts and human rights abuses*, Open Democracy (Feb.

25, 2014); https://www.opendemocracy.net/opensecurity/anna-feigenbaum/white-washing-

water-cannon-salesmen-scientific-experts-and-human-rights;

https://web.archive.org/web/20070221053037/http://newzimbabwe.com/pages/mdc44.15976.htm

l (fatalities reported in Zimbabwe in 2007, when water cannons were used on peaceful crowd,

causing panic); http://www.hurriyetdailynews.com/Default.aspx?pageID=238&nid=49009

(fatalities reported in Turkey in 2013, when water cannon water was mixed with teargas);

https://www.kyivpost.com/article/content/ukraine-politics/activist-watered-by-police-died-

because-of-pneumonia-335885.html (fatality reported in Ukraine in 2014, when businessman

Bogdan Kalynyak died from pneumonia after being sprayed by water cannon in freezing

temperatures).  There is no current caselaw on the use of water cannons against protesters in the

United States because, along with attack dogs, such use effectively ended in the U.S. in the

1960s amidst national outcry over the use of these tactics on nonviolent civil rights protesters.

Defendants indiscriminately fired these dangerous weapons, with no warning and no

notice or opportunity to disperse, at peaceful protesters. *See, e.g.*, Exs. C; D; E; F; G; L; M; N;

O; P; Q.) This was unconstitutional excessive force.

It should be noted that Defendants have additional, very concerning weapons in their

arsenal which should therefore also be addressed in the order. On prior occasions, notably

October 27, 2016, Morton County and assisting law enforcement agencies used both a Directed

Energy Device and a sound cannon (also known as a Long Range Acoustic Device (LRAD)) on the water protectors. "Acoustic weapons, sometimes called sound cannons or sonic cannons, emit painful, loud sounds that have the potential to cause significant harm to the eardrums and delicate organs of the ears, and may cause hearing loss. There is little medical literature on the effects of these weapons; serious questions remain about their safety and efficacy in crowd-control contexts." (Ex. V, p. 8.) "Directed Energy Weapons are electromagnetic heating devices that deliver very high-frequency millimetre wavelength electromagnetic rays that heat skin on contact and cause a painful, burning sensation. These have not been used in practice [at the time the INCLO report was written], and there has been no assessment of their safety in crowd-control settings. Existing information identifies concerns about tissue injury, particularly with prolonged exposure or exposure to vulnerable organs such as the eye." *Id*.

## III.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF DEFENDANTS' EXCESSIVE FORCE IS NOT ENJOINED.

Immediate injunctive relief is necessary here because absent such relief, Plaintiffs will continue to suffer the immediate harm of Fourth Amendment violations with physical injury, and curtailed First Amendment rights, for which they have no remedy at law.  Plaintiffs wish to continue expressive activity that is protected under the First Amendment, but they currently fear that doing so will subject them to excessive violence and serious risk of personal injury.  The excessive, indiscriminate, and potentially lethal tactics used by Defendants—spraying protesters with water in sub-freezing weather, enveloping the crowd in tear gas, and firing SIM and explosive grenades at them at short range—would unarguably chill a person of ordinary firmness from continuing First Amendment activity.  *See Ford v. City of Yakima*, 706 F.3d 1188, 1193-1194 (9th Cir. 2013) (holding that retaliatory arrests or searches and seizures, even without violence, are sufficient to chill First Amendment activity).

"It is well-established that the inability to exercise a constitutional right constitutes irreparable harm." *MKB Mgm't Corp. v. Burdick*, 954 F. Supp. 2d 900, 912 (D.N.D. 2013) (citing *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action,* 558 F.2d 861, 867 (8th Cir. 1977)).  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)), *overruled on other grounds by Phelps-Roper v. City of Manchester,* 697 F.3d 678 (8th Cir. 2012); *see also Eminth v. Jaeger*, 901 F. Supp. 2d 1138, 1142 (D.N.D. 2012).  As a result, establishing a reasonable likelihood of success on the merits of a First Amendment claim generally also establishes irreparable harm.  *Nixon*, 545 F.3d at 690.  Under the Fourth Amendment, too, "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of a preliminary injunction.  *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009); *see, e.g.*, *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-1502 (9th Cir. 1996) (affirming injunction against Fourth Amendment violations); *Am. Fed'n of Teachers v. Kanawha County Bd. of Educ.,* 592 F.Supp.2d 883, 905 (S.D.W.Va. 2009) (issuing injunction against Fourth Amendment violations). Indeed, the harm that Plaintiffs will suffer in the absence of an injunction is much more extreme than that at issue in *Mills* or *Easyriders*, both of which involved the possibility of brief vehicle detentions: Plaintiffs here face the real possibility that they will be shot, gassed, bombed, and sprayed with water in winter unless the Court intervenes. An injunction is necessary to prevent what money damages cannot undo: the harm to a person who loses use of their forearm and hand, or whose ribs are fractured by a munition, or who has been hit in the genitals with a high velocity munition. And given the

escalating nature of Morton County's misconduct, and the statements made by the Sheriff, it is extremely likely that such harm will recur.

## IV.    THE BALANCE OF HARMS FAVORS ENJOINING DEFENDANTS' USE OF EXCESSIVE FORCE.

The harm Plaintiffs will suffer from the chilling of their First Amendment rights absent an injunction vastly outweighs any harm the injunction would inflict on Defendants and other interested parties.  "In the context of injunctions, the Eighth Circuit has noted that '[t]he balance of equities . . . favors the constitutionally-protected freedom of expression.'"  *Emineth*, *supra*, 901 F. Supp. 2d at 1142 (quoting *Nixon*, 545 F.3d at 690).

