IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil No. 1:16-CV-00406

Vanessa Dundon, Jade Kalikolehuaokalani
Wool, Crystal Wilson, David Demo, Guy
Dullknife III, Mariah Marie Bruce, Frank
Finan, Isreal Hoagland-Lynn, and Noah
Michael Treanor,

on behalf of themselves and all similarly-
situated persons,

    Plaintiffs,

  vs.

Kyle Kirchmeier, Morton County, City of
Mandan, Jason Ziegler, Stutsman County,
Chad Kaiser, and Does 1-100,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS KYLE KIRCHMEIER,
MORTON COUNTY, CITY OF MANDAN,
JASON ZIEGLER, STUTSMAN COUNTY,
AND CHAD KAISER'S MOTION TO
DISMISS**

  \*\*\*   \*\*\*   \*\*\*

## I. INTRODUCTION

Law Enforcement are entitled to qualified immunity from suit as a matter of law as all of

the matters in the record which the Court is permitted to consider in relation to Law Enforcement's

Rule 12(b)(6) motion to dismiss, establish Plaintiffs have failed to plead plausible claims for

violation of their federal constitutional rights. Plaintiffs have failed to allege they were "seized"

by Law Enforcement on November 20, 2016, as required for an excessive force claim under the

Fourth Amendment. Even assuming a "seizure" has been adequately alleged, in accordance with

*Bernini v. City of St. Paul*, Law Enforcement's alleged use of force under the circumstances was

objectively reasonable as a matter of law. In the alternative, any right allegedly violated was not

so clearly established at the time of the violation that a reasonable officer would have known that

his actions were unlawful, in light of *Bernini*. Similarly, Plaintiffs fail to allege facts which, when

considered with the uncontroverted record properly considered by the Court, establish a use of force by Law Enforcement against Plaintiffs which "shocks the conscience", as a matter of law, thereby failing to allege a viable excessive force claim under the Fourteenth Amendment.

Plaintiffs' retaliation claim under the First Amendment also fails as a matter of law as the indisputable facts establish Plaintiffs had no lawful right to be present where they were allegedly exercising speech when force was allegedly applied as to them. All force was allegedly applied in close proximity to Law Enforcement's barricade on the north side of the Bridge, or along the north shore of the Cantapeta Creek near the barricade – all restricted areas closed to the public. In addition, Plaintiffs admit protesters with whom Plaintiffs were intermingled were engaged in removing and attempting to remove government property from Law Enforcement's barricade prior to force allegedly being applied to them. The only reasonable inference is the unlawful conduct of the protesters, not protected speech, motivated Law Enforcement's alleged use of force.

By failing to define a specific class to which Plaintiffs belong, and failing to identify others allegedly similarly situated with Plaintiffs class who were treated differently from Plaintiffs, and by failing to allege there was no rational basis for any such disparate treatment, Plaintiffs have failed to allege a plausible equal protection claim under the Fourteenth Amendment. In addition, Plaintiffs claims concerning "Policies, Customs, or Practices" (Third Claim), "Training, Supervision, or Discipline" (Fourth Claim), "Unequal Protection of Law" (Claim Five), and "Declaratory Relief" (Sixth Claim) are merely derivative of, and dependent upon Plaintiffs' prevailing upon the retaliation and excessive force claims. As Plaintiffs have failed to allege plausible claims for retaliation and excessive force, these derivative claims should also be dismissed.

## II.   RELEVANT FACTS

In ruling upon a Rule 12(b)(6) motion to dismiss, a district court may consider the plaintiffs' complaint, "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;" without converting the motion into one for summary judgment. *Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012); *Williams v. Employers Mutual Casualty Company*, 845 F.3d 891 (8th Cir. 2017)(quoting *Miller*). In *Miller v. Redwood Toxicology Laboratory, Inc.*, the United States Court of Appeals for the Eighth Circuit confirmed as appropriate a district court's consideration in relation to a Rule 12(b)(6) motion to dismiss of not only the plaintiff's complaint and amended complaint, but also the record created as a result of the plaintiff's motion for temporary restraining order, preliminary injunction and expedited discovery filed by plaintiff after the defendant's motion to dismiss was filed.

In the present action, and as a result of briefing in relation to Plaintiffs' pending motion for preliminary injunction (doc. 2), a considerable record has been established in this case, including numerous affidavits and declarations, public records, photographs, video, etc. While some of the evidence submitted contradicts Plaintiffs' allegations contained in their complaint, and to that extent the Plaintiffs' purely factual (non-conclusory) allegations must be accepted as true for purposes of this motion only, a great deal of the evidence in the record does not actually contradict Plaintiffs' purely factual allegations. As a result, Law Enforcement respectfully submits it is entirely appropriate for this Court to consider those items in the record in this case which do not directly contradict Plaintiffs' purely factual allegations contained in the complaint (doc. 1).

A factual description of the events leading up to, and occurring on November 20, 2016 and thereafter at, and in the vicinity of, the Backwater Bridge in southern Morton County, North

Dakota has previously been provided to the Court by Law Enforcement in relation to Plaintiffs' pending motion for preliminary injunction. To avoid duplication, Law Enforcement incorporates herein by reference its memorandum of law in opposition to Plaintiffs' motion for preliminary injunction (doc. 42), and all materials filed as part of the record in this case by Law Enforcement. Law Enforcement also incorporates herein by reference all of the images (photographs and video) submitted by Law Enforcement in further support of Law Enforcement's opposition to Plaintiffs' pending motion for preliminary injunction (docs. 92-1), and at the Court's request.

The following facts are derived from public records and others materials in the record in this case, and, as discussed in this brief, are uncontroverted or not reasonably disputable. Law Enforcement's description of the events of November 20, 2016 are also consistent with the infrared aerial surveillance video taken by the North Dakota Highway Patrol, available at docket 92-1 at Item 4, and other images provided by Law Enforcement in the record (doc. 92-1), with an index of images available at docket 92-2.

On August 15, 2016, the Morton County Board of Commissioners declared a state of emergency due to the unlawful activity occurring at the DAPL project site which threatened the health, well-being and safety of Law Enforcement and the public, and required additional manpower, resources and other expenditures to protect life and property. (Doc. 61-4.) On August 19, 2016, North Dakota Governor Jack Dalrymple signed Executive Order 2016-04 authorizing total utilization of the North Dakota State Emergency Operations Plan to respond to the situation. (Doc. 58-2.) On September 8, 2016, Governor Dalrymple activated a military police unit to support Law Enforcement efforts with primary responsibilities to involve traffic control points and administrative duties. (Doc. 61-2 at DEF000016.) The state of North Dakota made an Emergency Management Assistance Compact request to other states for law enforcement assistance on

October 7, 2016 due to the escalated unlawful tactics by individuals protesting the construction of the DAPL.  (Doc. 61-2 at DEF000041.)

The Bridge was deemed unsafe and closed to all access on October 28, 2016 by the NDDOT due to a large fire the protesters had started on the Bridge on October 27, 2016, including the burning of a vehicle on the Bridge (in addition to the two burned out dump trucks), and under the authority granted pursuant to N.D.C.C. § 24-03-05 and the Governor's Executive Order 2016-04, signed August 19, 2016.  (Docs. 58-1, 58-2, 59-2, 59-3.)

Pursuant to correspondence dated November 1, 2016 from the Corps to the Morton County Sheriff's Department, the Corps formally requested the assistance of Law Enforcement in removing protesters from the Corps-managed lands located north and east of the Bridge, as depicted in a map attached to the Corps' November 1 correspondence.  (Doc. 61-7, 61-3 at DEF000094.)  The Corps advised isolated groups had been observed on October 31, 2016 using small boats to travel from the Seven Council Fires Camp, up the North Branch of the Cantapeta Creek, to land and encamp upon Corps-managed federal lands located north of the Bridge.  (*Id.*)  The Corps advised it had not provided any permits or permission for anyone to access that area, and advised said area had not been opened for use by the public for recreational or camping purposes, and the Corps considered such individuals to be trespassers.  (*Id.*)

### November 20-21, 2016 Riot at Backwater Bridge

Prior to November 20, protesters had been making incursions onto private land (including the Cannonball Ranch across which the DAPL project passes) and the Corps-managed property located north of the Bridge, and destroyed private property and terrorized citizens and Law Enforcement for over three months.  These facts cannot reasonably be disputed as they have been the subject of voluminous media reports, Law Enforcement press releases, and other litigation before this Court.  *See* this Court's August 16, 2016 *Order Granting Plaintiff's Motion for*

*Temporary Restraining Order* (doc. 7) and September 15, 2016 *Order Cancelling Hearing and Dissolving Temporary Restraining Order* (doc. 45) in an action entitled *Dakota Access, LLC v. Archambault, et al.*, Case No. 1:16-cv-296 (discussing unlawful and violent activities of DAPL protesters).

On November 20, 2016, both of the previously burned Morton County trucks were located next to, and south of, the Jersey barriers and concertina wire barricades located on the north side of the Bridge blocking Highway 1806. (Doc. 54 [LE-3] at ¶ 35.) Both trucks were chained with large log chains to the concrete Jersey barriers, and formed a part of Law Enforcements' barricade. (*Id.*) There were two rows of Jersey barriers running east-west across Highway 1806, with each row positioned approximately 12 to 15 feet apart. (*Id.*) Between the two rows of Jersey barriers were three rows of concertina wire, with one row lying atop two ground level rows. (*Id.*) The Bridge was still closed by the NDDOT at this time following the fire thereon on October 27, 2016. The Bridge was clearly marked by two large combination signs stating "No Trespassing or Bridge" "No Trespassing," and Highway 1806 was shutdown at this location. (Doc. 52 [LE-1] at ¶ 44; doc. 54. [LE-3] at ¶ 36; doc. 92-1 at Item 8 [photo of one such combination sign].) In addition, the Corps had requested Law Enforcement prevent protesters from trespassing on Corps-managed land located north of the Seven Council Fires Camp. (Doc. 61-7))

The November 20-21, 2016 incident commenced in the afternoon when, against the repeated warnings and commands of Law Enforcement officers located on the north side of the barricade, protesters utilizing a large bolt cutter and a semi-truck cut the chain securing the burned out dump truck located in the west most lane, and drug it away from Law Enforcements' barricade. (Doc. 54 [LE-3] at ¶¶ 33-34, 41-44.) The protesters returned, determined to remove the remaining

burned out dump truck which was secured to, and a part of, Law Enforcements' barricade. (Doc. 54 [LE-3] at ¶ 45; doc. 92-1 at Item 4 [aerial video] at meter 0:03:00 to 0:05:40.) The number of protesters on the Bridge swelled quickly at this point to several hundred. (Doc. 54 [LE-3] at ¶ 45.) These protesters came organized and prepared for an assault on the roughly 20 Law Enforcement officers then manning the barricade. (Doc. 54 [LE-3] at ¶¶ 43, 45-47, 55.) Reinforcements were requested by Law Enforcement. (Doc. 54 [LE-3] at ¶ 49.) It was dark out. (Doc. 92-1 at Item 4 [aerial video – brief video not in infrared] at meter 0:22:56]

The protesters organized themselves into two principal bodies – a forward staged siege group wearing rain coats, goggles and bandanas over their faces, and bearing assorted shields made of plywood, plastic and corrugated tin/steel, along with tarps, and the larger group which remained further back on the Bridge. (Doc. 54 [LE-3] at ¶¶ 45, 55, 74; doc. 52 [LE-1] at ¶¶ 47, 61, 63, 69; doc. 53 [LE-2] at ¶¶ 26, 28, 33, 34, 40; doc. 92-1 at Item 4 [aerial video] at meter 00:20:37.) The forward group utilized their shields and tarps to form a mobile barricade to shield themselves and other protesters from Law Enforcements' view and from any force which may be applied by Law Enforcement. (Doc. 53 [LE-2] at ¶¶ 40, 41; doc. 52 [LE-1] Aff. at ¶¶ 61, 63; doc. 54 [LE-3] at ¶¶ 55, 60-61; doc. 92-1 at Item 4 [aerial vide] from meter 00:20:37 to end.) Protesters moved this mobile barricade up against Law Enforcements' barricade to shield other protesters who were attempting to cut the chains on the remaining burned out dump truck, and protesters cutting the concertina wire in Law Enforcements' barricade. (Doc. 54 [LE-3] at ¶¶ 55, 60-61, 73-74, 81; doc. 52 [LE-1] at ¶¶ 47, 61, 63, 69; doc. 53 [LE-2] at ¶¶ 28, 33-34.) Law Enforcement was giving warnings that protesters were trespassing and that protesters should disengage and return to the south side of the Bridge. (Doc. 54 [LE-3] at ¶¶ 39, 40, 42, 43, 47, 73, 76, 77, 81, 82; doc. 52 [LE-1] at ¶¶ 52, 60; doc. 53 [LE-2] at ¶¶ 27, 42.)

