## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Vanessa Dundon, Jade Kalikolehuaokal Wool, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, Frank Finan, Israel Hoagland-Lynn, and Noah Michael Treanor, on behalf of themselves and all similarly-situated persons, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | **ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | ) ) ) | Case No.: 1:16-cv-406 |
| Kyle Kirchmeier, Morton County, City of Mandan, Jason Ziegler, Stutsman County, Chad Kaiser, and Does 1-100, | ) ) ) ) | |
| Defendants. | ) ) | |

## I. INTRODUCTION

Before the Court is the Plaintiffs' motion for a preliminary injunction filed on November 28, 2016. See Docket No. 2. The Plaintiffs seek a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, specifically requesting an order prohibiting the Defendants from using excessive force in responding to the pipeline protests and prohibiting the use of specialty impact munitions (SIM), explosive grenades, chemical agents, sound cannons, directed energy devices, and water cannons or hoses, as a means of crowd dispersal. See Docket Nos. 2 and 14.

On November 28, 2016, the Plaintiffs filed a complaint asserting claims of declaratory and injunctive relief; retaliation; unreasonable use of force; policies, customs, or practices; training, supervision, or discipline; and unequal protection of the law. See Docket No. 1. That same day, the Plaintiffs also filed a motion for a temporary restraining order (TRO) and preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure. See Docket No. 2. On December 1, 2016, the Court denied the Plaintiffs' motion for a TRO because Plaintiffs' counsel failed to comply with Rule 65(b)(1). The Court gave the Defendants time to file a response to the Plaintiffs'

preliminary injunction motion.  See Docket No. 16.  On December 1, 2016, the Plaintiffs moved the Court to reconsider its order of December 1, 2016, denying the Plaintiffs' motion for a TRO.  See Docket No. 17.  On December 8, 2016, the Court denied the Plaintiffs' motion for reconsideration. See Docket No. 31.  On December 22, 2016, the Defendants filed a response in opposition to the Plaintiffs' motion for a preliminary injunction. See Docket No. 42.  On January 23, 2017, the Plaintiffs filed a reply. See Docket No. 81.  The Court conducted a telephone status conference with the parties on January 26, 2017. See Docket No. 89.  Following that conference, both parties submitted videos depicting the activities on the Backwater Bridge on November 20, 2016. See Docket Nos. 91 and 93.

## II.  **FACTS**

During the course of the prolonged Dakota Access pipeline ("DAPL") protest, the protesters have primarily occupied three areas: the Sacred Stone Camp and the Rosebud Camp located south of the Cannonball River, and the Seven Council Fires Camp (i.e. Oceti Sakowin) located between the north bank of the Cannonball River and the south bank of the North Branch of the Cantapeta Creek, a tributary of the Cannonball River. The Sacred Stone Camp and Rosebud Camps are located in Sioux County, and the Seven Council Fires Camp is located in Morton County. The Backwater Bridge is located on Highway 1806 and crosses the north branch of the Cantapeta Creek, north of the Seven Council Fires Camp, as depicted in the map below:



<u>See</u> Docket No. 61-1.

The United States Army Corps of Engineers ("Corps") manages the land upon which all three camps are located.  The Corps also manages federal lands in Morton County located along the north bank of the North Branch of the Cantapeta Creek, extending from the Backwater Bridge and eastward to and along the north bank of the Cannonball River, eastward to the Missouri River. The Corps-managed land located along the north banks, as well as privately-owned property to the north, encompasses the DAPL project route and the location from which the DAPL project plans to cross the Missouri River. The DAPL project route is located less than one-mile north of the Seven Council Fires Camp.

The Corps initially granted the protesters a permit to demonstrate on Corps-managed lands where the three camps are located. <u>See</u> Docket No. 61-9.  The permit pertaining to the Seven Council Fires Camp has been terminated.  The Corps established a December 5, 2016, deadline for all persons to evacuate the Seven Council Fires Camp. <u>See</u> Docket No. 61-11.  The Corps has not granted anyone

permits or permission with respect to public use of Corps-managed lands located north of the Cantapeta Creek or north and east of the confluence of the Cantepeta Creek and Cannonball Rivers, extending to the Missouri River. See Docket No. 61-7.

The protests in Morton County against the pipeline project began in April of 2016. A dramatic increase in the number of people involved in the protests occurred in August 2016, when protesters began gathering in Morton County, just north of the Standing Rock Sioux Indian Reservation.  This Court first became involved in the activities of the DAPL protesters in August 2016, when Dakota Access sought and obtained an *ex parte* temporary restraining order in federal court in a case entitled *Dakota Access, LLC v. Archambault, et al.*, Case No. 1:16-cv -296. In that civil action, and in response to the assertion the Court's temporary restraining order had a chilling effect on the exercise of the protesters rights to engage in the protected exercise of their constitutional rights, the undersigned said:

> With respect to the assertion the movement has been a peaceful protest, one need only turn on a television set or read any newspaper in North Dakota.  The viewer will find countless videos and photographs of the "peaceful" protestors attaching themselves to construction equipment operated by Dakota Access; vandalizing and defacing construction equipment; trespassing on privately-owned property; obstructing work on the pipeline; and verbally taunting, harassing, and showing disrespect to members of the law enforcement community.  The State of North Dakota has estimated the cost for law enforcement services to date at $2 million dollars.  The estimated damage to construction equipment and loss of work on the project is far in excess of several million dollars.  The Morton County Sheriff reported that 22 protestors were arrested on September 13, 2016, just a few days ago.  To suggest that all of the protest activities to date have been "peaceful" and law-abiding defies common sense and reality.  Nearly every day the citizens of North Dakota are inundated with images of "peaceful" protestors engaging in mindless and senseless criminal mayhem.
>
> The Court fully recognizes the unlawful and violent protestors arrested to date constitute a very small percentage of the entire entourage.  The Court also recognizes that many of the troublesome "peaceful protestors" are from out-of-state who have political interests in the pipeline protest and hidden agendas vastly different and far removed from the legitimate interests of Native Americans of the Standing Rock Sioux Tribe who are actually impacted by the pipeline project.  But for anyone to suggest the protests have been entirely peaceful and prayerful is less than forthright and ludicrous at best.

<u>Dakota Access, LLC v. Archambault, et al.</u>, No. 1:16-cv -296, Docket No. 45, pp. 3-4 (Sept. 26, 2016).

## III.     **THE PROTESTERS' VERSION OF EVENTS**

The Plaintiffs' allegations of excessive force by law enforcement officers can best be categorized as a riot that occurred on November 20, 2016, at the Backwater Bridge.  The Plaintiffs initially submitted 17 declarations from protesters and others with personal knowledge of the events that occurred on the Backwater Bridge on November 20, 2016. <u>See</u> Docket Nos. 14-3 through 14-19.

The original set of 17 declarations filed in support of the Plaintiffs' motion for a preliminary injunction reveal that on Sunday, November 20, 2016, the declarants (protesters) "went to the bridge immediately north of Oceti Sakowin camp on Highway 1806 to peacefully protest and pray to stop the pipeline from going through the river and polluting the Missouri River." <u>See</u> Docket Nos. 14-4; 14-5; 14-7 through 14-10; 14-12 through 14-17; 14-19.  The original declarations characterized the actions of law enforcement as aggressive and violent responses to the "peaceful and prayerful protests," which included the use of the following:

- water cannons
- tear gas
- flash bang or concussion grenades
- grenades
- rubber bullets and/or beanbag projectiles
- excessive force

None of the original 17 declarations mentioned any warnings being conveyed by law enforcement officers to the protesters to disperse, back away, and retreat from the Backwater Bridge; or to disengage and return to the south side of the bridge because they were trespassing on the Backwater Bridge located on Highway 1806.  None of the original 17 declarants made mention of

any violent or criminal activity committed by "peaceful and prayerful" protesters on November 20, 2016.

