IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NORTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| VANESSA DUNDON, JADE KALIKOLEHUAOKALANI WOOL, CRYSTAL WILSON, DAVID DEMO, GUY DULLKNIFE III, MARIAH MARIE BRUCE, FRANK FINAN, ISRAEL HOAGLAND-LYNN, and NOAH MICHAEL TREANOR, <br><br> on behalf of themselves and all similarly- situated persons, <br><br>     Plaintiffs, <br><br>     v. <br><br> KYLE KIRCHMEIER, MORTON COUNTY, CITY OF MANDAN, JASON ZIEGLER, STUTSMAN COUNTY, CHAD KAISER, and DOES 1-100, <br><br>     Defendants. | No. 1:16-cv-406 DLH-CSM <br><br> **FIRST AMENDED CIVIL RIGHTS CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **JURY TRIAL DEMANDED** |

## **INTRODUCTION**

1.     This is a civil rights class action for damages, injunctive and declaratory relief arising from defendants' curtailment of plaintiffs' First and Fourth Amendment rights by their indiscriminate use of highly dangerous

Specialty Impact Munitions (SIM), explosive teargas grenades, teargas canisters, and high pressure fire hoses and/or a water cannon, against persons engaged in protests and prayer ceremonies associated with opposition to the Dakota Access Pipeline (DAPL).  Plaintiffs are Native Americans and other concerned citizens, known as "water protectors," who have protested and wish to continue protesting against DAPL as well as in opposition to other actions that endanger the environment and desecrate sacred lands.

2.     On November 20, 2016, the plaintiffs gathered, along with a number of others, to pray and to peacefully protest the continued construction of DAPL and the ongoing blockage to through traffic of public highway 1806 by the State of North Dakota's closing of portions of public highway 1806 south of Mandan, which resulted in reduced vehicular access to Standing Rock Reservation.

3.     At Backwater Bridge, a bridge on Highway 1806, just north of where many of the Water Protectors were camped, plaintiffs engaged in peaceful First Amendment protected activities in a lawful public forum area on or near the bridge that was open and available to pedestrian assembly. Plaintiffs did not cross into the area north of the bridge that was marked and separated by a police barricade and closed to entry and assembly.

4.     The area in which plaintiffs assembled was not stripped of its public forum character, and even were defendants to have had a lawful basis to exclude persons from this public space, they did not adequately or sufficiently communicate that the public forum was closed to pedestrian assembly or otherwise issue an order to plaintiffs to disperse.

5.     Defendants assembled on the north side of the bridge behind a police-constructed barricade.  This assembly included a joint force of officers from

the Morton County Sheriff's Department, City of Mandan Police Department, Stutsman County Sheriff's Department and Doe unknown local law enforcement agencies subject to discovery.

6.     Defendants brought armored vehicles and were armed with an arsenal of dangerous implements and devices, including SIM, explosive teargas grenades, other chemical agent devices, and a water cannon and/or fire hoses which were mounted on an armored vehicle.

7.     The defendants did not give orders to disperse or warnings before the defendants indiscriminately used these weapons to inflict excessive force on the plaintiffs and other peaceful unarmed water protectors, all of whom were on the south side of the police barricade, including soaking them in water despite the subfreezing temperature. On this night, over 200 water protectors, including plaintiffs, were injured by indiscriminate and excessive police force, causing some of the plaintiffs to suffer life altering injuries.

8.     This was not the first or the last time defendants attacked water protectors who were praying and peacefully exercising their right to protest under the First Amendment to the U.S. Constitution.  However, November 20th, represented defendants' most brutal attack on plaintiffs of an increasingly violent campaign by defendants to suppress and chill constitutionally protected rights.

9.     Defendants, including authorized policymakers of the Defendant government entities, have taken no action to change the policies and practices that caused the civil rights violations complained of herein. In fact, defendants have ratified those policies and practices by asserting that they are justified in maintaining their policy of using these dangerous weapons in an indiscriminate manner as a means of crowd dispersal.

10.    This ongoing policy and practice results in the chilling of plaintiffs' rights to freedom of speech and freedom of association. Accordingly, plaintiffs seek an injunction to curtail the unlawful use of excessive force in the form of indiscriminate use of SIM, explosive grenades, chemical agents, and water cannons or hoses on peaceful persons as means of crowd dispersal, without lawful order, prior notice and opportunity to disperse, as well as damages.

## JURISDICTION AND VENUE

11.    This action seeks damages and injunctive relief under 42 U.S.C. §§ 1981 & 1983.  This court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.  It has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.  This court also has jurisdiction under the provisions of 28 U.S.C. § 2201 as this action is filed to obtain declaratory relief regarding the constitutionality of the actions and policies of local government.

12.    Venue properly lies within this District under 28 U.S.C. § 1391(b).  The named defendants perform their official duties in this District, and the events and omissions giving rise to plaintiffs' claims occurred in this District. Intradistrict venue is proper in the Western Division of the District of North Dakota pursuant to D.N.D. Civ. L.R. 3.1 and Gen. L.R. 1.1 because the claims asserted herein arise from acts and/or omissions which occurred in Morton County, North Dakota.

## PARTIES

13.    Plaintiffs VANESSA DUNDON, JADE KALIKOLEHUAOKALANI WOOL, CRYSTAL WILSON, DAVID DEMO, GUY DULLKNIFE III, MARIAH MARIE BRUCE, NOAH MICHAEL TREANOR, FRANK FINAN, and ISRAEL HOAGLAND-LYNN are adults who went to Standing Rock to

support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ (the Seven Council Fires, or Great Sioux Nation), in opposition to the construction and operation of DAPL, which is desecrating their ancestral land and burial sites and threatening the environment and water.

14.    Each of the plaintiffs came to Standing Rock to support the peaceful protest by the water protectors and the people of the Oceti Šakowiŋ (Seven Council Fires, or Great Sioux Nation) in opposition to the construction and operation of DAPL, which is desecrating their ancestral land and burial sites and threatening the environment and water.

15.    Defendant MORTON COUNTY is a body corporate for civil purposes and subject to suit pursuant to N.D. Cent. Code § 11-10-01.

16.    Defendant KYLE KIRCHMEIER is a law enforcement officer, the Sheriff and an authorized policymaker of Defendant MORTON COUNTY. KIRCHMEIER set in motion, supervised, directed, approved, ratified and acquiesced in officers' constitutional violations at the November 20, 2016, demonstration, including but not limited to, the use of indiscriminate and excessive force and deprivation of the plaintiffs' First Amendment rights by Morton County officers and officers of other jurisdictions providing mutual aid. KIRCHMEIER caused these violations by approving or acquiescing in the use by defendants of dangerous weapons at the protest and by maintaining the unconstitutional policy and practice of using dangerous weapons in an indiscriminate manner for crowd dispersal regardless of whether persons subjected to this practice posed a threat justifying the force.

17.    Defendant CITY OF MANDAN is a body corporate for civil purposes and subject to suit pursuant to N.D. Cent. Code § 40-01-02.

18.    Defendant JASON ZIEGLER is a law enforcement officer, the Chief of Police, and an authorized policymaker of defendant CITY OF MANDAN.

ZIEGLER set in motion, supervised, directed, approved, ratified and acquiesced in officers' constitutional violations at the November 20, 2016, demonstration, including but not limited to the use of excessive force and deprivation of the plaintiffs' First Amendment rights by Mandan police officers and officers of other jurisdictions providing mutual aid. ZIEGLER caused these violations by approving the use of dangerous weapons at the demonstration and maintaining the unconstitutional policy and practice of using dangerous weapons in an indiscriminate manner, including for crowd dispersal, regardless of whether persons subjected to it posed a threat justifying the force.

