IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

Civil No. 1:16-CV-00406

Vanessa Dundon, Jade Kalikolehuaokalani )
Wool, Crystal Wilson, David Demo, Guy )
Dullknife III, Mariah Marie Bruce, Frank )
Finan, Isreal Hoagland-Lynn, and Noah )
Michael Treanor, )
 )
 ) **MEMORANDUM OF LAW IN SUPPORT**
on behalf of themselves and all similarly- ) **OF DEFENDANTS KYLE KIRCHMEIER,**
situated persons, ) **MORTON COUNTY, CITY OF MANDAN,**
 ) **JASON ZIEGLER, STUTSMAN COUNTY,**
Plaintiffs, ) **AND CHAD KAISER'S SECOND MOTION**
 ) **TO DISMISS**
vs. )
 )
Kyle Kirchmeier, Morton County, City of )
Mandan, Jason Ziegler, Stutsman County, )
Chad Kaiser, and Does 1-100, )
 )
Defendants. )

***          ***          ***

## I.     INTRODUCTION

Dismissal of Plaintiffs' claims arising under federal law against both the individually named law enforcement officer defendants, as well as the named political subdivision defendants (collectively "Law Enforcement") is appropriate as Plaintiffs have failed to plead viable claims of violation of their constitutional rights.  In addition, even assuming, arguendo, Plaintiffs have sufficiently alleged a violation of their constitutional rights, individual law enforcement officers are entitled to qualified immunity as any right allegedly violated was not so clearly established at the time of the violation that a reasonable officer would have known that his actions were unlawful. In the event the Court dismisses Plaintiffs' constitutional claims arising under federal law, the Court should abstain from exercising supplemental jurisdiction over Plaintiffs' tort claims governed by state law.

Plaintiffs' retaliation claims under the First Amendment (Claim One) fail as a matter of law as the indisputable facts establish Plaintiffs had no lawful right to be present where they were allegedly exercising speech when force was allegedly applied as to them. All force was allegedly applied in close proximity to Law Enforcement's barricade on the north side of the Backwater Bridge ("Bridge"), or along the north shore of the Cantapeta Creek near the barricade – all restricted areas closed to the public. In addition, Plaintiffs admit protesters with whom Plaintiffs were intermingled were engaged in removing and attempting to remove government property from Law Enforcement's barricade prior to force allegedly being applied to them. The only reasonable inference is the unlawful conduct of the protesters, not protected speech, motivated Law Enforcement's alleged use of force.

Plaintiffs have also failed to allege they were "seized" by Law Enforcement on November 20, 2016, as required for an excessive force claim under the Fourth Amendment (Claim Two). Even assuming a "seizure" has been adequately alleged, Law Enforcement's alleged use of force under the circumstances was objectively reasonable as a matter of law. In the alternative, any right allegedly violated was not so clearly established at the time of the violation that a reasonable officer would have known that his actions were unlawful. Similarly, Plaintiffs fail to allege facts which, in light of matters properly considered by the Court, establish a use of force by Law Enforcement against Plaintiffs which "shocks the conscience", as a matter of law, thereby failing to allege a viable excessive force claim under the Fourteenth Amendment.

By failing to define a suspect class to which all Plaintiffs belong, and failing to identify others allegedly similarly situated with Plaintiffs class who were treated differently from Plaintiffs, and by failing to allege there was no rational basis for any such disparate treatment, Plaintiffs have failed to allege a plausible equal protection claim under the Fourteenth Amendment (Claim Three).

Plaintiffs' allegations of indiscriminate force applied as against all persons in the vicinity of the barricade is fatal to Plaintiffs' equal protection claim.

Plaintiffs' claim for "Declaratory Relief" (Claim Four) is merely derivative of, and dependent upon Plaintiffs' prevailing upon claims one ("Retaliation"), two ("Unreasonable Use of Force"), and/or three ("Unequal Protection of Law"). As Plaintiffs have failed to allege viable claims for retaliation, unreasonable force, and unequal protection of the law, as discussed above, this derivative claim should also be dismissed.

## II.     RELEVANT FACTS

### Matters Which May Be Considered by the Court

In ruling upon a Rule 12(b)(6) motion to dismiss, a district court may consider the plaintiffs' complaint, "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;" without converting the motion into one for summary judgment. *Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012); *Williams v. Employers Mutual Casualty Company*, 845 F.3d 891 (8th Cir. 2017)(quoting *Miller*). In *Miller v. Redwood Toxicology Laboratory, Inc.*, the United States Court of Appeals for the Eighth Circuit upheld a district court's consideration in relation to a Rule 12(b)(6) motion to dismiss of not only the plaintiff's complaint and amended complaint, but also the record created as a result of the plaintiff's motion for temporary restraining order, preliminary injunction and expedited discovery filed by plaintiff after the defendant's motion to dismiss was filed.

In the present action, and as a result of briefing in relation to Plaintiffs' previously denied motion for preliminary injunction (doc. 2), a considerable record has been established in this case,

including numerous affidavits and declarations, public records, photographs, video, etc. While some of the evidence submitted by Law Enforcement contradicts Plaintiffs' allegations contained in their pleadings, a great deal of the evidence in the record does not actually contradict Plaintiffs' purely factual allegations. In any event, discussed below are Plaintiffs' First Amended Complaint, matters incorporated by reference or integral to the claim including Plaintiffs' own sworn declarations, items subject to judicial notice, matters of public record, orders, and items appearing in the record of this case submitted by the Plaintiffs themselves. Such matters, alone, establish Plaintiffs have failed to allege viable claims of violation of their constitutional rights.

In an attempt to circumvent arguments in favor of dismissal of Plaintiffs' claims raised over one year ago in Law Enforcements' 2017 motion to dismiss, Plaintiffs have creatively amended their pleadings by removing admissions against interest, eliminating citations to the Plaintiffs' sworn declarations in support of the original Complaint, and alleging additional facts they perceive sufficient to avoid summary dismissal of their claims. Unfortunately for Plaintiffs, their admissions against interest still exist in the established record via their sworn declarations – statements which were directly incorporated into Plaintiffs' original Complaint, and which Plaintiffs' cannot now reasonably assert are controverted by them. In addition, the additional facts now alleged by Plaintiffs in their Amended Complaint are frequently directly contradicted by either their own sworn declarations, the sworn declarations of other protesters, and/or video evidence – all evidence submitted by the Plaintiffs in support of their original motion for preliminary injunction. To the extent Plaintiffs have submitted evidence which contradicts Plaintiffs' own factual allegations in the First Amended Complaint, this Court is not required to accept as true such allegations for purposes of this motion. *See e.g. Goines v. Valley Community Services Board*, 822 F.3d 159 (4th Cir. 2016) (in the context of considering a motion to dismiss

under Rule 12(b)(6), if an inconsistency exists between the pleading and an exhibit to the pleading upon which the pleading is based, the exhibit prevails.)

<u>Matters of Public Record or of Which Judicial Notice May Be Taken</u>

Adjudicative facts which may be judicially noticed by the Court is governed by Rule 201 of the Federal Rules of Evidence, which provides, in part:

> **(b)  Kinds of Facts That May Be Judicially Noticed**.  The court may judicially notice a fact that is not subject to reasonable dispute because it:
>
> **(1)**  is generally known within the trial court's territorial jurisdiction; or
>
> **(2)** can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

Fed. R. Evid. 201(b) (bold in original).  Law Enforcement requests the Court take judicial notice of the following adjudicative facts.

1.     Protests in Morton County against the DAPL project had been ongoing since at least April of 2016.

2.     A dramatic increase in the number of people involved in these protests occurred on or about August 10, 2016 when protesters began gathering in Morton County, just north of the Standing Rock Sioux Indian Reservation.

3.     On August 15, 2016, the Morton County Board of Commissioners declared a state of emergency due to protester activity occurring at the DAPL project site which threatened the health, well-being and safety of Law Enforcement and the public, and required additional manpower, resources and other expenditures to protect life and property.  (Doc. 61-4.)

4.    On August 19, 2016, North Dakota Governor Jack Dalrymple signed Executive Order 2016-04 authorizing total utilization of the North Dakota State Emergency Operations Plan to respond to the situation.  (Doc. 58-2)

5.    On September 8, 2016, Governor Dalrymple activated a military police unit to support Law Enforcement efforts with primary responsibilities to be with traffic control points and administrative duties.  (Doc. 61-2 at DEF000016.)

6.    The state of North Dakota made an Emergency Management Assistance Compact request to other states for law enforcement assistance on October 7, 2016 due to the escalated unlawful tactics by individuals protesting the construction of the DAPL.   (Doc. 61-2 at DEF000041.)

7.    During the course of the prolonged DAPL protest, protesters principally occupied three areas:  the Sacred Stone Camp and the Rosebud Camp located south of the Cannonball River, and the Seven Council Fires Camp (i.e. Oceti Sakowin) located between the north bank of the Cannonball River and the south bank of the North Branch of the Cantapeta Creek, a tributary of the Cannonball River.

8.    The Sacred Stone Camp and Rosebud Camps were located in Sioux County, whereas the Seven Council Fires Camp was located in Morton County.

9.    The Bridge is located on North Dakota Highway 1806 approximately 35 miles south of Mandan, North Dakota and crosses the north branch of the Cantapeta Creek, north of where the Seven Council Fires Camp was located throughout November of 2016.

10.   The Bridge is located in an isolated rural area of Morton County.

11.   A map depicting the locations of protester camps and related areas of interest as of November 20, 2016 is on file as docket 61-1.

12.     The Bridge is comprised of two driving lanes with no sidewalks thereon in a 65 mile per hour zone.

13.     It is commonly known the location where the Seven Council Fires camp was located floods each spring and flooding occurred there in the spring of 2017.

14.     The drill pad from which the Dakota Access Pipeline was to pass under the Missouri River was located approximately one mile to the northeast of the Backwater Bridge.

15.     The Bridge and Highway1806 at the location of the November 20 events at issue were not traditional public fora at any time prior to the DAPL protests, or during the protests.

16.     The Bridge was deemed unsafe and closed to all access on October 28, 2016 by the North Dakota Department of Transportation, and under the authority granted pursuant to N.D.C.C. § 24-03-05 and the Governor's Executive Order 2016-04, signed August 19, 2016.  (Docs. 58-1, 58-2, 59-2, 59-3.)

17.     The Bridge remained closed to all public access on November 20.

18.     The United States Army Corps of Engineers ("Corps") manages lands upon which all three camps were located, as well as additional federal lands in Morton County located along the north bank of the North Branch of the Cantapeta Creek extending from the Bridge and eastward to and then along the north bank of the Cannonball River, all the way eastward to the Missouri River.

19.     The Corps-managed land located along said north banks, as well as privately owned property north thereof, encompassed the DAPL project route and the location from which the DAPL project then planned to cross the Missouri River via horizontal directional drilling.

20.     The Corps had not granted anyone any permits or permission with respect to public use of Corps managed lands located north of the Cantapeta Creek or north and east of the confluence of the Cantepeta Creek and Cannonball Rivers, extending to the Missouri River.  (Doc. 61-7.)

