IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NORTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| VANESSA DUNDON, ET AL. on behalf of themselves and all similarly- situated persons,<br><br>    Plaintiffs,<br><br>    v.<br><br>KYLE KIRCHMEIER, ET AL.,<br><br>    Defendants. | No. 1:16-cv-406-DLH-CSM<br><br>**Plaintiffs' Memorandum In Opposition To Defendants' Second Motion To Dismiss (Rule 12(B)(6)); In The Alternative, Motion Pursuant to Fed. R. Civ. P. 56(d) To Allow Plaintiff To Conduct Discovery Prior To Ruling On Defendants' Motion As One For Summary Judgment.** |

## I.    INTRODUCTION

Plaintiffs state claims for relief, including under the First, Fourth, and Fourteenth Amendments and pursuant to *Monell*.[1] Defendants' second motion to dismiss must therefore be denied. Defendants' motion improperly requests this Court consider self-serving, argumentative and disputed facts outside the pleadings. In the alternative to denying defendants' motion, should the Court convert the motion to one for summary judgment, plaintiffs seek leave, pursuant to Fed. R. Civ. P. 56(d), to take discovery as to the purported facts alleged by defendants.

---

[1] *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978).

## II.    STANDARD OF REVIEW

Fed. R. Civ. P. 12(b)(6) allows defendants to file a motion to dismiss the complaint for failure to state a claim upon which relief can be granted prior to filing an answer or responsive pleading. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).)

A complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (*Iqbal*, 556 U.S. at 678.) In determining whether a complaint meets this standard, the reviewing court must take the plaintiff's factual allegations as true. (*Ibid.*; *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996).) "[D]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (*Hafley*, 90 F.3d at 266 (internal quotations omitted).) Where the requirements of Rule 8(a) are satisfied, even "claims lacking merit may be dealt with through summary judgment." (*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002).) In this regard, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).)

When considering a motion to dismiss, a district court must liberally construe a plaintiff's complaint and assume all factual allegations to be true. Dismissal will not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle plaintiff to relief. (*Bayley v. Mdu Res. Grp. Inc.,* No. 1:13-cv-002, 2013 U.S. Dist. LEXIS 197739, at \*3 (D.N.D. July 29, 2013) [This court citing *Eckert v. Titan Tire Corp.,* 514 F. 3d 801, 806 (8th Cir. 2008); *Goss v. City of Little Rock Ark.,* 90 F. 3d 306, 308 (8th Cir. 1996)].)

## III.   PLAINTIFFS' AMENDED COMPLAINT STATES CLAIMS FOR RELIEF

### A. *Defendants' Argument Relies on Disputed Facts And Material Which Are Not Proper Subjects of Judicial Notice.*

Plaintiffs adequately state claims for relief under the First, Fourth and Fourteenth Amendments for violations of First Amendment rights and for unreasonable use of force. (Claims 1 and 2.) Plaintiffs also state claims for unequal protection of the law and for declaratory relief. (Claims 3 and 4.) Plaintiffs further state common law claims of assault and battery and negligence. (Claims 5 and 6).

Defendants' motion fails its burden to demonstrate that plaintiffs' allegations, accepted as true, do not state a claim for relief. Instead, defendants do not accept the well pled allegations of the complaint as true, and rather argue defendants' claimed version of the facts. (Doc. 136, pp. 3-17.) Instead of meeting their burden upon a motion to dismiss, defendants present an alternate

disputed version of the facts and ask the court to accept disputed facts as true, including improperly asserting that their own press releases and selective media reports, often based on those press releases, and their own disputed interpretations of the photo and video evidence are "facts" of which it requests this court take judicial notice.

When considering a motion to dismiss under Rule 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or *do not contradict the complaint.* (*Missouri ex rel. Nixon v. Coeur D'Alene Tribe,* 164 F.3d 1102, 1107 (8th Cir.), *cert. denied,* 527 U.S. 1039 (1999).) As defendants acknowledge, a court may take judicial notice of a "fact that is *not subject to reasonable dispute*". (Doc. 98, p. 22, quoting *Williams v. Employers Mutual Casualty Company*, 845 F.3d 891 (8th Cir. 2017).) If a document offered for the truth of the matters within it and inferences to be drawn from them and those matters are disputed by plaintiffs, the document is not a proper subject of judicial notice under FRE 201(b), judicial notice of facts not subject to reasonable dispute. (E.g., *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 832 (8th Cir. 2003).)

Most of the "facts" as to which defendants request judicial notice are subject to reasonable dispute, contradict the complaint, rely on documents such

as press releases that are not the proper subject of judicial notice, and often misrepresent the material cited[2].

> **Defendants' "Fact" 3:** "*On August 15, 2016, the Morton County Board of Commissioners declared a state of emergency due to protester activity occurring at the DAPL project site which threatened the health, well-being and safety of Law Enforcement and the public, and required additional manpower, resources and other expenditures to protect life and property.*" (Doc. 61-4.)

Not only is this is a statement by a party-affiliated witness, defendant Morton County's own commission chairman, but defendants' brief misrepresents the statement, in that the document in question does not state that the protests presently "threatened" the health, well-being and safety or "life and property", but rather, that, according to the party-affiliated witness, "the impact of civil unrest *could* threaten the health, well-being, and safety of responders and the public". (Compare Doc. 136, p. 5, with Doc. 61-4.) This was essentially a funding measure which triggered Doc. 58-2, the state emergency proclamation which brought additional funding and mutual aid resources to defendant Morton County.

> **Defendants' "Fact" 5**: *Governor Dalrymple activated a military police unit.* (Doc 61-2 at DEF000016.)

The document referred to is a press release by defendant, stating that defendant brought in a small number of National Guard personnel to man the

---

[2] While identifying, by way of example, multiple instances of disputed fact, plaintiffs do not herein seek to address every disputed "fact" that defendants assert as they would were this a motion for summary judgment with accompanying statement of facts.

"traffic information point" on Highway 1806. This refers to the checkpoint just south of Mandan, not Backwater Bridge, and indicates that the road was being opened back up where it had previously been closed (see last paragraph on DEF000016). Moreover, press releases, or even press reports, are not proper subjects of judicial notice because they do not represent facts which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FRE 201(b)(2); *see, e.g.*, *Cofield v. Alabama Public Service Commission*, 936 F.2d 512, 517 (11th Cir. 1991) ("that a statement of fact appears in a daily newspaper does not of itself establish that the stated fact is 'capable of accurate and ready determination'").

> **Defendants' "Fact" 6**: *Emergency Management Assistance Compact request "due to the escalated unlawful tactics by individuals protesting the construction of the DAPL"*

This is again, a press release by defendant, and so not a proper subject of judicial notice. And again, the document is misrepresented -- it says nothing about "escalated unlawful tactics".

> **Defendants' "Fact" 15**: "*The Bridge and Highway 1806 at the location of the November 20 events at issue were not traditional public fora at any time prior to the DAPL protests, or during the protests.*"

This is an unsupported, disputed legal contention by defendants.

Plaintiffs have pled that the bridge was closed to through traffic at the time and was a public forum:

> 3. At Backwater Bridge, a bridge on Highway 1806, just north of where many of the Water Protectors were camped, plaintiffs engaged in peaceful First Amendment protected activities in a lawful public forum area on or

near the bridge that was open and available to pedestrian assembly. Plaintiffs did not cross into the area north of the bridge that was marked and separated by a police barricade and closed to entry and assembly.

4. The area in which plaintiffs assembled was not stripped of its public forum character, and even were defendants to have had a lawful basis to exclude persons from this public space, they did not adequately or sufficiently communicate that the public forum was closed to pedestrian assembly or otherwise issue an order to plaintiffs to disperse.

(Doc. 129, First Amd. Complt. ¶¶ 3-4.) (See, e.g., *Powell v. Noble*, 798 F.3d 690, 699 (8th Cir. 2015) [Traditional public forums are public areas such as streets and parks]; *Grove v. City of York, Penn.*, 342 F. Supp.2d 291, 302 fn. 2 (M.D. Pa. 2004) [no question that street closed to traffic is a traditional public forum].)

**Defendants' "Facts" 16 and 17**: *The Bridge was closed to "all access".*

Docs 59-2 and 59-3 are press releases. Moreover, none of the documents cited by defendants make any mention of closing the Bridge to "all access", including pedestrian: rather, motorists were re-routed. Plaintiffs dispute that the bridge was closed to pedestrians and have so pled. Plaintiffs do not dispute that there was no vehicular through traffic on the bridge on the night in question. (Doc. 129, ¶¶ 3-4.)

**Defendants' "Facts" 18-19:** *The Army Corps managed the land upon which all three camps were located and the location where DAPL planned to cross the Missouri River.*

These statements are unsupported and contradict the allegations of the Complaint. Some of the camps were on private property on the Standing Rock reservation. The camps that were on federal land had the permission of the Corps. (Doc. 129, ¶ 31.) Moreover, on November 20, 2016, DAPL was not

allowed to construct the Lake Oahe / Missouri River crossing, and the Corps had repeatedly requested that DAPL cease all construction within 20 miles of Lake Oahe. (Doc. 129, ¶ 33.)

**Defendants' "Fact" 22:** *The Army Corps requested assistance removing protesters.*

Doc. 61-7, the letter defendants cite in which the Corps requests defendant Kirchmeier's assistance in removing trespassers refers only to land *north of the bridge*, i.e., behind the barricade. The letter makes clear that the Corps was not asking Kirchmeier to remove the Oceti Šakowi camp immediately south of Backwater Bridge and does not mention the bridge itself.