The injunction sought would not harm Defendants.  The modest relief requested only prohibits excessive and violent tactics that present serious risk of physical harm to protesters without any counterbalancing benefit to public safety.

Defendants may claim that certain protesters on November 20 were engaged in unlawful conduct.  Even if *arguendo* that were true, it would not justify an indiscriminate use of force on the crowd. "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *NAACP v. Claiborne Hardware*, 458 U.S. 886, 908 (1982). Where First Amendment rights are involved, "precision of regulation is demanded," and the police "may not employ means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id*. at pp. 916, 920.

The requested injunction would not prevent Defendants from reasonably and proportionally responding to any unlawful conduct by protesters by making arrests or using reasonable force against individuals who present a threat, *if* such force was warranted. "The generally accepted way of dealing with unlawful conduct that may be intertwined with First

Amendment activity is to punish it after it occurs, rather than to prevent the First Amendment activity from occurring in order to obviate the possible unlawful conduct." *Collins v. Jordan, supra*, 110 F.3d at pp. 1371-1372, citing *Carroll,* supra, 393 U.S. at 180-181; *Kunz v. New York,* 340 U.S. 290, 294 (1951); *Collin v. Chicago Park District,* 460 F.2d 746, 754 (7th Cir.1972). Individuals who break the law can be arrested. Mass arrests can even be made if individuals refuse to disperse after a lawful order to disperse, and adequate notice and opportunity to do so. (E.g., *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 121 (D.C. Cir. 1977); *Barham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006).) Inflicting indiscriminate group physical punishment, on the other hand, is unconstitutional.

## V.     THE PUBLIC INTEREST FAVORS ENJOINING DEFENDANTS' USE OF EXCESSIVE FORCE.

"[T]he protection of constitutional rights is always in the public interest." *Burdick*, 954 F. Supp. 2d at 913 (citing *Nixon*, 545 F.3d at 690). Thus, a likely First Amendment violation always favors the issuance of an injunction. *Child Evangelism Fellowship of Minn. V. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012). So too, "[p]erhaps no greater public interest exists than protecting a citizen's [Fourth Amendment] rights under the constitution." *Marchwinski v. Howard*, 113 F.Supp.2d 1134, 1144 (E.D. Mich. 2000).

Thus, federal courts have issued injunctions to stop the police from interfering with protests. E.g., *Templeton v. Dotson*, E.D. Mo. Case No. 4:14-cv-02019 CEJ (TRO enjoining St. Louis Police and Highway Patrol from using chemical agents for the purpose of dispersing nonviolent protesters without first issuing clear warnings, ensuring means of safe egress, providing sufficient opportunity to disperse, and minimizing the impact of such chemical agents on individuals who were complying with commands); *Houser v. Hill*, 278 F.Supp. 920,926 (D.Ala. 1968) (enjoining police from "unlawfully interfering, through the use of force and

intimidation, with the peaceful and lawful assemblies of Negro citizens"); *Cottonreader v. Johnson*, 252 F.Supp. 492,496,497 (D. Ala. 1966) (enjoining police from committing acts of violence upon, or threatening, intimidating, assaulting or harassing African Americans picketers); *see also Schnell v. City of Chicago,* 407 F.2d 1084, 1085 (7th Cir.1969) (overruled on other grounds).

Plaintiffs seek a TRO and Preliminary Injunction that will prohibit Defendants, their employees, and those acting in concert or active participation with them, from using excessive force in responding to the pipeline protests and prayer ceremonies. Specifically, the indiscriminate use of SIM, explosive grenades, chemical agents, Directed Energy Devices, sound cannons, and water cannons or hoses, as means of crowd dispersal should be prohibited.

## VI.   PLAINTIFFS REQUEST A WAIVER OF THE BOND.

The amount of bond, if any, required by Fed. R. Civ. P. 65(c), "rests within the discretion of the trial court." *Rathmann Group v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989). Courts in the Eighth Circuit have waived the bond "where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043.

Defendants will suffer no harm, monetary or otherwise, from the injunction Plaintiffs seek, so there would be no damages to Defendants even if it were later determined that the requested injunction was wrongly issued.  As a result, the Court should waive the bond.

## CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that this Court enter a preliminary injunction and, pending the preliminary injunction hearing, that this Court schedule an emergency hearing and issue a temporary restraining order for the relief requested in the Complaint.

Dated:  November 28, 2016                    Respectfully Submitted,


  /s/ _____
RACHEL LEDERMAN, CA SBN 130192
Rachel Lederman & Alexsis C. Beach, Attorneys
558 Capp Street
San Francisco, CA 94110
(415) 282-9300
Fax (510) 520-5296
rachel@bllaw.info

LAUREN REGAN, Oregon SBN 970878
Civil Liberties Defense Center
783 Grant Street, Suite 200
Eugene, OR 97402
(541) 687-9180
Fax (541) 804-7391
lregan@cldc.org

JEFFREY HAAS, Attorney
NM State Bar No. 15587
1433 Seville Rd
Santa Fe, NM 87505
505-469-0714
Fax (505) 995-9866
JeffreyHaas42@gmail.com

JAMES R. FENNERTY
James R. Fennerty & Associates, L.L.C. 36
South Wabash Avenue, Suite 1310
Chicago, IL 60603
312-345-1704
312-422-0708 FAX
fennertylaw@yahoo.com

Attorneys for Plaintiffs