Protesters were yelling profanities and throwing and slinging large rocks, lug nuts, construction nuts, padlocks, frozen water bottles and other objects at Law Enforcement. (Doc. 54 [LE-3] at ¶¶ 46, 47, 59, 61, 66, 84; doc. 52 [LE-1] at ¶¶ 47, 59, 60, 66; doc. 53 [LE-2] at ¶¶ 27, 44; doc. 92-1 at Item 4 [aerial video] at meter 1:06:18 (protester throwing object at officer); *id.* at Item 1 [ground video] at meter 0:00:13 (unidentified object seen flying over barricade towards Law Enforcement); *id.* at Item 6 [ground video] at meter 0:32 (officer yells "heads up" while object flies through air at officers and officers dodge). *See* Doc. 61-3 at DEF000127 – DEF000137 (photographs of weapons recovered following the riot).) Law Enforcement officers were being struck by these objects – one officer was struck so violently he was dazed and required assistance back to an armored vehicle. (Doc. 54 [LE-3] at ¶¶ 46, 71; doc. 52 [LE-1] at ¶ 60; doc. 53 [LE-2] at ¶ 44.) Law Enforcement feared for their physical safety due to the imminent threats of serious bodily injury or death they were encountering. (Doc. 54 [LE-3] at ¶¶ 51, 68, 79, 85; doc. 52 [LE-1] at ¶¶ 49, 60, 67; doc. 53 [LE-2] at ¶¶ 47, 48.)

Protesters attempted to pull one of the combination "No Trespassing on Bridge" "No Trespassing" signs over onto the concertina wire barricade. This incident was captured on video on the ground, and from the air. (Doc. 92-1 at Item 5 [ground video]; *id.* at Item 4 [aerial video] at meter 1:05:50).

Law Enforcement deployed CS gas canisters to drive protesters away from the barricade, but due to the wind blowing to the northwest, the gas crossed over the police line, and its use was discontinued. (Doc. 54 [LE-3] at ¶ 52; doc. 52 [LE-2] at ¶¶ 36, 38.) Protesters also threw the CS gas canisters back at Law Enforcement. (Doc. 54 [LE-3] at ¶ 58; doc. 52 [LE-2] at ¶ 36; doc. 92-1 at Item 4 [aerial video] at meter 1:41:50, 1:59:37, 2:59:40, 3:05:00, 3:07:25.) Officers also attempted to stop the forward siege group and protesters from throwing objects

through use of OC spray and direct impact sponge and bean bag rounds, again to limited effect due to the protesters' mobile barricade and Law Enforcements' barricade. (Doc. 54 [LE-3] at ¶¶ 46, 53, 67, 70; doc. 52 [LE-1] at ¶ 59; doc. 53 [LE-2] at ¶¶ 32, 36, 37, 38, 39, 49.) Police shields were requested for the first time during the ongoing DAPL protests due to the constant barrage of objects being thrown at Law Enforcement. (Doc. 54 [LE-3] at ¶ 50.) Not all officers had helmets as the quarter master had run out. (Doc. 54 [LE-3] at ¶ 61; doc. 52 [LE-2] at ¶ 31.) A second Code Red was issued requesting all available officers to respond within a 100-mile radius. (Doc. 54 [LE-3] at ¶ 56.)

Protesters crossed the bridge and took up positions along the east and west flanks of the police line, starting several large bonfires along the east flank and along the north shore of the Cantapeta Creek. (Doc. 54 [LE-3] at ¶ 59, 63, 66; doc. 52 [LE-1] at ¶ 49, 51, 53; doc. 53 [LE-2] at ¶ 26; doc. 92-1 at Item 4 [aerial video] at meter 01:32:30, 2:20:30, 3:03:24.) One of the bonfires was built within roughly 30 feet of Law Enforcements' barricade and protesters in that vicinity began throwing burning logs at the police line. (Doc. 54 [LE-3] at ¶ 66.) A brush truck from the Mandan Rural Fire Department was requested to address these sorts of fires. (Doc. 54 [LE-3] at ¶¶ 70, 77; doc. 52 [LE-1] at ¶¶ 56-59; Doc. 56 [FO-1] at ¶ 2.)

As Law Enforcement reinforcements started to arrive, and when there were approximately 70 officers on the scene against approximately 800 to 1,000 protesters on or north of the Bridge, the officers formed a shield line along the barricade. (Doc. 54 [LE-3] at ¶ 57.) Protesters threw shields across the concertina wire and one protester climbed over Law Enforcements' barricade. (Doc. 54 [LE-3] at ¶ 74; doc. 53 [LE-2] at ¶ 42) This individual was the only person arrested during the riot – Law Enforcement was fully occupied in holding the line. (Doc. 54 [LE-3] at ¶ 74.)

While the siege group was working on cutting the concertina wire and the chains securing the truck to the barricade, and while other protesters continued to throw objects at Law Enforcement, a group of approximately 150 protesters gathered in the west ditch north of the Bridge and proceeded west and north in an attempt to flank the police line, cross-country. (Doc. 54 [LE-3] at ¶ 63; doc. 52 [LE-1] at ¶¶ 49-55; doc. 53 [LE-2] at ¶ 46; doc. 92-1 at Item 4 [aerial video] at meter 1:32:30 to 2:00:00.) A small group of roughly 20 officers proceeded west to intercept this group. (Doc. 54 [LE-3] at ¶ 68; doc. 52 [LE-1] at ¶¶ 49-55; doc. 92-1 at Item 4 [aerial video] at meter 01:35:50.)

During this time period, Law Enforcement on the scene were also being marked by lasers and spotlights by individuals on high ground. (Doc. 54 [LE-3] at ¶ 62; doc. 52 [LE-1] at ¶ 50; doc. 53 [LE-2] at ¶ 45.) This gave Law Enforcement concern officers were being targeted by snipers, consistent with previously known social media threats and intelligence regarding weapons in the possession of protesters. (Doc. 54 [LE-3] at ¶ 62; doc. 52 [LE-1] at ¶ 50; doc. 53 [LE-2] at ¶ 45.) Law Enforcement were also very concerned about being overrun by the aggressive and violent protesters, and the possible consequences in that eventuality. (Doc. 54 [LE-3] at ¶ 68; doc. 52 [LE-1] at ¶ 49; doc. 53 [LE-2] at ¶ 47; doc. 56 [FO-1] at ¶¶ 16-18; doc. 57 [FO-2] at ¶¶ 19-21.) In addition to being concerned about the obvious risks to the physical safety of Law Enforcement on the scene if overrun, there was genuine concern about the potential need to resort to deadly force for the protection of Law Enforcement and emergency responders now on site, and concern about the potential loss of Law Enforcement vehicles (including armored vehicles) and the weapons and munitions contained therein which may later be used by the protesters against Law Enforcement and others. (Doc. 54 [LE-3] at ¶ 68; doc. 52 [LE-1] at ¶¶ 49, 60, 67; doc. 53 [LE-2] at ¶ 47, 48.) A Signal-100 was issued, requesting the

assistance of all available law enforcement, state-wide.  (Doc. 54 [LE-3] at ¶ 69.)  Photographs and video of the riot are provided.  (Doc. 92-1 with index at doc. 92-2.)

With fire apparatus on the scene, and the methods thus far being utilized by Law Enforcement proving ineffective against the protesters, permission was requested, and received from command, to utilize water to extinguish fires and hold the police line.  (Doc. 54 [LE-3] at ¶ 70; doc. 52 [LE-1] at ¶¶ 56, 59, 63; doc. 53 [LE-2] at ¶¶ 32, 38.)  Following warnings by Law Enforcement, both in relation to the ongoing trespass and commands to proceed south of the Bridge, water was ultimately deployed against protesters utilizing the mobile barricade and attempting to dismantle and penetrate the Law Enforcement barricade, and those throwing objects at Law Enforcement.  (Doc. 54 [LE-3] at ¶ 73, 74; doc. 56 [FO-1] at ¶¶ 3-4, 11, 12, 15; doc. 57 [FO-2] at ¶¶ 5, 6, 8, 17, 19.)  Water was also applied to put out unlawful fires located north of the Cantapeta Creek, in proximity to the police line.  (Doc. 54 [LE-3] at ¶ 77; doc. 52 [LE-1] at ¶¶ 56-57, 59, 63; doc. 56 [FO-1] at ¶¶ 9, 10; doc. 57 [FO-2] at ¶¶ 18.)  All the protesters had to do to avoid getting wet or having force applied against them was obey the lawful commands of Law Enforcement and walk back south across the Bridge.  (Doc. 54 [LE-3] at ¶ 73, 76, 77; doc. 52 [LE-1] at ¶ 62; doc. 56 [FO-1] at ¶ 21; doc. 57 [FO-2] at ¶¶ 24-25.)  The application of water was crucial to Law Enforcements' ability to prevent the penetration of Law Enforcements' barricade and prevent serious bodily injury or death to Law Enforcement and emergency responders on the scene as a result of the immediate threats presented by the protesters.  (Doc. 54 [LE-3] at ¶ 79.)

The above facts are not controverted by Plaintiffs' purely factual allegations.  Plaintiffs' allegations from their complaint concerning the events at issue follow.

**Plaintiffs' Allegations**

Relevant to this motion to dismiss, Plaintiffs allege as follows in their pleadings:

Vanessa Dundon

35.　　Vanessa Dundon is an enrolled member of the Navajo Nation and a supporter of the movement to stop the Dakota Access Pipeline. Dundon came to the water protectors' camp September 11,2016, to stop the pipeline's desecration of ancestral, sacred and burial sites and its threat to the environment and water supply. She also came to stand up for indigenous peoples' rights.  (Ex. U, Dundon Decl.)

36.　　On Sunday, November 20, 2016 at sundown around 7:00 or 8:00PM (CT) Dundon went to Backwater Bridge immediately north of Oceti Sakowin camp on Highway 1806 to peacefully protect the water and to stop the pipeline from going through the Missouri River. It was very cold outside. She was one of the first people to arrive at the bridge. When she arrived at the bridge, other water protectors were using tow equipment in an attempt to move one of the burned out trucks from the bridge so emergency vehicles could reach camp. Army Corps had promised to remove the vehicles that had been placed there by law enforcement, but they never did, so people in camp mobilized to remove the vehicles for health and safety reasons as well as in the public interest. After the first truck was removed, a group of water protectors began to remove the second truck and Dundon saw a woman standing by herself across the razorwire barricade and in front of a line of law enforcement. The woman appeared to be a member of the media. Out of concern for the woman's safety, Dundon told her to move out of the way and the woman moved to the side of the road. At that moment, she and Dundon were the closest people to the line of law enforcement officers. As Dundon watched her move to the side of the road, Dundon heard a tear gas cannon go off. Dundon tried to see where the tear gas cannon was being shot and saw that it was coming straight for her face. She did not have time to move to avoid being hit by the canister. Dundon saw the tear gas canister was on fire or burning and was about a foot from her face. She instinctively closed her eyes and was struck in the face and right eye by a canister.  (Ex. U, Dundon Decl.)

37.　　After Dundon was shot in the eye, she fell to the ground and grabbed her bandana to cover her eye and turned around to run away. She was then shot in the back of her left leg right below her butt with a rubber bullet. The shot with the bullet caused her to fall down. Dundon couldn't see well and was in pain so she called out for help. At that point two water protectors grabbed her arms and they ran away from the frontline until they reached a minivan. Dundon could still not see at this point and was trying to open her eye. Her eye was bleeding so much that she could not see and she was worried her eyeball had been dislodged from its socket.  (Ex. U, Dundon Decl.)

　　　　　　　　*　　　　　　　　　*　　　　　　　　　*

43.　　As a result of these events, she worries that she will be subjected to further police abuse if she continues to participate in First Amendment Expression to protect the water in Morton County.  As a result of the actions of the Morton County Sheriff and assisting agencies, she is afraid and nervous about participating in further First Amendment activity

in opposition to the Dakota Access Pipeline in Morton County, even though she wants to gather and assemble peacefully with others who share her views. (Ex. U, Dundon Decl.) (Doc. 1 at ¶¶ 36-37, 43.) Dundon alleges permanent injury to her eye as a result of the events described. (*Id*. at ¶ 38-42.)

Jade Kalikolehuaokalani Wool

44.     Jade Kalikolehuaokalani Wool is of Native Hawaiian and Oglala Lakota Sioux Tribe heritage. Wool came to the water protector camp in August 2016 after finding out about the situation in Standing Rock. As an indigenous woman, she believes she needs to be at the camp in solidarity with the water protectors and to uphold tribal sovereignty rights. (Ex. E, Wool Decl.)

45.     On Sunday, November 20, 2016 in the evening, Wool went to the bridge immediately north of the Oceti Sakowin camp on Highway 1806 to peacefully gather with other water protectors to protest construction of the pipeline underneath the Missouri River. It was very cold and windy, with temperatures below freezing that night. (Ex. E, Wool Decl.)

46.     Wool could see a lot of law enforcement officers or security officers and lots of military vehicles on the other side of the bridge behind significant barricades. The officers and their vehicles were on the opposite side of a razor~wire fence. When she arrived at the bridge, she could hear people screaming and could see flashes from explosions. A few minutes after she arrived at the bridge, a grenade loudly exploded in the air right above her head. When that grenade went off, Wool was in the middle of a crowd of water protectors and for a few minutes she was dazed and could not really hear because of the noise of the explosion. (Ex. E, Wool Decl.)