On January 23, 2017, the Plaintiffs filed a reply in support of their motion for injunctive relief and filed 29 additional declarations. See Docket Nos. 81; 81-1 through 81-29. The following declarations are representative of the protesters' observations of the chaotic events that occurred on November 20, 2016:

The declaration of Martyn Lenoble provides a detailed account of the November 20, 2016, incident, with photographs. See Docket No. 81-27. Lenoble, a musician who lives in Los Angeles, was preparing to leave Oceti Sakowin Camp on November 20, 2016, when he noticed a semi-truck try to tow a burned out truck away from the police barricade. There were not more than ten people involved. The police remained behind the concrete barriers, the razor wire, and the armored vehicles. According to Lenoble, additional officers quickly arrived and began shooting impact munitions and teargas canisters. The first teargas canister started a fire in the brush. The semi pulled the burned out truck away from the barricade at about 5:30 p.m. Larger numbers of protesters began to arrive after that. Lenoble's pictures show the police shooting water at a peaceful crowd including a man holding up a ceremonial peace pipe, persons making peace signs with their fingers, and people who were taking photographs or video. When teargas was launched all the way to the south end of the bridge, it impeded protesters from leaving as south was the only way to go. According to Lenoble, the police continued to shoot impact munitions into the crowd.

Lenoble said he never saw anyone threaten or attack the police, although he acknowledged the protesters did not leave the bridge. See Docket No. 81-27. Lenoble stated, "The police appeared to be completely safe, and separated from the water protectors by the concrete and razor wire barricade, military style police vehicles, other police vehicles, and the one broken down truck that was remaining." See Docket No. 81-27, p. 13. Lenoble's photographs show that the law enforcement officers were wearing helmets and visors and holding shields. Lenoble described how the shooting

and water spraying went on for hours as protesters remained on the bridge, signing and drumming, and medics and ambulances removed the wounded.  After Lenoble took a photograph of a law enforcement officer, he saw him walk over to another officer who was holding a rubber bullet gun and nod in his direction.  The law enforcement officer took direct aim at him, but he was able to avoid getting hit.

Phillip Weeks was a "legal observer" in the vicinity of the Backwater Bridge for six hours on the night of November 20, 2016. <u>See</u> Docket No. 81-27.  Weeks observed that law enforcement officers were separated from the protesters by a burned vehicle and coils of concertina wire that blocked the law enforcement officers and the protesters from one another.  At the beginning of the evening, Weeks heard one announcement from law enforcement officers warning the protesters to move south.  After that, canisters and munitions were fired.  Weeks noted, "Most of those gathered were standing on the highway away from the razor wire and thus a significant distance from law enforcement who were all on the north side of the wire.  From what I could see they were only engaged in peaceful protest, song, or prayer." <u>See</u> Docket No. 81-27, p. 2.  Weeks further noted:

> At 6:36 pm, I recorded the sound of law enforcement using the water cannons to soak the protesters.  The force of the water cannons was enough to knock some of the protesters off their feet.  The water cannon they were using was on the top of a SWAT like vehicle where the LRAD equipment was located.  The top of the vehicle was approximately 15-20 feet off the ground and the water cannon could reach people on the road, arching water high in the air or by a direct line of fire.  Water protectors were sprayed whether they were on the highway or off to the side of the highway.  In addition to the water cannon, the tear gas, and the smoke canisters, there was ammunition fired over the protesters that created large booms.  At this time there were additional calls for medics for injured water protectors.

<u>See</u> Docket No. 81-23, p. 2.  Weeks states he did not hear another law enforcement announcement after the warning he recorded at approximately 6:23 pm – before the arrival of many of the protesters.  Weeks noted:

> The entire time that I was legal observing the use of the water cannons never appeared directed to put out the two controlled camp fires the protesters had made to keep warm, but rather, to assault water protectors. . . . I never observed any of

the protesters do anything that could reasonably be interpreted as aggressive toward law enforcement. The only things that I saw thrown from the side of the water protecters to the side of the razor wire where law enforcement was located was an occasional plastic bottle of water, maybe 4 in total throughout the entire evening (7 hours). I also witnessed an individual protester try to throw a spent smoke canister from where it landed on the west side [] of Highway 1806 to the north side of the razor wire where the police were located. All of the other protesters I observed gathered in protest to DAPL were only engaged in peaceful protest, song, or prayer. None of the protesters I witnessed were engaged in attempts to cross the razor wire or carry out any type of assault against the law enforcement. I witnessed the majority of protesters in prayer, standing quietly in opposition to the construction of the Dakota Access Pipeline, or chanting slogans.

See Docket No. 81-23, pp. 3-4.  Weeks also noted,

The water cannons were used throughout the night, either taking direct aim at protesters or arched high in the air. Thus many of the protesters who were far back from the "front line" were sprayed with water. At one point in the night, water protectors held up a tarp for the sole purpose of keeping the prayer assembly from being doused by the water from the cannons as they sung their prayers. . . . The use of the water cannons, pepper spray, and munitions by law enforcement appeared largely indiscriminate.

See Docket No. 81-23, p. 4.

Cecilia Candia, an attorney, who also acted as a legal observer, observed the incident from what she thought was a safe distance, south of the bridge, but was still impacted by the teargas. See Docket No. 81-25.  Candia observed use of the water cannon and gas canisters by law enforcement officers for over three hours.  Candia saw a gas canister launched next to the area where medics were trying to treat the injured, several yards to the south of the bridge and nowhere near the barbed wire fencing to the north of the bridge.  Candia noted:

Since there was only one way away from the area – South of the bridge and South on the highway – there often was no safe way away from law enforcement.  Because officers were throwing gas canisters far into the middle of the crowd on the bridge, and also to the South of the bridge, people, including myself, were locked in by the gas, and also blinded and gagging from the gas.  There was no safe way away and out.

See Docket No. 81-25, p. 4.  Candia saw many protesters injured and never heard any dispersal announcements from law enforcement officers.

8

Gabriela Lopez, an attorney, also acted as a legal observer of the November 20, 2016, incident on Backwater Bridge.  See Docket No. 81-28.  Lopez observed police indiscriminately shoot water cannons at peaceful protesters from behind the barricade.  Lopez saw what she believed to be flash bang grenades and tear gas canisters land as far as the south end of the bridge, close to where some medics were helping people.  Lopez saw several gas canisters shot at vehicles, including a medic vehicle, that were approximately 40-60 feet south of the police barricade.  Lopez observed the police throw at least four flash bang-like grenades at protesters peacefully assembling on the banks of the river.  Lopez noted that clouds of tear gas made it difficult to see where to go, her own eyes watered, she gagged, and due to her asthma, had difficulty breathing as a result of the tear gas.  Lopez observed injured people, including a person who had to be carried by others and a man who suffered a seizure, as well as repeated calls for medical attention.  During the three to four hours she was on the scene, Lopez said she never heard any warnings or dispersal orders from the police.  Lopez did not see any protesters threaten the police, or use any weapons, with the exception of a few individuals who threw the gas canisters that had been launched by the police, back towards the police.

Zachary Johnson, an emergency medical technician, heard that people were getting shot at the bridge and went to see if he could help injured individuals.  See Docket No. 81-2.  Johnson remained in the vicinity for about 7 – 9 hours.  Johnson saw law enforcement officers spraying the protesters with a water cannon for at least eight hours, including people who were not near the barricade, and were not doing anything threatening or aggressive.  It also appeared to Johnson that people with cameras were targeted with the water.  Johnson saw that some of the canisters fired by police were starting grass fires, and he and other protesters tried to put them out by dousing them with water and stomping on the fires, despite the tear gas.  Johnson watched as law enforcement officers fired at protesters who had their hands up while at close range; he saw an officer shoot a protester who had just shouted this was a peaceful action, and that man was carried away by medics.  Johnson saw law enforcement officers firing directly into crowds of people who were just standing together.  Johnson

9

said he saw a protester get shot in the back who was carrying someone away.  Johnson saw a law enforcement officer spray mace directly in the face of a protester who was sitting on the ground praying, and saw the officer laugh as he walked away.  Johnson saw protesters throw two open water bottles.  Each time this happened, he observed other protesters yell at the individual who threw the water bottle not to throw things or do anything violent because the protesters were engaged in prayerful action.