19.     Defendant STUTSMAN COUNTY is a body corporate for civil purposes and subject to suit pursuant to N.D. Cent. Code § 40-01-02.

20.     Defendant CHAD KAISER is a law enforcement officer, the Sheriff, and an authorized policymaker of defendant STUTSMAN COUNTY. On information and belief, KAISER set in motion, supervised, directed, approved, ratified and acquiesced in officers' constitutional violations at the November 20, 2016 demonstration, including, but not limited to the use of excessive force and the deprivation of the plaintiffs' First Amendment rights by Stutsman County officers and officers of other jurisdictions providing mutual aid. On information and belief, KAISER caused these violations by approving the use of dangerous weapons at the demonstration and maintaining the unconstitutional policy and practice of using dangerous weapons in an indiscriminate manner for crowd dispersal regardless of whether persons subjected to it posed a threat justifying that force.

21.     The individual defendants are sued in their individual capacities.

22.     Plaintiffs are ignorant of the true names and/or capacities of defendants sued herein as DOES 1 through 100, inclusive, and therefore

initiate suit against said defendants by such fictitious names. plaintiffs will amend this complaint to allege their true names and capacities when ascertained. The DOE defendants include other individuals who supervised and/or participated in the conduct complained of herein. Plaintiff is informed and believes and therefore alleges that each of the DOE defendants is legally responsible and liable for the incident, injuries and damages hereinafter set forth, and that each of said defendants proximately caused said incidents, injuries and damages by reason of their negligence, breach of duty, negligent supervision, management or control, violation of constitutional and legal rights, or by reason of other personal, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, or control or upon any other act or omission. Plaintiffs will ask leave to amend this complaint to insert further charging allegations when such facts are ascertained.

23.     In doing the acts alleged herein, each defendant acted within the course and scope of their employment.

24.     In doing the acts and/or omissions alleged herein, each defendant acted under color of authority and/or under color of law.

25.     In doing the acts and/or omissions alleged herein, each defendant acted as the agent, servant, employee and/or in concert with each of said other defendants.

## **GENERAL ALLEGATIONS**

26.     Plaintiffs VANESSA DUNDON, JADE KALIKOLEHUAOKALANI WOOL, CRYSTAL WILSON, DAVID DEMO, GUY DULLKNIFE III, MARIAH MARIE BRUCE, FRANK FINAN, ISRAEL HOAGLAND-LYNN, NOAH MICHAEL TREANOR, and all other similarly situated persons are herein referred to collectively as "Plaintiffs."  Defendants MORTON

COUNTY, KYLE KIRCHMEIER, CITY OF MANDAN, JASON ZIEGLER, STUTSMAN COUNTY, CHAD KAISER, and DOES 1 to 100 are herein referred to collectively as "Defendants."

27.    In 2014, Energy Transfer Partners proposed to construct a 1,172-mile long Dakota Access Pipeline (hereinafter DAPL) to carry 570,000 barrels a day of highly volatile fracked crude oil from the Bakken oil fields in North Dakota to Illinois.  The pipeline was originally planned to cross the Missouri River, referred to as Mni Šoše by the Lakota people, north of Bismarck, but due to concerns and public outcry by residents of Bismarck about contamination to the water supply, the pipeline company, Dakota Access LLC, rerouted the pipeline.  As of the last census data available, Bismarck had a population of 55,532 and of that, 94.78% are white. http://bismark.areaconnect.com.  The current pipeline route now crosses the Missouri River at Lake Oahe, the primary drinking water source for the Standing Rock and Cheyenne River Sioux Tribes, as well as thousands of other people who live in this area.  The Missouri River is sacred to the Oceti Šakowiŋ people and central to their ways of life and culture.  Lake Oahe is also an area of great cultural, historic, religious, and spiritual significance to the Standing Rock Sioux Tribe, the Cheyenne River Sioux Tribe, and other members of the Oceti Šakowiŋ.

28.    DAPL's path runs through Lakota ancestral and treaty lands known as the Unceded Lands.  Lakota ancestral territories include all of the Dakotas and others.  The 1851 Treaty of Fort Laramie (1851 Treaty) entered into by the United States and the Great Sioux Nation recognized all lands west of the Missouri River in current day North and South Dakota as territory of the Oceti Šakowiŋ.  11 Stat. 749 (Sept. 17, 1851).  The 1851 Treaty encompasses lands through which the DAPL is being and was constructed. In 1868, the

United States entered into a second treaty with the leaders of the Great Sioux Nation (1868 Treaty). 15 Stat. 635 (Apr. 29, 1868).  By Article XVI of the 1868 Treaty, the United States stipulated that this territory would be considered unceded Indian territory, and stipulated that no white person would be permitted to occupy or pass through it without consent of the Indians. These lands became essentially a buffer zone of "Indian territory" between the Great Sioux Reservation and the United States. The Oceti Šakowiŋ have never relinquished the Unceded Lands and under the terms of the 1868 Treaty, cession of further territory could only occur by treaty signed by at least three fourths of all adult male citizens of the nation. The DAPL violates both treaties.

29.     When the United States licensed building of the DAPL across Unceded Lands over the objections of the Oceti Šakowiŋ, the Standing Rock Sioux Nation formally invoked the right of consent and issued a call to all Sioux and their allies to peacefully stand in support of the Nation's sovereignty, treaty rights, territorial rights to the Unceded Lands and to protect people's essential water.

30.     DAPL threatens their environment, fish and wildlife, sacred ceremonial and burial sites, and vital water supply.  The Pipeline and Hazardous Materials Safety Administration (PHMSA) has reported more than 3,300 incidents of leaks and ruptures at oil and gas pipelines since 2010.

31.     In April 2016, Standing Rock and Cheyenne River Tribe members and other concerned citizens, known as "water protectors," began protesting the DAPL.  Despite objections from the Tribes, construction of DAPL began in August, 2016, and water protectors gathered in increasing numbers in spiritually based protest camps near Highway 1806, south of Backwater Bridge, some on private land on the Standing Rock reservation and some on

federal land with the permission of the United States Army Corps of Engineers.

32.    On or about September 3, 2016, Standing Rock tribal officials informed the federal government and DAPL construction managers that the proposed pipeline construction was in direct conflict with traditional sacred areas and burial grounds.  DAPL declined to suspend construction and instead accelerated the destruction of these known areas by their construction.  In response, Indigenous leaders and water protectors went to a location where the pipeline was being built to ceremoniously pray and to attempt to protect the graves and sacred areas from permanent destruction and desecration. DAPL security employees attacked water protectors who were protesting the bulldozing of sacred sites and burial sites with dogs and pepper spray. A number of protesters suffered injuries, including dog bites. Law enforcement, including MORTON COUNTY Sheriff personnel and other unknown officers, monitored this incident but failed to intervene in the unwarranted and vicious attacks on peaceful protestors.

33.    In response to overwhelming tribal and public outcry against the pipeline, on September 9, 2016, the U.S. Army Corps of Engineers ("Army Corps") withdrew an easement to drill and install a pipeline under Lake Oahe and repeatedly requested that DAPL cease all construction within 20 miles of Lake Oahe. Dakota Access, LLC ignored this repeated request by the Army Corps.