21.     Pursuant to a lease with a private party, said Corps-managed lands located on the north banks described were at all times relevant herein subject to private grazing rights. (Doc. 61-9.)

22.     On November 1, 2016, the Corps requested Law Enforcement assistance in removing what it described to be trespassing protesters from federal lands located on the north side of the Cantapeta Creek.  (Doc. 61-7.)

23.     Prior to November 20, 2016, protesters had been making incursions onto private land (including the Cannonball Ranch across which the DAPL project passes) and the Corps-managed property located north of the Bridge, and destroyed private property and terrorized citizens and Law Enforcement for over three months.  These facts cannot reasonably be disputed as they have been the subject of voluminous media reports, Law Enforcement press releases, and other litigation before this Court.  *See* this Court's August 16, 2016 *Order Granting Plaintiff's Motion for Temporary Restraining Order* (doc. 7) and September 15, 2016 *Order Cancelling Hearing and Dissolving Temporary Restraining Order* (doc. 45) in an action entitled *Dakota Access, LLC v. Archambault, et al.*, Case No. 1:16-cv-296 (discussing unlawful and violent activities of DAPL protesters).

Plaintiffs' Factual Admissions

Plaintiffs' Amended Complaint is comprised of 42 pages (excluding signature block) and 177 paragraphs. The majority of the pleading is comprised of legal conclusions, often cast in the form of factual allegations – all of which this Court may disregard for purposes of this motion to dismiss. Some of the more blatant examples of such legal conclusions include, among other things: Law Enforcement violated Plaintiffs' constitutional rights; Plaintiffs' were "engaged in peaceful First Amendment protected activities in a lawful public forum area on or near the bridge that was open and available to pedestrian assembly, peacefully protesting and posed no threat or danger to officers and others at the scene"; Law Enforcement did not adequately or sufficiently communicate the location at issue was closed to pedestrian assembly; and Law Enforcement applied indiscriminate and excessive force.

Plaintiffs make several factual admissions, and have themselves submitted evidence, which establishes Law Enforcement did not violate their constitutional rights. These include, among other things, the following:

1.  Plaintiffs admit they had been staying in the Seven Council Fires Camp (i.e. Oceti Sakowin) for several weeks to months prior to November 20, 2016, a camp located immediately south of, and in close proximity to, the Bridge. (Doc. 129 at ¶ 66 [Dundon], 76 [Wool], 84 [Wilson], 90 [Demo], 104 [Bruce], doc. 14-7 at ¶ 2 [Treanor Decl.], doc. 14-8 at ¶ 2 [Hoagland-Lynn Decl.], doc. 14-13 at ¶ 4 [Dullknife Decl.], doc. 14-15 at ¶ 2 [Finan Decl.].)

2.  Plaintiffs admit their objective was to prevent completion of the DAPL – completion of which would occur from a drill pad located a very short distance northeast of the Bridge. (Doc. 129 at ¶¶ 66 [Dundon], 118 [Treanor]; doc. 14-19 at ¶ 4 [Dundon Decl.]; doc. 14-5 at ¶ 3-4 [Wool Decl.]; doc. 14-16 at ¶ 10 [Wilson Decl.]; doc. 14-17 at ¶ 6 [Demo Decl.];

doc. 14-13 at ¶¶ 3-4 [Dullknife Decl.]; doc. 14-9 at ¶¶ 2, 6 [Bruce Decl.]; doc. 14-8 at ¶¶ 2-3 [Hoagland-Lynn Decl.].)

3.  Plaintiffs admit being forcibly removed from, or prevented from accessing, private property located north of the Cantapeta Creek by Law Enforcement on several occasions prior to November 20, 2016, including, among other places, Turtle Hill located on the north shoreline of the confluence of the Cannonball River and Cantapeta Creek, and the DAPL construction sites located north of the Bridge along Highway 1806. (Doc. 129 at ¶¶ 35-38; doc. 14-13 at ¶¶ 6-7 [Dullknife Decl.], doc. 14-16 at ¶¶ 5-8 [Wilson Decl.], doc. 14-17 at ¶ 5 [Demo Decl.]; doc. 14-9 at ¶¶ 3-5 [Bruce Decl.].)

4.  Plaintiffs admit observing Highway 1806 heavily barricaded on the north side of the Bridge and manned by Law Enforcement on November 20, 2016, prior to force allegedly being applied against them. (Doc. 129 at ¶¶ 68-69 [Dundon], 77 [Wool], 85 [Wilson], 92 [Demo], 99 [Dullknife], 104 [Bruce], 110 [Finan]; doc. 14-8 at ¶¶ 5-6 [Hoagland-Lynn Decl.]; doc. 14-13 at ¶ 8 [Dullknife Decl.].)

5.  Plaintiffs admit "Two 'No Trespassing' signs, facing south, were placed behind the concertina wire, north of the bridge, on the sides of the road.". (Doc. 129 at ¶ 40.)

6.  Plaintiff's Amended Complaint does not deny the existence of "No Trespassing on Bridge" signs, immediately alongside the "No Trespassing" signs located on the north side of the concertina-wire barricade located north of the Bridge. Instead, Plaintiffs artfully dodge that fact by phrasing their pleadings on the issue as follows:

    40.  Two "No Trespassing" signs, facing south, were placed behind the concertina wire, <u>north of the bridge</u>, on the sides of the road.

    41.  There were no other signs posted <u>in the immediate vicinity of the bridge</u> designating any other areas of the road as off limits and thus physically inaccessible, subject to trespass.

42. While the highway was closed as a through road, only the area marked by the barricade and "No Trespassing" signs <u>north of the bridge</u>, was identified as closed to pedestrians and assembly. There was no signage <u>near the south end of the bridge or anywhere on the bridge</u> indicating that the bridge itself was designated as closed to physical access. There was no barrier indicating an area not to be crossed into, similar to the demarcation of the area running north of the bridge.

(Doc. 129 at ¶¶ 40-42 (underlining added for emphasis). Plaintiffs are careful to identify specific locations when making allegations as to where signage was and was not located. Notably, Plaintiffs do not allege the "No Trespassing" signs were the only warning signs located "north of the bridge".

7. Video filed by the Plaintiffs in support of their previously denied motion for preliminary injunction establishes the presence of "No Trespassing on Bridge" signs behind the concertina wire barricade on both sides of ND Highway 1806 during the November 20, 2016 riot at issue. (Doc. 100 at meter 3:00 to 3:21 (although illegible due to poor film quality, large white signs are shown along Law Enforcement's barricade on both east and west sides of Highway 1806); *id.* at meter 9:43 (briefly showing "No Trespassing on Bridge" sign on the east side of Highway 1806 [fuzzy]); doc. 91 at MP4 file with numeric file name beginning "10000000" at meter 9:28 to 9:35 (clearly showing large white sign with black lettering "No Trespassing on Bridge" sign leaning against Humvee and facing south on east side of Highway 1806 – police line now established); doc. 91 at MP4 file with name beginning "Sub-zero" at meter 3:19 to 3:27 (showing only upper portion of large white sign on west side of Highway 1806 – top portion reads "No Trespassing" with bottom portion not depicted in video); *id.* at meter 5:55 to 5:58 (showing back side only of large white sign on west side of Highway 1806 – still standing upright while police line established).

8.  Dundon admits being one of the first protesters on the Bridge, observing protesters remove the first burned out dump truck from the barricade, and being on the Bridge in close proximity to the barricade while observing protesters using tow equipment in an attempt to remove the second burned out truck from Law Enforcement's barricade.  (Doc. 129 at ¶¶ 67-69 [Dundon]; doc. 14-19 at ¶¶ 5-7 [Dundon Decl.].)

9.  Dundon admits the protesters she was intermingled with when force was allegedly applied as to her were actively engaged in attempts to remove the second burned out dump truck from Law Enforcement's barricade.  (Doc. 129 at ¶¶ 68-69; doc. 14-19 at ¶¶ 6-7 [Dundon Decl.].)

10. Dundon alleges she was present among the other protesters when they removed the first dump truck, and also when they initially attempted to remove the second dump truck.  (Doc. 129 at ¶¶ 67-69; doc. 14-19 at ¶¶ 6-9 [Dundon Decl.].)  Dundon alleges force was applied by Law Enforcement against her during the protesters initial attempts to remove the second dump truck.  (*Id.*)

11. Dundon alleges she was injured during the protesters' attempt to remove the second dump truck from the barricade.  (Doc. 129 at ¶¶ 67-69 [Dundon]; doc. 14-19 at ¶¶ 6-9 [Dundon Decl.].)

12. Video filed by Plaintiffs in support of their previously denied motion for preliminary injunction depicts protesters commenting on intent to remove burned out dump trucks attached to Law Enforcement barricade and showing them actually doing so with a Semi-truck.  (Doc. 91 at MP4 video named "642034911" at meter 00:02 to 00:31.)

13. All other Plaintiffs allege they arrived on the scene after Dundon.

14.     In relation to the protesters' removal of the first dump truck from the barricade with the

Semi, one protester, whose sworn declaration was filed by Plaintiffs in this case, asserts

this occurred shortly after 5 p.m. on November 20, and admits "I heard the police on the

bullhorn address one of the guys on the bridge by name. 'Don't do this Mike. We have

10 more of these trucks, and tomorrow we'll just bring another one in. Go home!'"

(Doc. 81-27 at ¶ 15 [Lenoble Decl.].) This protester also admits Law Enforcement

utilized tear gas in an unsuccessful attempt to prevent the first dump truck from being

removed by protesters, and provides a color photograph of the incident evidencing the

cloud of smoke is clearly visible from a long distance away as there was still daylight.

(*Id.* at ¶ 16.) This protester asserts that, following several unsuccessful attempts and in

the face of *less-lethal* force being applied by Law Enforcement, protesters were

ultimately successful in removing the first dump truck away from the rest of the barricade

at approximately 5:30 p.m. (*Id.* at ¶ 17.) This protester alleges he heard the warnings

given by Law Enforcement to protesters against removal of the dump trucks and also

alleges he observed the protesters remove both the first dump truck from the barricade, as

well as the protesters initial efforts to remove the second dump truck. (Doc. 81-27 at ¶¶

10-18 [Lenoble Decl.].) He estimates 10 protesters where involved with removing the

first dump truck, but noted more protesters had showed up to help with the initial

attempts to remove the second dump truck, with numbers of protesters growing by the

minute. (*Id.* at ¶ 18.) He also asserts Law Enforcement utilized tear gas and rubber

bullets on the rapidly growing crowd of protesters for about an hour and one-half before

water was first deployed by Law Enforcement. (Doc. 81-27 at ¶ 20 [Lenoble Decl.].)

15. Most Plaintiffs admit to observing Law Enforcement utilizing force against other protesters in the vicinity of the barricade and Bridge prior to force allegedly being applied as against them on November 20. (Doc. 129 at ¶¶ 77 [Wool], 85 [Wilson], 99 [Dullknife], 110 [Finan]; doc. 14-13 at ¶¶ 6-7 [Dullknife Decl.], doc. 14-17 at ¶ 7 [Demo Decl.], doc. 14-9 at ¶ 9 [Bruce Decl.].)