**Defendants' "Fact" 23:** *Prior to November 20, 2016, protesters made incursions onto land north of the bridge and destroyed private property and terrorized citizens.*

The source for this contention is again, media reports and defendants' own press releases, which are not the proper subject of judicial notice. Plaintiffs dispute defendants' attempt to attribute the actions of other unidentified "protesters" on other dates to the plaintiffs. The plaintiffs gathered with others to pray and peacefully protest, south of the barricade and "No Trespassing" signs. (Doc. 129, ¶¶ 2, 44.) Plaintiffs engaged in peaceful First Amendment protected activities in a lawful public forum area on or near the bridge that was open and available to pedestrian assembly. (¶ 3.) The plaintiffs and all members of the proposed Class remained south of the law enforcement barricade at all times relevant. (¶ 47.) The vast majority of the crowd remained at a distance

from the barricade, and those closest to it were simply standing, demonstrating, and/or praying or singing, and not trying to cross the barricade or assault the officers. At no time did any of the plaintiffs or class members present a threat or do anything to justify defendant's use of force against them. (¶ 64.)

Defendants repeatedly characterize plaintiffs' conduct in misleading, conclusory, and argumentative fashion. Significantly, defendants rely on attributing actions to other unidentified "protesters" and then justifying force used against individual plaintiffs based on alleged conduct by unidentified others, including at other times and places. This Court should not accept as true defendants' disputed characterizations of plaintiffs and broad brush allegations against unknown and undifferentiated persons identified monolithically as "protesters" in its resolution of this motion.

Moreover, further doubt is cast on the press accounts, press releases and defendants' generalizations about the water protectors by the information that has recently come to light concerning the activities of TigerSwan. After the Army Corps withdrew Energy Transfer Partners' easement to drill and install the pipeline under Lake Oahe in September 2016, in response to the protests, and requested that DAPL / ETF cease all construction in the nearby area, Energy Transfer Partners hired military contractor TigerSwan. to run an "information operations campaign" in support of DAPL. This included surveilling, infiltrating or attempting to infiltrate, sowing divisions within and attempting to discredit the growing movement against DAPL, and engaged in

efforts to falsely portray the water protectors as dangerous and violent including through a robust public relations campaign. (Doc. 129, ¶¶ 33-34.)

Absent discovery, we do not know whether some or all of the alleged unlawful activities were in fact instigated or carried out by TigerSwan infiltrators, and the extent to which press accounts and Law Enforcement's calls for emergency aid and press releases were the products of Energy Transfer Partners' well-funded information operations campaign used by Law Enforcement in its collaboration with TigerSwan. "According to public documents, TigerSwan coordinated and collaborated with Defendant law enforcement agencies. DAPL paid Tiger Swan to advance DAPL's corporate and financial interests, not the public interest. TigerSwan was unlicensed in the State of North Dakota. Nevertheless, defendant entities allowed this private paid contractor to operate in North Dakota and not only attempt to defame the protestors who opposed DAPL but, additionally, to influence law enforcement actions against civilians protesting construction of the pipeline. In fact, defendants even allowed TigerSwan access to and participation in the Joint Operations Command Center." (¶ 34.) This casts into doubt many of the facts this Court accepted as true in its preliminary injunction decision. Moreover, as discussed, the standard of review on a 12(b)(6) motion requires the Court to ignore disputed materials that contradict the complaint.

### B. Defendants Mischaracterize the Facts Pled in the Amended Complaint and in the Previously Filed Declarations.

Defendants mischaracterize some of the allegations of the Complaint as "legal conclusions" and request that the Court disregard those well pled allegations. (Doc. 136, p. 9.) In addition, defendants' descriptions of the video evidence and various declarations and allegations of the complaint are inaccurate and/or distorted to support defendants' contentions. (See Doc. 136, pp. 9-30.)

> **"Admission" 2**. *Plaintiffs admit their objective was to prevent completion of the DAPL – completion of which would occur from a drill pad located a very short distance northeast of the Bridge.*

Plaintiffs do not dispute wanting to stop DAPL. Defendants seem to want this Court to infer, however, that that viewpoint meant that on November 20, 2016, plaintiffs were determined to break through the law enforcement barricade and impede construction by unlawful means at the nearby drill site. If that is to be inferred from opposition to the pipeline, however, the same would be inferred as to the Army Corps, since at the time of the event in question it had ordered that construction stop and there was presumably no drilling going on at the drill pad. (Doc. 129, ¶ 33 and see ¶ 125.) Moreover, each of the plaintiffs has stated that she or he went to the bridge to peacefully protest and/or pray and/or to observe and document. In fact, the "vast majority of the crowd remained at a distance from the barricade, and those closest to it were simply standing, demonstrating, and/or praying or singing, and not trying to

cross the barricade or assault the officers. At no time did any of the plaintiffs or class members present a threat or do anything to justify defendant's use of force against them." (¶ 64.)

**"Admission" No. 3**: *Plaintiffs admit being forcibly removed from, or prevented from accessing, private property located north of the Cantapeta Creek by Law Enforcement on several occasions prior to November 20, 2016.*

This refers to other areas, not the Backwater Bridge, and to events which did not include all of the plaintiffs. Moreover, plaintiffs contend that defendants' actions were unlawful. (See ¶¶ 35-37, discussing wrongful arrests and use of excessive force in October and early November, 2016.)

**"Admissions" No. 9 and 10**: *"Dundon admits the protesters she was intermingled with when force was allegedly applied as to her were actively engaged in attempts to remove the second burned out dump truck from Law Enforcement's barricade" and "Dundon alleges she was present among the other protesters when they removed the first dump truck and also when they initially attempted to remove the second dump truck."*

Nowhere in the complaint or in her declaration does plaintiff Vanessa Dundon state that she was "intermingled" or "among" the small group of people who were trying to remove the trucks. Rather, both her declaration and the complaint make clear that only a few people were involved, and Ms. Dundon was not a participant in this activity, but that when she saw what was happening, she tried to move bystanders to safety. (¶¶ 67-69.)

**"Admission" No. 14**: *[Witness Martin Lenoble] "estimates 10 protesters where involved with removing the first dump truck, but noted more protesters had showed up to help with the initial attempts to remove the second dump truck, with numbers of protesters growing by the minute."* (Citing Doc. 81-27 at ¶ 18.)

The Lenoble declaration does *not* state that more protesters showed up to help move the second dump truck. Rather, Mr. Lenoble states that only after the small group towed one of the trucks to the side of the road did more water protectors begin to arrive. (Doc. 81-27, ¶ 18.) He makes clear that after that point, the crowd was entirely non-violent and peaceful, presented no threat to the police, and included indigenous people who were engaged in traditional prayer and song. (Doc. 81-27, ¶¶ 19-39.)

**"Admissions" No. 16-17**: *Plaintiffs' proximity to the barricade*

The plaintiffs do not admit they were "in close proximity" to the barricade. The complaint makes clear that force was used indiscriminately on everyone in the general area, even persons at the south end of the bridge. (Doc. 129, ¶¶ 55, 58.) Those of the plaintiffs who have stated they were at the very front of the crowd were, for example, twelve to fourteen feet from it. (Dullknife, ¶ 99.)

**"Admission" No. 19**: *"Plaintiffs admit to bearing shields and tarps … while in close proximity to the barricade, matching the descriptions of protesters who engaged in assaults on the barricade behind shield walls."*

Plaintiffs have described how they tried to shield themselves or more often, others also engaged in peaceful First Amendment-protected association and activities, defensively, from the relentless onslaught of freezing water, chemical weapons and munitions. Defendants' statement that "protesters engaged in assaults on the barricade behind shield walls" is disputed by the

complaint as well as all of the declarations filed by plaintiffs and the video evidence. Only a single individual tried to breach the barricade and that person was immediately arrested. (¶ 61.) The officers remained at all times north of the barricade and were never subject to any attempt to overrun them or any other threat. (¶ 62.)

> **"Admission" No. 20**: *Video filed by Plaintiffs depicts protesters "advancing on Law Enforcement's barricade".*

This is a misrepresentation of the video content. The video evidence, such as the aerial video (Doc. 93-4), shows most of the crowd well back from the barricade. Doc. 91-642034911, cited by defendants, shows some people taking a few slow steps in the direction of the barricade for a few seconds, while trying to shield themselves from the water and munitions fire. There is nothing threatening in their behavior. This same cluster of people is also depicted in defendants' aerial video, Doc. 93-4, which shows that they stopped short of the barricade, and in defendants' video Doc. 93-9, on which they can be heard saying "We are peaceful" and "We are unarmed". (Doc. 93-9; 93-4, 21:29-23:20.)

The actions of these individuals cannot reasonably be interpreted as an attempt to get over the barricade and attack the police. On Doc. 100-20161120, cited by defendants, the people on the truck are not making any attempt to cross the barricade. There were multiple rows of concertina wire and concrete between them and the officers. The video shows that the water protectors' engagement with the officers who were behind the barricade was verbal only.

Water protectors can be heard saying such things to the officers as, "You could never get me to hurt anyone"; and "I believe that you are better than that. I believe in every one of you". Notably absent from these videos is anyone trying to breach the barricade or any barrage of objects thrown at law enforcement. The officers were never subject to any attempt to overrun them or any other threat. (¶ 62.) The vast majority of the crowd remained at a distance from the barricade, and those closest to it were simply standing, demonstrating, and/or praying or singing, and not trying to cross the barricade or assault the officers. At no time did any of the plaintiffs or class members present a threat or do anything to justify defendant's use of force against them. (¶ 64.)

**"Admission" No. 23-26**: *Law enforcement announcements.*

Plaintiffs do not dispute that at some points during the very long night, officers told some individuals to "step back" or gave other orders to those individuals who were closest to the barricade. Plaintiffs dispute that dispersal orders were given that were applicable and audible to most of the people assembled on the bridge after 7pm, as follows:

48. On the night of November 20-21, 2016, plaintiffs did not receive actual warnings or orders to disperse.

49. A single announcement was made by defendants at 6:23 pm, before most of the protectors arrived at the bridge. The announcement did not tell people to leave the area, but rather to stay off the bridge and to remain south of the river shoreline.