47.     Wool was also hit directly by a water cannon that the officers were using on the water protectors. When she got hit, the force of the torrent of water pushed her backward and she was completely soaked by the water cannon, even her boots were filled. The officers sprayed the crowd of water protectors with the water canon for about ten minutes at a time in the freezing night air. Officers would stop for a few minutes and then start again. This went on for the entire hour that Wool was on the bridge. (Ex. E, Wool Decl.)

48.     She saw a water protector who looked like he was injured and was crawling on the ground. Other water protectors tried to pull him away from the water cannon and while they were doing this, an officer kept firing the water cannon at the injured man. Wool located a plastic lid from a storage tote, and she moved near the injured man and tried to shield him from the water cannon. She was close enough to see the face of the officer intentionally shooting the water cannon at specific targeted people. She could see the officer looking at her before the officer hit her again with the water. At one point, the force of the water cannon knocked the plastic lid into her head. (Ex. E, Wool Decl.)

49.     Soon after the injured man was moved away by the water protectors, another grenade exploded in front of Wool's face. Pieces of the grenade hit Wool's face in several

places. The grenade burned her face and knocked her to the ground. After the grenade hit her, she was in shock and could not talk or respond to others around her. She remembers being put in a truck and being taken to the medical tent at Oceti Sakowin camp. She was transported to the hospital in Bismarck. The doctors had to cut off her clothes and hook her up to an IV. Her body ached, and her head hurt. (Ex. E, Wool Decl.)

50. Wool feels very shaken up by what happened that night. She still feels nauseated and has not been able to eat well for a few days. She still has a headache. She feels very nervous and anxious and cannot sit still very long or sleep through the night. She still feels cold all the time as a result of hypothermia or exposure caused by the repeated drenchings. (Ex. E, Wool Decl.)

51. As a result of these events, she worries that she will be subject to other abuses in the future if she participates in further peaceful prayer and protests in support of the water protectors in Morton County. Because of the actions of the Morton County police, she is nervous about participating in further First Amendment activities in opposition to the pipeline in Morton County even though she wishes to gather and assemble peacefully with others who share her views. (Ex. E, Wool Decl.)

(Doc. 1 at ¶¶ 44-51.)

Crystal Wilson

52. Crystal Wilson is of Blackfoot and Afro-indigenous heritage. She is a member of the movement to stop DAPL. She came to the water protectors' camp in late September 2016 to gather with other indigenous people. Since she has been in the camp, she has been volunteering and participating in peaceful, prayerful actions. (Ex. Q, Wilson Decl.)

53. On Sunday, November 20, 2016 in the evening around 7:00PM (CT), Wilson went to the bridge immediately north of Oceti Sakowin camp on Highway 1806 to peacefully gather with other water protectors to stop the pipeline from going through the river and polluting the Missouri River. She was praying with the other water protectors while she was there. It was very cold and windy. During the first hour, she and others were peacefully praying, unarmed, and not threatening police. Still, police were shooting a high-powered water cannon, tear gas canisters and flash-bang grenades at her. She left for a rest and returned to the bridge with more appropriate winter clothing. (Ex. Q, Wilson Decl.)

54. After she returned, a native elder was singing an indigenous song with his arm outstretched on either side, and the police were soaking him with the water cannon, even though it was very cold outside. Wilson held a piece of plastic up to shield others. Then, she heard a bang and felt an impact on her chest. She grabbed an aluminum sheet to protect herself and others. Then she walked back away from the police line. She noticed at the time she was covered with ice on her hair and back from the water canon. (Ex. Q, Wilson Decl.)

55. On November 20th, Wilson did not hear any request to disperse from the police throughout the entire night: when she was on the bridge, before or after she was shot, gassed, and soaked by the water cannon. (Ex. Q, Wilson Decl.)

56.     As a result of these events, Wilson worries that she will be subjected to other abuses if she participates in further peaceful protest and prayer in support of the water protectors in Morton County. Because of the actions of the Morton County Sheriff and assisting agencies, she is very nervous about participating in further First Amendment activity in opposition to the pipeline in Morton County even though she wishes to gather and assemble peacefully with others who share her views.  (Ex. Q, Wilson Decl.)

(Doc. 1 at ¶¶ 52-56.)

David Demo

57.     David Demo is of Penobscot heritage. Demo is a supporter of the movement to stop DAPL. He came to the water protectors' camp mid-August 2016, to protest the pipeline's desecration of ancestral sacred and burial sites and its threat to the environment and water supply.  (Exh. S, Demo Decl.)

58.     On Sunday, November 20, 2016 at 8:30PM or 9:00PM (CT), he went to the bridge immediately north of Oceti Sakowin camp on Highway 1806 to peacefully protest and pray to stop the pipeline from going through the river and polluting the Missouri River. (Exh. S, Demo Decl.)

59.     It was a cold night and below freezing. As he approached the bridge, and the line of police, he was holding a "GoPro" camera on a stick, filming the police behind the razor wire. He was there to observe what was going on, and continue protesting the pipeline. Within five minutes, he was targeted with the water cannon and was thoroughly soaked for about thirty seconds, even though he was not threatening the police or barricade in any way. He never heard warnings issued to get off the bridge, or that he would be assaulted with the water canon, or that projectiles would be fired against him. At the end of the approximately thirty seconds, one of the officers shot him with what seems to be a rubber bullet hitting him on the middle finger of his right hand, which was holding the video camera on a stick.  (Exh. S, Demo Decl.)

60.     After he was hit by the rubber bullet, he went back behind the bridge to receive first aid treatment from the medics. He drove back to Sacred Stone camp to put on dry clothes, and he returned to the bridge to join the protest. He was able to keep himself from getting soaked while on the bridge by using a board or tarp to protect himself. He stayed there until approximately 5 am.  (Exh. S, Demo Decl.)

61.     He went to the Indian Health Service hospital in Fort Yates at approximately 6:30 am and received treatment for his hand where he was shot. The doctors told him he had several broken knuckle bones, and he was informed that he would need reconstructive surgery.  (Exh. S, Demo Decl.)

62.     He never heard an order to disperse while he was on the bridge on the night of November 20, 2016. Officers only said to get away from the razor wire barricade. He did step back from the razor wire when the officers requested it, but he still was targeted with the water cannon and munitions.  (Exh. S, Demo Decl.)

63.    The events of November 20 were very traumatic. It was shocking for Demo to observe and experience such brutal, cruel, excessive force by public officers.  (Exh. S, Demo Decl.)

64.    As a result of these events, Demo worries that he will be subjected to other abuses if he participates in further peaceful protest and prayer in support of the water protectors in Morton County. Because of the actions of the Morton County Sheriff and assisting agencies, he is very nervous about participating in further First Amendment activity in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share his views.  (Exh. S, Demo Decl.)

(Doc. 1 at ¶¶ 57-64.)

<u>Guy Dullknife III</u>

65.    Guy Dullknife III is a member of the Oglala Lakota Sioux Tribe and resident of the Pine Ridge Indian Reservation in South Dakota. He comes from a Reservation where the community depends on water from the Missouri River as its sole water resource. The Pine Ridge Indian Reservation is within the poorest county in the United States, and the tribal community there would not be able to afford to buy water to replace their sole water source. He came to peacefully protest the building of the pipeline which may in the future leak and cause harm to his community.  (Exh. M, Dullknife Decl.)

66.    On the evening of November 20,2016 at around 10 or ll pm, Dullknife went to the bridge over the Cannonball River on highway 1806 north of Oceti Sakowin camp to· observe the prayer assembly. The temperature was below freezing. When he got there, he saw that the police were using water cannons to soak water protectors. He also saw a woman kneeling about 12 to 14 feet from the barbed wire the police had placed on the bridge. He saw the police officer firing the water cannon point directly at the woman. The police officer aimed the water cannon at her, and she was knocked down. The police continued spraying the woman while she was on the ground even though she posed no threat to the police. Another person helped Dullknife hold up a board to protect the woman from the water while she prayed. (Exh. M, Dullknife Decl.)

67.    Dullknife was hit in the chest, stomach, and leg by what he believes were shotgun-fired beanbags. One beanbag hit him in the chest, and he caught it with his hand. He now has pain and bruising from those injuries.  (Exh. M, Dullknife Decl.)

68.    While at the bridge, he observed three trucks brought in filled with water so they could continue to soak the protesters. One of the trucks was a fire engine. He observed the police shoot and injure many people that night with beanbags, rubber bullets, tear gas, flash-bangs, and grenades. He even overheard highly unprofessional police officers laughing and celebrating after they hit people with projectiles.  (Exh. M, Dullknife Decl.)

69.    As a result of these events, Dullknife worries that he will be subjected to other abuses if he participates in further peaceful protest and prayer in support of the water protectors in Morton County. Because of these actions of the Morton County Sheriff and assisting agencies, he is very concerned about participating in further First Amendment

activity in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share his views.  (Exh. M, Dullknife Decl.)

(Doc. 1 at ¶¶ 65-69.)

Mariah Marie Bruce

70.     Mariah Marie Bruce has been present at several protests since arriving at Oceti Sakowin camp in mid-October, 2016. She has protested and wishes to continue protesting the desecration of ancestral sacred and burial sites and DAPL's threat to the environment and water supply. On Saturday, October 22, 2016, the police had batons and knocked people to the ground so hard she could hear the bodies hit the ground. On November 15, 2016, the police response was even more aggressive than what she had seen previously. The police used batons, guns, loud sound machines, and pepper spray on peaceful protesters. She was concerned for two tribal elders that day, whom she tried to protect because the police used so much pepper spray on them.  (Ex. I, Bruce Decl.)

71.     On November 20, 2016 at about 6:30pm, Bruce went to the bridge immediately north of the Oceti Sakowin camp. She went there to peaceably protest DAPL. It was a very cold night, and the temperature was below freezing. When Bruce got near the bridge, she saw a barb wire fence across the bridge with the police lined up behind the barb wire. She then walked to the front and was sprayed by police officers with a powerful stream of water from a cannon. Throughout the entire time she was peaceably protesting at the bridge she was sprayed with water from the water cannon. Her two inner jackets were wet, and her most outer jacket was frozen. Her skirt was frozen, and she had no gloves. At the end of the night she had trouble moving her hands. Her hair was also frozen, and she saw another girl with icicles in her hair.  (Ex. I, Bruce Decl.)

72.     There were flood lights on the protestors, and Bruce couldn't see without taking her goggles off because of the light, which left her eyes vulnerable to the tear gas being deployed by the police officers. It was hard for her to breathe because the cloud of tear gas was so thick. The tear gas burned her eyes. She tried not to breathe because breathing the tear gas hurt her lungs and burned her nose.  (Ex. I, Bruce Decl.)

73.     Bruce bent down to grab a lid to a plastic container to use as a shield, and while she was bent over a police officer hit her in the vagina with an explosive teargas blast grenade, which exploded on her body. After Bruce was hit, she did not feel any immediate physical pain, but she thought about how glad she was that she was not pregnant because the impact and explosion could have caused her to miscarry.  (Ex. I, Bruce Decl.)

74.     Bruce remained near the front of the protests for another 20-30 minutes, but the tear gas was so overpowering that she eventually had to leave the front and seek medical attention. The medics near the front line put milk of magnesia in her eyes to help with the burning from the tear gas. She was then taken to the medics at Oceti Sakowin camp and was given tea to help her body warm-up, as she was very cold. As her body began to warm, she started to feel pain in her vagina and abdomen. The pain suddenly worsened and she began vomiting. The medics became very concerned. Bruce was put into an ambulance and taken to Sanford Hospital in Bismarck, North Dakota.  (Ex. I, Bruce Decl.)

75.     As of November 22, 2016, she is still in a lot of pain and needs assistance from others to move around. When she stands, it feels like her insides are falling out. She is also concerned about how this injury could impact her ability to have children in the future. (Ex. I, Bruce Decl.)

76.     Bruce has seen how the police response is becoming more aggressive and violent over the past few months. The police response was the most aggressive yet on November 20, 2016. Because of these events, she worries that she will be subjected to other abuses if she participates in further peaceful protests in support of the water protectors in Morton County. As a result of the actions of Morton County and assisting agencies, she is afraid about participating in further First Amendment activity in opposition to the pipeline in Morton County even though she wishes to gather and assemble peacefully with others who shares her views.  (Ex. I, Bruce Decl.)

(Doc. 1 at ¶¶ 70-76.)

Frank Finan

77.     Frank Finan came to North Dakota to document DAPL's desecration of ancestral sacred and burial sites. Finan also came because he is concerned about environmental injustice. On November 20, 2016 in the evening, he went to the bridge north of Oceti Sakowin to peacefully gather with other water protectors to stop the DAPL from going through the river and polluting the Missouri River. It was a very cold and below freezing that night. On the other side of the bridge, there were police officers and lots of military vehicles. From the bridge, he could see water from a water cannon being aimed at water protectors. There were two small campfires along the side of the highway, which were well controlled. He saw water protectors being carried away from the bridge by medics because they were soaking wet. There was a constant flow of water protectors being removed from the bridge and carried away by medics. He saw smoke canisters being thrown by the police, and he heard sounds like gunshots.  (Exh. O, Finan Decl.)

78.     While on the bridge, he was sprayed with a cloud of something that burned his eyes badly and made him cough. He then left the bridge to get away from the gas and to get his camera. When he got back to the bridge, he began taking photos. While taking photos, he was shot near his waistline by a police officer with what he assumes was a rubber bullet. The shot was so forceful that he was knocked to the ground. He fell and slid backwards because of the ice on the bridge. Some water protectors helped him to get up, and he was taken to see medics. He still experiences pain whenever he tries to stand-up or sit-down. (Exh. O, Finan Decl.)