Johnson stated he was hit in the leg with a "grenade" fired by law enforcement officers and fell down when he was more than 50 feet from the barricade.  Johnson was bruised for weeks afterward.  Johnson noted he still struggles with the trauma of that night, which "felt like a one-sided war zone." See Docket No. 81-2, p. 5.

Alberto Flores, a clinical social worker, went to the Oceti Sakowin camp to provide mental health support. See Docket No. 81-21.  On November 20, 2016, Flores observed what was occurring in the vicinity of the bridge for four to five hours.  Flores saw a small group of protesters close to the police barricade, and a larger group further back, on the southern portion of the bridge and south of the bridge itself.  Flores saw many protesters praying and drumming in a peaceful way while being drenched in icy water by the police from a mounted water cannon.  Throughout the four to five hours Flores was present at the scene, he saw officers spray water as far as it could reach on all sides of the bridge, apparently trying to soak as many people as possible.  Flores never heard any police announcements or orders from where he was standing.  With the exception of one person whom Flores saw throw a small object from 50-100 yards from the barricade, he did not see protesters throwing things at the police, or in any way threatening them.  Flores observed the police were well armed, they were behind razor wire, concrete barricades, and a burnt out truck, and they had multiple military style vehicles.

Flores saw teargas canisters land on the south side of the bridge, even as far as the area where medics were treating people, as well as in the middle of the crowd and in the grassy area on the banks

of the bridge.  Flores observed some of the canisters started fires in the grass along the banks of the bridge which protesters were trying to put out.  Flores observed tear gas envelope the medical area and impair the medics' ability to provide medical care to the affected protesters.  Flores witnessed at least twenty to forty protesters being treated for shock, hypothermia, and tear gas, and at least three people with large welts on their backs and faces who reported that their injuries were the result rubber bullets or similar projectiles.  Flores saw protesters start a small controlled fire and warm themselves there, on the south side of the bridge about 100 to 150 yards from the police barricade, and another to the northeast of the bridge.  Flores said he never saw or heard of anyone attempting to throw logs or burning logs at police.

David Karayof was in the area of the bridge from 5 p.m. until 12:30 a.m. the next day. <u>See</u> Docket No. 81-18.  Karayof said he went to peacefully protest, he was not armed, and he did not see any other protester armed with any weapon.  At 6:15 p.m., Karayof saw a man whose hands were up struck in the chest with a tear gas canister, causing him to fall backwards.  Karayof noted law enforcement officers shot additional tear gas canisters as he and others were bottlenecked on the bridge.  Later, Karayof noted law enforcement officers shot explosive devices and tear gas canisters toward both corners of the northern barricade and as people ran, additional canisters were shot into the crowd.  Karayof noted the tear gas caused his eyes and throat to burn, he had difficulty breathing, he gasped for air, and vomited.  Karayof saw other protesters vomiting, screaming, and crying. Karayof said he saw 20 protesters hit with rubber bullets.  Karayof observed protesters being directly sprayed with water while their eyes were closed and their hands were fixed in a praying position. Karayof was doused with water as he carried blankets and ponchos to others.

Thomas Frazier, a former commissioner of the Baltimore Police Department, reviewed the parties' briefs and the affidavits submitted and opined,

> In my professional opinion the Defendants' representation that what happened on November 20, 2016 near standing Rock was a riot is overstated and inaccurate.  It was, by and large, a crowd control event.  By that I mean there were a handful of

protestors whose intentions were to challenge law enforcement activity and cross police lines. They threw objects and attempted to breach the concertina wire and move the vehicle on the bridge. The one person able to cross the concertina wire was immediately arrested. The bulk of the protestors were there to protect tribal lands and sacred religious sites. Though present, these persons did not challenge law enforcement, were prayerful, and not assaultive in any way and there was, therefore, no justification to use force on them. Even assuming that there were persons on the front line who were throwing objects or otherwise posing a physical threat to the police, the reach of law enforcement's shoulder fired weapons and the water cannon were from 25 to 100 yards, an expansive area which encompassed and reached protestors who had no intention of challenging the line of law enforcement. The reach of these weapons ensured that individuals outside any zone or area that even could be considered to be directly confronting law enforcement could be and was subject to serious bodily injury. This is contrary to modern law enforcement standards for use of force.

See Docket No. 81-1, p. 3. Frazier went on to state, "If any protestor were able to breach the concertina wire, there were adequate law enforcement officers on the skirmish line to effect an immediate arrest." See Docket No. 81-1, p. 4. Frazier also noted, "Perhaps the true nature of the protest is best demonstrated by the fact that, despite the Defendants' claim that the protest was out of control, only one arrest was made and there was only one minor injury to an officer." See Docket No. 81-1, p. 4.

Frazier expressed the following concerns regarding the use of direct fired impact munitions, launched munitions, and water hoses on the crowd:

Law enforcement's unnecessary use of these weapons and the resulting serious injuries from their use are important reasons which justify the Plaintiff's request that this Court prohibit the reckless use of [] these weapons. If the victims of these weapons had violated the law, there were enough law enforcement officers present to arrest them. Therefore, there exists no reasonable justification for their use.

Additionally, the use by law enforcement of shotgun fired bean bag rounds, as seen in video supplied to me by the plaintiffs, is excessive. These are highly dangerous weapons which should never be used indiscriminately in a crowd, yet that is exactly what I saw based on the video evidence. It is inappropriate and excessive force to shoot beanbag rounds, or to launch direct impact sponge rounds, into a crowd for the purpose of crowd dispersal. Launched munitions, including explosive grenades, gas, and smoke canisters, with their high trajectory, as evidenced by the video, landed far behind protestor lines, injuring persons on the periphery of the protest who were clearly not advancing on the police. This too was an unnecessary use of force, and was also likely responsible for many of the fires reported by law enforcement. Also, when an emergency call for assistance is broadcast, the level of

training of responding officers is unknown and thus use of specialty impact munitions, explosive grenades and other weapons that require specialized training is contra-indicated.

I have never seen in any other American city or county, the use of water hoses or a water cannon against a United States citizen for any reason although I have read about this occurring in the early 1960s against civil rights marchers. The brute force of the impact of the water jet is a force option that would not be considered appropriate by most modern police chiefs or sheriffs, or tolerated by their citizenry. In this case, the use of this device in sub-freezing temperatures, in my opinion, serves no reasonable purpose and can only be considered a retaliatory and punitive action. Not only can the water jet cause injury when applied at such short range, but the water was also subsequently sprayed in a wide arc and far behind protestor lines, seemingly to get as many protestors wet as possible. The video evidence shows indiscriminate use of the water on peaceful protesters who were not being aggressive towards the police. In the sub-freezing weather, its use was certain to cause hypothermia, which it did. It was reported that approximately two dozen people were hospitalized for hypothermia on the night in question. This was an obvious and predictable outcome of the use of the water jet. Further, it was clearly intentional, and unnecessary on the part of the law enforcement decision makers.

See Docket No. 81-1, pp. 4-5.  Frazier further noted:

[A]lthough I would never condone [the] use of hoses or water cannons on protesters, or [the] indiscriminate use of impact munitions on a crowd, if the intention was crowd dispersal, such use should have ceased as soon as it became apparent that it was not having the desired effect.  Law enforcement should distinguish between persons who attack the police or actively resist arrest, and protesters who disobey dispersal orders as an act of symbolic civil disobedience. There is no legitimate reason to continue using force on demonstrators who are simply nonviolently disobeying a dispersal order once it is clear that they are determined to hold their ground until arrested.  The only proper police response is to make arrests – not to deliberately inflict physical punishment.