34.    Instead, Energy Transfer Partners hired military contractor TigerSwan to run an "information operations campaign" which included surveilling, infiltrating or attempting to infiltrate, sowing divisions within and attempting to discredit the growing movement against DAPL, and engaged in efforts to falsely portray the water protectors as dangerous and violent

including through a robust public relations campaign. According to public documents, TigerSwan coordinated and collaborated with Defendant law enforcement agencies. DAPL paid Tiger Swan to advance DAPL's corporate and financial interests, not the public interest. TigerSwan was unlicensed in the State of North Dakota. Nevertheless, defendant entities allowed this private paid contractor to operate in North Dakota and not only attempt to defame the protestors who opposed DAPL but, additionally, to influence law enforcement actions against civilians protesting construction of the pipeline. In fact, defendants even allowed TigerSwan access to and participation in the Joint Operations Command Center.

35.     At the same time, from September, 2016, on, rather than defending the public interest and halting DAPL's illegal construction, defendants increased their use of force and arrests of water protectors, responding to nonviolent First Amendment expression in an increasingly militarized and violent fashion. On multiple occasions in October, defendants conducted indiscriminate and unlawful mass arrests of people who were exercising their First Amendment rights to voice their opposition to the proposed pipeline, accompanied by unjustified violence against nonviolent protesters. For example, on October 22, 2016, defendants surrounded a peaceful prayer march and arrested 128 people without any warning or opportunity to disperse. On October 27, defendants responded to a demonstration near highway 1806 in Humvees and helicopters, unleashed a Long Range Acoustic Device (LRAD) sound weapon, SIM, and chemical agents on peaceful water protectors, and arrested 148 people, many of whom were engaged in prayer ceremonies, including a number of elders who were strip searched and detained in inhumane conditions for days.

36.     When the arbitrary mass arrests in October failed to deter all protests and expression of First Amendment rights, defendants resorted to even more violent tactics.  On November 2, 2016, hundreds of protesters, including indigenous elders, held a prayer ceremony across a river from the pipeline construction site. When a few protesters entered the frigid river, defendants bombarded the entire group with tear gas and SIM, endangering their safety and health.

37.     Defendants responded to a November 15, 2016 DAPL protest on a public roadway near a DAPL construction yard with widespread and indiscriminate use of chemical agents and stun guns.

38.     Prior to the incident at issue in this case, defendants closed an area of Highway 1806 north of the Backwater Bridge to access. As a barricade demarcating where the road was closed and inaccessible, law enforcement officials placed concertina wire, concrete barriers and two abandoned Morton County trucks north of Backwater bridge, chaining the trucks to the concrete barriers.

39.      Additionally, there were two rows of barriers running east-west across Highway 1806, twelve to fifteen feet apart, separated by three rows of concertina wire, north of Backwater Bridge.

40.     Two "No Trespassing" signs, facing south, were placed behind the concertina wire, north of the bridge, on the sides of the road.

41.     There were no other signs posted in the immediate vicinity of the bridge designating any other areas of the road as off limits and thus physically inaccessible, subject to trespass.

42.     While the highway was closed as a through road, only the area marked by the barricade and "No Trespassing" signs north of the bridge, was identified as closed to pedestrians and assembly. There was no signage near

the south end of the bridge or anywhere on the bridge indicating that the bridge itself was designated as closed to physical access. There was no barrier indicating an area not to be crossed into, similar to the demarcation of the area running north of the bridge.

43.    At no time did defendants communicate to plaintiffs that the bridge was closed to assembly.

44.    On November 20, 2016, starting at approximately 6 p.m. and thereafter, in freezing temperatures, the plaintiffs and hundreds of other water protectors went to the area of Backwater Bridge, south of the barricade and "No Trespassing" signs, to engage in First Amendment activity, including prayer and peaceful protest, of the law enforcement blockade of Highway 1806 north of the bridge and the DAPL under construction nearby. Journalists also went to the area to document the events, and later, medics went to attend to the injured.

45.    Plaintiffs are people of indigenous descent and those allied in support of the indigenous people's struggle against the Dakota Access Pipeline. All of the plaintiffs went to the Backwater Bridge and intended to engage in First Amendment activity.

46.    The plaintiffs and all members of the proposed Class remained south of the law enforcement barricade at all times relevant hereto.

47.    The law enforcement officers, at all times relevant hereto, remained north of and behind the barricade of concertina wire, concrete barriers, and vehicles.

48.    On the night of November 20-21, 2016, plaintiffs did not receive actual warnings or orders to disperse.

49.    A single announcement was made by defendants at 6:23 pm, before most of the protectors arrived at the bridge.  The announcement did not tell

people to leave the area, but rather to stay off the bridge and to remain south of the river shoreline.

50.     This ephemeral and temporal communication to a handful of persons at an earlier time does not constitute a lawful order or warning to the plaintiffs and many others who arrived later and cannot be imputed as issued to them.

51.     After that time, defendants did not issue warnings or orders to disperse to those present in the area and subjected to defendants' use of force.

52.     From at least 7:00 p.m. on, no defendants nor any law enforcement officer gave any amplified orders to disperse or other general instructions to the plaintiffs and assembled crowd, and none of the plaintiffs heard a dispersal order or directive to leave the area in which they were present. At least one person heard a command to "step back", but there was no time to do so before defendants shot SIM and other weapons into the crowd.

53.     Although defendants possessed the means and the opportunity to issue any such order or warning to those assembled and to those subject to their indiscriminate use of force, they chose not to do so prior to use of force.

54.     Defendants and other law enforcement officers unleashed a barrage of freezing water, chemical agents, SIM, and explosive grenades directed toward the entire crowd, for many hours, throughout the night and into the early morning.

55.     Defendants indiscriminately shot, launched, and sprayed their weapons on all persons who were present in the general area of Backwater Bridge.

56.     Defendant used this force excessively and gratuitously against plaintiffs and others engaged in First Amendment protected activities despite the fact that they were not threatening or attacking the officers or attempting to breach the barricade.

57.    The force of the water and munitions knocked most of the plaintiffs and many of the other assembled persons off their feet and otherwise restricted their freedom of movement by stopping them in their tracks and causing injuries. Clouds of chemical agents caused some of the plaintiffs and other assembled persons to be unable to escape or move either north or south off the bridge at certain times. Still others were temporarily stopped from getting to injured persons to aid them and helping them to safety.

58.    Persons who were attempting to leave to the south, as well as people who were standing still, were all indiscriminately attacked with the cold high pressure water, chemical agents, explosive grenades and impact munitions..

59.    Defendants egregiously restrained and intruded upon the liberty and privacy of plaintiffs by their show of force in striking plaintiffs about their bodies with munitions and explosives, assaulting plaintiffs with chemical agents in their eyes, noses and mouths, and drenching plaintiffs with water that froze plaintiffs' hair and clothing.

60.    The plaintiffs and other people on the bridge were variously praying, singing, chanting, protesting verbally, aiding others, taking photos and video, standing still, and walking around. It was apparent that the crowd consisted of individuals engaged in individual activity and was not acting as a monolithic unit or moving as a group toward the barricade.

61.    Among all the people present on the bridge, there was one single individual  who sought to breach the law enforcement barricade by climbing over the concertina wire. Law enforcement immediately arrested and removed that person.

62.    Over the course of ten hours, there was one officer who suffered an undefined minor injury. The officers remained at all times north of the

barricade and were never subject to any attempt to overrun them or any other threat.

63.   By contrast, many plaintiffs and other peaceful water protectors were seriously injured and/or suffered hypothermia, including the specific injuries set forth below in the sections describing each of the plaintiff's experiences.

64.   The vast majority of the crowd remained at a distance from the barricade, and those closest to it were simply standing, demonstrating, and/or praying or singing, and not trying to cross the barricade or assault the officers. At no time did any of the plaintiffs or class members present a threat or do anything to justify defendant's use of force against them.