16. All of the Plaintiffs admit they were either on the Bridge or along the north shoreline of the Cantepeta Creek, in close proximity to Law Enforcement's barricade, when force was allegedly applied as against them. (Doc. 129 at ¶¶ 67-70 [Dundon], 77-81 [Wool], 85-86 [Wilson], 92-94 [Demo], 99-100 [Dullknife], 104 [Bruce], 111 [Finan], 118-120 [Treanor]; doc. 14-8 at ¶¶ 6, 8, 11 [Hoagland-Lynn Decl.]; doc. 14-13 at ¶ 8 [Dullknife Decl.]; doc. 14-15 at ¶¶ 11-14 [Finan Decl.].)

17. With the sole exception of Dundon, all of the Plaintiffs admit remaining in close proximity to the barricade and on the Bridge within range of the continued force allegedly being applied, often for extended periods of time after force was initially allegedly applied against them by Law Enforcement. (Doc. 129 at ¶¶ 77-78 [Wool], 85-86 [Wilson], 90-92 [Demo], 99-101 [Dullknife], 104-106 [Bruce], 114-115 [Hoagland-Lynn], 118-120 [Treanor]; Doc. 14-15 at ¶¶ 11-15 [Finan Decl.]; doc. 14-11 at ¶¶ 5-10 [Hoagland-Lynn Decl.]; doc. 14-13 at ¶¶ 8-10 [Dullknife Decl.].) Although Plaintiffs allege in paragraph 64 of Plaintiffs' Amended Complaint "[t]he vast majority of the crowd remained at a distance from the barricade . . .", Plaintiffs do not allege they remained at a distance (ambiguous term) from the barricade.

18.   Plaintiffs admit to being surrounded by other protesters engaging in similar conduct (doc.
      129 at ¶¶ 77-81 [Wood], 85-86 [Wilson], 99-101 [Dullknife], 104-106 [Bruce], 110-111
      [Finan], 114-115 [Hoagland-Lynn]; doc. 14-19 at ¶¶ 5-7 [Dundon Decl.].).

19.   Plaintiffs admit to bearing shields and tarps (doc. 129 at ¶¶ 80 [Wool], 99 [Dullknife],
      105 [Bruce], 114-115 [Hoagland-Lynn]; doc. 14-16 at ¶ 12 [Wilson Decl.]; doc. 14-17 at
      ¶ 8 [Demo Decl.]), and wearing bandanas (doc. 14-19 at ¶ 9 [Dundon]), goggles (doc. 14-
      9 at ¶ 12 [Bruce Decl.]), rain coats (doc. 14-16 at ¶ 12 [Wilson Decl.] while in close
      proximity to the barricade, matching the descriptions of protesters who engaged in
      assaults on the barricade behind shield walls.

20.   Video filed by Plaintiffs in support of their previously denied motion for preliminary
      injunction depicts protesters bearing shields and tarps and wearing bandanas, goggles and
      rain coats advancing on Law Enforcement's barricade, and standing on the remaining
      burned dump truck (i.e. the barricade) despite application of force by Law Enforcement.
      (Doc. 91 at MP4 file named "642034911" at meter 2:14 to 2:35; doc. 100 at MP4 file
      name beginning "20161120" at meter 1:00 to 1:17, 1:43 to 1:54, 2:33 to 2:46.)

21.   Other protesters grudgingly admit to seeing objects thrown at Law Enforcement by
      protesters.  (Doc. 81-24 at ¶ 21 [Kanahele Decl.] ("I saw one person throw what appeared
      to be a rock in the direction of the police.  I saw another throw a stick in the direction of
      the police."); doc. 81-28 at ¶ 12 [Lopez Decl.] ("I did not see water protectors threaten
      the police, or use any weapons, with the exception of a few individuals who I saw throw
      the gas canisters that had been launched by the police, back toward the police."); doc. 81-
      27 at ¶ 58 [Lenoble Decl] ("A few people . . . threw plastic water bottles at the police . . .
      ."); (doc. 81-23 at ¶ 15 [Weeks Decl.] ("The only things that I saw thrown from the side

of the water protecters to the side of the razor wire where law enforcement was located was an occasional plastic bottle of water, maybe 4 in total throughout the entire evening (7 hours). I also witnessed an individual protester try to throw a spent smoke canister from where it landed on the west side side [sic] of the Highway 1806 to the north side of the razor wire where the police were located.")

22. Video filed by Plaintiffs in support of their previously denied motion for preliminary injunction shows a protester throwing a CS canister back at Law Enforcement. (Doc. 91 at MP4 file named "642034911" at meter 1:09 to 1:13.)

23. Plaintiff Demo admits Law Enforcement warned protesters to get away from the barricade. (Doc. 129 at ¶ 94.)

24. A protester asserts in his declaration:

> I do not recall any warning announcements. At some points the police would say, **"move off the side of the bridge;"** Once, I heard them say "we are going to test the LRAD" and they did for a second. That was the only time I heard it. I did not hear, or at least I do not recall hearing, any announcement about them using other less lethal weapons. However, it was hard to hear. There was a lot of noise and commotion. There were also people singing and praying. If they did announce anything, I could not hear it**. I only heard them announce things like "you're trespassing," "you're not supposed to be on the bridge," and "move to the south side."** There were no announcements that were warnings that I can recall.

(Doc. 81-24 at ¶ 22 [Kanahele Decl.](emphasis added).)

25. Another protester alleges "I do remember some sort of announcements being made by the police, but I don't remember – or at least did not hear – them making announcements about when they were going to use rubber bullets or gas or anything." (Doc. 81-14 at ¶ 18 [Toraty Decl.].)

26. Video filed by Plaintiffs in support of their previously denied motion for preliminary injunction evidences Law Enforcement broadcasting "I will give you one last warning.

Vacate the bridge immediately!" (Doc. 100 at MP4 file named beginning "RAW CLIP1" at meter 6:41.)

27. Plaintiffs and protester declarants also admit observing Law Enforcement's application of force as to others, including alleged use of gas canisters, smoke, impact munitions, fire hose, etc., yet incredibly decided to place themselves in close proximity to the barricade, often for extended periods of time, and despite Law Enforcements' alleged multiple applications of force as to them. (Doc. 129 at ¶¶ 77-81 [Wool], 85-86 [Wilson], 92 [Demo], 99 [Dullknife], 104-106 [Bruce], 110 [Finan], 114-115 [Hoagland-Lynn]; doc. 14-17 at ¶ 7 [Demo Decl.].)

28. Plaintiffs admit they were free to walk away from Law Enforcement's barricade and free to walk away from the force allegedly applied against them. (Doc. 129 at ¶¶ 70-71 [Dundon], 81 [Wool], 85-86 [Wilson], 106 [Bruce], 111 [Finan], 114-115 [Hoagland-Lynn], 120 [Treanor]; doc. 14-17 at ¶ 8 [Demo Decl.].)

29. Video filed by Plaintiffs in support of their previously denied motion for preliminary injunction depicts protesters freely moving north and south on the Bridge during the riot. (Doc. 100 at MP4 file name beginning "RAW CLIP1" at 0:00 to 3:00.)

30. Video filed by Plaintiffs in support of their previously denied motion for preliminary injunction, and filmed by a protester, is taken from a vantage point which is north (i.e. behind) and to the west of Law Enforcement's barricade, the general vicinity from which a large body of protesters attempted to flank Law Enforcement's barricade. (Doc. 92 at MP4 file named "642034911" at meter 3:05 to 3:19.)

## Plaintiffs' Legal Claims

Plaintiffs allege Law Enforcement's actions on November 20, 2016 at the Bridge constituted: unreasonable force in violation of their federal constitutional rights under the Fourth and Fourteenth Amendments (doc. 129 at ¶¶ 156-59); constituted retaliation for the exercise of protected speech in violation of the First Amendments (*id*. at ¶¶ 151-155); and constituted unequal protection of law in violation of the Fourteenth Amendment (*id*. at ¶¶ 160-162). Plaintiffs also allege the unreasonable force and retaliation claims were carried out pursuant to policy, practice and custom of municipal defendants. (*Id*. at ¶¶ 153, 158.) Further, Plaintiffs allege claims of assault and battery (*id*. at ¶¶ 158-173) and negligence (*id*. at ¶¶ 174-177). Finally, Plaintiffs request declaratory and injunctive relief declaring Law Enforcement's actions unlawful, and request monetary damages. (*Id*. at ¶¶ 120-28.)

## III. ARGUMENT

### A. <u>Applicable Standard – Fed. R. Civ. P. 12(b)(6)</u>

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the court takes all facts alleged in the complaint to be true. *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* (citations omitted). The Court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that the plaintiff draws from the facts pled. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Well-pleaded facts, not legal theories or conclusions, determine the adequacy of the complaint.

*Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. "[A] plaintiff 'must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims, . . ., rather than facts that are merely consistent with such a right.'" *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009), quoting *Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.E.2d 868 (2009).

> In this circuit, Rule 12(b)(6) motions are not automatically converted into motions for summary judgment simply because one party submits additional matters in support of or in opposition to the motion. *See Martin v. Sargent*, 780 F.2d 1334, 1336-37 (8th Cir. 1985). Some materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss. *See Papasan v. Allain*, 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *Hollis v. United States Dep't of Army*, 856 F.2d 1541, 1543-44 (D.C. Cir. 1988).

*State v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999). *See Papasan v. Allain*, 478 U.S. at 268 n.1 ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record, such as documentation of the history of the Mississippi and other school lands grants.").

> While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;" without converting the motion into one for summary judgment. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004).

*Miller v. Redwood Toxicology Laboratory, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) (taking into consideration, in relation to Rule 12(b)(6) motion, plaintiff's initial and amended

complaints, and the record created as a result of the plaintiff's motion for temporary restraining order, preliminary injunction and expedited discovery filed by plaintiff after the motion to dismiss was filed). *See, also Williams v. Employers Mutual Casualty Company*, 845 F.3d 891 (8th Cir. 2017) (citing *Miller* for proposition "courts may consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items that appear in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned" without converting a motion for judgment on the pleadings into a motion for summary judgment.) "Under Federal Rule of Evidence 201(b), a court may take judicial notice of a 'fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Williams v. Employers Mut. Cas. Co.*, 845 F.3d 891 (taking judicial notice of well-established scientific theory and principles).

    **B.**     **Plaintiffs' Fail To Plead A Violation Of Their Constitutional Rights, And Even Assuming, Arguendo, A Violation Has Been Alleged, Individual Defendants Are Entitled To Qualified Immunity From Suit**

Dismissal of Plaintiffs' claims against Law Enforcement is warranted on the basis Plaintiffs have failed to plead a violation of their constitutional rights. In the alternative, even assuming a violation of Plaintiffs' constitutional rights has been adequately pled, individual defendants would be entitled to qualified immunity from suit as any right allegedly violated was not so clearly established at the time of the violation that a reasonable officer would have known that his actions were unlawful.

As explained by the United States Supreme Court:

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 818 ... (1982). Qualified immunity balances two important interests –

the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." [citation omitted].

\*      \*      \*

Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." ... Indeed, we have made clear that the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved **prior to discovery**." .... Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."

*Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)(bold added).