50. This ephemeral and temporal communication to a handful of persons at an earlier time does not constitute a lawful order or warning to the

plaintiffs and many others who arrived later and cannot be imputed as issued to them.

51. After that time, defendants did not issue warnings or orders to disperse to those present in the area and subjected to defendants' use of force.

52. From at least 7:00 p.m. on, no defendants nor any law enforcement officer gave any amplified orders to disperse or other general instructions to the plaintiffs and assembled crowd, and none of the plaintiffs heard a dispersal order or directive to leave the area in which they were present. At least one person heard a command to "step back", but there was no time to do so before defendants shot SIM[3] and other weapons into the crowd.

53. Although defendants possessed the means and the opportunity to issue any such order or warning to those assembled and to those subject to their indiscriminate use of force, they chose not to do so prior to use of force.

(Doc. 129.)

> **"Admission" 28**. "*Plaintiffs admit they were free to walk away from Law Enforcement's barricade and free to walk away from the force allegedly applied against them.* (Doc. 129 at ¶¶ 70-71 [Dundon], 81 [Wool], 85-86 [Wilson], 106 [Bruce], 111 [Finan], 114-115 [Hoagland-Lynn], 120 [Treanor]; doc. 14-17 at ¶ 8 [Demo Decl.].)"

Again, defendants mischaracterize the allegations. Rather than being "free to walk away", law enforcement shot Ms. Dundon in the back of the leg when she tried to run away after she was shot in the eye, and caused her to fall down. She could not see due to the heavy bleeding from her eye, and had to be rescued by two people who helped her get to a medic van. (¶¶ 70-71.) Rather than being "free to walk away", Ms. Wool was knocked to the ground by the

---

[3] SIM is an abbreviation for Specialty Impact Munitions, also known as Kinetic Impact Projectiles or KIP, for example, lead-filled "bean bag" rounds that are fired from a shotgun and "eXact iMpact" or "sponge" rounds, which are made of plastic with a rubber tip.

grenade that exploded in her face and went into shock. She too had to be rescued by other civilians, who transported her in a truck to the medic tent and then the hospital. (¶ 81.) Similarly, law enforcement knocked Frank Finan to the ground by shooting him in the abdomen, and he had to be helped to get to medics. (¶ 111.) Mr. Hoagland-Lynn was also knocked to the ground when he was first shot in the back, and then in the head, causing him to lose consciousness and to require an ambulance. (¶¶ 114-115.) Mr. Treanor tried to roll away from the use of force, but he too was shot in the head, necessitating an ambulance. (¶ 120.)

> **"Admission" 29.** "Video filed by Plaintiffs in support of their previously denied motion for preliminary injunction depicts protesters freely moving north and south on the Bridge during the riot. (Doc. 100 at MP4 file name beginning "RAW CLIP1" at 0:00 to 3:00.)"

The video segment cited by defendants does not depict anything that could be characterized as a riot. It shows protesters walking around at the south end of the bridge. No dispersal orders are audible.

> **"Admission" 30**. "*Video filed by Plaintiffs in support of their previously denied motion for preliminary injunction, and filmed by a protester, is taken from a vantage point which is north (i.e. behind) and to the west of Law Enforcement's barricade, the general vicinity from which a large body of protesters attempted to flank Law Enforcement's barricade. (Doc. 92 at MP4 file named "642034911" at meter 3:05 to 3:19.)*"

As can be seen from the credit immediately after the portion referenced by defendants, this video is from a journalist with independent media organization Unicorn Riot, not from a protester. It is impossible to tell how far away the videographer as it appears he or she may have been using a telephoto

lens, but the vantage point seems to be across from, not behind, the police. Plaintiffs dispute that "a large body of protesters attempted to flank Law Enforcement's barricade". There is no support for that in the video segment cited, or in any other video in the record in this case. The officers were never under any threat. (¶ 62, 64.)

## C. Plaintiffs Have Stated a Claim for Violation of First Amendment Rights.

Plaintiffs allege they suffered deprivation of their First Amendment rights as they were subject to use of force and injury that truncated and deprived them of their engagement in constitutionally protected activities and/or caused them to endure pain and suffering in order to continue any engagement in those activities, as discussed further below. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. (*Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) [citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)].)

As elaborated above, plaintiffs have also alleged that defendants coordinated and collaborated with TigerSwan, the private, unlicensed contractor paid by DAPL to further DAPL's viewpoint and financial interests thus effecting a content-based application of law and law enforcement in violation of plaintiffs' First Amendment rights. (Doc. 129, ¶155). TigerSwan coordinated and collaborated with defendant law enforcement agencies to advance DAPL's corporate and financial interests, even including participating

in Joint Operations Command Center," the hub of command and control operations directing law enforcement actions in relation to the protests, including the events at issue. (Doc. 129, ¶ 34.) Defendant law enforcement agencies and personnel worked directly with TigerSwan in service to DAPL, the object of plaintiffs' protests, to suppress, demonize, extinguish and punish the expression of opposition viewpoints. Whether, and the extent to which, this private entity was allowed to influence and impact law enforcement actions against Plaintiffs based on content or viewpoint is a question of significant constitutional dimensions.

"To prevail on a First Amendment retaliation claim, the plaintiffs must show that they engaged in protected activity, that the defendants' actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and that a causal connection exists between the retaliatory animus and the injury." (*Bernini v. City of St. Paul*, 665 F.3d 997, 1007 (8th Cir. 2012).)

Plaintiffs have pled sufficient facts to state First Amendment claims for relief. Specifically, Plaintiffs state that they "are Native Americans and other concerned citizens, known as 'water protectors,' who have protested and wish to continue protesting against DAPL as well as in opposition to other actions that endanger the environment and desecrate sacred lands." (Doc. 129, ¶ 1.) Plaintiffs state that on November 20, 2016 they were "gathered … to pray and to peacefully protest the continued construction of DAPL and the ongoing

blockage of the public highway 1806." (Doc. 129, ¶ 2; *see also* ¶¶ 60, 67, 75, 77, 85, 86, 91, 92, 99, 105, 110, 114, 118, 119.) Plaintiffs "went to the area of Backwater Bridge, south of the barricade and 'no Trespassing' signs, to engage in First Amendment activity, including prayer and peaceful protest." (¶ 44.) Plaintiffs were subject to "a barrage of freezing water, chemical agents, SIM, and explosive grenades ... throughout the night and into the early morning." (¶ 54.)

Plaintiff Dundon was on the bridge "to peacefully protest to protect the water." When she arrived there were few people present on the bridge. She witnessed a small number of people attempt to remove a truck and did not participate in that activity. Concerned for the safety of bystanders she tried to have them move out of the way and was then shot by defendants directly in the eye with a burning tear gas canister followed by being shot in the back of her leg with a rubber bullet when she tried to leave. She has suffered permanent damage and vision loss. (Doc. 129, ¶¶ 66, 68, 69, 70, 73.) Plaintiff Wool went to the bridge to "peacefully gather to protest construction of the pipeline underneath the Missouri River" and was assaulted by grenade, water cannon and/or hoses while "attempting to engage in peaceful free speech activities." (¶¶ 77, 78.) Plaintiffs Wilson went to the bridge to peacefully protest and pray and was "peacefully praying, unarmed, and not threatening police" and engaging in "peaceful First Amendment activities" (¶¶ 85, 86) when she was assaulted by water, tear gas canisters, explosive grenades and other projectiles. Plaintiff

Demo was engaged in peaceful First Amendment protected activities on the bridge, including filming police misconduct, when he was targeted and assaulted with a SIM or other projectile striking his hand which held his camera "in retaliation for his First Amendment protected activity of recording [defendants'] actions and conduct." (¶¶ 92, 96.) Plaintiff Dullknife was present to peacefully protest the pipeline and observe the prayer assembly on the bridge, and was associating with and facilitating a woman's prayer activity when he was assaulted including being shot with projectiles. (¶¶ 99, 100.) Plaintiff Bruce was "peaceably protesting" when she was subject to water cannon and/or hoses, tear gas or other chemical agents, and explosive gas grenade used as a projectile. (¶¶ 105, 106.) Plaintiff Finan was on the bridge to "peacefully engage in First Amendment protected activity" and was subjected to chemical agents and further shot in the abdomen with a rubber bullet or other SIM while taking photos. (¶¶ 111, 112.) Plaintiff Hoagland-Lynn was on the bridge to "peacefully protest" and was subjected to water cannon and/or fire hoses and was then shot in the back by a SIM and further targeted by an officer and shot in the head by a SIM while trying to assist another person who had been injured by defendants. (¶¶ 114, 115.) Plaintiff Treanor "stood [on the bridge] praying for about half an hour when police officers started shooting at him with water and SIM." (¶ 83.) And, "[l]ater, Treanor bent down on one knee to pray," and defendants "shot at him at a closer range with water, so he turned around and was shot in the back of his legs with SIM." As he kneeled and

prayed, defendants continued to shoot at him. When he "rolled onto the grass at the side of the bridge and tried to shield himself" defendant officers shot him in the head.  (¶¶ 118, 119, 120).

The conduct plaintiffs were engaged in is, unquestionably, constitutionally protected.  The First Amendment protects prayer, protest, and journalism of the exact sort in which plaintiffs were engaged.

As a result of defendants' force, plaintiffs allege that they experienced pain, suffering, and numerous serious injuries—some maiming and permanent. This is unquestionably sufficient to chill a person of ordinary firmness from continuing to engage in these First Amendment protected activities.

Defendants do not seriously challenge that the pleadings establish First Amendment claims, including the requisite elements of a First Amendment retaliation claim[4]. Instead, defendants ask the Court to consider facts that *defendants* have alleged to dispute plaintiffs' claims, as discussed above. Defendants primarily rely on two arguments.