79.     As a result of these events, Finan worries that he will be subjected to other abuses if he participates in further peaceful demonstrations with the water protectors in Morton County, or if he takes more photos of what is happening in Morton County. Because of the actions of the Morton County Sheriff and assisting agencies, he is very nervous about participating in further First Amendment activity in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share

his views, and to document and communicate what is happening to others. (Exh. O, Finan Decl.)

(Doc. 1 at ¶¶ 77-79.)

## Israel Hoaglund-Lynn

80.  On November 20, 2016 at 8:00pm, Israel Hoagland-Lynn went to the bridge over Highway 1806 north of Oceti Sakowin camp to peacefully protest the DAPL. When he got there, he was 200 feet from the front line of the protests on the bridge. It was cold and below freezing. Eventually he moved closer to the front of the protest, at which point he was sprayed with water from a water cannon being operated by police officers. He left the bridge to warm up. On his way back to the bridge, he saw two Native Americans crouching on the ground and was asked to help shield those individuals with plywood to protect them from getting shot by the water cannon and rubber bullets. While holding the plywood to shield the Native Americans, Hoagland-Lynn was continually being shot with the water cannon. The police were also shooting rubber bullets in his direction. A water protector next to him was shot in the finger by a rubber bullet. Hoagland-Lynn reached over to help the water protector when Hoagland-Lynn was shot in the back by a rubber bullet. He knew it was a rubber bullet because he saw it when it fell to the ground. (Ex. H, Hoagland-Lynn Decl.)

81.  Hoagland-Lynn then looked up and saw a police officer pointing a gun at him. He curled his head down and shielded his body with the plywood. He was then hit by a rubber bullet in the top of his head. He dropped to the ground and lost consciousness. When he regained consciousness, he felt a hole in his head. He was in severe pain. He was taken to the clinic at the Oceti Sakowin camp where the medics tried to stop his bleeding. He was then transferred by ambulance to St. Alexius hospital in Bismarck. At the hospital, he was diagnosed with a laceration on his head, a chest wall contusion from falling after being shot, and a large bruise on his back where he was shot with the first rubber bullet. His head wound required 17 staples to close the laceration. He still has pain in his head and back. (Ex. H, Hoagland-Lynn Decl.)

82.  As a result of these events, Hoagland-Lynn worries that he will be subjected to other abuses if he participates in further peaceful protest in support of the water protectors in Morton County. Because of the actions of the Morton County Sheriff and assisting agencies, he is very nervous about participating in further First Amendment activity in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share his views. (Ex. H, Hoagland-Lynn Decl.)

(Doc. 1 at ¶¶ 80-82.)

## Noah Michael Treanor

83.  On Sunday, November 20, 2016 at about 7:00pm, Noah Michael Treanor went to a bridge immediately north of the Oceti Sakowin camp on Highway 1806. He went there to peacefully protest and to pray to stop DAPL. It was a very cold night and the temperature was below freezing. Treanor walked near the front of the bridge. He stood there praying

for about a half hour when police officers started shooting at him with the water cannon and SIM. Treanor stayed on the bridge in the same spot for at least two hours while being shot-by the police with the water cannon and SIM. (Exh. G, Treanor Decl.)

84. Later, Treanor bent down on one knee to pray. This time the police shot at him at a closer range with water, so he turned around. The police then started firing rubber bullets, and he was hit in the back of his legs. He then turned around facing the police again and kneeled and prayed for another hour. Police officers again shot at him with the water cannon and SIM while he prayed. (Exh. G, Treanor Decl.)

85. The police then began using two water hoses on Treanor at the same time. He rolled on to the grass at the side of the bridge and tried to shield himself. He was then shot in the head by police. He had a laceration to his head, and he was bleeding profusely. Water protectors then put him on the back of a truck and transported him to Oceti Sakowin camp. There, he was immediately put into an ambulance and transported to Sanford Hospital in Bismarck. At the hospital, his head wound was stapled together. As of November 22, 2016, Treanor still has many bruises on his body, and it hurts to open his eyes and look around. He still gets dizzy and has headaches. His body is achy and sore. (Exh. G, Treanor Decl.)

86. As a result of these events, he worries that he will be subjected to other abuses in the future if he participates in further peaceful prayer and protests in support of the water protectors in Morton County. Because of the actions of the Defendants, he is nervous about participating in further First Amendment activities in opposition to the pipeline in Morton County even though he wishes to gather and assemble peacefully with others who share his views. (Exh. G, Treanor Decl.)

(Doc. 1 at ¶¶ 83-86.)

87. At no time did any of the Plaintiffs or class members present a threat or do anything to justify Defendant's use of force on them.

(Doc. 1 at ¶ 87 (allegation not supported by Plaintiff's declaration).)

Plaintiffs' allege Law Enforcement's actions on November 20, 2016 at the Bridge constituted: excessive force in violation of their federal constitutional rights under the Fourth and Fourteenth Amendments (doc. 1 at ¶¶ 102-06); constituted retaliation for the exercise of protected speech in violation of the First, Fourth, and Fourteenth Amendments (*id*. at ¶¶ 97-101); and constituted unequal protection of law in violation of the Fourteenth Amendment (*id*. at ¶¶ 120-24). Plaintiffs also allege their federal constitutional rights under the First, Fourth and Fourteenth Amendments were violated as a result of Law Enforcement's maintaining policies, customs, practices, hiring, training, supervision and/or discipline that permit or are deliberately indifferent

to violations of their constitutional rights, which were a driving force behind the violation of Plaintiffs' constitutional rights. (*Id.* at ¶¶ 107-19.) Finally, Plaintiffs request declaratory and injunctive relief declaring Law Enforcement's actions unlawful. (*Id.* at ¶¶ 120-28.)

## III.   ARGUMENT

### A.   Applicable Standard – Fed. R. Civ. P. 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the court takes all facts alleged in the complaint to be true. *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* (citations omitted). The Court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that the plaintiff draws from the facts pled. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Well-pleaded facts, not legal theories or conclusions, determine the adequacy of the complaint. *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* "[A] plaintiff 'must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims, . . ., rather than facts that are merely consistent with such a right.'" *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009), quoting *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). "[D]etermining whether a complaint states a plausible claim is context-specific,

requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*,

556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.E.2d 868 (2009).

> In this circuit, Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or in opposition to the motion. *See Martin v. Sargent*, 780 F.2d 1334, 1336-37 (8th Cir. 1985). Some materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss. *See Papasan v. Allain*, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Hollis v. United States Dep't of Army*, 856 F.2d 1541, 1543-44 (D.C. Cir. 1988).

*State v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999). *See Papasan v. Allain*, 478

U.S. at 268 n.1 ("Although this case comes to us on a motion to dismiss under Federal Rule of

Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of

items in the public record, such as documentation of the history of the Mississippi and other

school lands grants.").

> While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;" without converting the motion into one for summary judgment. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004).

*Miller v. Redwood Toxicology Laboratory, Inc*., 688 F.3d 928, 931 n.3 (8th Cir. 2012)(taking into

consideration, in relation to Rule 12(b)(6) motion, plaintiff's initial and amended complaints, and

the record created as a result of the plaintiff's motion for temporary restraining order,

preliminary injunction and expedited discovery filed by plaintiff after the motion to dismiss was

filed). *See, also Williams v. Employers Mutual Casualty Company*, 845 F.3d 891 (8th Cir.

2017)(citing *Miller* for proposition "courts may consider matters incorporated by reference or

integral to the claim, items subject to judicial notice, matters of public record, orders, items that

appear in the record of the case, and exhibits attached to the complaint whose authenticity is

unquestioned" without converting a motion for judgment on the pleadings into a motion for summary judgment.) "Under Federal Rule of Evidence 201(b), a court may take judicial notice of a 'fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Williams v. Employers Mut. Cas. Co.*, 845 F.3d 891 (taking judicial notice of well-established scientific theory and principles).

### B. Law Enforcement Are Entitled to Qualified Immunity

Dismissal of Plaintiffs' claims is warranted on the basis Law Enforcement are entitled to qualified immunity. As explained by the United States Supreme Court:

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 818 ... (1982). Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." [citation omitted].

>    *      *      *

> Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." ... Indeed, we have made clear that the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved **prior to discovery**." ..... Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."

*Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)(bold added).

The Supreme Court has instructed that the issue of qualified immunity be resolved "at the earliest possible stage of the litigation." *Pearson v. Callahan*, 555 U.S. at 231 (quotation omitted); *see Mathers v. Wright*, 636 F.3d 396, 399 (8th Cir. 2011). This is because the defense is "an immunity from suit rather than a mere defense to liability" and "is effectively lost if a case is erroneously

permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Mathers v. Wright*, 636

F.3d at 399 (citing *Mitchell v. Forsyth*, 472 U.S. at 526). In addition, a "driving force behind the

creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against

government officials be resolved prior to discovery." *Pearson v. Callahan*, 555 U.S. at 231

(quotation omitted).

> Qualified immunity protects government officials from liability under § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 Led.2d 666 (2002). The test for whether an officer is entitled to qualified immunity is twofold: (1) whether the facts alleged, taken in the light most favorable to the injured party, show that the officer's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009); *Henderson v. Munn*, 439 F.3d 497, 501-02 (8th Cir. 2006). If no reasonable factfinder could answer yes to both of these questions, the officer is entitled to qualified immunity. *See Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006).

*Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). The defendant has the burden of proof with

the exception that the plaintiff must demonstrate that the law allegedly violated was clearly

established. *Harrington v. City of Council Bluffs, Iowa*, 678 F.3d 676, 679 (8th Cir. 2012).

As discussed below, Law Enforcement are entitled to qualified immunity as 1) Plaintiffs'

purely factual allegations, in light of the portions of the record in this case which do not directly

conflict with those allegations, establish Plaintiffs' have not alleged a plausible violation of their

constitutional rights by Law Enforcement, and 2) even if Plaintiffs have alleged a plausible claim

for violation of a constitutional right, such right was not so clearly established at the time of the

deprivation so that a reasonable officer would have understood his conduct was unlawful under

the circumstances presented.

### Bernini v. City of St. Paul, 655 F.3d 997 (8th Cir. 2012)

The November 20, 2016 events at issue, and Plaintiffs' claims in this action, are very similar to those considered by the Eighth Circuit Court of Appeals in *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). *Bernini* establishes the use of *less-lethal* munitions (described as *non-lethal* in *Bernini*) for the purpose of preventing unlawful entry into a restricted area closed to the public, by an unruly crowd which officers reasonably believe is acting as a unit, and to otherwise restore order, is objectively reasonable as a matter of law. *Bernini* also establishes a First Amendment retaliation claim will not stand where law enforcement's application of force is in response to unlawful conduct. Unlawful conduct will not be shielded under the rubric of the First Amendment. Consistent with the precedent of *Bernini*, Law Enforcement in this action are entitled to qualified immunity as a matter of law.

The material facts in *Bernini* were as follows:

From September 1–4, 2008, St. Paul hosted the Republican National Convention at the Xcel Energy Center. The Convention attracted large crowds of protestors. Throughout the first day, property damage was reported around the City. There were broken building windows, objects thrown at cars and buses, and vandalized police cars. After marches with permits had ended, Senior Commander Joseph Neuberger, who was the east area commander for mobile field force operations during the Convention, ordered that no one be allowed to enter the downtown area. Neuberger believed it was necessary to "reestablish control [and] reestablish law enforcement presence" downtown and around the Convention site.

The events at issue occurred on or near Shepard Road in St. Paul. Shepard Road runs along the southeastern edge of downtown St. Paul and borders the Mississippi River. The road was a major thoroughfare during the Convention. It served as a route for emergency vehicles to access the Xcel Energy Center, and it was the planned route of the First Lady's motorcade on the evening of September 1. Although Shepard Road runs along the edge of downtown St. Paul, it provides only limited access to downtown, because much of the road is bordered by the Mississippi River on one side and a large concrete wall on the other. Jackson Street and Sibley Street intersect with Shepard Road and provide access to the east end of downtown St. Paul.

After ordering downtown closed, Neuberger learned about a group of people marching east on Shepard Road. Neuberger instructed a team of officers—known as Neighborhood Response Team 36 ("Team 36")—to position itself at the intersections of Shepard Road

and Jackson Street and Shepard Road and Sibley Street to prevent entry to the downtown. As Team 36 traveled to the intersections, the unit passed a large group marching along Shepard Road. The officers received information that the group was connected to unlawful acts that had occurred earlier in the day. Team 36 positioned approximately 11 officers at each intersection, blocking access to the downtown area.

At about 4:30 p.m., as seen on video recordings submitted as evidence, a group of approximately 100 people gathered at the intersection of Shepard Road and Jackson Street and stood on the sidewalk across the street from the officers on the south side of Shepard Road. About fifteen people, advancing behind two large signs, soon began to cross Shepard Road, moving toward the officers and downtown St. Paul. The words "Direct Action Against Capitalism" were written across one of the signs.