See Docket No. 81-1, pp. 5-6.

A number of declarations submitted by the Plaintiffs in their reply brief note the protesters never heard any announcements from law enforcement officials warning the protesters to move south, one declarant only heard one announcement from law enforcement officials, and one declarant noted that he heard one announcement to step back, but there was not enough time to do so before impact munitions were utilized. See Docket Nos. 81-4, p. 1; 81-12, p. 2; 81-16, p. 1; 81-21, p. 2; 81-23, pp. 1-3; 81-25, pp. 4-5.  Several declarants said they observed law enforcement officers employ force

indiscriminately on the protesters, including individuals who were not threatening or attacking law enforcement officers. See Docket No. 81-2, p. 2; 81-5, p. 2; 81-18, p. 3; 81-21, pp. 1-2; 81-26, pp. 1-2; 81-27, pp. 9, 17-18; 81-28, p. 2. The Plaintiffs also contend the Defendants' use of excessive force has continued. In support of their assertion, the Plaintiffs submitted a declaration by Marcus Mitchell which states he was injured on January 19, 2017, when law enforcement officers again used impact munitions to disperse a crowd of protesters from the Backwater Bridge. See Docket No. 81-10.

As noted by this Court in Dakota Access, LLC v. Archambault, et al., in September 2016, the majority of the protesters are non-violent. However, it is clear and undisputed there are a sizeable minority of protesters who can best be categorized as a group of unlawful and violent agitators who are masked up; terrorize law enforcement officers with taunting, threats, and acts of violence; and whose primary purpose is to simply create chaos and mayhem. To describe these agitators as "peaceful and prayerful" defies common sense.

State and local public officials have taken action in attempts to get the mayhem under control. On August 15, 2016, the Morton County Board of Commissioners declared a state of emergency due to the unlawful activity occurring at the DAPL project site which threatened the health, well-being and safety of law enforcement officers and the general public, and required additional manpower, resources and other expenditures to protect life and property. See Docket No. 61-4. On August 19, 2016, North Dakota Governor Jack Dalrymple signed Executive Order 2016-04 authorizing the total utilization of the North Dakota State Emergency Operations Plan to respond to the situation. See Docket No. 58-2. On September 8, 2016, Governor Dalrymple activated a military police unit to support law enforcement efforts with primary responsibilities to be with traffic control points and administrative duties. See Docket No. 61-2, pp. 15-16. The State of North Dakota made an Emergency Management Assistance Compact request to other states for law enforcement assistance on October 7, 2016, due to the escalated protest activities by individuals protesting the pipeline

construction. See Docket No. 61-2, p. 40.  By October 2016, law enforcement had made 269 arrests in relation to the DAPL protests. See Docket No. 61-2, p. 49.

### IV.    THE DEFENDANTS' VERSION OF EVENTS

#### A.  OCTOBER 27, 2016

Prior to October 27, 2016, the protesters had re-established the camp ("North Camp") on private property (Cannonball Ranch) located north of the Backwater Bridge, without permission to do so, in the direct path of the pipeline project. See Docket Nos. 52, p. 2; 54, pp. 2-3. The camp was located east of Highway 1806 and extended eastward and south along Highway 1806 from a point where the Dakota Access pipeline had planned to cross beneath Highway 1806. See Docket Nos. 52, p. 2; 54, pp. 2-3.  The North Camp included teepees, tents and other structures. See Docket Nos. 52, p. 2; 53, p. 2; 54, p. 3; 55, p. 8.

It was estimated several hundred protesters were occupying the North Camp and private property, with an additional 80 protesters with a dozen horses located at the County Road 134 site. See Docket Nos. 52, p. 3; 53, p. 2; 54, p. 4.  Protesters had also established road blocks on County Road 134 and on Highway 1806, including at the Backwater Bridge. See Docket Nos. 52, p. 2; 53, pp. 1-2; 54, p. 4; 55, p. 3.  The undisputed evidence reveals protesters refused commands by law enforcement and government officials on October 26, 2016, to vacate the private property and remove protester-built road blocks, despite repeated assurances by law enforcement officials to protesters they were "free to go" and would not be arrested if they simply walked south to the Seven Council Fires Camp, located south of the Backwater Bridge. See Docket No. 55, pp. 3-4.

On October 27, 2016, law enforcement's efforts to remove the blockades and protesters from private property located north of the Backwater Bridge was met with violence.  See Docket Nos. 52, pp. 3-5; 53, p. 3-6; 54, pp. 4-6; 55, pp. 6-9.  Protesters threw rocks, logs, bottles, feces, and other debris at officers and one woman pulled a weapon and fired three rounds near the police line. See

Docket Nos. 52, p. 3; 53, pp. 4-5; 54, p. 4; 55, pp. 7-8; 61-5.  Some of the protesters wore ear plugs, goggles or gas masks and wore bandanas over their face to conceal their identities. See Docket Nos. 52, p. 4; 53, pp. 2-3; 54, p. 4; 55, p. 6.  Protesters burned heavy construction equipment used on the DAPL project, set fire to a vehicle on Highway 1806 near the North Camp, set fire on a bridge on County Road 134, tried to set a vehicle on fire under an electrical transmission tower located along Highway 1806, and set a vehicle and an electronic highway sign on fire near the north end of the Bridge. See Docket Nos. 52, pp. 4-5; 53, pp. 3, 5-6; 54, pp. 4-6; 55, p. 7-9.  As the police line proceeded south toward the Backwater Bridge, protesters threw Molotov cocktails (homemade explosives) at law enforcement. See Docket Nos. 53, p. 6; 54, p. 6; 55, p. 9.  It is undisputed that protesters secured themselves to buried anchors located in structures and to vehicles located on Highway 1806 with devices called sleeping dragons. See Docket Nos. 53, p. 4; 54, p. 5.  Another protester attempted to secure himself with a sleeping dragon to the Mine Resistant Ambush Protected ("MRAP") vehicle utilized by law enforcement officials on Highway 1806 in an attempt to immobilize it. See Docket No. 54, p. 5.  Protesters on horseback intentionally stampeded several hundred bison toward law enforcement officers and other protesters – twice, which were diverted by the intervention of a nearby helicopter which moved the bison away from people. See Docket Nos. 52, p. 4; 53, p. 5; 54, p. 5; 55, pp. 7-8.  Protesters also attempted to flank the police line. See Docket Nos. 52, p. 4; 53, p. 5; 55, p. 7.

The record reveals protesters repeatedly resisted law enforcement's commands, and it frequently took three or four law enforcement officers to restrain and cuff a single protester. See Docket Nos. 52, p. 4; 53, p. 4; 54, p. 5; 55, p. 7.  Law enforcement officers reported the observance of numerous weapons on the protesters during this incident, including a firearm, hunting knives, hatchets, large logs, large rocks, and other weapons. See Docket Nos. 52, p. 4; 53, p. 4-5; 54, pp. 4-5; 55, p. 4-9.  One or more protesters drove a vehicle beneath an electric powerline tower located a

short distance to the east of, and near the intersection of County Road 134 and Highway 1806, placed a rag in its gas tank, and tried to set it on fire. See Docket Nos. 52, p. 5; 53, p. 6.

After law enforcement officials moved protesters south of the Backwater Bridge, law enforcement placed and disabled two large military surplus dump trucks across the north side of the Backwater Bridge as a barricade. See Docket Nos. 53, p. 6; 54, p. 6; 55, pp. 8-9. Within roughly 10-15 minutes of these vehicles being placed on the bridge, protesters set both vehicles on fire. See Docket Nos. 52, p. 5; 53, p. 6; 54, p. 6; 55, pp. 8-9. Protesters also set a third vehicle and a North Dakota Department of Transportation ("DOT") electronic sign on fire near the north end of the bridge. See Docket Nos. 52, p. 5; 53, p. 6; 54, p. 6. It is undisputed that protesters gathered on the bridge and refused commands to leave. See Docket No. 54, p. 6.