65.   Defendants' actions deprived plaintiffs of their rights to freedom of speech, freedom of association, freedom of religion, and freedom of the press; to be free from unreasonable searches and seizures; to be free from the use of excessive and/or arbitrary force; and to be free from unreasonable, summary punishment, all guaranteed by the United States Constitution.

## FACTS SPECIFIC TO THE NAMED PLAINTIFFS

### Vanessa Dundon

66.   Vanessa Dundon came to the water protectors' camp on September 11, 2016, to stop the pipeline's desecration of ancestral, sacred and burial sites and its threat to the environment and water supply and stand up for indigenous peoples' rights.

67.   On Sunday, November 20, 2016, Ms. Dundon went to Backwater Bridge immediately north of Oceti Šakowiŋ camp on Highway 1806 to peacefully protest to protect the water.  It was very cold outside.  When she arrived at the bridge in the early evening, there were very few people present.

68.   At that point, a small number of people were using tow equipment in an attempt to move one of the burned out trucks that was blocking the

highway. Ms. Dundon was not a participant in this activity. She did not hear law enforcement make any announcements or orders or any communication between the individuals who were trying to tow the truck and law enforcement.

69.     Ms. Dundon was concerned for the safety of bystanders in the roadway, and began trying to get them out of the path of the vehicles. She saw a woman who appeared to be a journalist standing by herself close to the concertina wire barricade and a line of law enforcement officers who had formed on the other side. Dundon told the journalist to move out of the way. At that moment, she and Dundon were about ten to 20 feet from the barricade and were the people closest to the line of law enforcement officers. As Dundon watched the journalist move to the side of the road, she heard the sound of a weapon being fired, looked up, and saw a tear gas canister coming straight for her face.  It was burning, and about a foot from her face when she saw it, and she did not have time to move to avoid being struck in the face and right eye by the canister.

70.     When Dundon was shot in the eye, she turned around to run away. She was then shot in the back of her left leg right below her butt with a rubber bullet.  The shot with the bullet caused her to fall down.  Dundon called out for help and two water protectors grabbed her arms and helped her reach a minivan.  Dundon's eye was bleeding profusely and she could not see.

71.     Ms. Dundon was one of the first people injured on the bridge, and thus no ambulances had been summoned to Oceti Šakowiŋ camp yet. She had to be transported by volunteer camp medics in the minivan. At the medic yurt at Oceti Šakowiŋ, volunteers placed butterfly sutures on her eye to stop the bleeding. Ms. Dundon was then transported to the Emergency Room at Sanford Hospital in Bismarck, North Dakota.  There, she was seen by an

ophthalmologist who put several stitches in her eye. She was kept overnight in the ER.

72.    Ms. Dundon was eventually told that her eye injury was very serious and that her retina was likely detached or would detach in the near future as a result of the injury. She was referred to a specialist in Minnesota for further treatment, but surgery had to wait until the swelling went down. The doctor initially advised her not to return home to Arizona because of the elevation difference, not to lift anything, cough too hard or otherwise put pressure on her eye. The doctor said that the trauma to her eye would likely affect her vision for the rest of her life. Dundon's eye was in severe pain. There was an almost constant throbbing and pressure in her eye.

73.    Ms. Dundon has had a series of three surgeries to re-attach her retina as a result of defendants' act of shooting her in the eye. She has regained some very limited vision, but has a significant permanent vision loss and ongoing anxiety and distress that have affected her daily activities and ability to work.

74.    Defendants did not issue a warning or order to Dundon prior to subjecting her to force and injury.

75.    Ms. Dundon continues to desire, and possesses the intention, to peacefully and lawfully assemble and express her views and religious beliefs in opposition to the Dakota Access Pipeline and related issues in Morton County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing her to refrain from such intended expressive activities because she is afraid that they will injure her again by such indiscriminate, unlawful and/or excessive use of force that harmed her and other persons engaged in lawful and peaceful activity.

### Jade Kalikolehuaokalani Wool

76.    Jade Kalikolehuaokalani Wool is of Native Hawaiian and Oglala Lakota heritage. Wool came to the water protector camp in August 2016.  As an indigenous woman, she believed she needed to be at the camp in solidarity with the water protectors and to uphold tribal sovereignty rights.

77.    On Sunday, November 20, 2016, in the evening, Wool went to the bridge immediately north of the Oceti Šakowiŋ camp on Highway 1806 to peacefully gather to protest construction of the pipeline underneath the Missouri River. Ms. Wool observed many law enforcement officers and military vehicles on the other side of the bridge, behind the concertina wire and barricades.  When she arrived at the bridge, she could hear people screaming and could see flashes from explosions.  A few minutes after she arrived, a grenade loudly exploded in the air right above her head. The noise of the explosion caused Ms. Wool to temporarily become dazed and lose hearing.

78.    Ms. Wool was also sprayed directly by the fire hoses and/or water cannon. The force of the torrent of water pushed her backward and she was completely soaked. Even her boots were filled with water.  The officers sprayed the hoses and/or water cannon into the crowd for about ten minutes at a time in the freezing night air.  Without explanation or warning, defendants would stop for a few minutes and then start again.  This went on for an hour that Wool was on the bridge attempting to engage in peaceful free speech activities.

79.    Wool was never issued any warning or order from law enforcement, including an order to disperse. Wool did not fail to comply with any order. Wool wished to peacefully engage in First Amendment protected activity.

80.    She saw a water protector who looked like he was injured and was crawling on the ground.  Other water protectors tried to pull him away from

the water and while they were doing this, an officer kept spraying water at the injured man on the ground. Ms. Wool located a plastic lid from a storage tote, and tried to shield the injured man from the water.  She saw the officer shooting the water look directly at her before he hit her again with the water. At one point, the force of the water knocked the plastic lid into her head.

81.    Soon after that, another grenade exploded in front of Ms. Wool's face. Pieces of the grenade hit Wool's face in several places.  The grenade burned her face and knocked her to the ground.  After the grenade hit her, she was in shock and could not talk or respond to others around her.  She remembers being put in a truck and being taken to the medical tent at Oceti Šakowiŋ camp.  She was then transported to the hospital in Bismarck.  The doctors had to cut off her clothes and hook her up to an IV.  Her body ached, and her head hurt.

82.    Ms. Wool was traumatized and shaken by what happened that night. She could barely eat for days and suffered headaches, nervousness and anxiety. She could not sit still very long or sleep through the night and continued to feel cold all the time for quite some time.

83.    Ms. Wool continues to desire, and possesses the intention, to peacefully and lawfully assemble and express her views and religious beliefs in opposition to the Dakota Access Pipeline and related issues in Morton County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing her to refrain from such intended expressive activities because she is afraid that they will injure her again by such indiscriminate, unlawful and/or excessive use of force that harmed her and other persons engaged in lawful and peaceful activity.

**Crystal Wilson**

84.    Crystal Wilson is of Blackfoot and Afro-indigenous heritage. She came to the water protectors' camp in late September, 2016, to gather with other indigenous people. At the camp, she volunteered and participated in peaceful, prayerful actions.

85.    On Sunday, November 20, 2016, around 7:00 p.m., Ms. Wilson went to the bridge immediately north of Oceti Šakowiŋ camp on Highway 1806 to peacefully protest the pipeline and pray with other water protectors. Police were shooting high pressure water, tear gas canisters and explosive grenades at her and other peaceful, unarmed water protectors.  After about an hour, she left and then later returned to the bridge with warmer clothing to continue to engage in peaceful First Amendment protected activities.