The Supreme Court has instructed that the issue of qualified immunity be resolved "at the earliest possible stage of the litigation." *Pearson v. Callahan*, 555 U.S. at 231 (quotation omitted); *see Mathers v. Wright*, 636 F.3d 396, 399 (8th Cir. 2011). This is because the defense is "an immunity from suit rather than a mere defense to liability" and "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Mathers v. Wright*, 636 F.3d at 399 (citing *Mitchell v. Forsyth*, 472 U.S. at 526). In addition, a "driving force behind the creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials be resolved prior to discovery." *Pearson v. Callahan*, 555 U.S. at 231 (quotation omitted).

Qualified immunity protects government officials from liability under § 1983 when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 Led.2d 666 (2002). The test for whether an officer is entitled to qualified immunity is twofold: (1) whether the facts alleged, taken in the light most favorable to the injured party, show that the officer's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815-16, 172 L.Ed.2d 565 (2009); *Henderson v. Munn*, 439 F.3d 497, 501-02 (8th Cir. 2006). If no reasonable factfinder could answer yes to both of these

questions, the officer is entitled to qualified immunity. *See Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006).

*Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009). The defendant has the burden of proof with the exception that the plaintiff must demonstrate that the law allegedly violated was clearly established. *Harrington v. City of Council Bluffs, Iowa*, 678 F.3d 676, 679 (8th Cir. 2012).

As discussed below, all claims against all Law Enforcement defendants should be dismissed as 1) Plaintiffs' purely factual allegations, along with other matters this Court is allowed to consider in relation to this Rule 12(b)(6) motion, establish Plaintiffs' have not alleged a plausible violation of their constitutional rights by Law Enforcement, and 2) even if Plaintiffs have alleged a plausible claim for violation of a constitutional right, such right was not so clearly established at the time of the deprivation that a reasonable officer would have understood his conduct was unlawful under the circumstances presented, thereby establishing the individual Defendants are entitled to qualified immunity from suit.

### Bernini v. City of St. Paul, 655 F.3d 997 (8th Cir. 2012)

The November 20, 2016 events at issue, and Plaintiffs' claims in this action, are very similar to those considered by the Eighth Circuit Court of Appeals in *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). *Bernini* establishes the use of *less-lethal* munitions (described as *non-lethal* in *Bernini*) for the purpose of preventing unlawful entry into a restricted area closed to the public, by an unruly crowd which officers reasonably believe is acting as a unit, and to otherwise restore order, is objectively reasonable as a matter of law. *Bernini* also establishes a First Amendment retaliation claim will not stand where law enforcement's application of force is in response to unlawful conduct. Unlawful conduct will not be shielded under the rubric of the First Amendment. Consistent with the precedent of *Bernini*, Law Enforcement in this action are entitled to qualified immunity as a matter of law.

The material facts in *Bernini* were as follows:

From September 1–4, 2008, St. Paul hosted the Republican National Convention at the Xcel Energy Center. The Convention attracted large crowds of protestors. Throughout the first day, property damage was reported around the City. There were broken building windows, objects thrown at cars and buses, and vandalized police cars. After marches with permits had ended, Senior Commander Joseph Neuberger, who was the east area commander for mobile field force operations during the Convention, ordered that no one be allowed to enter the downtown area. Neuberger believed it was necessary to "reestablish control [and] reestablish law enforcement presence" downtown and around the Convention site.

The events at issue occurred on or near Shepard Road in St. Paul. Shepard Road runs along the southeastern edge of downtown St. Paul and borders the Mississippi River. The road was a major thoroughfare during the Convention. It served as a route for emergency vehicles to access the Xcel Energy Center, and it was the planned route of the First Lady's motorcade on the evening of September 1. Although Shepard Road runs along the edge of downtown St. Paul, it provides only limited access to downtown, because much of the road is bordered by the Mississippi River on one side and a large concrete wall on the other. Jackson Street and Sibley Street intersect with Shepard Road and provide access to the east end of downtown St. Paul.

After ordering downtown closed, Neuberger learned about a group of people marching east on Shepard Road. Neuberger instructed a team of officers—known as Neighborhood Response Team 36 ("Team 36")—to position itself at the intersections of Shepard Road and Jackson Street and Shepard Road and Sibley Street to prevent entry to the downtown. As Team 36 traveled to the intersections, the unit passed a large group marching along Shepard Road. The officers received information that the group was connected to unlawful acts that had occurred earlier in the day. Team 36 positioned approximately 11 officers at each intersection, blocking access to the downtown area.

At about 4:30 p.m., as seen on video recordings submitted as evidence, a group of approximately 100 people gathered at the intersection of Shepard Road and Jackson Street and stood on the sidewalk across the street from the officers on the south side of Shepard Road. About fifteen people, advancing behind two large signs, soon began to cross Shepard Road, moving toward the officers and downtown St. Paul. The words "Direct Action Against Capitalism" were written across one of the signs.

The officers instructed these people to "back up, back up!" As the group continued to cross Shepard Road, the officers deployed stinger blast balls. These balls contain rubber pellets; they are designed to sting the targeted persons. The small group then retreated to the sidewalk on the south side of Shepard Road. Although the plaintiffs deny seeing anyone throw objects at Team 36, the officers reported that numerous objects—including rocks and bags containing feces—were propelled at them.

After the group retreated to the sidewalk along Shepard Road, it began to move to the west.

The officers, soon joined by reinforcements, also moved west in an attempt to direct the crowd away from Jackson Street and back in the direction from which it came. As the crowd proceeded west, it grew to include hundreds of people. On video footage, members of the crowd can be heard chanting in unison "the whole world is watching" and various profanities. The police continued to use non-lethal munitions, including smoke, blast balls, and chemical irritants, in an apparent effort to keep the crowd moving west.

In consultation with Neuberger, Steven Frazer, the officer in charge at the scene, decided to encircle the crowd in a park adjacent to Shepard Road and near Ontario Street, approximately 0.6 mile west of the Jackson Street intersection. Because much of Shepard Road is bordered by the river and concrete wall, this park presented the first opportunity west of Jackson Street to gather the crowd, which now included approximately 400 individuals. After the officers contained the crowd in the park, they announced multiple times by loudspeaker that all persons were under arrest and must sit down and place their hands on their heads. Officers then attempted to determine who had been present at the Shepard–Jackson intersection. According to one officer, these people "stayed together as group" and "were segmented off from the other people" in the park. The sorting process led to the release of approximately 200 people. The officers then booked and placed into custody about 160 others. The parties dispute whether the officers ordered the crowd to disperse before encircling the park and making the arrests.

Thirty-two people filed suit pursuant to 42 U.S.C. § 1983 against the City of St. Paul and the five appellee police officers in their individual capacities. The plaintiffs were present along Shepard Road in various capacities, including as legal observers, medics, concert-goers, protestors, and members of the media. At least eighteen plaintiffs were present in the immediate vicinity of the Shepard–Jackson intersection at the time of the confrontation. The remaining plaintiffs claim they were located somewhere between the intersection and the park, and were added to the group as police moved the crowd west. Although each plaintiff was present in the park when it was encircled by the police, seven plaintiffs (including two who were present at the Shepard–Jackson intersection) were briefly detained and released, and twenty-five were booked and taken into custody. Those taken into custody were released within 72 hours, and all charges were eventually dismissed.

*Bernini v. City of St. Paul*, 665 F.3d at 1001-02. The plaintiffs in *Bernini* alleged the actions of police violated their rights under the First and Fourth Amendments and asserted claims of unlawful arrest (not at issue in the present action), excessive force, and retaliation. The district court granted summary judgment in favor of the officers on the basis of qualified immunity.

The Eighth Circuit Court of Appeals affirmed the district court's decision. In analyzing the plaintiffs' Fourth Amendment claim against the officers in *Bernini* for alleged unlawful arrests in the park, the Court determined the officers were entitled to qualified immunity if they had

"arguable probable cause" to make the arrests, and under the undisputed evidence, including video evidence, the officers "reasonably could have concluded that the group [at issue] had committed a crime and that the group was acting as a unit." *Id.* at 1003. The Court reasoned as follows:

> What is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons. The D.C. Circuit has addressed the practical dilemma faced by officers responsible for reacting to large group activity, and recognized that a "requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot." *Carr v. District of Columbia,* 587 F.3d 401, 408 (D.C.Cir.2009). The court concluded that the Fourth Amendment "is satisfied if the officers have grounds to believe all arrested persons were a part of the *unit* observed violating the law." *Id.* at 407 (emphasis added). *Carr* thus demonstrates that a reasonable officer in St. Paul could have believed that the Fourth Amendment did not require a probable cause determination with respect to each individual in a large and potentially riotous group before making arrests.
>
> . . . Video footage shows that the group marched east on Shepard Road and then stopped at the intersection, positioning itself directly across from the line of Team 36 officers. Many members of the group had donned gas masks and other facial coverings, as though they were preparing for a confrontation with police. Flags waved from within the crowd, and several people can be heard shouting profanities and taunting the officers. A portion of the group, shielding itself behind two large signs, then began to cross the intersection toward the officers. And after the confrontation at the intersection, as the group was driven west on Shepard Road, members chanted statements in unison.
>
> From these actions, a reasonable officer could have concluded that the individuals at the intersection were acting together and that they intended to break through the police line in an attempt to access downtown St. Paul. It was reasonable, therefore, for an officer to believe that the group, as a whole, was committing one or more offenses under state law, including third degree riot and unlawful assembly. *See* Minn.Stat. §§ 609.71 subdiv. 3, 609.705; *State v. Hipp,* 298 Minn. 81, 213 N.W.2d 610, 614–15 (1973). We thus conclude that the police did not violate the clearly established rights of sixteen plaintiffs who were both present at the intersection and arrested at the park. *Carr,* 587 F.3d at 409–10; *cf. Vodak v. City of Chicago,* 639 F.3d 738, 745–46 (7th Cir.2011) (holding that police who effected a mass arrest of protestors were not entitled to qualified immunity where the crowd did not try to "break through the police barrier," and the circumstances "were not threatening to the safety of the police or other people").

\*\*\*

It was reasonable for the officers to believe they could arrest those who were acting as a unit with the protestors who attempted to break through the police barrier at the Shepard–Jackson intersection. The videos depict approximately 100 people present at the

intersection. The eleven officers were positioned under an overpass, making it difficult for them to see how far the crowd extended to the west. From the officers' vantage point, it appeared as if "people were continuously arriving from the west." The officers, especially without the benefit of the videos, could not have been sure of the precise number. They did release approximately 200 people at the park in an attempt to avoid custodial arrests of innocent bystanders. Given the situation at the intersection, the officers' allegedly mistaken belief at the park that 160 people were part of a unit that had gathered to enter downtown at the Shepard–Jackson intersection was objectively reasonable. We therefore affirm the district court's conclusion that the officers are entitled to qualified immunity for the seizures.

*Bernini*, at 103-04, 105 (footnotes omitted). Summarizing, the Eighth Circuit recognizes a "requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot", and law enforcement is not required to pinpoint every person in the crowd who has engaged in specific unlawful conduct, but may reasonably conclude the individuals in the vicinity are acting together as a *unit*. In such event, it is objectively reasonable for law enforcement to effectuate arrests (i.e. seizures) of the entire *unit*.