First, defendants assert that plaintiffs were "in close proximity" to the area that was closed to the public, the area behind the barricade, and that they "had no lawful right to be present where they were." (Doc. 136, p. 2.) Plaintiffs

---

[4] Defendants do not dispute that the pleadings, taken as true, establish that defendants' actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, or that a causal connection exists between the retaliatory animus and the injury.

dispute that they approached or were "in close proximity" to the barricade or, as discussed, that they had no right to be present where they were.

Second, defendants assert that other unidentified persons – not any plaintiff - engaged in unlawful activity, specifically "removing and attempting to remove government property...from the barricade" prior to force being used against the plaintiffs who were not engaged in any such activity, many of whom were not even present when these activities occurred. (Doc. 136, p. 2.) Defendants claim that plaintiffs were "intermingled" with unidentified other persons, a fact that plaintiffs dispute. Based on this disputed fact, defendants claim they were justified in using force against any and all "protesters," and for hours after such activity ceased, based on the alleged conduct of a few persons that occurred before most of the plaintiffs and other persons arrived. (Doc. 136, p. 2, referring to protesters as monolithic group engaged in unlawful conduct.)

While, as discussed above, plaintiffs contend that the bridge was a public forum as long as it was closed to through traffic (see page 7), it should be noted that the question of whether the bridge was a public forum is not determinative of plaintiffs' First Amendment claim. Plaintiffs' expressive, religious and journalistic activity was protected by the First Amendment whether the bridge was a public forum or not. While restrictions on First Amendment activity in a public forum must be narrowly drawn to serve a compelling state interest, restrictions on First Amendment activity in a nonpublic forum must still be reasonable and non-content based. (*Cornelius v. NAACP Legal Def. & Educ.*

*Fund, Inc.*, 473 U.S. 788, 800 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).)

Defendants' First Amendment argument claims that plaintiffs were not engaged in protected activity at the time that force was unleashed against them because, defendants allege, plaintiffs were also trespassing. Crucially, however, the facts *pled by plaintiffs* do not show that plaintiffs were trespassing at the time in question and the allegation by defendants that plaintiffs were committing trespass is, at minimum, a matter of factual dispute.

Accepting plaintiffs' allegations as true, plaintiffs did not know and could not know that their First Amendment conduct—which occurred exclusively on the apparently open *south* side of the Backwater Bridge blockade—was on a portion of the public right-of-way that was allegedly closed to pedestrians. (*See e.g.*. Doc. 129, ¶¶ 38, 39, 40, 41, 42, 43.)

Moreover, defendants were also well aware that the area in which plaintiffs were assembled was not physically closed. Further, there was no visual indicator placed in the approach to or in the area where the plaintiffs were that announced it was closed (as opposed to the closed area behind the barricade), and no verbal closure orders were issued to the persons who were subjected to defendants' use of force. (Doc. 129, ¶¶ 38, 39, 40, 41, 42, 43.)

To commit trespass in North Dakota, a party must have actual knowledge that she is not permitted to be on the property in question at the time in question. (*See* N.D.C.C.§ 12.1-22-03.) The defendants did not have a reasonable

basis to believe that the plaintiffs had such actual knowledge and, thus, that probable cause existed to arrest plaintiffs and others present for trespass. Defendants had no basis to believe that plaintiffs and other protestors entered or remained in an area which was posted No Trespassing or given actual notice that they were trespassing. (*State v. Herzig,* 2012 N.D. 247, 252 (2012).) Actual notice is shown by either a public posting or a person with authority over the property upon which plaintiffs are alleged to have trespassed giving the plaintiffs notice that they were trespassing. (*See* N.D.C.C.§ 12.1-22-03.) The defendants did not and could not see any posting –since it did not exist, that indicated that plaintiffs could not be south of the bridge. Law enforcement did not give the plaintiffs actual notice. (Doc. 129, ¶¶ 48-53.)

Although defendants now assert that the portion of the road in question was closed to pedestrians (which is distinct from its closure to vehicular traffic), plaintiffs have alleged that they were in an area "that was open and available to pedestrian assembly. Plaintiffs did not cross into the area north of the bridge that was marked and separated by a police barricade and closed to entry and assembly," and that even had defendants possessed a lawful basis to exclude persons from this area "they did not adequately or sufficiently communicate that the public forum was closed to pedestrian assembly or otherwise issue an order to plaintiffs to disperse." (Doc. 129, ¶¶ 3, 4.) Therefore, for purposes of this Motion to Dismiss, plaintiffs' pleadings establish that plaintiffs were not

trespassing, and could not reasonably have been assumed to be trespassing, while they engaged in the First Amendment conduct in question.

Defendants assert that "No Trespassing/ No Trespassing on Bridge" signs were posted, but admit that those signs stating "No Trespassing on Bridge" as well as those stating "No Trespassing", were located *north* of the bridge, on the sides of the road, *behind* the concertina wire and jersey barricades, *in the area that was closed*. The protestors were at all relevant times south of the signs and south of the barricade. There were no "No Trespassing" signs posted in the area around the southern approach to the bridge, or on the bridge itself, which were accessible to pedestrians. (Doc. 129, ¶¶ 40, 41, 42) ["There was no signage near the south end of the bridge or anywhere on the bridge indicating that the bridge itself was designated as closed to access. There was no barrier indicating an area not to be crossed into, similar to the demarcation of the area running north of the bridge").)

In fact, law enforcement permitted and allowed pedestrians to walk on the bridge, south of the barricade, as of the day of this incident[5]. The photographs of the bridge should make clear that this is not a genuine factual dispute. But, in any case, the Court should not, for purposes of a 12(b)(6) motion, decide such factual disputes. Plaintiffs' allegations are sufficient to establish that adequate notice of trespass was not given, that the bridge was open to pedestrian assembly, and/or that defendants failed to issue closure or

---

[5] See Declaration of Martin Lenoble and photographs therein, Doc. 81-27.

dispersal orders to plaintiffs —and, therefore, that plaintiffs' expressive and religious activity did not lose its protected character.

Finally, defendants argue that some combination of inferences that plaintiffs should have drawn constitute sufficient notice: plaintiffs "observ[ed] Highway 1806 heavily barricaded on the north side of the Bridge and manned by Law Enforcement on November 20, 2016"; "Plaintiffs admit they had been staying in . . . a camp located immediately south of, and in close proximity to, the Bridge" "for several weeks to months prior to November 20, 2016"; "[p]ublic records establish the Corps had previously (November 1, 2016) requested Law Enforcement assistance in removing trespassing protestors from federal lands located on the north side of the Cantapeta Creek;" and "Plaintiffs admit being forcibly removed from, or prevented from accessing, private property located north of the Cantapeta Creek by Law Enforcement on several occasions prior to November 20, 2016." (Doc. 136 p. 31).

This argument, too, is unavailing. Even accepting that each plaintiff was aware of each of these facts— facts that are disputed —defendants do not explain how this combination of events involving property located *north* of the blockade should have put plaintiffs on notice that they could not protest on certain public land *south* of the blockade (where they had been protesting for months with U.S. Army Corps' permission). Again, at most, this would create a

disputed question of fact as to what warning or notice plaintiffs were given as to the trespass in question.[6]

Defendants did not issue an order to plaintiffs, and plaintiffs did not fail to comply with any order. (Doc. 129, ¶¶ 4, 43, 46, 48, 49-53, 68, 79, 87, 102, 107, 112, 116, 121.)

As plaintiffs have alleged, defendants had the means at their disposal to issue an order to disperse that would have been effectively communicated to plaintiffs. (Doc. 129, ¶¶ 51-53.) Defendants had the ability to provide fair notice to plaintiffs that the public forum area in which plaintiffs stood was now closed to pedestrian assembly and/or to declare the assembly unlawful. Defendants chose not to do so. Instead, defendants unleashed unreasonable, excessive and protracted force against plaintiffs engaged in First Amendment protected activities.

*Bernini v. St. Paul,* relied on by defendants, is inapposite. In *Bernini,* which was decided on a Motion for Summary Judgment *after discovery* including depositions, the Court assessed evidence showing that protesters on the move marched as a group, moved towards police officers as a group and defied orders issued to the group. It determined that "based on undisputed

_____

[6] Defendants also suggest that their excessive force itself served as notice to plaintiffs that they were trespassing sufficient to satisfy the notice requirement. But, as plaintiffs have alleged, and this lawsuit itself indicates, defendants' aggressive use of water hoses and "less lethal" munitions communicated to plaintiffs defendants' desire to extinguish and chill their First Amendment activities. Defendants' argument, if accepted as true, would allow defendants in such circumstances to use excessive force in lieu of giving fair notice and yet be immunized from liability for such clearly improper uses of force.

evidence" it was reasonable for the police to believe that the protesters who were part of the group in that case were "acting as a unit" with those who moved toward the police in a threatening manner intending to break through the police line to continue their march forward and access downtown St. Paul and blocked moving traffic along a major roadway in violation of state law.. The Court also noted that none of the individual plaintiffs in Bernini showed (after discovery) that gratuitous force had been used against them, and further found that it was reasonable to use certain force to keep a noncompliant crowd that was on the move, moving in the direction preferred by police. (*Bernini v. City of St. Paul*, 665 F.3d 997, 1003 -1007 (8th Cir. 2012).)

In contrast in the present case, it was not reasonable for the police to believe that plaintiffs were acting as a unit with persons who were engaged in unlawful activity. The truck moving activity had long since ceased by the time most of the plaintiffs arrived, and only about ten people were ever involved. While plaintiffs acknowledge that a few individuals threw things in the direction of the police later on, and one person climbed the concertina wire, these were limited, isolated actions by a small number of individuals that took place at different points over a long period, not by a crowd that was acting as a unit. Rather, plaintiffs' allegations establish that those assembled were not on the move, marching on the police line and that "the plaintiffs and other people on the bridge were variously praying, singing, chanting, protesting verbally, aiding others, taking photos and video, standing still, and walking around. It

was apparent that the crowd consisted of individuals engaged in individual activity and was not acting as a monolithic unit or moving as a group toward the barricade." (Doc. 129, ¶ 60.)