The officers instructed these people to "back up, back up!" As the group continued to cross Shepard Road, the officers deployed stinger blast balls. These balls contain rubber pellets; they are designed to sting the targeted persons. The small group then retreated to the sidewalk on the south side of Shepard Road. Although the plaintiffs deny seeing anyone throw objects at Team 36, the officers reported that numerous objects—including rocks and bags containing feces—were propelled at them.

After the group retreated to the sidewalk along Shepard Road, it began to move to the west. The officers, soon joined by reinforcements, also moved west in an attempt to direct the crowd away from Jackson Street and back in the direction from which it came. As the crowd proceeded west, it grew to include hundreds of people. On video footage, members of the crowd can be heard chanting in unison "the whole world is watching" and various profanities. The police continued to use non-lethal munitions, including smoke, blast balls, and chemical irritants, in an apparent effort to keep the crowd moving west.

In consultation with Neuberger, Steven Frazer, the officer in charge at the scene, decided to encircle the crowd in a park adjacent to Shepard Road and near Ontario Street, approximately 0.6 mile west of the Jackson Street intersection. Because much of Shepard Road is bordered by the river and concrete wall, this park presented the first opportunity west of Jackson Street to gather the crowd, which now included approximately 400 individuals. After the officers contained the crowd in the park, they announced multiple times by loudspeaker that all persons were under arrest and must sit down and place their hands on their heads. Officers then attempted to determine who had been present at the Shepard–Jackson intersection. According to one officer, these people "stayed together as group" and "were segmented off from the other people" in the park. The sorting process led to the release of approximately 200 people. The officers then booked and placed into custody about 160 others. The parties dispute whether the officers ordered the crowd to disperse before encircling the park and making the arrests.

Thirty-two people filed suit pursuant to 42 U.S.C. § 1983 against the City of St. Paul and the five appellee police officers in their individual capacities. The plaintiffs were present along Shepard Road in various capacities, including as legal observers, medics, concert-goers, protestors, and members of the media. At least eighteen plaintiffs were present in

the immediate vicinity of the Shepard–Jackson intersection at the time of the confrontation. The remaining plaintiffs claim they were located somewhere between the intersection and the park, and were added to the group as police moved the crowd west. Although each plaintiff was present in the park when it was encircled by the police, seven plaintiffs (including two who were present at the Shepard–Jackson intersection) were briefly detained and released, and twenty-five were booked and taken into custody. Those taken into custody were released within 72 hours, and all charges were eventually dismissed.

*Bernini v. City of St. Paul*, 665 F.3d at 1001-02.  The plaintiffs in *Bernini* alleged the actions of police violated their rights under the First and Fourth Amendments and asserted claims of unlawful arrest (not at issue in the present action), excessive force, and retaliation.  The district court granted summary judgment in favor of the officers on the basis of qualified immunity.

The Eighth Circuit Court of Appeals affirmed the district court's decision.  In analyzing the plaintiffs' Fourth Amendment claim against the officers in *Bernini* for alleged unlawful arrests in the park, the Court determined the officers were entitled to qualified immunity if they had "arguable probable cause" to make the arrests, and under the undisputed evidence, including video evidence, the officers "reasonably could have concluded that the group [at issue] had committed a crime and that the group was acting as a unit."  *Id.* at 1003.  The Court reasoned as follows:

> What is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons. The D.C. Circuit has addressed the practical dilemma faced by officers responsible for reacting to large group activity, and recognized that a "requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot." *Carr v. District of Columbia,* 587 F.3d 401, 408 (D.C.Cir.2009). The court concluded that the Fourth Amendment "is satisfied if the officers have grounds to believe all arrested persons were a part of the *unit* observed violating the law." *Id.* at 407 (emphasis added). *Carr* thus demonstrates that a reasonable officer in St. Paul could have believed that the Fourth Amendment did not require a probable cause determination with respect to each individual in a large and potentially riotous group before making arrests.

> . . . Video footage shows that the group marched east on Shepard Road and then stopped at the intersection, positioning itself directly across from the line of Team 36 officers. Many members of the group had donned gas masks and other facial coverings, as though they were preparing for a confrontation with police. Flags waved from within the crowd, and

several people can be heard shouting profanities and taunting the officers. A portion of the group, shielding itself behind two large signs, then began to cross the intersection toward the officers. And after the confrontation at the intersection, as the group was driven west on Shepard Road, members chanted statements in unison.

From these actions, a reasonable officer could have concluded that the individuals at the intersection were acting together and that they intended to break through the police line in an attempt to access downtown St. Paul. It was reasonable, therefore, for an officer to believe that the group, as a whole, was committing one or more offenses under state law, including third degree riot and unlawful assembly. *See* Minn.Stat. §§ 609.71 subdiv. 3,[3] 609.705;[4] *State v. Hipp,* 298 Minn. 81, 213 N.W.2d 610, 614–15 (1973). We thus conclude that the police did not violate the clearly established rights of sixteen plaintiffs who were both present at the intersection and arrested at the park. *Carr,* 587 F.3d at 409–10; *cf. Vodak v. City of Chicago,* 639 F.3d 738, 745–46 (7th Cir.2011) (holding that police who effected a mass arrest of protestors were not entitled to qualified immunity where the crowd did not try to "break through the police barrier," and the circumstances "were not threatening to the safety of the police or other people").

\*\*\*

It was reasonable for the officers to believe they could arrest those who were acting as a unit with the protestors who attempted to break through the police barrier at the Shepard–Jackson intersection. The videos depict approximately 100 people present at the intersection. The eleven officers were positioned under an overpass, making it difficult for them to see how far the crowd extended to the west. From the officers' vantage point, it appeared as if "people were continuously arriving from the west." The officers, especially without the benefit of the videos, could not have been sure of the precise number. They did release approximately 200 people at the park in an attempt to avoid custodial arrests of innocent bystanders. Given the situation at the intersection, the officers' allegedly mistaken belief at the park that 160 people were part of a unit that had gathered to enter downtown at the Shepard–Jackson intersection was objectively reasonable. We therefore affirm the district court's conclusion that the officers are entitled to qualified immunity for the seizures.

*Bernini*, at 103-04, 105. Summarizing, the Eighth Circuit recognizes a "requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot", and law enforcement is not required to pinpoint every person in the crowd who has engaged in specific unlawful conduct, but may reasonably conclude the individuals in the vicinity are acting together as a *unit*. In such event, it is objectively reasonable for law enforcement to effectuate arrests (i.e. seizures) of the entire *unit*.

With respect to the excessive force claim, the Court noted there was no evidence to suggest the individually named defendant officers directly used force against any of the plaintiffs. *Bernini*, at 106. The Court noted the plaintiffs' claims were primarily directed toward a lead sergeant of Team 36 who admitted his use of non-lethal munitions against protesters implicitly authorized his subordinates to do so. The Court concluded the lead sergeant was entitled to qualified immunity. "The circumstances led officers reasonably to believe that a growing crowd intended to penetrate a police line and access downtown St. Paul [and] [the lead sergeant's] use and authorization to use non-lethal munitions to direct the crowd away from the intersection and toward the park where the crowd could be controlled did not violate clearly established rights." *Id.* at 106. The Court also rejected the plaintiffs' argument it was unreasonable for law enforcement to continue to use non-lethal munitions against them because the crowd was "complying with the movement of the officers and posed no threat to the officers" as video footage revealed some people would not leave the roadway and that some turned to face the officers. As a result, "[i]t was reasonable for the officers to deploy non-lethal munitions to keep all members of the crowd moving [toward the park]." *Id.* The Court also rejected the argument law enforcement directly targeted them by allegedly spraying chemical irritant on their face, neck, ears, and back, noting there was no evidence to establish the lead sergeant authorized that type of force against a compliant individual – his authorization involved force deployed against a noncompliant crowd. *Id.*

The Court also concluded the plaintiffs failed to make a submissible First Amendment retaliation claim. *Bernini*, at 1006-07. Although the protesters in *Bernini* were engaged in protected speech at the intersection, members of the *unit* moved toward the police in a threatening manner and began to block traffic along a major roadway, conduct which a reasonable officer could conclude violated Minnesota law and was not protected speech. Video footage established

officers engaged the group only after the unlawful conduct, and there was no evidence to establish the group was singled out while others similarly situated were not arrested. "The only reasonable inference supported by the record is that the group's unlawful conduct, not the protected speech, motivated the officers' actions." *Id*.

Although there are numerous obvious similarities between the facts at issue in *Bernini* and the present case, there are some material distinguishing facts, including the following. First, in *Bernini*, the protesters were not actually in the portion of St. Paul shut down by the Senior Commander (downtown) when non-lethal munitions were applied against protesters. Instead, protesters were located on Shepard Road which ran along the southeasterly edge of the downtown area. The officers' use of force commenced when the protesters engaged in activities which led the officers to believe they were attempting to breach the police lines to gain access to the restricted area and engaging in unlawful conduct. In the present case, as discussed below, Plaintiffs admit that, at all times when force was allegedly applied by Law Enforcement against them, they were in close proximity to Law Enforcement's barricade, either located on the Bridge or along the north shore – areas which were closed to all public access by the Corps, NDDOT and Morton County, and for which Plaintiffs and other protesters were not authorized or privileged to enter. Plaintiffs were also intermingled with protesters who were engaged in removing, or attempting to remove, portions of the barricade. In other words, in the instant case, it is indisputable the protesters were trespassing in the locations where the alleged excessive force was used. Second, in *Bernini*, non-lethal munitions were used to essentially herd the mob along Shepard Road toward a park for the purpose of effectuating orderly arrests. Shepard Road was bordered on one side by the Mississippi and on the other by a concrete wall and police lines at intersections. In other words, there was no escape once the officers began herding the crowd toward the Park. The Court's application of the

Fourth Amendment "objective reasonableness" standard to the excessive force claim in *Bernini* therefore makes sense under those circumstances as the herded protesters would not have reasonably believed they were free to leave to any location they had a lawful right to be. In the present case, there is no allegation, and Law Enforcement did not attempt to, effectuate any arrests or detentions of Plaintiffs or any other protesters, except the one who actually penetrated the barricade (not a named plaintiff in this case). Plaintiffs admit they could have, and did freely walk away from Law Enforcement at all times on November 20 in this case. Regardless, *Bernini* establishes the use of non-lethal munitions upon an unruly crowd, which officers reasonably believe is acting as a unit, to prevent the crowds unlawful access to property and to restore order, is objectively reasonable as a matter of law.

*Bernini* also establishes demonstrations lose their protected character as expression when demonstrators engage in unlawful conduct. As noted by the United States Court of Appeals for the District of Columbia in addressing a First Amendment retaliation claim brought by demonstrators against officers, and in a decision cited in *Bernini*:

> Plaintiffs contend that First Amendment principles prohibited their arrest without first being given a chance to disperse. In sum, plaintiffs contend that they were marching peacefully and if peaceful marchers can be arrested without warning because some other protestors resorted to violence, it will chill First Amendment rights. The premise of this argument is fundamentally flawed, however, because . . . it appeared to officers as if the entire crowd was rioting or encouraging riotous acts. And "where demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

*Carr v. District of Columbia*, 587 F.3d 401, 410, n.6 (D.C. Cir. 2009).

In the present case, Plaintiffs admit they and other protesters were present in an area which, according to public records, constituted an area off limits to the public, and when force was allegedly applied, Plaintiffs were indisputably trespassing. Plaintiffs admit protesters had removed, and were removing burned out trucks from Law Enforcement's barricade before and

while force was applied. This area was marked with large "No Trespassing on Bridge" and "No Trespassing" signs, a fact Plaintiffs do not deny. Materials in the record also establish protesters greatly outnumbered Law Enforcement and were throwing objects at Law Enforcement, attempting to flank the barricade to the west-cross country, and actively assaulting the barricade over a prolonged period of time (several hours). Protesters had been engaging in unlawful and violent activity north of the Cantapeta Creek in the vicinity for many weeks prior to November 20, and had to be forcibly removed from their North Camp located on the DAPL project construction site – private property. On the date at issue, November 20, 2016, Law Enforcement issued two Code Red requests for assistance, and a Signal 100 request for all available law enforcement officers, state-wide, to come to the immediate aid of the officers in distress. Video footage in the record, as well as affidavit testimony from officers and fire service personnel in the record, establish protesters were throwing and slinging large rocks, CS gas canisters, water bottles, construction nuts, and other objects at Law Enforcement on November 20, and officers and fire service personnel feared for their physical safety. No reasonable officer under these circumstances could have believed the use of *less-lethal* munitions and water upon the protesters violated any clearly established constitutional rights, especially in light of *Bernini.*

As discussed below, even assuming all of Plaintiffs' purely factual allegations to be true, and taking into consideration other information in the record or otherwise which this Court is permitted to consider in relation to a motion to dismiss, Plaintiffs have failed to allege a plausible cause of action against Law Enforcement.