The Backwater Bridge was deemed unsafe and closed to all access on October 28, 2016, by the DOT due to a large fire the protesters had started on the bridge on October 27, 2016, including the burning of a vehicle on the bridge (in addition to the two burned out dump trucks), and under the authority granted pursuant to N.D.C.C. § 24-03-05 and the Governor's Executive Order 2016-04, signed on August 19, 2016. See Docket Nos. 58, pp. 2-3; 58-1; 58-2; 59; 59-2; 59-3.

During the October 27, 2016, violent incident, it is undisputed protesters also assaulted a DAPL construction worker north and east of the bridge, by forcing the worker's vehicle off the road and chasing him while bearing weapons, firing a flare gun at him, and then burning the worker's vehicle , all of which was captured on video. See Docket No. 61-6. The worker was ultimately extricated by Bureau of Indian Affairs officers near the bridge where he had been surrounded by protesters along the shoreline. See Docket Nos. 61-3, p. 11 and 61-6.

The record reveals law enforcement officers arrested 141 protesters on October 27, 2016—a majority for conspiracy to endanger by fire, explosion, engaging in a riot and maintaining a public nuisance. See Docket No. 54, p. 6. As of October 28, 2016, law enforcement had made 411 arrests in relation to the DAPL protest. As of 12:00 a.m. Friday morning (October 28, 2016), law

enforcement were holding a line north of the bridge to prevent protesters from moving north—the same location law enforcement would hold the line again during the subsequent November 20, 2016, riot. See Docket No. 54, p. 6.  The protesters' stated objective is to stop completion of the pipeline project across the Missouri River by any means possible.  Photographs of the riot and damage caused by protesters is available on the Morton County website. See Docket Nos. 61-2, pp. 69-81; 61-3, pp. 1-8.

Pursuant to correspondence from the Corps to the Morton County Sheriff's Department on November 1, 2016, the Corps formally requested the assistance of law enforcement in removing protesters from the Corps-managed lands located north and east of the Backwater Bridge. See Docket Nos. 61-3, p. 12 and 61-7.  The Corps advised that isolated groups had been observed on October 31, 2016, using small boats to travel form the Seven Council Fires Camp, up the North Branch of the Catapeta Creek, to land and encamp upon Corps-managed federal lands located north of the bridge.  The Corps advised it had not provided any permits or permission for anyone to access that area, and advised the area had not been opened for use by the public for recreational or camping purposes.  It is undisputed the Corps considered such individuals to be trespassers.

Law enforcement officers investigated the Corps' report and discovered the protesters were rebuilding a man-made, wooden bridge across the Cantapeta Creek east of the Backwater Bridge near the confluence of the Cannonball River. See Docket No. 52, pp. 5-6.  The wooden bridge violated numerous federal and state law and provided protesters access to the Corps-managed land on the north short, and direct access to the nearby Dakota Access pipeline project site located immediately to the north.  Protesters attempted to cross the creek at this location (Turtle Island to Turtle Hill) via man-made structures, boats, kayaks, canoes, swimming and wading, despite repeated warnings by law enforcement not to do so. See Docket No. 52, pp. 5-6.  Protesters at this location threw rocks, bricks, a paddle, and other objects at law enforcement officers located on the north shoreline and in boats utilized to dismantle the illegal structures. See Docket No. 52, pp. 6-7.

18

As stated by Cass County Sheriff Paul Laney:

In my 27 years in law enforcement, I have never seen such an absolute disregard for the law, or other people's rights because of someone else's ideology. The idea that because you have a strong opinion about something means you can threaten, harass and intimidate other American citizens is just plain wrong. I took an oath to protect the first amendment, but I also took an oath to protect citizens from this continual harassment and intimidation.

See Docket No. 61-3, p. 13.

Between October 27, 2016, and the November 20, 2016, riot, protesters also engaged in unlawful activities at other locations throughout Morton County and Burleigh County, including: creating illegal roadblocks on Highway 6 south of St. Anthony; creating illegal roadblocks on County Road 135 and County Road 81; trespassing on private property; slashing tires on six law enforcement vehicles; damaging construction equipment used on the DAPL project; blocking a BNSF railway by attempting to set a disabled vehicle, placed across the tracks, on fire west of Mandan; resisting arrest; and otherwise ignoring lawful commands from law enforcement. See Docket No. 61-3, pp. 13-22.


## B. **NOVEMBER 20, 2016**

Prior to the November 20, 2016, riot, protesters had been making incursions onto private land (including the Cannonball Ranch across from which the pipeline project passes) and Corps-managed property located north of the bridge, for over three months.  On November 20, 2016, both of the previously burned Morton County trucks were located next to, and south, of the jersey barriers and concertina wire barricades on the north side of the Backwater Bridge which blocked Highway 1806. See Docket No. 54, p. 7-8.  Both trucks were chained with large log chains to the concrete jersey barriers, and formed a part of law enforcements' barricade.  There were two rows of jersey barriers running east-west across Highway 1806, with each row positioned approximately 12 to 15 feet apart. Between the rows of jersey barriers were three rows of concertina wire, with one row lying atop two ground level rows.  The Backwater Bridge was closed by the DOT following the fire on October 27,

2016.  The bridge was marked by two large signs stating "No Trespassing," and Highway 1806 was shutdown at this location.  See Docket Nos. 52, p. 11; 54, p. 8.  The Corps had requested that law enforcement prevent protesters from trespassing on Corps-managed land located north of the Seven Council Fires Camp.  See Docket No. 61-7, p. 1.

The November 20, 2016, incident started in the afternoon when, against the repeated warnings and commands of law enforcement officers located on the north side of the barricade, protesters used a large bolt cutter and a semi-truck to cut the chain securing the burned out dump truck located in the west lane, and drug it away from the law enforcements' barricade.  See Docket No. 54, pp. 7-9.  The protesters then returned to remove the remaining burned out dump truck which was secured to, and a part of, the law enforcements' barricade.  The affidavits submitted by the Defendants reveal the number of protesters on the Backwater Bridge swelled at this point to several hundred.  See Docket No. 54, p. 9.  The Defendants contend the protesters appeared to be prepared for an assault on the roughly 20 law enforcement officers manning the barricade.

The protesters organized themselves into two principal bodies – a forward staged siege group wearing rain coats, goggles, and bandanas over their faces, and bearing assorted shields made of plywood, plastic, and corrugated tin/steel, along with tarps, and a larger group which remained further back south on the Backwater Bridge.  See Docket Nos. 52, p. 10-11, 15-16; 53, p. 6-10; 54, pp. 9, 11, 15.  The forward group utilized their shields and tarps to form a mobile barricade to shield themselves and other protesters from law enforcements' view and from any force which may be applied by law enforcement.  See Docket Nos. 52, p. 15; 53, p. 10; 54, pp. 11-12.  The protesters moved this mobile barricade up against the barricade to shield other protesters who were attempting to cut the chains on the remaining burned out dump truck, and protesters cutting the concertina wire in the law enforcement's barricade.  See Docket Nos. 52, pp. 10-11, 15-16; 53, p. 7-9; 54, p. 11-12, 14-17.  Law enforcement officers gave repeated warnings over a Long Range Acoustic Device ("LRAD") that

protesters were trespassing and that protesters should disengage and return to the south side of the bridge. See Docket Nos. 52, pp. 13-15; 53, pp. 7, 10; 54, pp. 8-10, 15-17.

It is undisputed that protesters were yelling profanities and throwing and slinging large rocks, lug nuts, construction nuts, padlocks, frozen water bottles, and other objects at law enforcement officers. See Docket Nos. 52, pp. 11-12, 14-16;53, pp. 7, 11; 54, pp. 9-10, 12-13, 17; 61-3, pp. 46-55 (photographs of weapons recovered following the riot). The record reveals law enforcement officers feared for their physical safety due to the imminent threats of serious bodily injury or death they were encountering. See Docket Nos. 52, pp. 11-12; 53, p. 12; 54, pp. 11, 13-14, 16-17.