86.    When she returned, a native elder was singing an indigenous song with his arms outstretched on either side, and the police were soaking him with the water, even though it was very cold outside.  Ms. Wilson held a piece of plastic up to shield others so that they could engage in peaceful First Amendment activities. Then, she heard a bang and was struck in the chest by a SIM or other projectile. She also she noticed that her hair and back were covered in ice from defendants' soaking her in water.

87.    Ms. Wilson was never issued any warning or order from law enforcement, including an order to disperse. Wilson did not fail to comply with any order. Wilson wished to peacefully engage in First Amendment protected activity.

88.    As a result of defendants' actions, Ms. Wilson has suffered pain and trauma which are still continuing at the present time.

89.    Ms. Wilson continues to desire, and possesses the intention, to peacefully and lawfully assemble and express her views and religious beliefs in opposition to the Dakota Access Pipeline and related issues in Morton

County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing her to refrain from such intended expressive activities because she is afraid that they will injure her again by such indiscriminate, unlawful and/or excessive use of force that harmed her and other persons engaged in lawful and peaceful activity.

### David Demo

90.     David Demo is of Penobscot heritage. Demo is a supporter of the movement to stop DAPL who came to the water protectors' camp in mid-August 2016, to protest the pipeline's desecration of ancestral sacred and burial sites and its threat to the environment and water supply.

91.     On Sunday, November 20, 2016, around 8:30 or 9 p.m., Mr. Demo went to the bridge immediately north of Oceti Šakowiŋ camp on Highway 1806 to peacefully observe what was going on and document the events with a GoPro camera.

92.     Mr. Demo was holding his "GoPro" camera on a stick, filming the police and the spraying of water. Within minutes, he was targeted with the water and was thoroughly soaked for about thirty seconds, even though he was not threatening the police or barricade in any way.  He was not issued orders to get off the bridge or warnings that he would otherwise be assaulted with the water or that projectiles would be fired against him.  As he attempted to continue filming the police misconduct, one of the officers targeted him and shot him with a SIM or other projectile in the middle finger of his right hand, which was holding the video camera on a stick.

93.     Mr. Demo went to the Indian Health Service (IHS) hospital in Fort Yates at approximately 6:30 a.m. on November 21, 2016, to get treatment for his hand where he had been shot.  The doctors told him he had several broken bones, and that he would need reconstructive surgery.

94.     He never heard, and he was never issued, an order to disperse while he was on the bridge on the night of November 20-21, 2016.  He heard officers say to step back from the barricade.  Demo complied with all police orders. Demo did step further back from the barricade when the officers requested it, but he still was targeted with the water and munitions.

95.     The events of November 20-21 were very traumatic for Demo. It was shocking for Demo to observe and experience such brutal, cruel, unlawful and excessive force by public officers.

96.     In addition to being subject to indiscriminate use of force, Demo was targeted by defendants with unlawful force in retaliation for his First Amendment protected activity of recording their actions and conduct.

97.     Mr. Demo continues to desire, and possesses the intention, to peacefully and lawfully assemble and express his views and religious beliefs in opposition to the Dakota Access Pipeline and related issues in Morton County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing him to refrain from such intended expressive activities because he is afraid that they will injure him again by such indiscriminate, unlawful and/or excessive use of force that harmed him and other persons engaged in lawful and peaceful activity.

## Guy Dullknife III

98.     Guy Dullknife III is a member of the Oglala Lakota Sioux Tribe and a resident of the Pine Ridge Indian Reservation in South Dakota. The Oglala Lakota is one of the seven nations, the Seven Council Fires, that compose the Oceti Šakowiŋ. The Missouri River is a main water source for the Pine Ridge Reservation. The Reservation is within the poorest county in the United States, and the tribal community there would not be able to afford to buy

water to replace the water from the Missouri.  He came to peacefully protest the pipeline which may leak and cause harm to his community.

99.    On the evening of November 20, 2016, at around 10 or 11 p.m., Mr. Dullknife went to the bridge over the Cannonball River on Highway 1806 north of Oceti Šakowiŋ camp to observe the prayer assembly. When he arrived, he observed that the police were using water cannons and/or fire hoses to soak water protectors.  He observed a woman kneeling about twelve to fourteen feet from the barricade, and the police spraying the high pressure water directly at her, knocking her down.  The police continued spraying the woman while she was on the ground even though she posed no threat to the police.  Another person helped Dullknife hold up a board to protect the woman from the water and allow her to pray.

100.    Mr. Dullknife was hit in the chest, stomach, and leg by what he believes were shotgun-fired beanbags or another SIM. He sustained pain and bruising.

101.    Mr. Dullknife observed the police shoot and injure many people that night with SIM, chemical agents, and explosive grenades.  He overheard the officers laughing and celebrating after they hit people with projectiles.

102.    Mr. Dullknief was never issued any warning or order from law enforcement, including an order to disperse. Wilson did not fail to comply with any order. Wilson wished to peacefully engage in First Amendment protected activity.

103.    Mr. Dullknife continues to desire, and possesses the intention, to peacefully and lawfully assemble and express his views and religious beliefs in opposition to the Dakota Access Pipeline and related issues in Morton County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water

spray is causing him to refrain from such intended expressive activities because he is afraid that they will injure him again by such indiscriminate, unlawful and/or excessive use of force that harmed him and other persons engaged in lawful and peaceful activity.

## Mariah Marie Bruce

104.   Mariah Marie Bruce is a member of the Houma Nation. Ms. Bruce arrived at Oceti Šakowiŋ camp in mid-October, 2016, and was present at several protests and prayer marches.  She has protested and wishes to continue protesting the desecration of ancestral sacred and burial sites and DAPL's threat to the environment and water supply.

105.   On November 20, 2016, at about 6:30pm, Ms. Bruce went to the bridge immediately north of the Oceti Šakowiŋ camp to peaceably protest DAPL. When Bruce got near the bridge,  she saw concertina wire barricade at the north end of the bridge with the police lined up behind it, marking the closed area north of the barricade.  She then walked to the front of the area open to assembly and was sprayed by police officers with a powerful stream of water, which continued throughout the entire time she was peaceably protesting at the bridge. Her two inner jackets were wet, and her outer jacket and skirt were frozen. At the end of the night she had trouble moving her hands.  Her hair was also frozen. The tear gas and/or other chemical agents burned her eyes, nose and lungs.

106.   Ms. Bruce bent down to grab a lid to a plastic container to protect herself, and while she was bent over a police officer hit her in the genitals with an explosive teargas blast grenade, which exploded on her body.  Ms. Bruce did not feel any immediate physical pain in that area, and remained at the protest for another 20-30 minutes before seeking medical attention. The medics at Oceti Šakowiŋ camp gave her tea to help her body warm up, as she was very cold. As her body began to warm, she started to feel pain in her

pelvic area. The pain suddenly worsened and she began vomiting.  The medics became very concerned. Bruce was put into an ambulance and taken to Sanford Hospital in Bismarck, North Dakota.

107.   Ms. Bruce was never issued any warning or order from law enforcement, including an order to disperse. She did not fail to comply with any order. Ms. Bruce wished to peacefully engage in First Amendment protected activity.

108.   Ms. Bruce continued to experience severe pain and difficulty walking for many months after being shot. She is also concerned about how this injury could impact her ability to have children in the future.

109.   Ms. Bruce continues to desire, and possesses the intention, to peacefully and lawfully assemble and express her views in opposition to the Dakota Access Pipeline and related issues in Morton County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing her to refrain from such intended expressive activities because she is afraid that they will injure her again by such indiscriminate, unlawful and/or excessive use of force that harmed her and other persons engaged in lawful and peaceful activity.