With respect to the excessive force claim, the *Bernini* Court noted there was no evidence to suggest the individually named defendant officers directly used force against any of the plaintiffs. *Bernini*, at 106. The Court noted the plaintiffs' claims were primarily directed toward a lead sergeant of Team 36 who admitted his own use of non-lethal munitions against protesters implicitly authorized his subordinates to do so. The Court concluded the lead sergeant was entitled to qualified immunity. "The circumstances led officers reasonably to believe that a growing crowd intended to penetrate a police line and access downtown St. Paul [and] [the lead sergeant's] use and authorization to use non-lethal munitions to direct the crowd away from the intersection and toward the park where the crowd could be controlled did not violate clearly established rights." *Id.* at 106. The Court also rejected the plaintiffs' argument it was unreasonable for law enforcement to continue to use non-lethal munitions against them because the crowd was

"complying with the movement of the officers and posed no threat to the officers" as video footage revealed some people would not leave the roadway and that some turned to face the officers. As a result, "[i]t was reasonable for the officers to deploy non-lethal munitions to keep all members of the crowd moving [toward the park]." *Id.* The Court also rejected the argument law enforcement directly targeted them by allegedly spraying chemical irritant on their face, neck, ears, and back, noting there was no evidence to establish the lead sergeant authorized that type of force against a compliant individual – his authorization involved force deployed against a noncompliant crowd. *Id.*

The Court also concluded the plaintiffs failed to make a submissible First Amendment retaliation claim. *Bernini*, at 1006-07. Although the protesters in *Bernini* were engaged in protected speech at the intersection, members of the *unit* moved toward the police in a threatening manner and began to block traffic along a major roadway, conduct which a reasonable officer could conclude violated Minnesota law and was not protected speech. *Id.* Video footage established officers engaged the group only after the unlawful conduct, and there was no evidence to establish the group was singled out while others similarly situated were not arrested. "The only reasonable inference supported by the record is that the group's unlawful conduct, not the protected speech, motivated the officers' actions." *Id.*

Although there are numerous obvious similarities between the facts at issue in *Bernini* and the present case, there are some material distinguishing facts, including the following. First, in *Bernini*, the protesters were not actually in the portion of St. Paul shut down by the Senior Commander (downtown) when non-lethal munitions were applied against protesters. Instead, protesters were located on Shepard Road which ran along the southeasterly edge of the downtown area. The officers' use of force commenced when the protesters engaged in activities which led

the officers to believe they were attempting to breach the police lines to gain access to the restricted area and were engaging in unlawful conduct.

In the present case, Plaintiffs admit that, at all times when force was allegedly applied by Law Enforcement against them, they were in close proximity to Law Enforcement's barricade, either located on the Bridge or along the north shore – areas which were closed to all public access by the Corps, NDDOT and Morton County, and for which Plaintiffs and other protesters were not authorized or privileged to enter. Plaintiffs were also intermingled with protesters who were engaged in removing, or attempting to remove, portions of the barricade. In other words, in the instant case, it is indisputable the protesters were trespassing in the locations where the alleged excessive force was used.

Second, in *Bernini*, non-lethal munitions were used to essentially herd the protesters along Shepard Road toward a park for the purpose of effectuating orderly arrests. Shepard Road was bordered on one side by the Mississippi and on the other by a concrete wall with police lines at intersections. In other words, there was no escape once the officers began channeling the crowd toward the Park. The Court's application of the Fourth Amendment "objective reasonableness" standard to the excessive force claim in *Bernini* therefore makes sense under those circumstances as the herded protesters would not have reasonably believed they were free to leave to any location they had a lawful right to be.

In the present case, there is no allegation, and Law Enforcement did not attempt to effectuate any arrests or detentions of Plaintiffs or any other protesters, except the one who actually successfully penetrated the barricade (not a named plaintiff in this case). Plaintiffs admit they could have, and did freely walk away from Law Enforcement at all times on November 20 in this case. Regardless, *Bernini* establishes the use of non-lethal munitions upon an unruly crowd, which

officers reasonably believe is acting as a unit, to prevent the crowd's unlawful access to property and to restore order, is objectively reasonable as a matter of law.

*Bernini* also establishes demonstrations lose their protected character as protected expression when demonstrators engage in unlawful conduct. As noted by the United States Court of Appeals for the District of Columbia in addressing a First Amendment retaliation claim brought by demonstrators against officers, a decision cited in *Bernini*:

> Plaintiffs contend that First Amendment principles prohibited their arrest without first being given a chance to disperse. In sum, plaintiffs contend that they were marching peacefully and if peaceful marchers can be arrested without warning because some other protestors resorted to violence, it will chill First Amendment rights. The premise of this argument is fundamentally flawed, however, because . . . it appeared to officers as if the entire crowd was rioting or encouraging riotous acts. And "where demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

*Carr v. District of Columbia*, 587 F.3d 401, 410, n.6 (D.C. Cir. 2009).

In the present case, Plaintiffs admit that when force was allegedly applied as to them, they and other protesters were present in an area which was closed to public access as established by public records and "No Trespassing on Bridge" signage depicted in video evidence presented by the Plaintiffs themselves. Plaintiffs were undisputedly trespassing.

As discussed in the facts section above, Plaintiff's Amended Complaint does not deny the existence of "No Trespassing on Bridge" signs, immediately alongside the "No Trespassing" signs located on the north side of the concertina-wire barricade located north of the Bridge. Video evidence submitted by Plaintiffs themselves in support of their previously denied motion for preliminary injunction conclusively establishes the presence of large "No Trespassing on Bridge" signs along the barricade on November 20, 2016.

Plaintiffs admit protesters had removed, and were removing burned out trucks from Law Enforcement's barricade before and while force was applied. Video evidence in the record

presented by Plaintiffs also establishes protesters greatly outnumbered Law Enforcement and were throwing objects at Law Enforcement, attempting to flank the barricade to the west-cross country, and actively assaulting the barricade over a prolonged period of time (several hours). Protesters had been engaging in unlawful and violent activity north of the Cantapeta Creek in the vicinity for many weeks prior to November 20, and had to be forcibly removed from their North Camp located on the DAPL project construction site – private property. On the date at issue, November 20, 2016, Law Enforcement issued two Code Red requests for assistance, and a Signal 100 request for all available law enforcement officers, state-wide, to come to the immediate aid of the officers in distress. No reasonable officer under these circumstances could have believed the use of *less-lethal* munitions and water upon the protesters violated any clearly established constitutional rights, especially in light of *Bernini.*

As discussed below, even assuming all of Plaintiffs' purely factual allegations to be true, and taking into consideration other information in the record submitted by Plaintiffs themselves, or which this Court is otherwise permitted to consider in relation to a motion to dismiss, Plaintiffs have failed to allege a violation of their constitutional rights by Law Enforcement.

## C.    Plaintiffs' Retaliation Claim

With respect to the Plaintiffs' claim of retaliation, the Plaintiffs and other protesters had no constitutional right to exercise their First Amendment rights at any location where the alleged force was applied. All of the Plaintiffs admit they were either on the Bridge or along the north shoreline of the Cantapeta Creek, in close proximity to Law Enforcement's barricade, when force was allegedly applied as against them. As discussed, video of the riot submitted by Plaintiffs establishes the existence of "No Trespassing on Bridge" and "No Trespassing" signs along the barricade. Plaintiffs' allegations and the video evidence they themselves have submitted to the

Court also amount to admissions of unlawful criminal trespass, civil trespass, and presence upon, and attempted access to areas which were off limits to the public. Public records establish both the Bridge and Highway 1806 at this location were closed at this time due to damage thereto caused by protesters who started a large fire on the Bridge. Public records establish the Bridge had been closed since October 28, 2016, more than three weeks prior to the November 20-21, 2016 riot.

Plaintiffs' allegations also establish they were on notice the Bridge and Highway 1806 were closed, and that their presence on the north shore was not permitted by Law Enforcement. Plaintiffs admit observing Highway 1806 heavily barricaded on the north side of the Bridge and manned by Law Enforcement on November 20, 2016, prior to force allegedly being applied against them. Plaintiffs admit they had been staying in the Seven Council Fires Camp (i.e. Oceti Sakowin) for several weeks to months prior to November 20, 2016, a camp located immediately south of, and in close proximity to, the Bridge. Public records establish the Corps had previously (November 1, 2016) requested Law Enforcement assistance in removing trespassing protesters from federal lands located on the north side of the Cantapeta Creek. Plaintiffs admit being forcibly removed from, or prevented from accessing, private property located north of the Cantapeta Creek by Law Enforcement on several occasions prior to November 20, 2016, including, among other places, Turtle Hill located on the north shoreline of the confluence of the Cannonball River and Cantapeta Creek, and the DAPL construction sites located north of the Bridge along Highway 1806. Most Plaintiffs admit to observing Law Enforcement utilizing force against other protesters in the vicinity of the barricade and Bridge prior to force allegedly being applied against them on November 20. Dundon admits being one of the first protesters on the Bridge, observing protesters remove the first burned out dump truck from the barricade, and being on the Bridge in close proximity to the barricade while observing protesters using tow equipment in an attempt to remove

the second burned out truck from Law Enforcement's barricade. With the sole exception of Dundon, all of the Plaintiffs admit remaining in close proximity to the barricade and on the Bridge, often for extended periods of time after force was initially allegedly applied against them by Law Enforcement, within range of the continued force allegedly being applied. Plaintiffs admit to being surrounded by other protesters engaging in similar conduct, and the video footage submitted by Plaintiffs, in the record, substantiates that conduct. Such video footage conclusively establishes Law Enforcement broadcasted warnings to the protesters to get off the bridge and posted signage along the barricade warned "No Trespassing on Bridge". Plaintiffs' assertion they received no warnings from Law Enforcement to the effect they were not supposed to be on the Bridge, or north of the Bridge, or that they had no warning Law Enforcement would apply force against them within the vicinity of the Bridge or north thereof, is contrary to the evidence they themselves have submitted to this Court.

Plaintiffs and other protesters had no constitutional right to express their views on the closed Bridge or any location where force was applied by Law Enforcement on November 20, 2016. *See Wood v. Moss*, 134 S.Ct. 2056, 2066, 188 L.Ed.2d 1039 (2014) ("[T]he fundamental right to speak secured by the First Amendment does not leave people at liberty to publicize their views " 'whenever and however and wherever they please.' " (quoting *United States v. Grace*, 461 U.S. 171, 177-178, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), quoting *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 17 L.Ed 2d 149 (1966)). The Supreme Court has clearly indicated the First Amendment cannot be utilized as a justification for trespass and that the government has the right to enforce trespass laws in relation to both private and public property. *See Adderley v. State of Florida*, 385 U.S. at 48, (rejecting protesters' argument they had a constitutional First Amendment right to remain in the curtilage of a jailhouse over the objection of the sheriff, concluding "[t]he

United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose."). As explained by the Supreme Court in *Cox v. State of Louisiana*:

> The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations.