Moreover, defendants did not just direct their force at those close to the barricade, but unleashed a barrage of freezing water, chemical agents, SIM, and explosive grenades throughout the night and into the early morning, on all persons who were present in the general area of Backwater Bridge. (¶¶ 54-55.) Defendant used this force excessively and gratuitously against plaintiffs and others engaged in First Amendment protected activities despite the fact that they were not threatening or attacking the officers or attempting to breach the barricade. (¶ 56.) Persons who were attempting to leave to the south, as well as people who were standing still, were all indiscriminately attacked with the cold high pressure water, chemical agents, explosive grenades and impact munitions. (¶ 58.) Plaintiffs also pled with specificity incidents of gratuitous and excessive force applied against individuals, causing maiming injuries. Defendants also cite to *Carr v District of Columbia,* 587 F.2d 401 (2009) for the proposition that "demonstrations lose their protected character as protected expression when demonstrators engage in unlawful conduct," and assert that plaintiffs were trespassing. (Doc. 136 p. 29.) *Carr* reiterated the proposition that demonstrators who engage in *violence* lose their First Amendment protected status. In *Carr* a distinct group of 65-75 persons marched as a group breaking windows or glass doors at different businesses. An officer testified as

to his observation of the behavior of all marchers as a group acting as a unit, which the court found to constitute engaging in a riot or encouraging a riot. The Court distinguished the facts in *Carr*, from the facts in *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006), where the composition of persons assembled was fluid, with people flowing to and from the assembly over a period of time and where alleged unlawful actions taking place at different times and places could not be ascribed to the group as a whole. *Barham* reaffirmed the requirement that probable cause be particularized, holding that allegations that generically referred to 'demonstrators' as having committed offenses were insufficient basis to act against all persons present and that such undifferentiated mass arrests violated clearly established Fourth Amendment rights.

Plaintiffs' allegations, accepted as true, establish that plaintiffs were engaged in protected First Amendment conduct on a public area in a manner not prohibited by North Dakota's trespass laws at the time that defendants used excessive force. As a consequence, this Court should hold that plaintiffs have pled a claim for relief for First Amendment violations.

## D. *Plaintiffs Have Stated A Claim For Violation Of The Fourth Amendment Right To Be Free From Unreasonable Force.*

The law is clear that defendants' use of force here is properly analyzed under the Fourth Amendment, not the Fourteenth Amendment due process clause. The Supreme Court has stated:

> all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other "seizure" of

a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

(*Graham v. Connor,* 490 U.S. 386, 395 (1989).)

### 1. Plaintiffs were seized within the meaning of the Fourth Amendment.

Defendants misstate the proper analysis as to seizure, conflating show of force and/or show of authority with actual use of force to conclude that regardless of use of force, "a person subjected to the force would [need to] believe[] he or she was not free to leave as a result of the application of force." Def Mot 37. This seeks to imply that a person who is seized temporarily by force, without arrest or continuing restraint on liberty, has not been seized if thereafter or otherwise they are free to leave. Defendants citation to *U.S. v. Mendenhall,* 446 U.S. 544 (1980), is inapplicable to the matter at hand, as it addresses the circumstances under which a show of authority, absent use of physical force, is sufficient to constitute a seizure. At issue here is the actual and intentional application of force.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." (*Brendlin v. California,* 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted). *Accord,*

*County of Sacramento v. Lewis,* 523 U.S. 833, 844 (1998).) Whether the force is ostensibly used for the purpose of effectuating an arrest, or for the purpose of self-defense, it is an acquisition of physical control by a law enforcement official that implicates the victim's Fourth Amendment interest to be free from unreasonable seizures. (*Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir. 1989), overruled on other grounds by *Virginia v. Moore*, 553 U.S. 164, 175 (2008); *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995) [applying mace constitutes a seizure]; *McCracken v. Freed,* 243 Fed. Appx. 702, 708 (3d Cir.2007) [throwing pepper spray canisters into a house constitutes a seizure].)

In *Atkinson v. City of Mountain View*, the 8th Circuit addressed and dismissed an argument similar to defendants':

> Pointing to *Mendenhall,* [defendant] would have us ignore the physical force that hurled Atkinson backward and ask only whether, at the moment Atkinson landed on the ground, he "would [reasonably] have believed that he was not free to leave," [citation omitted]. This is the wrong question.

> …It would make little sense to ask whether a person felt "free to leave" while an officer restrained the person's freedom of movement through physical force because the force itself necessarily—if only briefly— "restrained [the person's] liberty." [citation omitted.]

> Viewing this case through the common law lens of *Hodari D.,* we conclude the facts most favorable to Atkinson are sufficient to establish a seizure occurred the moment [defendant] charged into Atkinson. It is undisputed [defendant] intentionally applied physical force against Atkinson, and the evidence most favorable to Atkinson shows far more than a slight physical touch—[defendant's] "bull rush" forced Atkinson ten to fifteen feet backward into the side of a truck, broke three ribs, punctured one lung, and caused repeated pneumothorax. This violence was more than enough physical force to effect a seizure under the Fourth Amendment. *See, e.g., Acevedo,* 457 F.3d at 725 ("In a case like this one ... where a police officer's

use of force causes a man to reel backwards and fall to the ground, a seizure has occurred."); *see also United States v. Pratt,* 355 F.3d 1119, 1122 (8th Cir.2004).

(*Atkinson v. City of Mountain View, Mo.,* 709 F.3d 1201, 1208–09 (8th Cir. 2013).)

Plaintiffs have sufficiently pled that defendants intentionally used force against and upon plaintiffs, including shooting projectiles, tear gas canisters, and high pressure water, and that these weapons hit and impacted them.

The Supreme Court has repeatedly held that the Fourth Amendment analysis is not a subjective one. (*See, e.g., Ashcroft v. al–Kidd,* 563 U.S. 731, 736 (2011); *Brendlin,* 551 U.S. at 261, 127 S.Ct. 2400; *Whren v. United States,* 517 U.S. 806, 813 (1996).) "The intent that counts under the Fourth Amendment is the intent [that] has been conveyed to the person confronted, and the criterion of willful restriction on freedom of movement is no invitation to look to subjective intent when determining who is seized." (*Brendlin,* 551 U.S. at 260–261, [alterations in original, internal quotation marks and citation omitted].) "[T]he Fourth Amendment regulates conduct rather than thoughts." (*al–Kidd,* 563 U.S. at 736.)

Thus, when an officer shoots "less lethal" munitions, it is irrelevant whether the officer intended to make arrests or only to disperse a crowd. Their application of force is unquestionably a seizure under the Fourth Amendment. (*Nelson v. City of Davis*, 685 F.3d 867, 877–878 (9th Cir. 2012).)

Here, the officers terminated plaintiffs' freedom of movement through means intentionally applied when they fired and launched impact munitions, explosive grenades, and chemical weapons at plaintiffs and sprayed plaintiffs with fire hoses, similar to the officers in *Nelson v. City of Davis*, who, responding to an unruly party involving 1,000 university students, launched pepper balls into the crowd, and a student was shot in the eye. The *Nelson* defendants argued that their actions could not constitute a seizure because their intent was to disperse the crowd, not to make arrests. The Court of Appeals rejected this argument. (And see *Keating v. City of Miami*, 598 F.Supp.2d 1315, 1329-133 (2009) [affirmed in part, reversed in part on other grounds by *Keating v. City of Miami*, 598 F.3d 753 (11th Cir. 2010)] [plaintiffs' allegations that defendants opened fire on demonstrators with teargas, pepper-spray, shotgun-based projectiles and other weapons, encircled them and forced them to move sufficiently alleged a seizure, relying on *Marbet v. City of Portland,* No. CV 021448 HA, 2003 WL 23540258 (D. Or. 2003), *Coles v. City of Oakland,* No. C03–2962 TEH (N.D.Cal. 2005), and *Rauen v. City of Miami,* No. CV 06–21182, 2007 WL 686609 (S.D.Fla. 2007).)

Defendants argue that no seizure occurred because they sought to "prevent[] unauthorized access" to private and/or public property without intending to arrest. Def. Mot. 37. They compare their actions to a Secret Service officer "block[ing] an unauthorized person's entry into the oval office" without otherwise restricting "freedom of movement to lawful locations." Putting aside

the comparison of protectorate responsibilities for the President of the United States in the White House to the land area around the bridge at issue, were Secret Service agents to unleash similar force against a person for the different purpose/circumstances of stopping unauthorized entry to the Oval Office, it would still be a seizure, subject to an analysis as to reasonableness under those very different circumstances.

Whether the officers intended to arrest the water protectors or encourage them to disperse is of no importance when determining whether a seizure occurred. The officers fired their weapons towards plaintiffs. Regardless of their motives, their application of force was a knowing and willful act that restrained the freedom of movement of plaintiffs who were struck. Nor is it relevant whether the officers were successful in controlling plaintiffs' movement. "[D]efendants appear to contend that the Fourth Amendment is not offended by the intentional use of force that physically injures a citizen and only reduces his or her freedom of movement. If the citizen is able to walk or hobble away, according to defendants, no Fourth Amendment violation has occurred. However, as the Supreme Court has held, 'the word 'seizure' readily bears the meaning of laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.'" (*Marbet v. City of Portland, supra* at *10, quoting *California v. Hodari D.,* 499 U.S. 621, 626 (1991).) Here, "the force of the water and munitions knocked most of the plaintiffs and many of the other assembled persons off their feet and otherwise

restricted their freedom of movement by stopping them in their tracks and causing injuries. Clouds of chemical agents caused some of the plaintiffs and other assembled persons to be unable to escape or move either north or south off the bridge at certain times. Still others were temporarily stopped from getting to injured persons to aid them and helping them to safety." (Doc. 129, ¶ 57.) The striking of plaintiffs with munitions and freezing blasts of water unquestionably constituted a seizure under the Fourth Amendment.