## C.    Plaintiffs' Retaliation Claim

With respect to the Plaintiffs' claim of retaliation, the Plaintiffs and other protesters had no constitutional right to exercise their First Amendment rights at any location where the alleged force

was applied.  All of the Plaintiffs admit they were either on the Bridge or along the north shoreline of the Cantepeta Creek, in close proximity to Law Enforcement's barricade, when force was allegedly applied as against them.  (Doc. 1 at ¶¶ 36-38 [Dundon], 47 [Wool], 53-54 [Wilson], 59-60 [Demo], 66 [Dullknife], 71, 74 [Bruce], 78 [Finan], 80 [Hoagland-Lynn], 83-85 [Treanor].)  Plaintiffs' complaint does not deny the existence of combination "No Trespassing on Bridge" and "No Trespassing" signs along the barricade, a photograph of one of such combination signs present on November 20 is in the record.  (Doc. 92-1 at Item 8 [photo].)  Plaintiffs' allegations amount to admissions of unlawful criminal trespass, civil trespass, and presence upon, and attempted access to areas which were off limits to the public.  Public records establish both the Bridge and Highway 1806 at this location were closed at this time due to damage thereto caused by protesters who started a large fire on the Bridge.  Public records establish the Bridge was so closed since October 28, 2016, more than three weeks prior to the November 20-21, 2016 riot.

Plaintiffs' allegations also establish they were on notice the Bridge and Highway 1806 were closed, and that their presence on the north shore was not permitted by Law Enforcement. Plaintiffs admit observing Highway 1806 heavily barricaded on the north side of the Bridge and manned by Law Enforcement on November 20, 2016, prior to force allegedly being applied against them.  (Doc. 1 at ¶¶ 36 [Dundon], 46 [Wool], 53 [Wilson], 59 [Demo], 66 [Dullknife], 71 [Bruce], 77 [Finan], 80 [Hoagland-Lynn].)  Plaintiffs admit they had been staying in the Seven Council Fires Camp (i.e. Oceti Sakowin) for several weeks to months prior to November 20, 2016, a camp located immediately south of, and in close proximity to, the Bridge.  (Doc. 1 at ¶¶ 35 [Dundon], 44-45 [Wool], 52 [Wilson], 57 [Demo], 71 [Bruce], doc. 14-7 at ¶ 2 [Treanor Decl.], doc. 14-8 at ¶ 2 [Hoagland-Lynn Decl.], doc. 14-13 at ¶ 4 [Dullknife Decl.], doc. 14-15 at ¶ 2 [Finan Decl.].) Public records establish the Corps had previously (November 1, 2016) requested Law Enforcement

assistance in removing trespassing protesters from federal lands located on the north side of the Cantapeta Creek. (Doc. 61-7.) Plaintiffs admit being forcibly removed from, or prevented from accessing, private property located north of the Cantapeta Creek by Law Enforcement on several occasions prior to November 20, 2016, including, among other places, Turtle Hill located on the north shoreline of the confluence of the Cannonball River and Cantapeta Creek, and the DAPL construction sites located north of the Bridge along Highway 1806. (Doc. 1 at ¶¶ 31, 32, 33, doc. 14-13 at ¶¶ 6-7 [Dullknife Decl.], doc. 14-16 at ¶¶ 5-8 [Wilson Decl.], doc. 14-17 at ¶ 5 [Demo Decl.].) Most Plaintiffs admit to observing Law Enforcement utilizing force against other protesters in the vicinity of the barricade and Bridge prior to force allegedly being applied as against them on November 20. (Doc. 1 at ¶¶ 46 [Wool], 66 [Dullknife], 77 [Finan], doc. 14-13 at ¶¶ 6-7 [Dullknife Decl.], doc. 14-17 at ¶ 7 [Demo Decl.], doc. 14-9 at ¶ 9 [Bruce Decl.].) Dundon admits being one of the first protesters on the Bridge, observing protesters remove the first burned out dump truck from the barricade, and being on the Bridge in close proximity to the barricade while observing protesters using tow equipment in an attempt to remove the second burned out truck from Law Enforcement's barricade. (Doc. 1 at ¶ 36.) With the sole exception of Dundon, all of the Plaintiffs admit remaining in close proximity to the barricade and on the Bridge, often for extended periods of time after force was initially allegedly applied against them by Law Enforcement, within range of the continued force allegedly being applied. (Doc. 1 at ¶¶ 46-49 [Wool], 53-55 [Wilson], 59-60 [Demo], 66-67 [Dullknife], 71-74 [Bruce], Doc. 14-15 at ¶¶ 11-15 [Finan Decl.], 80-81 [Hoagland-Lynn], doc. 14-11 at ¶¶ 6-9 [Hoagland-Lynn Decl.], 83-85 [Treanor].) Plaintiffs admit to being surrounded by other protesters engaging in similar conduct (doc. 1 at ¶¶ 46-47 [Wood], 53-54 [Wilson], 74 [Bruce], 77 [Finan], 80 [Hoagland-Lynn]), and the video footage and affidavits submitted by Law Enforcement, in the record, substantiate that

conduct. Any assertion Plaintiffs may make that they received no warnings from Law Enforcement to the effect they were not supposed to be on the Bridge, or north of the Bridge, or that they had no warning Law Enforcement would apply force as to them within the vicinity of the Bridge or north thereof, would be contrary to their own allegations.

Plaintiffs and other protesters had no constitutional right to express their views on the closed Bridge or any location where force was applied by Law Enforcement on November 20, 2016. *See Wood v. Moss*, 134 S.Ct. 2056, 2066, 188 L.Ed.2d 1039 (2014) ("[T]he fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views "'whenever and however and wherever they please.'" (quoting *United States v. Grace*, 461 U.S. 171, 177-178, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), quoting *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed 2d 149 (1966)). The Supreme Court has clearly indicated the First Amendment cannot be utilized as a justification for trespass and that the government has the right to enforce trespass laws in relation to both private and public property. *See Adderley v. State of Florida*, 385 U.S. at 48, (rejecting protesters' argument they had a constitutional First Amendment right to remain in the curtilage of a jailhouse over the objection of the sheriff, concluding "[t]he United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose."). As explained by the Supreme Court in *Cox v. State of Louisiana*:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would

not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.

   We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. []  We reaffirm the statement of the Court in Giboney v. Empire Storage & Ice Co., supra, 336 U.S., at 502, 69 S.Ct., at 691, that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

379 U.S. 536, 554-55, 85 S.Ct. 453, 464-65, 13 L.Ed.2d 471 (1965) (citations omitted).

The Bridge and Highway1806 at the location of the November 20 riot were not traditional public fora at any time prior to the DAPL protests, or during the protests.  The location in question is located in an isolated rural area.  It is commonly known the location where the Seven Council Fires camp is currently located floods each spring.  The Bridge is comprised of two driving lanes with no sidewalks thereon in a 65 mile per hour zone.  The NDDOT closed the Bridge following the October 27 riot, on October 28, and prior to November 20 for safety reasons due to damage to the bridge caused by fires started thereon by protesters, calling the structural integrity of the bridge into question. *See* N.D.C.C. § 24-03-05 (authorizing NDDOT to close any portion of a highway by posting same with suitable signs and placement of barricades, and making it unlawful to remove, pass through, over, or around any such barricade). The Bridge remained closed on November 20.  No public access on the Bridge was allowed on November 20, for any purpose. As a matter of law, anyone other than an authorized governmental employee who entered upon the Bridge, or any location north of the Bridge within the vicinity of the events at issue on November

20, were engaging in criminal trespass, civil trespass, and otherwise present upon public property closed to the public without authorization or privilege, and contrary to the wishes of the property owners (NDDOT and Corps.).

Law Enforcement had the authority and duty to direct Plaintiffs and other protesters off of the Bridge and property located along the north bank of the North Branch of the Cantapeta Creek within the vicinity of the events at issue. Plaintiffs and protesters had no constitutional right to exercise their First Amendment rights at the locations at issue. As a result, Plaintiffs' retaliation claim fails as a matter of law. Further, as discussed below, Plaintiffs' excessive force claims, which underpin Plaintiffs' retaliation claims, also fail as a matter of law.

### D. Plaintiffs' Fourth Amendment Excessive Force Claim

Plaintiffs allege they were subjected to excessive force by Law Enforcement on November 20, 2016 in violation of their federal constitutional rights under the Fourth and Fourteenth Amendments. As discussed below, Plaintiffs have failed to allege a "seizure" by Law Enforcement, as required under a Fourth Amendment excessive force claim. In addition, Plaintiffs fail to allege facts to establish a plausible claim the force allegedly applied by Law Enforcement "shocks the conscience," as required under a Fourteenth Amendment excessive force claim.

#### 1. Plaintiffs Excessive Force Claim Could Only Potentially Proceed Under Either the Fourth or Fourteenth Amendment, Not Both

As a preliminary matter, even assuming, arguendo, Plaintiffs have alleged any plausible excessive force claim against Law Enforcement, which is denied, Plaintiffs could only potentially proceed under either the Fourth or Fourteenth Amendment, which apply different standards. Any claim alleging excessive force against law enforcement in relation to a "seizure" must be analyzed under the "objective reasonableness" standard of the Fourth Amendment, as opposed to the

Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.E.2d 443 (1989). As a result, if Plaintiffs have sufficiently alleged facts to support a claim they were "seized" by Law Enforcement, their claim must proceed under the Fourth Amendment only. On the other hand, if Plaintiffs have not sufficiently alleged a "seizure", their claims must proceed under the "shocks the conscience" standard under the Fourteenth Amendment.

### 2.     Plaintiffs Have Not Alleged A "Seizure"

In the present case, Plaintiffs allege Law Enforcement utilized unreasonable force in violation of the Fourth Amendment. The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. CONST. AMEND. IV. An excessive force claim under the Fourth Amendment requires an allegation of the use of excessive force by the government in connection with a "seizure" of the plaintiff by the government. *See Graham v. Connor*, 490 U.S. at 393-396 (noting the Fourth Amendment guarantees citizens right " 'to be secure in their persons . . . against unreasonable . . . seizures' of the person", and noting excessive force claims under the Fourth Amendment relate to the use of force in the context of seizures). As explained by the United States Supreme Court,

> Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred. *Terry v. Ohio*, 392 U.S. [1,] 19, n. 16, 88 S.Ct. [1868,] 1879, n. 16.
>
> ***
>
>   We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
>
> ***

> **We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.**

*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)(bold added). The subjective intent of law enforcement to detain is irrelevant unless such intent was expressed to the individual. *Id.* at 554, n. 6. The Supreme Court subsequently clarified the termination or restraint upon a person's freedom of movement must be through "means intentionally applied" to constitute a "seizure" – an unintentional act cannot result in a seizure. *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.E.2d 132 (2007). In addition, an attempted but failed seizure of a person is beyond the scope of the Fourth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44, 118 S.Ct. 1708, 1715 140 L.Ed.2d 1043 (1998).

In the present case, Plaintiffs have not alleged, nor were they, arrested or detained by Law Enforcement on November 20, 2016, or even advised by Law Enforcement they were not free to walk away from Law Enforcement. Plaintiffs admit they freely walked south off the Bridge, sometimes to change into warmer clothes or otherwise warmup before returning to the barricade and voluntarily and intentionally walking within range of the force allegedly being applied by Law Enforcement. Plaintiffs' pleading establishes Plaintiffs were at all times able to remove themselves from the presence of Law Enforcement and all force applied by simply voluntarily disengaging from Law Enforcement, and proceeding south across the Bridge from where they came-which they did. Plaintiffs' Fourth Amendment excessive force claim fails as a matter of law as Plaintiffs have failed to allege a "seizure" by Law Enforcement governed by the Fourth Amendment.

It is anticipated Plaintiffs will argue <u>any</u> restriction upon their freedom of movement through any force constitutes a "seizure." Law Enforcement respectfully submit Plaintiffs

misinterpret applicable law. Ultimately, "a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. at 554. An officer's enforcement of the law through prevention of unauthorized and unprivileged entry upon private or public property which has been closed to the public, where there has been no actual or expressed intention to apprehend or detain the person, and an objectively reasonable person would believe they were free to move to any lawful location cannot logically be construed as a seizure subject to Fourth Amendment analysis. In such circumstance, no liberty interest has been restrained. *See Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The relevant inquiry in the "seizure" analysis is not simply whether force was applied, but rather whether a reasonable person subjected to the force would have believed they were not free to leave as a result of the application of force.

A citizen has no liberty interest to infringe upon the property rights of others by engaging in trespass or otherwise being present upon property without authorization or privilege. If that were not the case, a seizure would occur each time an officer prevents unauthorized access to private property, or to restricted public property, despite no attempt to apprehend. Query, do Secret Service officers commit a "seizure" when they block an unauthorized person's entry into the oval office but do not otherwise restrict the person's freedom of movement to lawful locations? Plaintiffs' failure to allege they were "seized" by Law Enforcement is fatal to their excessive force claim under the Fourth Amendment.

### 3.    In The Alternative, Law Enforcement's Alleged Use Of Force Was Objectively Reasonable As A Matter of Law

Even assuming Plaintiffs have alleged a "seizure" under the Fourth Amendment, which is denied, the relevant inquiry is whether the force applied was "objectively reasonable" under a totality of the circumstances analysis. *Graham v. Connor*, 490 U.S. at 396-97.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Id.* (citations and quotations omitted).

Plaintiffs own allegations, along with those portions of the record which do not directly contradict Plaintiffs' purely factual allegations, establish Law Enforcement's alleged application

of force was objectively reasonable under the circumstances, as a matter of law, and consistent with standards applied in *Bernini* (discussed above).