Law enforcement officers then deployed hand-tossed CS gas canisters to drive protesters away from the barricade, but due to the wind blowing to the northwest, the gas crossed over the police line, and its use was discontinued. See Docket Nos. 53, p. 9; 54, p. 11. Protesters also threw the CS gas canisters back at law enforcement. See Docket Nos. 53, p. 9; 54, p. 12. Officers attempted to stop the forward siege group and protesters from throwing objects through the use of OC spray and direct impact sponge and bean bag rounds, again to a limited effect due to the protesters' mobile barricade and law enforcements' barricade. See Docket Nos. 52, p. 14; 53, pp. 8-10, 12; 54, pp. 9-11, 13-14. Police shields were requested for the first time during the ongoing DAPL protests due to the constant barrage of objects being thrown at law enforcement. See Docket No. 54, p. 11. Not all officers had helmets as the quarter master had run out. See Docket No. 54, p. 12. **A second "Code Red" was issued requesting all available law enforcement officers to respond within a 100-mile radius.** See Docket No. 54, p. 12.

The record reveals protesters crossed the bridge and took up positions along the east and west flanks of the police line, starting several large bonfires along the east flank and along the north shore of the Cantapeta Creek. See Docket Nos. 52, pp. 12-13; 53, pp. 6-7; 54, pp. 12-13. One of the bonfires was built within approximately 30 feet of law enforcements' barricade and protectors in that vicinity began throwing burning logs at the police line. See Docket No. 54, p. 13. A brush truck from the

Mandan Rural Fire Department was requested to address the fires. <u>See</u> Docket Nos. 52, pp. 13-14; 54, p. 14-16; 56, pp. 1-2.

As law enforcement reinforcements started to arrive, and when there were approximately 70 officers on the scene to deal with approximately 800 – 1,000 protesters on or north of the Backwater Bridge, the officers formed a shield line along the barricade. <u>See</u> Docket No. 54, p. 12.  The protesters threw shields across the concertina wire, and one protester climbed over law enforcements' barricade. <u>See</u> Docket Nos. 53, p. 10; 54, p. 15.  This individual was the only person arrested during the riot— law enforcement was fully occupied in holding the line. <u>See</u> Docket No. 54, p. 15.

While the siege group was working on cutting the concertina wire and the chains securing the truck to the barricade, and while other protesters continued to throw objects at law enforcement officers, a group of approximately 150 protesters gathered in the west ditch north of the bridge and proceeded west and north in an attempt to flank the police line. <u>See</u> Docket Nos. 52, pp. 12-13; 53, pp. 11-12; 54, p. 12.  A small group of roughly 20 officers proceeded west to intercept this group. <u>See</u> Docket Nos. 52, pp. 12-13; 54, p. 12.

During this time period, law enforcement officers on the scene were also being marked by lasers and spotlights by individuals on high ground. <u>See</u> Docket Nos. 52, pp. 12-13; 53, p. 11; 54, p. 12.  The record reveals there was concern about being targeted by snipers, consistent with previously known social media threat and intelligence regarding weapons in the possession of protesters. <u>See</u> Docket Nos. 52, pp. 12-13; 53, p. 11; 54, p. 12.  Law enforcement officers were also concerned about being overrun by the aggressive and violent protesters, and the possible consequences of that eventuality.  <u>See</u> Docket Nos. 52, p. 12; 53, p. 12; 54, pp. 13-14; 56, pp. 3-4; 57, pp. 4-5.  In addition to being concerned about the obvious risks to the physical safety of law enforcement officers on the scene is overrun, there was genuine concern about the potential need to resort to deadly force for the protection of law enforcement and emergency responders on site, and concern about the potential loss of law enforcement vehicles (including armored vehicles) and the weapons and munitions which may

later be used by the protesters against law enforcement and others. See Docket Nos. 52, pp. 12, 14-16; 53, p. 12; 54, pp. 13-14.  **At that time, a "Signal-100" was issued, requesting the assistance of all available law enforcement, state-wide.** See Docket No. 54, p. 14.  The record reveals a number of photographs of the riot.  See Docket No. 61-3, pp. 38-40.

With fire apparatus on the scene, and the methods being utilized by law enforcement proving ineffective against the protesters, permission was requested, and received from command, to utilize water to extinguish fires and hold the police line. See Docket Nos. 52, pp. 13-15; 53, pp. 8-9; 54, p. 14.  Following repeated warning by law enforcement, both in relation to the ongoing trespass and commands to proceed south of the bridge, and in relation to the intended application of water, water was ultimately deployed against protesters utilizing the mobile barricade and attempting to dismantle and penetrate the law enforcement barricade, and those throwing objects at law enforcement officers. See Docket Nos. 54, pp. 14-15; 56, pp. 2-3; 57, pp. 2-5.  The Defendants contend no "water cannon" was involved. See Docket Nos. 54, p. 15; 56, p. 3; 57, p. 4.  The Defendants also assert the application of water was crucial to law enforcements' ability to prevent the penetration of law enforcements' barricade and prevent serious bodily injury or death to law enforcement and emergency responders on the scene as a result of the immediate threats presented by the protesters. See Docket No. 54, p. 16.

On November 25, 2016, the Corps notified the Standing Rock Sioux Tribe they were closing the Corps-managed land located north of the Cannonball River, an area encompassing the Seven Council Fires Camp, to all public access and use, effective December 5, 2016. See Docket No. 61-11.  The Corps advised anyone found on the property after December 5th would be considered trespassing and subject to prosecution.  The Corps said the decision was necessary to protect the general public from the dangerous confrontations between protesters and law enforcement officials which have occurred in the area, and to reduce the risk of harm to people in the encampments due to the harsh North Dakota winter conditions. See Docket No. 61-11.  The Corps also established a free

speech zone located south of the Cannonball River for use by the protesters—an area more accessible to emergency services.

On November 28, 2016, and pursuant to Executive Order 2016-08, Governor Jack Dalrymple ordered the immediate mandatory evacuation of all persons occupying areas managed by the Corps located in Morton County due to severe winter conditions, and ordered no person shall return to the evacuation area. See Docket No. 61-8. The evacuation area encompasses the Seven Council Fires Camp located immediately south of the bridge. Despite the Governor's order, protesters remained in the evacuation area.

On December 4, 2016, in an attempt to de-escalate the situation, law enforcement moved its presence further north, away from the Backwater Bridge and out of visual site from the bridge. See Docket No. 61-3, p. 64. This decision was based upon the following conditions:

1)   The protesters would agree to stay in the identified protest area which is the main camp and south of the Backwater Bridge, and not on the bridge.

2)   The protesters would agree to stay off the bridge unless a prearranged meeting with Morton County is approved.

3)   The protesters do not, at any time, attempt to remove any barriers or wires from the bridge. It is not their property and it remains there for safety reasons.

4)   The protesters do not, at any time, move north of the bridge by walking, riding or flying a drone. This includes trying to flank Law Enforcement on any side.

See Docket No. 61-3, p. 64. The protesters were advised that "[a]dhering to these requests will show good faith by the protest groups, and will reinforce their message of peaceful and prayerful gatherings. Violation of these requests will show that protesters have chosen to be aggressors by violating the law, and it will result in their arrest." See Docket No. 61-3, p. 64.