## Frank Finan

110.   Frank Finan came to North Dakota to document DAPL's desecration of ancestral sacred and burial sites as a journalist, and because he is concerned about environmental injustice. On November 20, 2016, in the evening, he went to the bridge north of Oceti Šakowiŋ. On the other side of the bridge, Finan observed that there were police officers and many military-like vehicles. He could see water being aimed and shot at water protectors.  There were two small campfires along the side of the highway, which were well controlled. He observed a constant flow of injured, wet water protectors being

removed from the bridge and carried away by medics.  He saw canisters being thrown by the police, and he heard sounds like gunshots.

111.   While on the bridge, Mr. Finan was sprayed with a cloud of chemical agent that burned his eyes badly and made him cough.  He left the bridge to get away from the gas and to get his camera. When returned to the bridge, he began taking photos to document the police actions. While taking photos, he was shot in the abdomen by a police officer with a rubber bullet or other SIM. The shot was so forceful that he was knocked to the ground. Some water protectors helped him to get up, and he was taken to see medics. He suffered pain whenever he tried to stand-up or sit-down for some time after this incident.

112.   Mr. Finan was never issued any warning or order from law enforcement, including an order to disperse. He did not fail to comply with any order. Finan wished to peacefully engage in First Amendment protected activity.

113.   Mr. Finan continues to desire, and possesses the intention, to peacefully and lawfully assemble, express his views in opposition to the Dakota Access Pipeline and related issues and document protests in Morton County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing him to refrain from such intended expressive activities because he is afraid that they will injure him again by such indiscriminate, unlawful and/or excessive use of force that harmed him and other persons engaged in lawful and peaceful activity.

## Israel Hoagland-Lynn

114.   On November 20, 2016, at about 8:00 p.m., Israel Hoagland-Lynn went to the bridge over Highway 1806 north of Oceti Šakowiŋ camp to peacefully protest the DAPL.  While on the bridge he was sprayed with water.  He left

the bridge to warm up.  On his way back, he saw two Native Americans crouching on the ground and was asked to help shield those individuals with plywood to protect them from getting shot by the water and SIM.  While holding the plywood to shield the Native Americans, Hoagland-Lynn was continually sprayed with the water cannon and/or fire hoses.  The police were also shooting SIMs in his direction.  A water protector next to him was shot in the finger. When Mr. Hoagland-Lynn reached over to help the injured person, Hoagland-Lynn was shot in the back by a SIM.

115.   Hoagland-Lynn then looked up and saw an officer pointing a gun or launcher at him.  He curled his head down and shielded his body with the plywood.  He was then hit by a SIM on the top of his head. He fell to the ground and lost consciousness. When he regained consciousness, he felt a significant wound in his head. He was in severe pain. He was taken to the clinic at the Oceti Šakowiŋ camp where the medics tried to stop his bleeding. He was then transferred by ambulance to St. Alexius hospital in Bismarck. At the hospital, he was diagnosed with a laceration on his head, a chest wall contusion from falling after being shot, and a large bruise on his back where he was shot with the first munition.  His head wound required 17 staples to close the laceration.  He suffered from pain in his head and back for some time afterward.

116.   Mr. Hoagland-Lynn was never issued any warning or order from law enforcement, including an order to disperse. He did not fail to comply with any order. Hoagland-Lynn wished to peacefully engage in First Amendment protected activity.

117.   Mr. Hoagland-Lynn continues to desire, and possesses the intention, to peacefully and lawfully assemble and express his views in opposition to the Dakota Access Pipeline and related issues in Morton County and nearby

locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing him to refrain from such intended expressive activities because he is afraid that they will injure him again by such indiscriminate, unlawful and/or excessive use of force that harmed him and other persons engaged in lawful and peaceful activity.

### Noah Michael Treanor

118.   Plaintiff Noah Michael Treanor went to the bridge at about 7 p.m., to peacefully protest and to pray to stop DAPL. He stood there praying for about a half hour when police officers started shooting at him with water and SIM. Mr. Treanor stayed in the same spot for at least two hours while the police shot him with the water and SIM.

119.   Later, Treanor bent down on one knee to pray.  This time the police shot at him at a closer range with water, so he turned around and was shot in the back of his legs with SIM. He turned facing the police again and kneeled and prayed.  Police officers again shot at him with the water and SIM while he prayed.

120.   The police then began using two water hoses on Treanor at the same time.  He rolled onto the grass at the side of the bridge and tried to shield himself, and officers shot him in the head. He had a laceration to his head, and he was bleeding profusely.  Water protectors transported him to Oceti Šakowiŋ camp where he was put into an ambulance and transported to Sanford Hospital in Bismarck. At the hospital, his head wound was stapled together.  He suffered a concussion and many bruises.

121.   Mr. Treanor was never issued any warning or order from law enforcement, including an order to disperse. He did not fail to comply with

any order. Treanor wished to peacefully engage in First Amendment protected activity.

122.   Mr. Treanor is still suffering from post-concussion syndrome and trauma at the present time.

123.   Mr. Treanor continues to desire, and possesses the intention, to peacefully and lawfully assemble and express his views in opposition to the Dakota Access Pipeline and related issues in Morton County and nearby locations in North Dakota, but the defendants' indiscriminate and excessive use of munitions, chemical agents and/or water spray is causing him to refrain from such intended expressive activities because he is afraid that they will injure him again by such indiscriminate, unlawful and/or excessive use of force that harmed him and other persons engaged in lawful and peaceful activity.

## SUBSEQUENT EVENTS

124.   On December 2, 2016, the Standing Rock Sioux Tribe, the Cheyenne River Sioux Tribe and the Yankton Sioux Tribe asked the Inter-American Commission on Human Rights (IACHR) to stop the violence against water protectors at Standing Rock. An official petition has been submitted to the IACHR.

125.   On December 4, 2016, the U.S. Army Corps of Engineers announced that it would deny DAPL the easement to cross the Missouri River and instead prepare an Environmental Impact Statement for alternative routes.

126.   On Jan. 18, 2017, the Army Corps began the Environmental Impact process by publishing a notice soliciting public comment inviting interested parties to identify potential issues, concerns, and reasonable alternatives that should be considered in an EIS.

127.   Also on January 18, 2017, defendants caused another water protector to be shot in the eye and face with SIM, similarly shot into a crowd of

protesters without notice or opportunity to disperse. The water protector suffered very serious injuries requiring surgeries and is blind in that eye.

128.    On Jan. 24, 2017, President Trump signed a memorandum calling for expedited approval of DAPL. On February 8, 2017, the U.S. Army Corps withdrew its objections and granted the easement to drill under Lake Oahe.

129.    On February 15, 2017, Governor Burgum issued an evacuation order for the Oceti Sakowin camp and on February 22, officers carried out the eviction, arresting more than 50 people.

130.    On June 1, 2017, the DAPL began operating. It has leaked at least five times since then.

131.    On June 14, 2017, the United States District Court for the District of Columbia, found that the Trump Administration had violated environmental laws when it hastily issued permits for DAPL to cross the Missouri River. In October, the Court declined a request to shut down the pipeline completely while this further review is taking place, but expressed a willingness to consider alternative interim measures that would reduce risks pending the completion of a new environmental study.

132.    On November 16, 2017, the Keystone Pipeline leaked 210,000 gallons of oil in northeast South Dakota, stirring further public concern over the risks associated with oil pipelines.