> We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. [] We reaffirm the statement of the Court in Giboney v. Empire Storage & Ice Co., supra, 336 U.S., at 502, 69 S.Ct., at 691, that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

379 U.S. 536, 554-55, 85 S.Ct. 453, 464-65, 13 L.Ed.2d 471 (1965) (citations omitted).

The Bridge and Highway1806 at the location of the November 20 riot were not traditional public fora at any time prior to the DAPL protests, or during the protests. The location in question is located in an isolated rural area. It is commonly known the location where the Seven Council Fires camp was located floods each spring. The Bridge is comprised of two driving lanes with no sidewalks thereon in a 65 mile per hour zone. The NDDOT closed the Bridge following the October 27 riot, on October 28, and prior to November 20 for safety reasons due to damage to the

bridge caused by fires started thereon by protesters, calling the structural integrity of the bridge into question. *See* N.D.C.C. § 24-03-05 (authorizing NDDOT to close any portion of a highway by posting same with suitable signs and placement of barricades, and making it unlawful to remove, pass through, over, or around any such barricade). The Bridge remained closed on November 20. No public access on the Bridge was allowed on November 20, for any purpose. As a matter of law, anyone other than an authorized governmental employee who entered upon the Bridge, or any location north of the Bridge within the vicinity of the events at issue on November 20, were engaging in criminal trespass, civil trespass, and otherwise present upon public property closed to the public without authorization or privilege, and contrary to the wishes of the property owners (NDDOT and Corps.).

Law Enforcement had the authority and duty to direct Plaintiffs and other protesters off of the Bridge and property located along the north bank of the North Branch of the Cantapeta Creek within the vicinity of the events at issue. Plaintiffs and protesters had no constitutional right to exercise their First Amendment rights at these locations. As a result, Plaintiffs' retaliation claim fails as a matter of law. Further, as discussed below, Plaintiffs' excessive force claims, which underpin Plaintiffs' retaliation claims, also fail as a matter of law.

### D. Plaintiffs' Fourth Amendment Excessive Force Claim

Plaintiffs allege they were subjected to excessive force by Law Enforcement on November 20, 2016 in violation of their federal constitutional rights under the Fourth and Fourteenth Amendments. As discussed below, Plaintiffs have failed to allege a "seizure" by Law Enforcement, as required to state a cognizable Fourth Amendment excessive force claim. In addition, Plaintiffs fail to allege facts to establish a plausible claim the force allegedly applied by Law Enforcement "shocks the conscience," an essential element of a viable Fourteenth Amendment excessive force claim.

1. **Plaintiffs Excessive Force Claim Could Only Potentially Proceed Under Either the Fourth or Fourteenth Amendment, Not Both**

As a preliminary matter, even assuming, arguendo, Plaintiffs have alleged any plausible excessive force claim against Law Enforcement, which is denied, Plaintiffs could only potentially proceed under either the Fourth or Fourteenth Amendment, which apply different standards. Any claim alleging excessive force against law enforcement in relation to a "seizure" must be analyzed under the "objective reasonableness" standard of the Fourth Amendment, as opposed to the Fourteenth Amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.E.2d 443 (1989). As a result, if Plaintiffs have sufficiently alleged facts to support a claim they were "seized" by Law Enforcement, their claim must proceed under the Fourth Amendment only. On the other hand, if Plaintiffs have not sufficiently alleged a "seizure", their claims must proceed under the "shocks the conscience" standard of the Fourteenth Amendment. Regardless, Plaintiffs have failed to plead a viable excessive force claim.

2. **Plaintiffs Have Not Alleged A "Seizure"**

In the present case, Plaintiffs allege Law Enforcement utilized unreasonable force in violation of the Fourth Amendment. The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. CONST. AMEND. IV. An excessive force claim under the Fourth Amendment requires an allegation of the use of excessive force by the government in connection with a "seizure" of the plaintiff by the government. *See Graham v. Connor*, 490 U.S. at 393-396 (noting the Fourth Amendment guarantees citizens right " 'to be secure in their persons . . . against unreasonable . . . seizures' of the person", and noting excessive force claims under the Fourth Amendment relate to the use of force in the context of seizures). As explained by the United States Supreme Court,

Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred. *Terry v. Ohio*, 392 U.S. [1,] 19, n. 16, 88 S.Ct. [1868,] 1879, n. 16.

\*\*\*

We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

\*\*\*

**We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.**

*United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (bold added). The subjective intent of law enforcement to detain is irrelevant unless such intent was expressed to the individual. *Id.* at 554, n. 6. The Supreme Court subsequently clarified the termination or restraint upon a person's freedom of movement must be through "means intentionally applied" to constitute a "seizure" – an unintentional act cannot result in a seizure. *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.E.2d 132 (2007). In addition, an attempted but failed seizure of a person is beyond the scope of the Fourth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44, 118 S.Ct. 1708, 1715 140 L.Ed.2d 1043 (1998).

In the present case, Plaintiffs have not alleged, nor were they, arrested or detained by Law Enforcement on November 20, 2016, or even advised by Law Enforcement they were not free to walk away from Law Enforcement. Plaintiffs admit they freely walked south off the Bridge, sometimes to change into warmer clothes or otherwise warmup before returning to the barricade and voluntarily and intentionally walking within range of the force allegedly being applied by Law Enforcement. Plaintiffs' pleading establishes they were at all times able to remove themselves from the presence of Law Enforcement and from all force applied by simply voluntarily disengaging from Law Enforcement, and proceeding south across the Bridge from where they

came-which they did. Plaintiffs' Fourth Amendment excessive force claim fails as a matter of law as Plaintiffs have failed to allege a "seizure" by Law Enforcement governed by the Fourth Amendment.

Ultimately, "a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. at 554. An officer's enforcement of the law through prevention of unauthorized and unprivileged entry upon private or public property which has been closed to the public, where there has been no actual or expressed intention to apprehend or detain the person, and an objectively reasonable person would believe he or she was free to move to any lawful location cannot logically be construed as a seizure subject to Fourth Amendment analysis. In such circumstance, no liberty interest has been restrained. *See Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16 ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The relevant inquiry in the "seizure" analysis is not simply whether force was applied, but rather whether a reasonable person subjected to the force would have believed he or she was not free to leave as a result of the application of force.

A citizen has no liberty interest to infringe upon the property rights of others by engaging in trespass or otherwise being present upon property without authorization or privilege. If that were not the case, a seizure would occur each time an officer prevents unauthorized access to private property, or to restricted public property, despite no attempt to apprehend. Query whether Secret Service officers commit a "seizure" when they block an unauthorized person's entry into the oval office but do not otherwise restrict the person's freedom of movement to lawful locations?

Plaintiffs' failure to allege they were "seized" by Law Enforcement is fatal to their excessive force claim under the Fourth Amendment.

### 3. In The Alternative, Law Enforcement's Alleged Use Of Force Was Objectively Reasonable As A Matter of Law

Even assuming Plaintiffs have alleged a "seizure" under the Fourth Amendment, which is denied, the relevant inquiry is whether the force applied was "objectively reasonable" under a totality of the circumstances analysis. *Graham v. Connor*, 490 U.S. at 396-97.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, nor by the mistaken execution of a valid search warrant on the wrong premises. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Id.* (citations and quotations omitted).

Plaintiffs own allegations, along with those portions of the record submitted by the Plaintiffs themselves, establish Law Enforcement's alleged application of force was objectively reasonable under the circumstances, as a matter of law, and consistent with standards applied in *Bernini* (discussed above).

Pursuant to North Dakota Century Code § 12.1-05-02, "[c]onduct engaged in by a public servant in the course of the person's official duties is justified when it is required or authorized by law." A Sheriff shall, in part, "preserve the peace", "prevent and suppress all affrays, breaches of the peace, riots, and insurrections which may come to the sheriff's knowledge", and "[p]erform such other duties as are required of the sheriff by law." N.D.C.C. § 11-15-03(1), (3), (10). A person is not justified in using force for the purposes of resisting arrest or other performance of duty by a public servant under color of law. N.D.C.C. § 12.1-05-03.

Dundon admits the protesters she was intermingled with when force was allegedly applied to her were actively engaged in attempts to remove the second burned out dump truck from Law Enforcement's barricade. Such protester activity is verified by the video evidence submitted by the Plaintiffs themselves. Dundon also admits witnessing, while on the Bridge, protesters remove the first dump truck from Law Enforcement's barricade. It is a violation of N.D.C.C. § 24-03-05, for any person to open, remove, or deface any barricade, fence, or other obstruction, or any warning sign placed by the North Dakota Department of Transportation across any highway without express written permission. Such activity also constitutes an unlawful obstruction of a law enforcement or other government (NDDOT) function in violation of N.D.C.C. § 12.1-25-01(2). Law Enforcement clearly had a duty to prevent public property (i.e. the dump trucks forming part of the barricade) from being hauled away by the protesters, and to prevent unauthorized and unprivileged entry upon public property which has been closed to the public, particularly where

the governmental entity managing the property has requested Law Enforcement's assistance in removing what it referred to as "trespassers". A person violates N.D.C.C. § 12.1-08-02 if a person employs means justifying or requiring substantial force to overcome resistance to . . . the discharge of the duty."

> Force is justified if it is used to . . . prevent an unlawful carrying away or damaging of property, if the person using such force first requests the person against whom such force is to be used to desist from his interference with the premises or property, except that a request is not necessary if it would be useless or dangerous to make the request or substantial damage would be done to the property sought to be protected before the request could effectively be made.

N.D.C.C. § 12.1-05-06. Pursuant to N.D.C.C. § 12.1-05-06, force is justified to prevent the carrying away or damaging of personal property, even without an advance request to stop the activity where such request would have been useless under the circumstances. Section 12.1-05-06 only references a warning to desist from interference with the property – it does not reference any warning about the actual use of force. The uncontroverted record in this case establishes Law Enforcement did warn the protesters against removal of the dump trucks. Plaintiffs' complaint does not allege Law Enforcement did not warn protesters against removal of the dump trucks. Evidence of a warning against removal of the trucks on November 20, 2016, before they were actually removed, is also in the record. In relation to the protesters' removal of the first dump truck from the barricade with the Semi, one protester, who asserts this occurred shortly after 5 p.m. on November 20, admits "I heard the police on the bullhorn address one of the guys on the bridge by name. 'Don't do this Mike. We have 10 more of these trucks, and tomorrow we'll just bring another one in. Go home!'" (Doc. 81-27 at ¶ 15 [Lenoble Decl.].) The protester also admits Law Enforcement utilized tear gas in an unsuccessful attempt to prevent the first dump truck from being removed by protesters, and provides a color photograph of the incident evidencing the cloud of smoke is clearly visible from a long distance away as there was still daylight. (*Id*. at ¶ 16.) The

protester asserts that, following several unsuccessful attempts and in the face of *less-lethal* force being applied by Law Enforcement, protesters were ultimately successful in removing the first dump truck away from the rest of the barricade at approximately 5:30 p.m. (*Id.* at ¶ 17.) In other words, it was plainly evident to everyone from the outset of the protesters' activity in removing the first dump truck on November 20, before anyone alleges they were injured, that attempts to tamper with the barricade would be met with force. Dundon alleges she was one of the first protesters on the Bridge and she alleges she was injured during the protesters' attempt to remove the second dump truck from the barricade. All other Plaintiffs allege they arrived on the scene after Dundon. Under these circumstances, it was objectively reasonable for Law Enforcement to believe the protesters, as a whole in the vicinity, were acting as a unit and engaging in unlawful conduct which justified the use of force.