### 2. Plaintiffs have pled unreasonable and excessive force claims.

Plaintiffs have stated a claim for excessive force, and the reasonableness of the force must be analyzed by a trier of fact. The question in an excessive force case is whether an officer's actions are objectively reasonable in light of the facts and circumstances confronting him. (*Graham* at 397.) Factors to consider include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the crime at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting arrest. (*Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473 (2015).)

Here, it is undisputed that defendants directed their force indiscriminately at all persons assembled in the area of the bridge including all the way to the south end – not just at the front of the crowd near the barricade.

The force used was enough to cause grave physical injury, including striking individuals in the eye, groin and about their bodies with tear gas canisters, specifically targeting innocent people in subzero temperatures with high pressure water, exploding grenades in people's faces and striking bodies with shotgun fired bean bags and rubber bullets. These uses of force caused immediate pain, broken bones, contusions, bleeding, a detached retina and other injuries requiring medical attention, and permanent injuries to multiple individuals, none of whom was charged with any violation or crime.

This is not a case where law enforcement officers were forced to make split second decisions. They, in fact, engaged in their actions over approximately ten hours. No justification has been offered for each of the many uses of force that were utilized over the course of hours against plaintiffs who were engaged in protest, prayer and filming of police action, even medics tending the injured. Defendants do not describe unlawful actions undertaken by plaintiffs that would justify use of force. Defendants issued no orders to plaintiffs with which they failed to comply, including no dispersal orders, did not declare the area that had been open to pedestrian assembly closed, and did not declare the assembly unlawful. Defendants directed multiple weapons at individuals who were not advancing towards, let alone attempting to breach, the police barricade or enter the area north of the barricades demarked as closed. Defendants targeted dangerous weapons at individuals causing severe injuries and also used weapons indiscriminately against all water protectors

assembled, some as far as several hundred feet from the police. (Doc. 129, ¶¶ 54-58.)

Defendants state that their use of this massive force was justified for the purpose of "prevention of unauthorized and unprivileged entry upon private or public property that has been closed to the public," and to "protect private property interests." (Doc. 136, pp. 37, 42.)

The Fourth Amendment requires police officers to use only an amount of force that is objectively reasonable in light of the circumstances facing them. (*Tennessee v. Garner,* 471 U.S. 1 (1985).) To the extent that defendants used force against plaintiffs to "prevent" them from entering the closed area behind and north of the barricade that plaintiffs never attempted to enter, the use of force was objectively unreasonable. To the extent that defendants assert their use of force was to prevent plaintiffs from standing where they stood, it is a matter of disputed fact whether effective and fair notice had issued that the area in which plaintiffs assembled was closed, and whether it was in fact closed, as police had permitted pedestrian access. Additionally, the absence of any dispersal order, or revocation of permission to be present, being issued to plaintiffs renders the use of force objectively unreasonable. Police had ample ability to issue such an order. They did not do so and plaintiffs did not disobey any order. (*See Vodak v. City of Chicago,* 639 F.3d 738, 747 (7th Cir. 2011) [Supreme Court held decades ago that "police must give notice of revocation of permission to demonstrate before they can begin arresting demonstrators"].) No

less must be true of the unwarranted use of force. If a demonstrator cannot be arrested without warning, it is axiomatic that so-called "less lethal" weapons may not be used without warning.

Defendants state that conduct by law enforcement is justified when required or authorized by law and that a sheriff's duties include preserving the peace and suppressing breaches of peace, riots and insurrections, citing provisions of the North Dakota Century Code. (Doc. 136 p. 41.) The Defendants seem to suggest that so long as they had an avowed intention to enforce the law or protect property interests, this provides concomitant or carte blanche authorization for force regardless of its unreasonableness. Nothing in the NDCC authorizes excessive or unreasonable force.

Where activities protected under the First Amendment are involved, the requirements of the Fourth Amendment must be applied with scrupulous exactitude. (*Zurcher v. Stanford Daily,* 436 U.S. 547, 564 (1978).) "What value would the First Amendment carry if its demonstrators could be dispersed or intimidated by police brutality or unnecessary force? Qualified immunity is not widely available in an area so closely touching our most precious freedoms." (*Lamb v. City of Decatur*, 947 F. Supp. 1261, 1264–1265 (C.D. Ill. 1996) [use of pepper spray on labor demonstrators], citing *Edenfield v. Fane,* 507 U.S. 761, 777 (1993), internal quot. omitted.)

Defendants rely heavily on disputed facts and characterizations to justify their use of force as reasonable. As discussed above, defendants repeatedly use

the terms "protesters" rather than plaintiffs, to impute conduct to plaintiffs that they did not engage in, ascribing to plaintiffs responsibility for activities alleged to have been undertaken by *other* persons. Defendants claim that plaintiffs were "intermingled" with persons engaged in activities that plaintiffs dispute. Further, defendants characterize the whole of the activities, including prayer and First Amendment protected protest, as a riot, apparently requiring suppression. As discussed in Sections II A and B above, plaintiffs dispute this portrayal of their activities. The violence that occurred throughout the evening of November 20, 2016 was carried out by the police, not by the plaintiffs or the assembled group.

Other than plaintiff Dundon, defendants do not address any other individual plaintiff's allegations or challenge the sufficiency of specific facts as pled by those individuals. Defendants do not justify use of force against any of the other plaintiffs, Wool, Wilson, Demo, Dullknife, Bruce, Finan, Hoagland-Lynn, or Treanor, as individually detailed in plaintiffs' complaint. Other than referencing all "plaintiffs" without differentiation in portions of their argument, defendants make no argument as to the specific facts as pled by these plaintiffs or why each of these individual's claims should be dismissed as insufficiently pled. Having failed to initially so move, defendants should not be permitted to raise new arguments as to these individual plaintiffs in their reply.

Defendants assert that Dundon was "intermingled" with protesters engaged in law breaking activities because she "witnessed" the activity,

specifically that when she arrived on the bridge she saw a small group of people attempting to remove a dump truck. (Doc. 136, p. 39.) Defendants then go on at length to describe actions *undertaken by others* in which Dundon *did not participate* to justify use of force not only against those other persons and but also Ms. Dundon, and even the use of force against all other plaintiffs hours later. (Doc. 136, pp. 39-41.) Dundon does not state that she intermingled or participated in the removal of the truck. To the contrary, the Complaint states that she "was not a participant in that activity," that it was undertaken by a "small number of people" (Doc. 129 ¶ 68) at a time when "very few people were present," (Doc. 129 ¶ 67) and that, concerned about bystander safety, she urged people to move away (Doc. 129 ¶ 69).

The fact that an individual participates in political activity with, and may share similar lawful political goals with, others who additionally pursue those political goals by unlawful means, does not provide law enforcement with probable cause to arrest that individual under the Fourth Amendment and cannot provide justification for law enforcement to use force to seize an individual pursuant to the Fourth Amendment. (See, *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 908, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct . . . that itself is not protected").

In a time of protest, even if violence occurs, the First Amendment requires police to act with precision and to not abridge or violate the constitutional rights of peaceful persons, especially through arrest or use of force. (*See NAACP v. Claiborne Hardware Co.*, 458 U.S. at 816 ["The First Amendment does not protect violence. . . When such conduct occurs in the context of constitutionally protected activity, however, 'precision of regulation' is demanded"], quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). "[O]therwise there is a danger that one in sympathy with the legitimate aims of" a political movement but not "intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." (*Id.* at 919.)

Defendants state that their force was reasonable against plaintiffs alleging that unnamed and unidentified "protesters" had "previously infringed upon these private property interests, and had assaulted individuals, during the ongoing protest activities against" DAPL. (Doc. 136, p. 42.) This admission that a basis for use of force against plaintiffs was previous alleged unspecified activity by unidentified other persons, demonstrates the unlawful and unreasonable nature of defendants' excessive force. Defendants cite no authority, as there is no such authority, that they may assault persons based on the allegation that others alleged to share a political goal engaged in unlawful activity at another time and another place. (*See Papineau v. Parmley,* 465 F.3d

46, 59 (2d Cir. 2006) [holding that officers could not have thought indiscriminate arrests were lawful when "a few individuals within [a protesting] crowd had violated the law at an earlier time and then desisted").)

Defendants also argue that their application of force against plaintiffs was reasonable because unidentified other "protesters did in fact throw dangerous objects at Law Enforcement which subjected Law Enforcement to *potential serious bodily injury or death*." (Doc. 136, p. 42 (emphasis added).) This is a matter of factual dispute, contrary to defendants' assertions.[7] In any case, however, at no point do defendants identify any plaintiff as having thrown or attempted to throw any object at defendants, and no such facts exists in the Complaint. (*See Barham v. Ramsey, supra*, 434 F.3d at 574 ["[v]ague allegations that 'demonstrators' committed offenses will not compensate" for a failure to show any objective basis for arresting individual protesters].)

Defendants claim that plaintiffs had shields and protective items and were in "close proximity to the barricade, matching the descriptions of protesters who engaged in assaults on the barricade." (Doc. 136, pp. 43, 44.) Again, unable to meet their burden, defendants inappropriately ask the Court to assume entirely contested facts asserted by defendants as true and to

---

[7] Defendants make multiple allegations as to acts, including actions of other persons present, that they assert should be taken as true on the grounds that plaintiffs "do not deny" such facts or observing such actions. See e.g. Def Mot 43, 44. Plaintiffs (or any person) cannot be asked to affirmatively identify and catalogue all things that did *not* happen or all things that they did *not* observe, in the absence of which such allegations are deemed admitted. Should defendants wish to move for summary judgment and offer a statement of material facts they assert are not in dispute, plaintiffs would then offer a statement of facts they assert are disputed.

disregard plaintiffs' well pled allegations. Additionally, plaintiffs' Complaint makes clear that even those who were toward the front of the assembly area were some distance from the barricade and undertook no actions to advance upon or assault the barricade, and further, that far from using materials in any aggressive or unlawful manner, ad hoc shields were used to protect themselves and shield persons engaged in prayer activity from the unlawful and painful police assault.