Pursuant to North Dakota Century Code § 12.1-05-02, "[c]onduct engaged in by a public servant in the course of the person's official duties is justified when it is required or authorized by law." A Sheriff shall, in part, "preserve the peace", "prevent and suppress all affrays, breaches of the peace, riots, and insurrections which may come to the sheriff's knowledge", and "[p]erform such other duties as are required of the sheriff by law." N.D.C.C. § 11-15-03(1), (3), (10). A person is not justified in using force for the purposes of resisting arrest or other performance of duty by a public servant under color of law. N.D.C.C. § 12.1-05-03.

Dundon admits the protesters she was intermingled with when force was allegedly applied as to her were actively engaged in attempts to remove the second burned out dump truck from Law Enforcement's barricade. Such protester activity is verified by the North Dakota Highway Patrol aerial surveillance video on file with the Court (doc. 92-1 at Item 4 [aerial video] at meter 0:03:00, 18:00 military time). Dundon also admits witnessing, while on the Bridge, protesters remove the first dump truck from Law Enforcement's barricade. It is a violation of N.D.C.C. § 24-03-05, for any person to open, remove, or deface any barricade, fence, or other obstruction, or any warning sign placed by the North Dakota Department of Transportation across any highway without express written permission. Such activity also constitutes an unlawful obstruction of a law enforcement or other government (NDDOT) function in violation of N.D.C.C. § 12.1-25-01(2). Law Enforcement clearly had a duty to prevent public property (i.e. the dump trucks forming part of the barricade) from being hauled away by the protesters, and to prevent unauthorized and unprivileged entry upon public property which has been closed to the public, particularly where the governmental entity managing the property has requested Law Enforcement's assistance in

removing what it referred to as trespassers.  A person violates N.D.C.C. § 12.1-08-02 if a person employs means justifying or requiring substantial force to overcome resistance to . . . the discharge of the duty."

> Force is justified if it is used to . . . prevent an unlawful carrying away or damaging of property, if the person using such force first requests the person against whom such force is to be used to desist from his interference with the premises or property, except that a request is not necessary if it would be useless or dangerous to make the request or substantial damage would be done to the property sought to be protected before the request could effectively be made.

N.D.C.C. § 12.1-05-06.  Pursuant to N.D.C.C. § 12.1-05-06, force is justified to prevent the carrying away of personal property, even without an advance request to stop the activity where such request would have been useless under the circumstances.  Section 12.1-05-06 only references a warning to desist from interference with the property – it does not reference any warning about the actual use of force.  The uncontroverted record in this case establishes Law Enforcement did warn the protesters against removal of the dump trucks.  Plaintiffs' complaint does not allege Law Enforcement did not warn protesters against removal of the dump trucks.  Video footage published on Youtube on November 6, 2016 (two weeks prior to events at issue) memorializes a clear and unequivocal warning by Law Enforcement to protesters with a Semi at the barricade not to remove the barricade.  (Doc. 92-1 at Item 4 [aerial video] at Item 7.)  Evidence of a warning against removal of the trucks on November 20, 2016, before they were actually removed, is also in the record.  In relation to the protesters' removal of the first dump truck from the barricade with the Semi, one protester, who asserts this occurred shortly after 5 p.m. on November 20, admits "I heard the police on the bullhorn address one of the guys on the bridge by name.  'Don't do this Mike. We have 10 more of these trucks, and tomorrow we'll just bring another one in.  Go home!'"  (Doc. 81-27 at ¶ 15 [Lenoble Decl.].)  The protester also admits Law Enforcement utilized tear gas in an unsuccessful attempt to prevent the first dump truck from being removed by protesters, and

provides a color photograph of the incident evidencing the cloud of smoke is clearly visible from a long distance away as there was still daylight.  (*Id*. at ¶ 16.)  The protester asserts that, following several unsuccessful attempts and in the face of *less-lethal* force being applied by Law Enforcement, protesters were ultimately successful in removing the first dump truck away from the rest of the barricade at approximately 5:30 p.m.  (*Id.* at ¶ 17.)  Law Enforcement confirms they repeatedly warned the protesters against removal of the dump trucks, and applied less-lethal in attempts to prevent their removal.  (Doc. 54 [LE-3] at ¶¶ 34, 39-45.)  In other words, it was plainly evident to everyone from the outset of the protesters' activity in removing the first dump truck on November 20, before anyone alleges they were injured, that attempts to tamper with the barricade would be met with force.  Dundon alleges she was one of the first protesters on the Bridge and she alleges she was injured during the protesters' attempt to remove the second dump truck from the barricade.  All other Plaintiffs allege they arrived on the scene after Dundon.  Under these circumstances, it was objectively reasonable for Law Enforcement to believe the protesters, as a whole in the vicinity, were acting as a unit and engaging in unlawful conduct which justified the use of force.

The record also establishes the protesters, even at this early stage, were engaged in a riot. "Riot" is defined under North Dakota's Criminal Code to mean "a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons or substantially obstructs law enforcement or other government function."  N.D.C.C. § 12.1-25-01(2).  The protester who alleges he heard the warnings given by Law Enforcement to protesters against removal of the dump trucks also alleges he observed the protesters remove both the first dump truck from the barricade, as well as the protesters initial efforts to remove the second dump truck.  (Doc. 81-27 at ¶¶ 10-18 [Lenoble

Decl.].)  He estimates 10 protesters where involved with removing the first dump truck, but noted more protesters had showed up to help with the initial attempts to remove the second dump truck, with numbers of protesters growing by the minute.  (*Id*. at ¶ 18.)  This is roughly consistent with the record filed by Law Enforcement in this case.  (Doc. 54 [LE-3] at ¶¶ 34, 39-45.)  Dundon alleges she was present among the other protesters when they removed the first dump truck, and also when they initially attempted to remove the second dump truck.  (Doc. 1 at ¶ 36.)  Dundon alleges force was applied by Law Enforcement against her during the protesters initial attempts to remove the second dump truck.  (*Id*.)

Law Enforcement also indisputably had the authority and duty to protect private property interests and individuals located north of the Bridge – interests which had been infringed upon and damaged, and individuals assaulted, by protesters during the ongoing protest activities against the Dakota Access Pipeline Project.  Plaintiffs admit their objective is to prevent completion of the DAPL – completion of which would occur from a drill pad located a very short distance northeast of the Bridge.

In addition, in accordance with *Bernini* (discussed above), the use of non-lethal munitions for the purpose of preventing unlawful entry onto property by an unruly crowd, which officers reasonably believe is acting as a unit, is objectively reasonable as a matter of law.  *Bernini* also establishes the use of non-lethal munitions is objectively reasonable for purposes of restoring order under riot conditions, as a matter of law.  Further, it is objectively reasonable for Law Enforcement to utilize not only *less-lethal* force, but lethal force as well "when used in lawful self-defense, or in lawful defense of others, if such force is necessary to protect the actor or anyone else against death, serious bodily injury, or the commission of a felony involving violence."  N.D.C.C. § 12.1-05-07(2)(b).

The uncontroverted record establishes protesters did in fact throw dangerous objects at Law Enforcement which subjected Law Enforcement to potential serious bodily injury of death. Although the Plaintiffs allege they went to the Bridge to "peacefully" or "peaceably" protest or pray on November 20, such allegation amounts to an assertion of each Plaintiffs' intent when they left the Oceti Sakowin camp, not an allegation as to what they actually did at the Bridge. The use of the words "peacefully" and "peaceably" in the context of the claims and defenses in this case also constitutes a legal conclusion which this Court may ignore for purposes of this motion. The purely factual allegations in the complaint as to what the Plaintiffs and other protesters did at the Bridge are the relevant allegations. The Plaintiffs, in their declarations, also do not deny observing other protesters around them: throwing or slinging objects at Law Enforcement, including CS gas canisters, large rocks, frozen water bottles, burning logs, or other objects; attempting to flank Law Enforcement's barricade to the west – cross-country; assaulting the barricade with a mobile shield wall; and starting fires along the north shore of the Cantapeta Creek in proximity to the barricade. Other protesters grudgingly admit to seeing objects thrown at Law Enforcement by protesters. (Doc. 81-24 at ¶ 21 [Kanahele Decl.] ("I saw one person throw what appeared to be a rock in the direction of the police. I saw another throw a stick in the direction of the police."); doc. 81-28 at ¶ 12 [Lopez Decl.] ("I did not see water protectors threaten the police, or use any weapons, with the exception of a few individuals who I saw throw the gas canisters that had been launched by the police, back toward the police."); doc. 81-27 at ¶ 58 [Lenoble Decl] ("A few people . . . threw plastic water bottles at the police . . . ."); (doc. 81-23 at ¶ 15 [Weeks Decl.] ("The only things that I saw thrown from the side of the water protectors to the side of the razor wire where law enforcement was located was an occasional plastic bottle of water, maybe 4 in total throughout the entire evening (7 hours). I also witnessed an individual protester try to throw a spent smoke

canister from where it landed on the west side side [sic] of the Highway 1806 to the north side of the razor wire where the police were located.")  These are all events established through video and affidavit testimony in the record submitted by Law Enforcement and Fire Service officers which are not contradicted by Plaintiffs' allegations in the complaint.  Plaintiffs admit to bearing shields and tarps (doc. 1 at ¶¶ 48 [Wood], 54 [Wilson], 60 [Demo], 66 [Dullknife], 73 [Bruce], 80-81 [Hoagland-Lynn]), and wearing bandanas (*id.* at ¶ 37 [Dundon]), goggles (*id*. at ¶ 72 [Bruce]), rain coats (doc. 14-16 at ¶ 12 [Wilson Decl.] while in close proximity to the barricade, matching the descriptions of protesters who engaged in assaults on the barricade behind shield walls, as identified in Law Enforcement's affidavits, documented in video evidence shot from the perspective of the protesters forming the shield wall, and evidenced by the North Dakota Highway Patrol infrared aerial surveillance video, all in the record herein.  (Doc. 54 [LE-3] at ¶¶ 45, 55, 60-61, 73, 74, 81; doc. 52 [LE-1] at ¶¶ 47, 61, 63, 69; doc. 53 [LE-2] at ¶¶ 26, 28, 33, 34, 40, 41; doc 92-1 [video] at Items 4, 9.)  These uncontroverted activities constitute felony assault upon law enforcement officers (N.D.C.C. § 12.1-17-01), felony reckless endangerment with extreme indifference to the value of human life (N.D.C.C. § 12.1-17-03), and felony terrorizing (N.D.C.C. § 12.1-17-04), as well as the misdemeanors of criminal trespass (N.D.C.C. § 12.1-22-03), engaging in a riot (N.D.C.C. § 12.1-25-03), disobedience of public safety orders under riot conditions (N.D.C.C. § 12.1-25-04), other assaults (N.D.C.C. § 12.1-17-02), passing over a closed highway and removing a barricade thereon (N.D.C.C. § 24-03-05), and obstruction of government function (N.D.C.C. § 12.1-08-01).  (Doc. 54 [LE-3] at ¶ 88; doc. 52 [LE-1] at ¶ 70.)  Although Plaintiffs' generically allege in their complaint "[a]t no time did any of the Plaintiffs or class members present a threat or do anything to justify Defendant's use of force on them" (doc. 1 at ¶ 87), this allegation

constitutes a legal conclusion and should be disregarded by the Court for purposes of this motion as it does not allege purely factual matter.

Plaintiffs and protesters do not deny Law Enforcement were being struck by the objects being thrown by protesters, or deny one officer was struck so hard he became dazed and required assistance by other officers to an armored vehicle. (Doc. 54 [LE-3] at ¶¶ 46, 71; doc. 52 [LE-1] at ¶ 60; doc. 53 [LE-2] at ¶ 44.) Plaintiffs and protesters do not deny a group of approximately 150 protesters gathered in the west ditch north of the Bridge and proceeded west and north in an attempt to flank the police line, cross-country. (Doc. 54 [LE-3] at ¶ 63; doc. 52 [LE-1] at ¶¶ 49-55; doc. 53 [LE-2] at ¶ 46.) They do not deny protesters threw shields across the concertina wire and one protester climbed over Law Enforcements' barricade. (Doc. 54 [LE-3] at ¶ 74; doc. 52 [LE-2] at ¶ 42.) That Law enforcement were genuinely concerned they were going to be overrun and were concerned about the immediate attempts by protesters to inflict serious bodily injury or death upon Law Enforcement and emergency responders on the scene is not directly controverted by Plaintiffs. (doc. 54 [LE-3] at ¶¶ 51, 68, 79, 85; doc. 52 [LE-1] at ¶¶ 49, 60, 67; doc. 53 [LE-2] at ¶¶ 47, 48.) The NDHP aerial surveillance video provided to the Court (doc. 92-1 at Item 4) establishes there were hundreds, if not more than one thousand, protesters involved in the riot on November 20, 2016 at or near the Bridge.