On January 24, 2017, United States President Donald Trump signed a presidential memorandum regarding the construction of the Dakota Access pipeline:

MEMORANDUM FOR THE SECRETARY OF THE ARMY

SUBJECT: Construction of the Dakota Access Pipeline

Section 1. Policy. The Dakota Access Pipeline (DAPL) under development by Dakota Access, LLC, represents a substantial, multi-billion-dollar private investment in our Nation's energy infrastructure. This approximately 1,100-mile pipeline is designed to carry approximately 500,000 barrels per day of crude oil from the Bakken and Three Forks oil production areas in North Dakota to oil markets in the United States. At this time, the DAPL is more than 90 percent complete across its entire route. Only a limited portion remains to be constructed.

I believe that construction and operation of lawfully permitted pipeline infrastructure serve the national interest.

Accordingly, pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby direct as follows:

Sec. 2. Directives. (a) Pipeline Approval Review. The Secretary of the Army shall instruct the Assistant Secretary of the Army for Civil Works and the U.S. Army Corps of Engineers (USACE), including the Commanding General and Chief of Engineers, to take all actions necessary and appropriate to:

(i) review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL, including easements or rights-of-way to cross Federal areas under section 28 of the Mineral Leasing Act, as amended, 30 U.S.C. 185; permits or approvals under section 404 of the Clean Water Act, 33 U.S.C. 1344; permits or approvals under section 14 of the Rivers and Harbors Act, 33 U.S.C. 408; and such other Federal approvals as may be necessary;

(ii) consider, to the extent permitted by law and as warranted, whether to rescind or modify the memorandum by the Assistant Secretary of the Army for Civil Works dated December 4, 2016 (Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota), and whether to withdraw the Notice of Intent to Prepare an Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota, dated January 18, 2017, and published at 82 Fed. Reg. 5543;

(iii) consider, to the extent permitted by law and as warranted, prior reviews and determinations, including the Environmental Assessment issued in July of 2016 for the DAPL, as satisfying all applicable requirements of the National Environmental Policy Act, as amended, 42 U.S.C. 4321 et seq., and any other provision of law that requires executive agency consultation or review (including the consultation or review required under section 7(a) of the Endangered Species Act of 1973, 16 U.S.C. 1536(a));

(iv) review and grant, to the extent permitted by law and as warranted, requests for waivers of notice periods arising from or related to USACE real estate policies and regulations; and

(v) issue, to the extent permitted by law and as warranted, any approved easements or rights-of-way immediately after notice is provided to the Congress pursuant to section 28(w) of the Mineral Leasing Act, as amended, 30 U.S.C. 185(w).

(b) Publication. The Secretary of the Army shall promptly provide a copy of this memorandum to the Speaker of the House of Representatives, the President pro tempore of the Senate, the Majority Leader of the Senate, and the Governors of each State located along the Dakota Access Pipeline route. The Secretary of the Army is authorized and directed to publish this memorandum in the Federal Register.

(c) Private Property. Nothing in this memorandum alters any Federal, State, or local process or condition in effect on the date of this memorandum that is necessary to secure access from an owner of private property to construct the pipeline and facilities described herein. Land or an interest in land for the pipeline and facilities described herein may only be acquired consistently with the Constitution and applicable State laws.

Sec. 3. General Provisions. (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

https://www.whitehouse.gov/the-press-office/2017/01/24/presidential-memorandum-regarding-construction-dakota-access-pipeline.

## V.     LEGAL ANALYSIS

The Plaintiffs seek to obtain a preliminary injunction pursuant to Rule 65(b) of the Federal Rules of Civil Procedure.  Rule 65(b) directs the court to look to the specific facts shown by an affidavit to determine whether immediate and irreparable injury, loss, or damage will result to the applicant.  It is well-established in the Eighth Circuit Court of Appeals that the court is required to consider the factors set forth in Dataphase Systems, Inc., v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981), in determining whether a preliminary injunction should be granted.  The *Dataphase* factors include "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability the movant will succeed on the merits; and (4) the public interest."  Id.

It is well-established that the movant has the burden of establishing the necessity of a preliminary injunction. Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994).  "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." Id. at 1472.

### A.  PROBABILITY OF SUCCESS ON THE MERITS

When evaluating a movant's likelihood of success on the merits, the court should "flexibly weigh the case's particular circumstances to determine 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'"  Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987).  At this stage, the Court need not decide whether the party seeking the preliminary injunction will ultimately prevail.  PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007).  Although a temporary restraining order or a preliminary injunction cannot be issued if the movant has no chance on the merits, "the Eighth Circuit has rejected a requirement as to a 'party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.'"

Id.  The Eighth Circuit has also held that of the four factors to be considered by the district court in considering preliminary injunctive relief, the likelihood of success on the merits is "most significant." S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1992).

The Plaintiffs' complaint alleges six separate causes of action, denoted as claims one through six, claims three through six ("Policies, Customs, or Practices," "Training, Supervision, or Discipline," "Unequal Protection of Law," and "Declaratory Relief") are merely derivative of, and dependent upon the Plaintiffs' prevailing upon their claims of ("Retaliation") and/or two ("Unreasonable Use of Force").  Claim One, alleging Retaliation, contends the Defendants, by causing the Plaintiffs to suffer injuries, have chilled the exercise of their free speech rights in violation of the First, Fourth, and Fourteenth Amendments.  Claim Two alleges the Defendants used unreasonable force in dispersing the Plaintiffs on the Backwater Bridge on November 20, 2016, in violation of their Fourth and Fourteenth Amendment rights.

The United States Supreme Court has said the First Amendment cannot be utilized as a justification for trespass, and the government has the right to enforce trespass laws as to both private and public property.  See Adderley v. State of Florida, 385 U.S. 39, 47-48 (1966) (rejecting protesters' argument they had a constitutional First Amendment right to remain in the curtilage of a jailhouse over the objection of the sheriff, concluding "[t]he United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose.").  As explained by the United States Supreme Court in Cox v. State of Louisiana:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means

of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.

We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. See the discussion and cases cited in No. 49, post, at p. 480. We reaffirm the statement of the Court in Giboney v. Empire Storage & Ice Co., supra, 336 U.S., at 502, 69 S.Ct., at 691, that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

379 U.S. 536, 554-55 (1965) (citations omitted).

It is clear and undisputed that on November 20, 2016, the Backwater Bridge and Highway 1806 near Cannonball, North Dakota, were closed to the general public and to all of the pipeline protesters. The Backwater Bridge is comprised of two driving lanes with no sidewalks in a 65 mile-per-hour zone. The DOT closed the Backwater Bridge immediately following the October 27, 2016, riot and prior to November 20, 2016, for safety reasons due to damage to the bridge caused by fires started by protesters. See N.D.C.C. § 24-03-05 (authorizing DOT to close any portion of a highway by posting same with suitable signs and placement of barricades, and making it unlawful to remove, pass through, over, or around any such barricade). It is undisputed the Backwater Bridge remained closed on November 20, 2016. No public access on the bridge was allowed on November 20, 2016, for any purpose. The Backwater Bridge was heavily barricaded, manned by law enforcement officers, and the bridge and surrounding areas were secured areas. All persons, other than authorized law enforcement or government officials who entered upon the Backwater Bridge, or any location north of the bridge within the vicinity of the events on November 20, 2016, were trespassing and in violation of the law.

The United States Supreme Court has said the control of traffic on public bridges, highways, and streets is a clear example of governmental responsibility to ensure peace, order, and the rule of law.  Even "peaceful and prayerful" protesters cannot insist upon marching, picketing, or protesting on public bridges, streets, and highways as a form of freedom of speech or assembly, or a means of social protest, at any time or place they choose without restrictions.  Even the demonstrations by DAPL protesters on the streets of downtown Bismarck were unlawful without the proper permits and permission of city officials.  No one has the constitutional right to insist upon protesting on public bridges or highways whenever they unilaterally decide to do so, and without any permission to do so.