133.    On December 4, 2017, the U.S. District Court for the District of Columbia imposed several interim measures on the DAPL operation in an attempt to reduce the risks of further spills. The Standing Rock, Cheyenne River, Oglala and Yankton Sioux Tribes are continuing to litigate to shut down the DAPL.

## CLASS ALLEGATIONS

134.    Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated, pursuant to Federal Rule of Civil Procedure 23

(b)(1), (2), and (3). Plaintiffs seek certification of a class defined as follows: All persons who were shot or harmed by water, SIM, chemical agents, grenades or other weapons on November 20, 2016, in the vicinity of Backwater Bridge, Highway 1806, North Dakota, on the south side of the law enforcement barricade.

135.   The treatment to which plaintiffs, and the class they represent, have and will be subjected—being shot or injured with SIM, explosive grenades, chemical agents, and water cannons or hoses while engaging in First Amendment activities—were all performed pursuant to policies, customs, and/or practices of defendants.

136.   By ordering officers to use unjustified indiscriminate force on the crowd, and failing to adopt policies prohibiting such use of excessive force following that event, defendants have acted on grounds generally applicable to the class, so that injunctive and declaratory relief is appropriate respecting the class as a whole. Pursuant to Federal Rule of Civil Procedure 23(a), the members of the class are so numerous that joinder of all members is impractical. Plaintiffs do not know the exact number of class members. Plaintiffs are informed and believe, and thereupon allege that there are more than 100 persons in the class defined above.

137.   Pursuant to Federal Rule of Civil Procedure 23(a), plaintiffs are informed and believe, and thereupon allege, that there are questions of law and fact common to the class, including but not limited to:

- Whether defendants' use of SIM, water, chemical agents, explosive grenades and other weapons on the plaintiff class constituted unlawful and/or excessive force under the Fourth Amendment;

- Whether defendants' use of SIM, water, chemical agents, explosive grenades and other weapons effected an unlawful restriction on

and/or chill of the plaintiff class' rights to freedom of speech, assembly and association and free exercise of religion in violation of the First Amendment;

- Whether defendants are liable for violating the First and Fourth Amendment rights of the Plaintiff class;

- Whether defendants should be enjoined from continuing to use these weapons indiscriminately and as a mechanism of crowd dispersal including against peaceful persons and in the absence of lawful dispersal orders, warnings, or fair notice.

138.  Pursuant to Federal Rules of Civil Procedure 23(a), plaintiffs' claims are typical of the class they seek to represent.  The named plaintiffs and class members claim that their First Amendment rights have been chilled by the same misconduct of defendants and are based on the same legal theories. Plaintiffs and the class members were all subjected to indiscriminate and excessive force by being shot at or injured by SIM, explosive grenades, chemical agents, water cannons or hoses and other weapons intended to prevent them from exercising their right to peacefully protest and/or pray. Plaintiffs have the same interests and have suffered the same type of injuries as the proposed class.  Each proposed class member suffered actual damages as a result of the challenged conduct.

139.  Plaintiffs' counsels have the resources, experience, and expertise to successfully prosecute this action against defendants. Counsel know of no conflicts among any members of the class, or between counsel and any members of the class.

140.  Pursuant to Federal Rules of Evidence 23(b)(3), upon certification, class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be

identified through reasonable effort.  If this action is certified as a class action, plaintiffs contemplate that individual notice will be given to class members, at such last known address by first class mail, as well as notice by publication informing them of the following:

i.      The pendency of the class action and the issues common to the class;

ii.     The nature of the action;

iii.    Their right to "opt-out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action:

iv.     Their right to "opt-out" to be represented by their own counsel and to enter an appearance in the case; otherwise they will be represented by the named class plaintiffs and their counsel; and

v.      Their right, if they do not "opt-out" to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues adverse to the class.

## REQUISITES FOR RELIEF

141.   As against Government Entity Defendants MORTON COUNTY, CITY OF MANDAN, STUTSMAN COUNTY, and DOE Government Entities, plaintiffs allege that the constitutional violations alleged herein were the proximate result of decisions, orders, acts and omissions of the Government Entity Defendants' authorized policymakers including but not limited to KIRCHMEIER, ZIEGLER, and KAISER, who gave orders which caused the law enforcement officers at the scene to deploy dangerous weapons to the highway blockade, including the armored car mounted water cannon and/or fire hoses, SIM, chemical agents, and explosive grenades, and to use those weapons in an indiscriminate manner against peaceful water protectors, medics and observers, without lawful justification and based simply on their

association with the protest; and set in motion, supervised, directed, approved, and acquiesced in the use of the dangerous weapons in an unconstitutional, indiscriminate, excessive, and unreasonable manner which violated plaintiffs' constitutional rights.

142.   As against Government Entity Defendants MORTON COUNTY, CITY OF MANDAN, STUTSMAN COUNTY, and DOE Government Entities, plaintiffs allege that the constitutional violations described herein were the proximate result of said defendants' policies, customs, and/or practices that permit or are deliberately indifferent to violations of plaintiffs' First, Fourth and Fourteenth Amendment rights secured by the U.S. Constitution.  These include but are not limited to policies, customs and practices which authorize, encourage, condone, ratify and/or acquiesce in the use of excessive force against protesters and water protectors; the use of chemical agents, high pressure water, SIM and explosive grenades against non-violent persons; the failure to properly and/or adequately train, supervise and/or discipline officers with respect to the use of "less lethal" weapons, excessive force, constitutional limitations on the use of force, and First Amendment rights; and/or other customs, policies and/or practices subject to continuing discovery.

143.   The policies, customs and practices of defendants posed a substantial risk of causing substantial harm to plaintiffs, and defendants were aware of the risk.

144.   Plaintiffs are informed and believe that defendants MORTON COUNTY, KIRCHMEIER, CITY OF MANDAN, ZIEGLER, STUTSMAN COUNTY, KAISER, and DOES, and/or each of them, caused the violation of the plaintiffs' constitutional rights as a result of their supervisory malfeasance and/or deliberate indifference to the need for more or different

training, supervision and/or discipline of the law enforcement personnel assigned to the subject incident.

145.   As a direct and proximate result of the conduct of defendants described herein, plaintiffs have been denied their constitutional, statutory and legal rights as stated below, and have suffered general and special damages, including but not limited to, constitutional damages, pain, suffering, humiliation, emotional distress, fear, anxiety, disabilities, medical and related expenses, lost wages, and other damages in amounts according to proof.

146.   The individual defendants' acts were willful, wanton, malicious and oppressive and done with conscious disregard and deliberate indifference for plaintiffs' rights and safety, justifying an award of punitive damages.

147.   Defendants' policies, practices, customs, conduct and acts alleged herein have resulted and will continue to result in irreparable injury to the plaintiffs, including but not limited to violations of their constitutional and statutory rights. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Plaintiffs intend in the future to exercise their constitutional rights of freedom of speech and association by engaging in peaceful protest, prayer, journalism, and other expressive activities in Mandan County and North Dakota. Defendants' conduct described herein and their continuing defense and use of the policies at issue and failure to take adequate measures to prevent a recurrence of this conduct, has created fear, anxiety and uncertainty among plaintiffs with respect to their exercise now and in the future of these constitutional rights.

148.   Plaintiffs therefore seek injunctive relief from this court prohibiting the indiscriminate use of SIM, explosive grenades, chemical agents, and

water cannons or hoses on peaceful persons as means of crowd dispersal, without lawful dispersal order, prior notice and opportunity to disperse.