The Plaintiffs' allegations, as well as the record submitted by the Plaintiffs themselves, also establishes the protesters, even at this early stage, were engaged in a riot. "Riot" is defined under North Dakota's Criminal Code to mean "a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons or substantially obstructs law enforcement or other government function." N.D.C.C. § 12.1-25-01(2). The protester who alleges he heard the warnings given by Law Enforcement to protesters against removal of the dump trucks also alleges he observed the protesters remove both the first dump truck from the barricade, as well as the protesters initial efforts to remove the second dump truck. (Doc. 81-27 at ¶¶ 10-18 [Lenoble Decl.].) He estimates 10 protesters where involved with removing the first dump truck, but noted more protesters had showed up to help with the initial attempts to remove the second dump truck, with numbers of protesters growing by the minute. (*Id.* at ¶ 18.) Dundon alleges she was present among the other

protesters when they removed the first dump truck, and also when they initially attempted to remove the second dump truck. Dundon alleges force was applied by Law Enforcement against her during the protesters initial attempts to remove the second dump truck.

Law Enforcement also indisputably had the authority and duty to protect private property interests and individuals located north of the Bridge. The protesters had previously infringed upon these private property interests, and had assaulted individuals, during the ongoing protest activities against the Dakota Access Pipeline Project. Plaintiffs admit their objective was to prevent completion of the DAPL – completion of which would occur from a drill pad located a very short distance northeast of the Bridge.

In addition, in accordance with *Bernini* (discussed above), the use of non-lethal munitions for the purpose of preventing unlawful entry onto property by an unruly crowd, which officers reasonably believe is acting as a unit, is objectively reasonable as a matter of law. *Bernini* also establishes the use of non-lethal munitions is objectively reasonable for purposes of restoring order under riot conditions, as a matter of law. Further, it is objectively reasonable for Law Enforcement to utilize not only *less-lethal* force, but lethal force as well "when used in lawful self-defense, or in lawful defense of others, if such force is necessary to protect the actor or anyone else against death, serious bodily injury, or the commission of a felony involving violence." N.D.C.C. § 12.1-05-07(2)(b).

The uncontroverted record establishes protesters did in fact throw dangerous objects at Law Enforcement which subjected Law Enforcement to potential serious bodily injury or death. Although the Plaintiffs allege they went to the Bridge to "peacefully" or "peaceably" protest or pray on November 20, those allegation amount to an assertion of each Plaintiffs' intent when they left the Oceti Sakowin camp, not an allegation as to what they actually did at the Bridge. The use

of the words "peacefully" and "peaceably" in the context of the claims and defenses in this case also constitutes a legal conclusion which this Court may ignore for purposes of this motion. The purely factual allegations in the complaint as to what the Plaintiffs and other protesters did at the Bridge are the relevant allegations. The Plaintiffs, in their declarations, also do not deny observing other protesters around them: throwing or slinging objects at Law Enforcement, including CS gas canisters, large rocks, frozen water bottles, burning logs, or other objects; attempting to flank Law Enforcement's barricade to the west – cross-country; assaulting the barricade with a mobile shield wall; and starting fires along the north shore of the Cantapeta Creek in proximity to the barricade. Other protesters grudgingly admit to seeing objects thrown at Law Enforcement by protesters. (Doc. 81-24 at ¶ 21 [Kanahele Decl.] ("I saw one person throw what appeared to be a rock in the direction of the police. I saw another throw a stick in the direction of the police."); doc. 81-28 at ¶ 12 [Lopez Decl.] ("I did not see water protectors threaten the police, or use any weapons, with the exception of a few individuals who I saw throw the gas canisters that had been launched by the police, back toward the police."); doc. 81-27 at ¶ 58 [Lenoble Decl] ("A few people . . . threw plastic water bottles at the police . . . ."); (doc. 81-23 at ¶ 15 [Weeks Decl.] ("The only things that I saw thrown from the side of the water protecters to the side of the razor wire where law enforcement was located was an occasional plastic bottle of water, maybe 4 in total throughout the entire evening (7 hours). I also witnessed an individual protester try to throw a spent smoke canister from where it landed on the west side side [sic] of the Highway 1806 to the north side of the razor wire where the police were located.") These are all events established through video and sworn testimony in the record submitted by Plaintiffs, as well as Plaitniffs' allegations in the Amended Complaint. Plaintiffs admit to bearing shields and tarps, and wearing bandanas, goggles, and rain coats while in close proximity to the barricade, matching the descriptions of protesters

who engaged in assaults on the barricade behind shield walls, as depicted in the video evidence submitted by Plaintiffs. These uncontroverted activities constitute felony assault upon law enforcement officers (N.D.C.C. § 12.1-17-01), felony reckless endangerment with extreme indifference to the value of human life (N.D.C.C. § 12.1-17-03), and felony terrorizing (N.D.C.C. § 12.1-17-04), as well as the misdemeanors of criminal trespass (N.D.C.C. § 12.1-22-03), engaging in a riot (N.D.C.C. § 12.1-25-03), disobedience of public safety orders under riot conditions (N.D.C.C. § 12.1-25-04), other assaults (N.D.C.C. § 12.1-17-02), passing over a closed highway and removing a barricade thereon (N.D.C.C. § 24-03-05), and obstruction of government function (N.D.C.C. § 12.1-08-01). (Doc. 54 [LE-3] at ¶ 88; doc. 52 [LE-1] at ¶ 70.) Although Plaintiffs' generically allege in their complaint "[a]t no time did any of the plaintiffs or class members present a threat or do anything to justify defendant's use of force against them" (doc. 129 at ¶ 64), this allegation constitutes a legal conclusion that should be disregarded by the Court for purposes of this motion as it does not allege purely factual matter, and is directly contradicted by the record submitted by Plaintiffs.

Plaintiffs and protesters do not deny Law Enforcement were being struck by the objects being thrown by protesters, or deny one officer was struck so hard he became dazed and required assistance by other officers to an armored vehicle. Plaintiffs and protesters do not deny a group of approximately 150 protesters gathered in the west ditch north of the Bridge and proceeded west and north in an attempt to flank the police line, cross-country. They do not deny protesters threw shields across the concertina wire and one protester climbed over Law Enforcements' barricade. That Law enforcement were genuinely concerned they were going to be overrun and concerned about the immediate attempts by protesters to inflict serious bodily injury or death upon them and upon emergency responders on the scene is not directly controverted by Plaintiffs. The video

evidence in the record submitted by Plaintiffs establishes there were hundreds, if not more than one thousand, protesters involved in the riot on November 20, 2016 on or north of the Bridge.

Neither Plaintiffs' Amended Complaint, nor any Plaintiff's declaration, contains any allegation Plaintiffs were not aware Highway 1806 and the Bridge were closed to all access on November 20, or for over three weeks prior thereto. Plaintiffs' Amended Complaint and the Plaintiffs' declarations contain no allegation Plaintiffs were not aware they were not authorized or privileged to be on the Bridge or on the Corps-managed land located north of the Cantapeta Creek on November 20, 2016. Plaintiff Demo admits Law Enforcement warned protesters to get away from the razor wire barricade. (Doc. 1 at ¶ 62.) Another protester asserts in his declaration:

> I do not recall any warning announcements. At some points the police would say, **"move off the side of the bridge;"** Once, I heard them say "we are going to test the LRAD" and they did for a second. That was the only time I heard it. I did not hear, or at least I do not recall hearing, any announcement about them using other less lethal weapons. However, it was hard to hear. There was a lot of noise and commotion. There were also people singing and praying. If they did announce anything, I could not hear it**. I only heard them announce things like "you're trespassing," "you're not supposed to be on the bridge," and "move to the south side."** There were no announcements that were warnings that I can recall.

(Doc. 81-24 at ¶ 22 [Kanahele Decl.](emphasis added).) Another protester alleges "I do remember some sort of announcements being made by the police, but I don't remember – or at least did not hear – them making announcements about when they were going to use rubber bullets or gas or anything." (Doc. 81-14 at ¶ 18 [Toraty Decl.].) The uncontroverted record establishes Law Enforcement gave warnings.

With respect to the use of water, the uncontroverted record establishes there was a substantial time delay between when the confrontation began with the removal of the first dump truck around 5:00 p.m., when *less-lethal* was first deployed, and when water was first utilized. The same protester who admits Law Enforcement gave warnings to the initial protesters before the

first dump truck was removed from the barricade also asserts Law Enforcement utilized tear gas and rubber bullets on the rapidly growing crowd of protesters for about an hour and one-half before water was first deployed by Law Enforcement. (Doc. 81-27 at ¶ 20 [Lenoble Decl.].) Plaintiffs admit to finding no current case law on the use of water against protesters in the United States. (Doc. 14 at p. 24.) Plaintiffs have cited to no case law at all determining the use of water by law enforcement constitutes excessive force. Query how Law Enforcement's use of water under the circumstances could therefore possibly constitute a violation of a clearly established constitutional right for which a reasonable officer would have known was unlawful. As very recently explained by the Supreme Court of the United States:

> Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law. This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality.

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the fact of each case, and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.

> ***

> . . . Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

*Kisela v. Hughes*. 2018 WL 1568126 * 2-3, 584 U.S. ___ (April 2, 2018) (per curiam) (numerous citations and quotations omitted). As there is no clearly established, existing precedent establishing the use of water by law enforcement officers constitutes excessive force, even

assuming, arguendo, such use could constitute excessive force, which it did not, the individual officers would none-the-less be entitled to qualified immunity from suit.

Plaintiffs and protester declarants also admit observing Law Enforcement's application of force as to others, including alleged use of gas canisters, smoke, impact munitions, fire hose, etc., yet incredibly decided to place themselves in close proximity to the barricade, often for extended periods of time, and despite Law Enforcements' alleged multiple applications of force against them. Query the futility of providing additional warnings to individuals with this mindset. Plaintiffs allege the air was full of smoke and gas, there were shots being fired and explosions heard, and fire hose(s) utilized on persons standing in proximity to the barricade. No reasonable person would observe such alleged use of force by Law Enforcement standing behind a barricade with armored vehicles and believe their presence was authorized or lawful, regardless of whether any additional warnings were provided by Law Enforcement.

The uncontroverted record establishes Plaintiffs' have failed to allege a plausible excessive force claim against Law Enforcement under the Fourth Amendment. Dismissal of such claim is warranted at this time.

### E. Plaintiffs' Fourteenth Amendment Excessive Force Claim

As discussed above, Plaintiffs may not proceed with both their excessive force claim under the Fourth Amendment, and under the Fourteenth Amendment, simultaneously. In the event the Court concludes Plaintiffs have sufficiently alleged they were "seized" by Law Enforcement on November 20, their claim is limited to a Fourth Amendment analysis, and their excessive force claim under the Fourteenth Amendment must be dismissed.