The repeated and varied uses of force by the defendants here, and the serious injuries resulting to plaintiffs, were clearly excessive considering the totality of the circumstances and were not objectively reasonable in light of the factors the Supreme Court has set forth. Defendants have not set forth the need for their use of force, much less related any need to the amount of force used against plaintiffs. A single individual was arrested for attempting to breach the police barricade. The excessive amount of force continued not only after this arrest but for many hours after anyone was tampering with the abandoned vehicles in the street.

The extent of plaintiffs' injuries are substantial and in some cases permanent. Defendants made no attempt to temper or limit the amount of force used by law enforcement over the course of this incident. The crime or security problem at issue, protecting either the area behind the barricade or the street in which plaintiffs stood, from being accessed is not set forth by defendants and does not justify the massive amount of force used against plaintiffs and injuries

incurred, under any circumstances, and especially where no plaintiff attempted to enter the closed area behind the barricade and no dispersal order was issued. Any threat reasonably perceived by officers was minimal, a single minor injury resulted from contact with a flying object allegedly thrown at law enforcement by one individual. There is no evidence that any plaintiff was actively resisting law enforcement. Therefore, the factors set forth in *Graham v. Connor* and *Kingsley v. Hendricks* clearly weigh in favor of plaintiffs and plaintiffs have set forth a claim for excessive force.

### 3. The force was excessive even under a 14th Amendment standard.

Although it is clear that plaintiffs were seized within the meaning of the Fourth Amendment and that the use of force here is properly analyzed under the Fourth Amendment, firing dangerous munitions on peaceful protestors and spraying them with fire hoses in freezing weather is so egregious and outrageous that it may also be fairly said to shock the contemporary conscience in violation of the Fourteenth Amendment.

Arbitrary conduct shocking to the conscience, including a showing that law enforcement's only purpose was to cause harm unrelated to the legitimate object of arrest, may violate the Fourteenth Amendment's guarantee of substantive due process. (*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 836 (1998) [high-speed chases with no intent to harm suspects physically do not give rise to liability under the Fourteenth Amendment].)

In *Lewis*, the Supreme Court recognized the necessity of law enforcement to make split second decisions in certain circumstances and that an officer's "instant judgment in unforeseen circumstances" will not rise to the level of violating substantive due process. This is in stark contrast to the circumstances here, where Law Enforcement knew about protest activities over the course of months and the incident in question occurred over a span of ten hours.

Here, defendants admit that law enforcement did not attempt to effectuate any arrests or detentions other than the one person who breached the concertina wire. Instead, law enforcement arbitrarily and indiscriminately targeted all persons assembled on the bridge, shooting them with teargas canisters, explosive grenades, lead-filled "beanbags", rubber bullets and blasts of water in freezing cold temperatures. Moreover, the weapons were used in darkness and when visibility was decreased even more by the use of the teargas, making it certain that innocent people would be hit in potentially lethal non-target areas such as the head.

This indiscriminate use of impact munitions, explosives, and fire hoses over many hours in freezing weather, the likes of which has not been seen in the last 50 years, if ever, was not only unnecessary, but punitive in nature. Defendants' use of force can fairly be said to be egregious, extraordinary and to shock the conscience.

### E. *Plaintiffs' 14th Amendment Equal Protection Claim*

The Fourteenth Amendment "guarantees citizens their State will govern them impartially." (*Davis v. Bandemer*, 478 U.S. 109, 166 (1986).) When state action is allegedly based on race, religion, national origin, alienage, sex, or illegitimacy, or involves a deprivation of the fundamental right of travel, voting, or raising one's family, the court applies either strict or intermediate scrutiny— otherwise, the improper state conduct in question is reviewed to determine whether there is a rational basis for the alleged difference in treatment. (*City of Cleburn v. Cleburn Living Ctr. Inc.*, 473 U.S. 432, 439-41 (1985).)

Plaintiffs identify—in the first paragraph of the Complaint—that they are largely members of a protected class: "Plaintiffs are Native American and other concerned citizens" (Doc. 129, ¶ 1); "Plaintiffs are people of indigenous descent and those allied in support of the indigenous people's struggle against the Dakota Access Pipeline" (Doc. 129, ¶ 45). Throughout the Complaint, in fact, plaintiffs emphasize the racial, religious, and national origin dynamics at play. First, most of the named plaintiffs are specifically identified as indigenous: "Plaintiff Jade Kalikolehuoakalani Wool is . . . of Native Hawaiian and Oglala Lakota heritage" (¶ 76); "Plaintiff Crystal Wilson is . . . of Blackfoot and Afro-indigenous heritage" (¶ 84); "Plaintiff David Demo is . . . of Penobscot heritage" (¶ 90); "Plaintiff Guy Dullknife III is a . . . member of the Oglala Lakota Sioux

Tribe" (¶ 98); Plaintiff "Mariah Marie Bruce is a member of the Houma Nation" (¶ 104)[8].

Second, the Complaint notes the racial environmental justice issues at the center of the protest. See Doc. 129, ¶¶ 27-30, noting that Bismarck is 94.78% white and describing that the pipeline route was moved to avoid impacting the population of Bismarck to an area that is almost exclusively indigenous; and the religious, cultural, economic and historical significance of the route to the Lakota people. Third, throughout, the Complaint emphasizes the indigenous-led and indigenous-focused nature of the protestors. *See, e.g.*, Doc. 129, ¶ 31 (describing how "Standing Rock and Cheyenne River Tribe members and other concerned citizens . . . began protesting the DAPL"); ¶ 33 (discussing "overwhelming tribal and public outcry"); Doc. 129. ¶ 36 (describing "hundreds of protestors, including indigenous elders, [holding] a prayer ceremony"); Doc. 129. ¶ 114 (describing how Israel Hoagland-Lynn was asked to help shield two praying Native Americans from the water and SIM and was targeted as a result). Finally, the Complaint expressly alleges that Plaintiffs were targeted as a result of their religious practices. *See, e.g.*, Doc 129, ¶¶ 1-2 (weapons were used "against persons engaged in protests and prayer ceremonies …  . the plaintiffs  gathered…to pray and peacefully protest…"); ¶ 8 ("This was not the first or the last time defendants attacked water protectors who were praying . . . ."); ¶ 118-119 (Treanor stood on the bridge when police officers

---

[8] Vanessa Dundon is a member of the Navajo Nation and Israel Hoagland Lynn is also of indigenous heritage.

started shooting at him with water and SIM; later Treanor bent down on one knee to pray and was shot at at closer range); .¶ 86 (describing seeing "a native elder [] singing an indigenous song with his arm outstretched on either side" while "the police were soaking him with the water"). Together, this is more than sufficient to establish that plaintiffs are largely comprised of a race- or religious-based protected class.

Plaintiffs have also alleged that the police conduct in question should not survive rational basis review, let alone intermediate or strict scrutiny. Throughout the Complaint, plaintiffs' repeatedly discuss how their peaceful and prayerful actions were met with extreme uses of force. Accepting plaintiffs' allegations as true, the Government does not have any rational basis, let alone a compelling reason, to, for example, endanger the lives of a protestor kneeling in prayer on a public piece of land that he had never been asked to leave, see Doc. 129, ¶¶ 118-119, or an elder man singing on public land that he had not been asked to leave, *see* ¶ 86. Plaintiffs' allegations, accepted as true, paint a picture of a peaceful group of individuals assembled on public land engaged in a proper exercise of their First Amendment rights who, without any warning or dispersal order, were soaked by Defendants with water in sub-freezing temperatures and bombarded with "less-lethal" munitions. This is plainly not a reasonable or rational exercise of force (let alone an exercise of force narrowly tailored to any compelling state interest), nor is this in any manner a standard way in which potential trespassers are generally treated in North Dakota or

any other state. (*See* Doc. 81-1, Declaration of Thomas C. Frazier.) Together, the allegations state a claim for relief for a Fourteenth Amendment Equal Protection violation.

## F. *Plaintiffs' Monell Claims*

Defendants do not move to dismiss plaintiffs' *Monell* claims on any basis other than the assertion that plaintiffs have not sufficiently pled any violation of their constitutional rights (Doc. 136, pp. 52-53), and should not be permitted to proffer new grounds upon reply. As discussed above, plaintiffs have sufficiently pled violations of their constitutional rights.

The Eighth Circuit has rejected the argument that there must be a finding that a municipal employee is liable in his individual capacity as a predicate to municipal liability. (*Speer v. City of Wynne, Arkansas,* 276 F. 3d 980, 985 (8th Cir. 2002); *Shannon v. Koehler,* 616 F. 3d 855, 866 (8th Cir. 2010) [whether an officer is entitled to qualified immunity and question of municipality's *Monell* liability are not inextricably intertwined and require entirely different analyses]. *See also*, *Cunningham v. Gates*, 229 F.3d 1271, 1285-86 (9th Cir. 2000) [explaining that whether a city's 'policy, customs, or usage caused [the] plaintiffs' injuries is a separate inquiry from whether . . . non-supervisory officers are entitled to qualified immunity'"].)

The Supreme Court has specifically rejected any heightened pleading standard for *Monell* claims. (*Leatherman v. Tarrant Cnty. Narcotics Intel. &*

*Coord. Unit*, 507 U.S. 163, 168 (1993).)  The Eighth Circuit recognizes the holding of *Monell*:

> [M]unicipalities are liable as 'persons' under section 1983, but only for their own unconstitutional or illegal policies. Specifically, 'it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.'