Notably, only two of the Plaintiffs deny hearing particularly described warnings in their pleadings. Wilson only denies hearing any order by Law Enforcement to disperse, and Demo denies hearing any orders to disperse, to get off the Bridge, or that force would be used by Law Enforcement. The remaining Plaintiffs do not deny receiving warnings from Law Enforcement. In addition, none of the Plaintiffs deny large combination "No Trespassing on Bridge" "No Trespassing" signs, as evidenced by the photograph in the record (doc. 92-1 at Item 8) were plainly

posted along the barricade on both the east and west sides of Highway 1806.  Demo's allegation

he did not hear the described warnings is not the same as alleging no such warnings were given to

him or other protesters.  Neither Plaintiffs' complaint, nor any Plaintiff's declaration, contains any

allegation Plaintiffs were not aware Highway 1806 and the Bridge were closed on November 20,

or for over three weeks prior thereto.  Plaintiffs' complaint and the Plaintiffs' declarations contain

no allegation Plaintiffs were not aware they were not authorized or privileged to be on the Bridge

or on the Corps-managed land located north of the Cantapeta Creek on November 20, 2016.

Plaintiff Demo admits Law Enforcement warned protesters to get away from the razor wire

barricade.  (Doc. 1 at ¶ 62.)  A protester asserts in his declaration:

> I do not recall any warning announcements.  At some points the police would say, **"move
> off the side of the bridge;"**  Once, I heard them say "we are going to test the LRAD" and
> they did for a second.  That was the only time I heard it.  I did not hear, or at least I do not
> recall hearing, any announcement about them using other less lethal weapons.  However,
> it was hard to hear.  There was a lot of noise and commotion.  There were also people
> singing and praying.  If they did announce anything, I could not hear it.  **I only heard them
> announce things like "you're trespassing," "you're not supposed to be on the bridge,"
> and "move to the south side."**  There were no announcements that were warnings that I
> can recall.

(Doc. 81-24 at ¶ 22 [Kanahele Decl.](emphasis added).)  Another protester alleges "I do remember

some sort of announcements being made by the police, but I don't remember – or at least did not

hear – them making announcements about when they were going to use rubber bullets or gas or

anything."  (Doc. 81-14 at ¶ 18 [Toraty Decl.].)  The uncontroverted record establishes Law

Enforcement gave warnings.

With respect to the use of water, the uncontroverted record establishes there was a

substantial time delay between when the confrontation began with the removal of the first dump

truck around 5:00 p.m. when *less-lethal* was first deployed, and when water was first utilized.  The

same protester who admits Law Enforcement gave warnings to the initial protesters before the first

dump truck was removed from the barricade also asserts Law Enforcement utilized tear gas and rubber bullets on the rapidly growing crowd of protesters for about an hour and one-half before water was first deployed by Law Enforcement. (Doc. 81-27 at ¶ 20 [Lenoble Decl.].) The NDHP aerial surveillance video confirms a substantial time delay between the protesters initiation of the assaults on the barricade (video starts with protester attempts to remove second dump truck) until Law Enforcement finally resorted to the use of water. (Doc. 92-1 at Item 4 [aerial video], meter 00:37:48 (first deployment of water from brush truck hose atop MRAP at 18:36 military time.) Plaintiffs admit to finding no current case law on the use of water against protesters in the United States. (Doc. 14 at p. 24.) Query how Law Enforcement's use of water under the circumstances could therefore possibly constitute a violation of a clearly established constitutional right for which a reasonable officer would have known was unlawful.

Plaintiffs and protester declarants also admit observing Law Enforcement's application of force as to others, including alleged use of gas canisters, smoke, impact munitions, fire hose, etc., yet incredibly decided to place themselves in close proximity to the barricade, often for extended periods of time, and despite Law Enforcements' alleged multiple applications of force as to them. Query the futility of providing additional warnings to individuals with this mindset. Plaintiffs allege the air was full of smoke and gas, there were shots being fired and explosions heard, and fire hose(s) utilized on persons standing in proximity to the barricade. No reasonable person would observe such alleged use of force by Law Enforcement standing behind a barricade with armored vehicles and believe their presence was authorized or lawful, regardless of whether any additional warnings were provided by Law Enforcement.

The uncontroverted record establishes Plaintiffs' have failed to allege a plausible excessive force claim against Law Enforcement under the Fourth Amendment. Dismissal of such claim is warranted at this time.

### E.    Plaintiffs' Fourteenth Amendment Excessive Force Claim

As discussed above, Plaintiffs may not proceed with both their excessive force claim under the Fourth Amendment, and under the Fourteenth Amendment, simultaneously. In the event the Court concludes Plaintiffs have sufficiently alleged they were "seized" by Law Enforcement on November 20, their claim is limited to a Fourth Amendment analysis, and their excessive force claim under the Fourteenth Amendment must be dismissed.

In addition, considering the uncontroverted factual materials in the record, Plaintiffs fail to allege a plausible excessive force claim under the Fourteenth Amendment, as a matter of law. The Fourteenth Amendment Due Process Clause protects citizens from governmental deprivation of life, liberty and property without due process of law. U.S. CONST. AMEND. XIV. The United States Court of Appeals for the Eighth Circuit has noted the standards which must be met to establish excessive force in violation of the Fourteenth Amendment is a more burdensome standard than is applied under the "objective reasonableness" standard under the Fourth Amendment as the claimant must establish, among other things, the specific application of force "shocks the conscience" under the circumstances. *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000). *See generally County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)(discussing elements and application of excessive force claim under Fourteenth Amendment). An excessive force claimant who cannot win his case under the Fourth Amendment standard certainly cannot win his case under Fourteenth Amendment standards. *Wilson v. Spain,* 209 F.3d at 716. Therefore, a plausible claim of excessive force under the Fourteenth Amendment

requires alleged facts which, if proven, establish a specific application of force which "shocks the conscience" under the circumstances.

Considering the circumstances Law Enforcement were confronted with during the November 20 riot, as discussed above in the context of Plaintiffs' excessive force claim under the Fourth Amendment, it cannot reasonably be concluded the use of intermediate and *less lethal* force by Law Enforcement to hold back the uncontrolled mob, protect government property and the physical safety of Law Enforcement and other fire service personnel, and otherwise restore order on scene "shocks the conscience", in a constitutional sense. Plaintiffs admit they were in close proximity to Law Enforcements' barricade. Plaintiffs admitted locations where force was allegedly applied against them necessarily means they were intermingled with the trespassing mob which was throwing objects at Law Enforcement and attempting to breach Law Enforcement's barricade. In addition, Plaintiffs have not alleged a deprivation of any liberty interest. As discussed, Plaintiffs had no right to be in any location where force was allegedly applied against them, and had no right to proceed north through or around the barricade in this vicinity. Plaintiffs admit they and other protesters remained within range of Law Enforcement's alleged application of force for, in many cases, hours. No reasonable person could conclude such conduct did not, at the very least, evidence a failure to comply with the obvious directive from Law Enforcement to vacate the vicinity where force was being applied. Plaintiffs' and the protesters' intentions were clear – they wanted to stop completion of the DAPL project by any means necessary. Plaintiffs' excessive force claim under the Fourteenth Amendment should be dismissed as Plaintiffs have not even alleged facts which, if true, would "shock the conscience."

      **F.**      <u>**Plaintiffs' Equal Protection Claim**</u>

The Fourteenth Amendment to the United States Constitution indicates no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. This clause essentially "guarantees citizens their State will govern them impartially." *Davis v. Bandemer*, 478 U.S. 109, 166 (1986)(citing *Karcher v. Daggett*, 462 U.S. 725, 748 (1983)(Stevens, J., concurring)). However, while Equal Protection requires a "distinction made have some relevance to the purpose for which the classification is made", it "does not require that all persons be dealt with identically." *Baxtrom v. Herold*, 383 U.S. 107, 111 (1966)(citing *Walters v. City of St. Louis*, 347 U.S. 231, 237 (1954)). The Supreme Court of the United States has recognized several suspect classifications. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439-41 (1985). If a plaintiff is in one of these groups, a higher level of scrutiny applies. *Id.* If the alleged discrimination is based on race, national origin, alienage, sex, or illegitimacy, or involves a deprivation of the fundamental rights of travel, voting, or raising one's family, the court applies either strict or intermediate scrutiny. *Id.*

In the present case, Plaintiffs have not alleged they are a member of a protected class. In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court held, where the plaintiff does not allege membership in a class or group, it may nevertheless sustain a claim of a violation of the Equal Protection Clause if it alleges that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Id.* (citing *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989)); *Barstad v. Murray County*, 420 F.3d 880, 884 (8th Cir. 2005).

The government's different treatment of persons will "'be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis

for the classification.'" *Vasquez-Velezmoro v. U.S. I.N.S.*, 281 F.3d 693, 697 (8th Cir. 2002) (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). "[T]he [government] need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative "'any reasonably conceivable state of facts that could provide a rational basis for the classification."'" *Board of Trustees of University of Alabama v. Garrett***, 531 U.S. 356, 367 (2001) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. at 313)). "This [rational basis] standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely [the court] may think a political branch has acted.'" *F.C.C. v. Beach Communications, Inc.* 508 U.S. at 314 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).

Plaintiffs provide only a cursory explanation of the nature of their equal protection claim under the Fourteenth Amendment in their complaint by alleging "Defendants, acting under the color of state law are subjecting Plaintiffs to unequal protection of the law in violation of Plaintiffs' constitutional rights. The unequal treatment to which Plaintiffs are subject includes the use of excessive force including deployment of an arsenal of dangerous implements and devices, including SIM, explosive teargas grenades, tear canisters, and water cannons spraying high pressure water on Plaintiffs and others despite the subfreezing temperature." (Doc. 1 at ¶ 122.) Plaintiffs' complaint does not directly define the class to which Plaintiffs assert they belong for purposes of the equal protection claim, or identify others allegedly similarly situated who were not subjected to the same alleged use of force by Law Enforcement. Plaintiffs fail to provide even a

bare bones recitation of the required elements for a viable equal protection claim, let alone sufficient facts to establish a plausible claim under *Twombly* and *Iqbal*.

The only definition of a class contained in Plaintiffs' complaint appears under the Class Allegations section where Plaintiffs request certification of a class comprised of "All persons who were shot or harmed by water, SIM, chemical agent, or grenades on November 20, 2016." (Doc. 1 at ¶ 90.) However, the Class Allegations section of Plaintiffs' complaint identifies the questions of law and fact allegedly common to the defined class in paragraph 92. Missing from paragraph 92 is any reference to an equal protection claim or other claim under the Fourteenth Amendment. Plaintiffs' pleadings also fail to identify others similarly situated to the defined class who were not shot or harmed by water, SIM, chemical agent, or grenades on November 20, 2016. In other words, Plaintiffs fail to allege facts, which if assumed to be true, could potentially establish Plaintiffs were singled out for application of force from among the other persons located in the vicinity of Law Enforcement's barricade on November 20, 2016. Plaintiffs fail to allege a viable equal protection claim, and dismissal of such claim is requested.

### G. Derivative Claims

Plaintiffs' claims concerning "Policies, Customs, or Practices" (Third Claim), "Training, Supervision, or Discipline" (Fourth Claim), "Unequal Protection of Law" (Claim Five), and "Declaratory Relief" (Sixth Claim) are merely derivative of, and dependent upon Plaintiffs' prevailing upon claims one ("Retaliation") and/or two ("Unreasonable Use of Force"). As Plaintiffs have failed to allege viable claims for retaliation and excessive force, as discussed above, these derivative claims should also be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Law Enforcement respectfully requests dismissal of Plaintiffs' claims, with prejudice.

Dated this 6th day of February, 2017.

                              BAKKE GRINOLDS WIEDERHOLT


                              By: _____/s/ Randall J. Bakke_____
                                   Randall J. Bakke (#03989)
                                   Shawn A. Grinolds (#05407)
                                   Bradley N. Wiederholt (#06354)
                                   Special Assistant State's Attorneys for
                                   Morton and Stutsman Counties
                                   300 West Century Avenue
                                   P.O. Box 4247
                                   Bismarck, ND 58502-4247
                                   (701) 751-8188
                                   rbakke@bgwattorneys.com
                                   sgrinolds@bgwattorneys.com
                                   bwiederholt@bgwattorneys.com

                                   Attorneys for Defendants Kyle Kirchmeier,
                                   Morton County, City of Mandan, Jason
                                   Ziegler, Stutsman County, and Chad Kaiser

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 6, 2017, a true and correct copy of the foregoing **Memorandum of Law In Support of Defendants Kyle Kirchmeier, Morton County, City of Mandan, Jason Ziegler, Stutsman County, and Chad Kaiser's Motion to Dismiss** was filed electronically with the Clerk of Court through ECF.\

ATTORNEYS FOR PLAINTIFFS:

Rachel Lederman
Rachel Lederman & Alexsis C. Beach, Attorneys
558 Capp Street
San Francisco, CA 94110
(415) 282-9300
rachel@bllaw.info

Lauren Regan
Civil Liberties Defense Center
783 Grant Street, Suite 200
Eugene, OR 97402
(541) 687-9180
lregan@cldc.org

Jeffrey Haas
1433 Seville Rd
Santa Fe, NM 87505
jeffreyhaas42@gmail.com

James Fennerty
James R. Fennerty & Associates, L.L.C.
36 South Wabash Avenue, Suite 1310
Chicago, IL 60603
fennertylaw@yahoo.com

Melinda Power
West Town Law Office
2502 W. Division
Chicago, IL 60511
melindapower@comcast.net


By: ___/s/Randall J. Bakke_____
        Randall J. Bakke