The Court finds that law enforcement officials had the clear authority to direct the Plaintiffs and other protesters to disperse and remove themselves from the Backwater Bridge and land located along the north bank of the North Branch of the Cantapeta Creek on November 20, 2016.  The named Plaintiffs and pipeline protesters did not have an unfettered constitutional right to exercise their First Amendment rights on the Backwater Bridge on November 20-21, 2016.  Based on a careful review of the record before the Court, the Plaintiffs are unlikely to prevail on their claim of retaliation.  The Plaintiffs have not sustained their burden of proof, and the burden of establishing the necessity of a preliminary injunction, based on the record before the Court.  The Court also finds that based on the current record, the Plaintiffs are unlikely to prevail on their claims of excessive force under the Fourth or Fourteenth Amendments.

It is well-established in the Eighth Circuit Court of Appeals that to determine "whether a particular use of force was excessive, [the court] consider[s] whether it was objectively reasonable under the circumstances[,] . . .rely[ing] on the perspective of a reasonable officer present at the scene rather than the '20/20 vision of hindsight.'"  Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012) (quoting Graham v. Connor, 490 U.S. 386, 396 (1986)); Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002) ("Force is excessive when an officer's actions are not objectively reasonable in light of the facts and circumstances confronting him.").

The first step in analyzing an excessive force claim under 42 U.S.C. § 1983 is to identify the specific constitutional right allegedly infringed upon.  The Plaintiffs allege an excessive force claim under the Fourth Amendment.  The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. Amend. IV.   An excessive force claim under the Fourth Amendment requires an allegation of the use of excessive force by the government in connection with a seizure of the plaintiff.  "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).

The Plaintiffs have neither alleged they were arrested or detained by law enforcement officials on November 20, 2016, nor alleged they were informed by law enforcement officers they were not free to leave and walk away.  The Plaintiffs and other pipeline protesters could have easily removed themselves from the Backwater Bridge and the presence of law enforcement by simply complying with lawful commands, voluntarily disengaging from law enforcement, and dispersing and proceeding south and away from the barricade on the Backwater Bridge and the secured areas manned by law enforcement officers.

Assuming for the sake of argument the Plaintiffs have alleged viable excessive force claims under the Fourth Amendment, the relevant inquiry is whether the level of force applied was "objectively reasonable" based on a totality of the circumstances analysis.  See Graham v. Connor, 490 U.S. 386, 396-97 (1989).

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.   Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.  Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

Graham, 490 U.S. at 396-97.

At this early stage of the litigation, and after a careful review of the record, the Court finds no reasonable juror could conclude the level of non-lethal force used by law enforcement officers during the chaos on November 20, 2016, at the Backwater Bridge was objectively unreasonable, based on the totality of the facts and circumstances that confronted law enforcement officers on the bridge. **The record reveals two "Code Reds" and a "Signal 100" requesting the aid of <u>every</u> available law enforcement officer statewide were utilized – which are emergency measures not taken lightly.** Intermediate and *less-lethal* force was utilized by law enforcement personnel after commands for protesters to disperse.

The videos reviewed by the Court reveal a very chaotic scenario with law enforcement officers outmanned and flanked by protesters on and around the bridge area. The Court is fully aware of the indiscriminate use of water and other forms of *non-lethal* force that were used that evening in the midst of the darkened chaos. The Court is also cognizant that is it sometimes difficult for a law

enforcement officer to determine how the doctrine of excessive force will apply to the particular factual situation the officer is confronted with. See Ashcroft v. Kidd, 563 U.S. 731, 742 (2011).

The Court further finds that based on the record reviewed at this stage, the Plaintiffs are unlikely to prevail on their claim of excessive force under the Fourteenth Amendment. The Fourteenth Amendment Due Process Clause protects citizens from governmental deprivation of life, liberty, and property without due process of law. U.S. Const. Amend. XIV. The Eighth Circuit Court of Appeals has noted the standard which must be met to establish excessive force in violation of the Fourteenth Amendment is a more burdensome standard than is applied under the "objective reasonableness" standard utilized under the Fourth Amendment. The claimant must establish, among other things, the specific application of force which "shocks the conscience." Wilson v. Spain, 209 F.3d 713, 716 (8th Cir. 2000).

Based upon the record presented to the Court, the Court finds the Plaintiffs are unlikely to succeed on the merits of their claims, and they have not sustained their burden of proof. Thus, this *Dataphase* factor weighs against the requested injunctive relief.


### B. IRREPARABLE HARM

In their request for injunctive relief, the Plaintiffs are asserting a possibility that law enforcement officers may use excessive force at some undetermined time and place, and in relation to unknown factual circumstances that cannot reasonably be predicted at this time. This Court has held that the 'mere possibility' harm may occur before a trial on the merits is not enough" to establish irreparable harm if injunctive relief is not granted. MKB Management Corp. v. Burdick, 954 F.Supp.2d 900, 912 (D.N.D. 2013). The party seeking injunctive relief has the burden to show that a significant risk of harm exists, and the absence of such a showing is sufficient grounds to deny a request for injunctive relief. This *Dataphase* factor weighs against the issuance of a preliminary injunction.

### C.  **THE BALANCE OF HARM**

The balance of harm *Dataphase* factor examines the harm to all parties to the dispute and other interested parties, including the general public.  See *Dataphase*, 640 F.2d at 114; Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991).  The Court finds that the harm to the public interest in maintaining law and order, preserving the peace, protecting the lives and safety of law enforcement officers when upholding the rule of law, and preserving private and public property, far outweighs the Plaintiffs' claim of entitlement to protest in locations where they have no legal right to be, and while engaging in unlawful behavior.  The rights of free speech and assembly do not mean the Dakota Access pipeline protesters can trespass on public or private property, or protest on public bridges, streets, and highways without permission, whenever they choose to do so under the guise of such activity being a "peaceful and prayerful protest."  Simply stated, those who protest on city streets while failing to obtain proper permits and permission from city authorities, or protest on public bridges or rural highways closed to the general public, are in violation of the law.  Such persons are subject to prosecution in the courts of the cities, counties, or states where the unlawful activity occurs.  The Court finds this *Dataphase* factor weighs against the issuance of a preliminary injunction.


### D.  **THE PUBLIC INTEREST**

The Plaintiffs have essentially asked the Court to find that their interests to protest (and trespass) upon the Backwater Bridge and Highway 1806, near Cannonball, North Dakota, outweigh the public interest in preserving and protecting the peace and rule of law.  Based upon a careful consideration of all the evidence presented by the parties to date, the Court finds that the public interest strongly weighs against the issuance of a preliminary injunction.  As previously noted, the rights of free speech and assembly do not mean, and have never meant, that everyone who chooses to protest against the Dakota Access pipeline may do so at any time, any place, and under any set of

conditions they choose in total disregard of the law.  To allow that to occur would result in anarchy and an end to the rule of law in civilized society.  This *Dataphase* factor weighs strongly in favor of a denial of a preliminary injunction.


## VI.   <u>CONCLUSION</u>

It is not realistically possible to predict the dangers law enforcement officers and others will face in the future relative to the Dakota Access pipeline protests.  The protests have plagued western North Dakota for more than six months, with the resulting mayhem that has occurred on the Backwater Bridge, Highway 1806, the city streets, and rural highways.  The events that occurred on the Backwater Bridge on November 20-21, 2016, are a tragedy.  All parties involved bear some responsibility for the chaos that day.  However, it is clear the Plaintiffs and pipeline protesters had no constitutional right to be present and engage in civil protest on the Backwater Bridge and Highway 1806 on November 20-21, 2016.  Their presence was in clear violation of the law.  Under well-established Eighth Circuit law, the protesters bear the burden of proof, and bear the burden of establishing the necessity of a preliminary injunction.  The Court concludes the Plaintiffs have not met that difficult burden.   A careful consideration of the entire record, and the *Dataphase* factors, reveals the *Dataphase* factors do not weigh in favor of the Plaintiffs.  The Plaintiffs' motion for a preliminary injunction (Docket No. 2) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 7th day of February, 2017.

<u>/s/ Daniel L. Hovland</u>
Daniel L. Hovland, Chief Judge
United States District Court