149.   An actual controversy exists between plaintiffs and defendants in that plaintiffs contend that the policies, practices and conduct of defendants alleged herein are unlawful and unconstitutional, whereas defendants contend that said policies, practices and conduct are lawful and constitutional. Plaintiffs seek a declaration of rights with respect to this controversy.

150.   Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs in amounts to be determined according to proof.

## CLAIMS FOR RELIEF

### ONE – FIRST AMENDMENT (42 U.S.C. § 1983)

151.   The first claim is asserted by plaintiffs and the proposed class against all defendants.

152.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs to the extent relevant, as if fully set forth herein.

153.   Plaintiffs were engaging in constitutional-protected activity when defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, caused plaintiffs to suffer injuries that would chill a person of ordinary firmness from continuing to engage in that activity. Plaintiffs' association with the water protectors and opposition to the DAPL were substantial and motivating factors for the defendants use of force on them. The acts and/or omissions of the defendants, and each of them, individually and/or while acting in concert with one another, chilled the plaintiffs' rights to freedom of speech, expression and association and freedom of the press, under the First Amendment to the United States

Constitution. These actions were carried out pursuant to policy, practice and custom of municipal defendants.

154.   Defendants' coordination and collaboration with TigerSwan, the private, unlicensed contractor paid by DAPL to further its viewpoint and financial interests, also effected a content-based application of law and law enforcement in violation of plaintiffs' First Amendment rights.

155.   As a direct and proximate result of defendants' actions, plaintiffs suffered injuries entitling them to recover compensatory and punitive damages and declaratory and injunctive relief against the individual defendants.

WHEREFORE, plaintiffs pray for relief as hereunder appears.


## TWO - UNREASONABLE USE OF FORCE

### (Fourth & Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)

156.   The second claim is asserted by plaintiffs and the proposed class against all defendants.

157.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs to the extent relevant, as if fully set forth herein.

158.   Defendants, acting or purporting to act in the performance of their official duties as law enforcement officers, used unreasonable force on plaintiffs. The unreasonable force to which plaintiffs were subjected included defendants' shooting at them with SIM, explosive teargas grenades, teargas canisters and other chemical agent devices, and water cannons and/or fire hoses in a subfreezing temperature, without justification. These actions were carried out pursuant to policy, practice and custom of municipal defendants.

159.   As a direct and proximate result of defendants' actions, plaintiffs suffered injuries entitling them to compensatory damages and declaratory and injunctive relief against defendants.

WHEREFORE, plaintiffs pray for relief as hereunder appears.


## THREE - UNEQUAL PROTECTION OF THE LAW

160.   The third claim is asserted by plaintiffs and the proposed Class against all defendants.

161.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs.

162.   Defendants, acting under the color of state law, subjected plaintiffs to unequal protection of the law in violation of plaintiffs' constitutional rights. The unequal treatment to which plaintiffs were subjected was based on plaintiffs' status as indigenous persons or association with indigenous persons and their political and religious beliefs in opposition to DAPL and fossil fuels, and includes the use of excessive force on plaintiffs when plaintiffs were attempting to exercise their constitutional rights.

163.   As a direct and proximate result of defendants' actions or inactions, plaintiffs suffered injuries entitling them to receive compensatory damages and declaratory and injunctive relief against defendants, and punitive damages against the individual defendants.

WHEREFORE, plaintiffs pray for relief as hereupon appears.


## FOUR - DECLARATORY RELIEF
### (28 U.S.C. § 2201)

164.   The fourth claim is asserted by plaintiffs and the proposed Class against all defendants.

165.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs to the extent relevant, as fully set forth in this Claim.

166.   There presently exists an actual controversy within this Court's jurisdiction regarding whether or not defendants' actions and inactions described are lawful, pursuant to the First and Fourth and Fourteenth Amendments of the U.S. Constitution.  Plaintiffs are interested parties because they were subject to actions and inactions described and, accordingly, seek a declaration of their rights concerning the legality of those actions and inactions to which they were subject.

167.   As a direct and proximate result of defendants' actions and inactions, plaintiffs suffered and are continuing to suffer injuries and chilling of their First Amendment rights, entitling them to receive declaratory and injunctive relief against defendants.

WHEREFORE, plaintiffs pray for relief as hereupon appears.

## FIVE - ASSAULT AND BATTERY

168.   The fifth claim is asserted by plaintiffs and the proposed Class against all defendants.

169.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

170.   Defendants willfully or recklessly caused each of the plaintiffs to suffer offensive harmful contact, serious bodily injury, and/or to have immediate apprehension of offensive harmful contact, severe bodily harm or bodily restraint, by shooting them with munitions, spraying them with high pressure water, and/or launching and/or hurling chemical agent devices and grenades at them, or by causing the force to be used against them.

171.   Said acts by defendants and/or each of them were unreasonable and excessive uses of force.

172.   Plaintiffs did not consent to the use of force against them and were injured thereby.

173.   WHEREFORE, plaintiffs pray for relief as hereunder appears.

## SIX – NEGLIGENCE

174.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint.

175.   Defendants, and/or each of them, individually and/or while acting in concert with one another, owed plaintiffs the duty to use reasonable care to avoid causing foreseeable injury and damage to plaintiffs during the events described in this Complaint The above-described acts and omissions of defendants breached the duty of care defendants owed to plaintiffs.

176.   In doing the acts and/or omissions as alleged herein, defendants and/or each of them, breached said duty to use reasonable care and said breach of duty caused, and/or contributed to the cause, of plaintiffs' injuries and damages as alleged in this Complaint.

177.   Wherefore, the plaintiffs pray for relief as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs seek Judgment as follows:

1. For declaratory and injunctive relief declaring defendants' actions unlawful, and enjoining preliminarily and permanently, from the indiscriminate use of dangerous weapons, including SIM, explosive teargas grenades, teargas canisters, and water cannons and hoses against peaceful persons for crowd dispersal, without lawful dispersal order, notice and opportunity to disperse.

2. For compensatory, general, and special damages for plaintiffs, and for each proposed member of the class, according to proof at trial.

3. For an award of exemplary/punitive damages against defendants KIRCHMEIER, ZIEGLER, KAISER and DOE individual defendants, in an amount sufficient to deter future unlawful conduct by them and others, because their actions and/or inactions, as alleged, were motivated by malice, involved reckless or callous indifference to the federally protected rights, or were wantonly or oppressively done;

4. For an award of reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988, and any other statute or law as may be applicable; and

5. For an award of any other further relief, as the Court deem fair, just, and equitable.

## JURY TRIAL DEMAND

A jury trial is demanded on behalf of plaintiffs VANESSA DUNDON, JADE KALIKOLEHUAOKALANI WOOL, CRYSTAL WILSON, DAVID DEMO, GUY DULLKNIFE III, MARIAH MARIE BRUCE, FRANK FINAN, ISRAEL HOAGLAND-LYNN, NOAH MICHAEL TREANOR, and all persons similarly situated.

Dated:  Jan. 29, 2018

Respectfully Submitted,

/s/ Rachel Lederman_____

By: RACHEL LEDERMAN, CA SBN 130192
Rachel Lederman & Alexsis C. Beach, Attorneys
558 Capp Street
San Francisco, CA 94110
(415) 282-9300
Fax (510) 520-5296
rachel@bllaw.info

Melinda Power
West Town Law Office
2502 W. Division
Chicago, Il. 60622
773-278-6706
773-278-0634
melindapower1@gmail.com

Mara Verheyden-Hilliard
Partnership for Civil Justice Fund
617 Florida Avenue NW
Washington, D.C. 20001
202-232-1180
202-747-7747
mvs@justiceonline.org