Plaintiffs fail to allege a plausible excessive force claim under the Fourteenth Amendment, as a matter of law. The Fourteenth Amendment Due Process Clause protects citizens from

governmental deprivation of life, liberty and property without due process of law.  U.S. CONST. AMEND. XIV.  The United States Court of Appeals for the Eighth Circuit has noted the standards which must be met to establish excessive force in violation of the Fourteenth Amendment is a more burdensome standard than is applied under the "objective reasonableness" standard under the Fourth Amendment as the claimant must establish, among other things, the specific application of force "shocks the conscience" under the circumstances.  *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000).  *See generally County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (discussing elements and application of excessive force claim under Fourteenth Amendment).  An excessive force claimant who cannot win his case under the Fourth Amendment standard certainly cannot win his case under Fourteenth Amendment standards. *Wilson v. Spain,* 209 F.3d at 716.  Therefore, a plausible claim of excessive force under the Fourteenth Amendment requires alleged facts which, if proven, establish a specific application of force which "shocks the conscience" under the circumstances.

Considering the circumstances Law Enforcement were confronted with during the November 20 riot, as discussed above in the context of Plaintiffs' excessive force claim under the Fourth Amendment, it cannot reasonably be concluded the use of intermediate and *less lethal* force by Law Enforcement to hold back the uncontrolled mob, protect government property and the physical safety of Law Enforcement and other fire service personnel, and otherwise restore order on scene "shocks the conscience", in a constitutional sense.   Plaintiffs admit they were in close proximity to Law Enforcements' barricade.   Plaintiffs admitted locations where force was allegedly applied against them necessarily means they were intermingled with the trespassing mob which was throwing objects at Law Enforcement and attempting to breach Law Enforcement's barricade.   In addition, Plaintiffs have not alleged a deprivation of any liberty interest.   As

discussed, Plaintiffs had no right to be in any location where force was allegedly applied against them, and had no right to proceed north through or around the barricade in this vicinity. Plaintiffs admit they and other protesters remained within range of Law Enforcement's alleged application of force for, in many cases, hours. No reasonable person could conclude such conduct did not, at the very least, evidence a failure to comply with the clear directive from Law Enforcement to vacate the vicinity where force was being applied. Plaintiffs' and the protesters' intentions were clear – they wanted to stop completion of the DAPL project by any means necessary. Plaintiffs' excessive force claim under the Fourteenth Amendment should be dismissed as Plaintiffs have not even alleged facts which, if true, would "shock the conscience."

### F.    Plaintiffs' Equal Protection Claim

The Fourteenth Amendment to the United States Constitution indicates no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. This clause essentially "guarantees citizens their State will govern them impartially." *Davis v. Bandemer*, 478 U.S. 109, 166 (1986)(citing *Karcher v. Daggett*, 462 U.S. 725, 748 (1983)(Stevens, J., concurring)). However, while Equal Protection requires a "distinction made have some relevance to the purpose for which the classification is made", it "does not require that all persons be dealt with identically." *Baxtrom v. Herold*, 383 U.S. 107, 111 (1966)(citing *Walters v. City of St. Louis*, 347 U.S. 231, 237 (1954)). The Supreme Court of the United States has recognized several suspect classifications. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439-41 (1985). If a plaintiff is in one of these groups, a higher level of scrutiny applies. *Id.* If the alleged discrimination is based on race, national origin, alienage, sex, or illegitimacy, or involves a deprivation of the fundamental rights of travel, voting, or raising one's family, the court applies either strict or intermediate scrutiny. *Id.*

In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court held, where the plaintiff does not allege membership in a class or group, it may nevertheless sustain a claim of a violation of the Equal Protection Clause if it alleges that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Id.* (citing *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989)); *Barstad v. Murray County*, 420 F.3d 880, 884 (8th Cir. 2005).

The government's different treatment of persons will "'be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Vasquez-Velezmoro v. U.S. I.N.S.*, 281 F.3d 693, 697 (8th Cir. 2002) (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). "[T]he [government] need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative ' "any reasonably conceivable state of facts that could provide a rational basis for the classification." ' ." *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 367 (2001) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *F.C.C. v. Beach Communications, Inc.*, 508 U.S. at 313)). "This [rational basis] standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely [the court] may think a political branch has acted.'" *F.C.C. v. Beach Communications, Inc.* 508 U.S. at 314 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).

In the present case, Plaintiffs allege, in relevant part, "[t]he unequal treatment to which plaintiffs were subjected was based on plaintiffs' status as indigenous persons or association with

indigenous persons and their political and religious beliefs in opposition to DAPL and fossil fuels, and includes the use of excessive force on plaintiffs when plaintiffs were attempting to exercise their constitutional rights." (Doc. 129 at ¶ 162.) Plaintiffs fail to allege a viable equal protection claim.

First, Plaintiffs' Amended Complaint does not identify others allegedly similarly situated who were not subjected to the same alleged use of force by Law Enforcement. In fact, Plaintiffs expressly allege Law Enforcement indiscriminately applied force to essentially everyone located in close proximity to the barricade, i.e. everyone similarly situated to Plaintiffs. (Doc. 129 at ¶ 54 ("Defendants and other law enforcement officers unleashed a barrage of freezing water, chemical agents, SIM, and explosive grenades directed toward the entire crowd, for many hours, though out the night and into the early morning."); *id*. at ¶ 55 ("Defendants indiscriminately shot, launched, and sprayed their weapons on all persons who were present in the general area of the Backwater Bridge."). Plaintiffs have failed to allege an unequal application of the law to persons similarly situated.

Second, merely being associated with indigenous persons does not make a person a member of a protected class.

Third, Plaintiffs' assertion their opposition to DAPL and fossil fuels makes them members of a protected class on religious or political grounds is entirely baseless, and without legal support or precedent.

Fourth, query how law enforcement officers would have been able to identify any particular protester as being an indigenous person under the circumstances. Protesters were hiding behind shields, tarps and the burned out dump truck, were wearing rain coats, goggles, bandanas, hoodies, etc.

Fifth, as discussed, the record established by Plaintiffs evidences that Plaintiffs were in fact violating the law when force was allegedly applied, thereby providing a reasonable basis for any alleged classification. Of course, not mentioned in Plaintiffs' Amended Complaint was Plaintiffs and other protesters objective of once again gaining access to the DAPL project site located a short distance to the northeast of the Bridge in order to stop the pipeline at all costs.

Plaintiffs fail to provide even a bare bones recitation of the required elements for a viable equal protection claim, let alone sufficient facts to establish a plausible claim under *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plaintiffs fail to allege facts, which if assumed to be true, could potentially establish Plaintiffs were singled out for application of force from among the other persons located in the vicinity of Law Enforcement's barricade on November 20, 2016. Plaintiffs fail to allege a viable equal protection claim, and dismissal of such claim is requested.

### G. Derivative Claim – Declaratory Relief

Plaintiffs' claim for "Declaratory Relief" (Fourth Claim) is merely derivative of, and dependent upon Plaintiffs' prevailing upon claims one ("Retaliation"), two ("Unreasonable Use of Force"), and/or three ("Unequal Protection of Law"). Similarly, Plaintiffs' request for class certification is also dependent upon the viability of the underlying claims of retaliation, unreasonable use of force, and/or unequal protection of law. *See Miller v. Redwood Toxicology Laboratory, Inc*. 688 F.3d at 937 (dismissing class certification claim due to dismissal of underlying claims of individual plaintiffs). As Plaintiffs have failed to allege viable claims for retaliation, unreasonable force, and unequal protection of the law, as discussed above, this derivative claim should also be dismissed.

### H. Claims Against Political Subdivision Defendants

Plaintiffs allege the political subdivision defendants (i.e. Morton County, Stutsman County and City of Mandan) are liable for the alleged conduct of their employee law enforcement officers on the basis the alleged constitutional violations were the result of "policies, practices and customs" of the political subdivision defendants. As explained by the United States Court of Appeals in *Speer v. City of Wynne, Arkansas*, 376 F.3d 960 (8th Cir. 2002), a political subdivision cannot be held liable in a § 1983 action absent an actual violation of a plaintiff's constitutional rights. Absent such violation, neither the political subdivision's employee(s) at issue, or the political subdivision itself, could be potentially liable to the plaintiff(s). In this case, as discussed, the evidence this Court is permitted to consider in relation to this Rule 12(b)(6) motion reveals Plaintiffs' have failed to allege a viable claim for violation of their constitutional rights. As a result, dismissal of Plaintiffs' claims against the political subdivision defendants is requested.

I.   **The Court Should Abstain From Exercising Supplemental Jurisdiction Over Plaintiffs' State Law Tort Claims**

Plaintiffs have invoked this Court's federal question jurisdiction over this dispute. (Doc. 129 at ¶ 11.) Therefore, in the event the court dismisses Plaintiffs' claims under federal law for which this Court has original jurisdiction, there would be no justification for this Court to exercise supplemental jurisdiction over Plaintiffs' tort claims of assault and battery (fifth claim) and negligence (sixth claim) governed by state law.

Supplemental jurisdiction is governed by 28 U.S.C. § 1367, which provides, in relevant part:

> **(a)**   Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

***

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

> **(1)** the claim raises a novel or complex issue of State law,
> **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> **(3)** the district court has dismissed all claims over which it has original jurisdiction, or
> **(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.A. § 1367 (bold in original). "A district court's decision whether to exercise that [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citations omitted).

## IV.    CONCLUSION

For the foregoing reasons, Law Enforcement respectfully requests dismissal of Plaintiffs' claims, with prejudice.

Dated this 6th day of April, 2018.

BAKKE GRINOLDS WIEDERHOLT

By:    */s/* Randall J. Bakke
     Randall J. Bakke (#03989)
     Shawn A. Grinolds (#05407)
     Bradley N. Wiederholt (#06354)
     Special Assistant State's Attorneys for Morton and Stutsman Counties
     300 West Century Avenue
     P.O. Box 4247
     Bismarck, ND 58502-4247
     (701) 751-8188
     rbakke@bgwattorneys.com
     sgrinolds@bgwattorneys.com

bwiederholt@bgwattorneys.com

Attorneys for Defendants Kyle Kirchmeier, Morton County, City of Mandan, Jason Ziegler, Stutsman County, and Chad Kaiser

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 6, 2018, a true and correct copy of the foregoing **Memorandum of Law In Support of Defendants Kyle Kirchmeier, Morton County, City of Mandan, Jason Ziegler, Stutsman County, and Chad Kaiser's Second Motion to Dismiss** was filed electronically with the Clerk of Court through ECF.

Rachel Lederman
Rachel Lederman & Alexsis C. Beach, Attorneys
558 Capp Street
San Francisco, CA 94110
(415) 282-9300
rachel@bllaw.info

Melinda Power
West Town Law Office
2502 W. Division
Chicago, IL 60622
Melindapower1@gmail.com

Mara Verheyden-Hillard
Partnership for Civil Justice Fund
617 Florida Avenue NW
Washington, D.C. 20001
mvh@justiceonline.org

Janine Hoft
Shubra Ohri
People's Law Office
1180 N. Milwaukee Ave
Chicago, IL 60642
janinehoft@gmail.com
shubraohri@gmail.com

By:     _/s/_Randall J. Bakke_____
                Randall J. Bakke