(*Coleman v. Watt,* 40 F.3d 255, 261-262 (8th Cir. 1994) [citations omitted].)

Plaintiffs have adequately stated a claim for relief that policies and practices of the defendants were deliberately indifferent to plaintiffs and were a moving force behind the violation of plaintiffs' rights. (Doc. 129, ¶ ¶141-143.) Plaintiffs have alleged that defendants' policies and practices with regard to hiring, training, supervision and/or discipline were patently deficient and were also likely to result in the violation of plaintiffs' rights. (¶¶ 144.) The policies and practices may be as a result of an official policy enacted by defendants to chill plaintiffs' constitutional rights, a custom perpetrated by defendants, or the act of a defendant policymaker.

In addition, the individual defendants herein may be held directly liable under § 1983 as supervisors if they failed to properly train, supervise, direct or control the actions of a subordinate who caused the injury. (*Johnson v. Lockhart*, 941 F.2d 705, 707 (8th Cir. 1991).) They

may also be directly liable for directing, encouraging, or acquiescing in their subordinates' unlawful acts, even if they were not personally present at the scene. (*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), cert. granted in part, judgment rev'd in part on other grounds, 446 U.S. 754 (1980).) In *Hampton v. Hanrahan*, proof that supervisors had approved the selection of men and weapons and had directed the early morning hour for execution of a search warrant at a Black Panther Party apartment which resulted in deaths and injuries to occupants, was held to present an issue of liability for the jury. The appellate court found that it was for the jury to determine whether the consequences of those actions by the supervisors were foreseeable, and a directed verdict in their favor was reversed. (*Hampton,* 600 F.2d at 626–627. *And see Aswegan v. Bruhl*, 965 F.2d 676 (8th Cir. 1992) [evidence sufficient to find prison supervisors deliberately indifferent to plaintiff's medical needs].)

Accordingly, plaintiffs have adequately stated claims for *Monell* liability of the defendant government entities, as well as supervisory liability of the individual defendants.

## F. *Defendants Are Not Protected By Qualified Immunity.*

Public officers are entitled to qualified immunity unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person would have known. (*Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009).) To overcome the defendants' qualified immunity claims,

the plaintiff must show that: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional right; and, (2) the right was clearly established at the time of the deprivation. (*Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010).) A dismissal based on qualified immunity at the pleading stage is proper "only when the immunity is established on the face of the complaint." (*Springdale Educ. Ass'n v. Springdale School Dist.* 133 F.3d 649, 653, fn. 3 (8th Cir. 1998).) The Eighth Circuit has instructed that district courts "must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record . . . that no reasonable jury could believe [them]." (*Solomon v. Petray,* 795 F.3d 777, 786 (8th Cir. 2015) (citations omitted).)

As discussed above, the facts on which defendants' claim of immunity are premised are disputed.

The individual defendants are not entitled to qualified immunity under the Eighth Circuit's holding in *Bernini v. City of St. Paul*, *supra*, 665 F.3d 997. In *Bernini,* there were facts establishing that the crowd was acting "as a unit", advancing on officers in an attempt to break through police lines into a downtown area, where a valid order, known to the *Bernini* plaintiffs, was in place that prohibited their entry into that area. Police gave repeated dispersal orders and deployed rubber pellet balls and chemical agents to move the crowd – but there was no evidence that any defendant officer directly used force

against any of the *Bernini* plaintiffs or that any of the plaintiffs were injured. (*Id.* at 1006.) The *Bernini* court found the defendant sergeant was entitled to qualified immunity for the authorization to deploy munitions because the officers reasonably believed the growing crowd intended to penetrate the police line and the munitions were used to direct the crowd away and toward a park where it could be contained. (*Ibid.*)

In stark contrast here, plaintiffs suffered serious injuries as a result of defendants' unreasonable use of force. There are no facts that indicate force was used in a systematic way to move the crowd without causing injury. In fact the force employed indiscriminately impacted those who remained hundreds of feet away from the barricade. There are no facts that indicate that the water protectors within the crowd were acting as a unit. Plaintiffs over the course of many hours were praying, singing, chanting, verbally protesting, aiding others, taking photos and video, standing still and walking around. As discussed above, only a single individual tried to breach the law enforcement barricade and was immediately arrested. The crowd of water protectors as a whole consisted of individuals engaged in various nonviolent activity. The vast majority remained at a distance from the barricade, and those closest to it were not trying to cross the barricade or assault the officers.

Moreover, the force employed here was not used to move an advancing crowd to another area where they could be contained, but against everyone within a wide radius of hundreds of feet, indiscriminately. "Persons who were

attempting to leave to the south, as well as people who were standing still, were all indiscriminately attacked with the cold high pressure water, chemical agents, explosive grenades and impact munitions." (Doc. 129, ¶ 58.) Water was directed at an injured person crawling on the ground (¶ 80); an elder who was singing (¶ 85); people who were crouching or kneeling and praying were sprayed and shot at (¶¶ 99, 114, 119); and Plaintiff Treanor was shot in the head while lying on the ground. (¶ 120).

Resolution of the individual defendants' claim of qualified immunity turns on disputed facts as to whether the crowd was acting as a unit and whether it presented a threat to the officers justifying the high level of force used. This Court recognized that defendants may have had the authority to direct plaintiffs to disperse and remove themselves from the area, but a reasonable jury could find that defendants' indiscriminate and brutal use of force to do so was not objectively reasonable. (Doc. 99, pp. 30, 32.)

IV. **SHOULD THE COURT CONVERT DEFENDANTS' MOTION TO DISMISS TO A MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS ARE ENTITLED TO DISCOVERY PRIOR TO ANY RULING, AND SO MOVE.**

Federal Rule of Civil Procedure provides: "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. rule 12(b)(6)(d); see

*Martin v. Sargent* (1985) 780 F.3d 1334, 1336, cited in Doc. 98 at 22.  "[I]f the

defendant files an affidavit in support of a Rule 12(b)(6) motion to dismiss, the

district court *must* treat the motion as one for summary judgment unless it

decides to exclude the affidavit in considering the motion." (*Court v. Hall

County,* 725 F.2d 1170, 1172 (8th Cir. 1984) [italics added].)

     In *Court v. Hall County*, defendant law enforcement officials successfully

moved to dismiss pretrial detainees' constitutional claims on the ground of

qualified immunity.  (*Id.* at pp. 1171-1172.) The defendants filed an affidavit

with their motion to dismiss and the district court relied on the affidavit in its

decision, thus converting the motion to a motion for summary judgment, but

failed to provide notice of the conversion to the plaintiffs.  The Eighth Circuit

held the district court's actions were improper, vacated the court's order, and

remanded for further proceedings. (*Id.* at p. 1172; see also *Woods v. Dugan*, 660

F.2d 379, 380-381 (8th Cir. 1981) [vacating district court order granting motion

to dismiss on grounds of qualified immunity where court relied on affidavit

submitted by defendant without giving plaintiff notice of conversion to

summary judgment motion]; *Jensen v. Klecker*, 599 F.2d 243, 245 (8th Cir.

1979) [similar but not involving qualified immunity].)

     A party is entitled to summary judgment only when there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law and in ruling on a motion for summary judgment, the court must

accept the evidence of the non-movant and all justifiable inferences therefrom

are to be drawn in the non-movant's favor. (*Morgan v. Robinson,* No. 17-1002, 2018 U.S. App. LEXIS 2622, at *5 (8th Cir. Feb. 2, 2018) (citations omitted).) The Eighth Circuit "require[s] strict compliance with the provisions of Rule 56". (*Jensen v. Klecker*, *supra*, at p. 245.)

Fed. R. Civ. P. 56(d) provides that a court may deny or defer considering a motion for summary judgment and allow time for discovery when certain facts are unavailable to the non-movant. Essential discovery is needed including related to the veracity and credibility of the currently untested averments in the declarations of individual law enforcement officers; the timing, duration and character of any announcements or warnings issued by the police; the reach of any such warnings or announcements; the information in the possession of officers and command staff at the time decisions were made including the information flowing into and out from the Joint Operations Command Center including any running resume, logs, digital feeds or other information; identification of officers who used force and exploration as to law enforcement's allegations of conduct by individuals justifying actions against all those assembled including at other times; exploration of allegations of conduct by the crowd as unit; the nature and extent of collaboration between the private unlicensed contractor TigerSwan and public law enforcement authorities; information provided or created by TigerSwan influencing or used by law enforcement; infiltration and surveillance of water protectors by TigerSwan and/or law enforcement including whether provocative actions were undertaken

by persons in either an undercover or plainclothed capacity; the propriety of use of force, methods of force, and proper use of munitions; defendants' policies and practices, training, supervision and/or discipline; the existence of intent to suppress speech. (See Affidavit of Rachel Lederman filed herewith.)

## V.  CONCLUSION

Plaintiffs respectfully request that defendants' Motion to Dismiss be denied, or in the alternative, should this Court convert the motion to one requesting summary judgment, plaintiffs move to take discovery.

Dated:  April 27, 2018          Respectfully submitted,

/S/ Rachel Lederman, CA SBN 130192
Rachel Lederman & Alexsis C. Beach, Attorneys
558 Capp Street, San Francisco, CA 94110
(415) 282-9300
rachel@bllaw.info

Mara Verheyden-Hilliard
Partnership for Civil Justice Fund
617 Florida Avenue NW, Washington, D.C. 20001
202-232-1180
mvh@justiceonline.org

Melinda Power
West Town Law Office,
2502 W. Division, Chicago, Il. 60622
773-278-6706
melindapower1@gmail.com

Janine Hoft, IL SBN 6188139
Shubra Ohri, IL SBN 6309824
People's Law Office
1180 N. Milwaukee Ave, Chicago IL, 60642
773-235-0070
janinehoft@gmail.com, shubraohri@gmail.com