UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Vanessa Dundon, et al. ) | |
| ) | Case No. 1:16-cv-406 |
| Plaintiffs, ) | |
| ) | |
| vs. ) | **TIGERSWAN LLC'S MEMORANDUM** |
| ) | **IN OPPOSITION TO PLAINTIFFS'** |
| Kyle Kirchmeier, Morton County, City of ) | **MOTION TO COMPEL** |
| Mandan, Jason Ziegler, Stutsman County, ) | |
| Chad Kaiser, et al., ) | |
| ) | |
| Defendants. ) | |

# **INTRODUCTION**

[1]     TigerSwan produced a knowledgeable, qualified, and prepared witness to testify to the topics for examination. The witness, Shawn Sweeney, is a Vice-President of TigerSwan. He was actively involved in TigerSwan's work in North Dakota in the fall of 2016, both having been stationed in North Dakota for well over a month in a supervisory capacity and having continued involvement from the company's headquarters. He also conferred with the only other TigerSwan employee who was also present in North Dakota at the relevant times. Mr. Sweeney also reviewed all available, relevant documentation. While Plaintiffs may not have liked TigerSwan's answers, TigerSwan directly provided information responsive to the topics for examination to the best of Mr. Sweeney's ability and based on the information reasonably available to TigerSwan. Plaintiffs' motion to compel should be denied.

**FACTUAL BACKGROUND**

**I.      TIGERSWAN IS A THIRD PARTY WHO DOES NOT HAVE INFORMATION ABOUT ISSUES GENUINELY IN DISPUTE.**

[2]     TigerSwan is not a party to this lawsuit.  No claims have been made against it.  TigerSwan has taken no position in the lawsuit.  It stands solely in the position of a potential third-party witness.

[3]     This case, as we understand it as counsel for a non-party, relates to alleged physical and/or constitutional injuries alleged by Plaintiffs who participated in protests against the construction of the Dakota Access Pipeline in the fall of 2016.  The specific incident alleged to have caused the injuries was a law enforcement action taken on November 20 or 21, 2016.

[4]     TigerSwan did not have any part in that law enforcement activity, and we are aware of no allegation to the contrary.  Plaintiffs' Amended Complaint alleges only that "TigerSwan coordinated and collaborated with Defendant law enforcement agencies."  Am. Comp. ¶ 34.

[5]     It is not clear how the alleged coordination and collaboration between TigerSwan and the law enforcement Defendants is relevant to the claims alleged.  It may have something to do with TigerSwan's alleged "influence [of] law enforcement actions against civilians protesting construction of the pipeline," as alleged by Plaintiffs.  Am. Comp. ¶ 34.

[6]     From a review of the filings in this case, however, it appears that the law enforcement Defendants have taken the position – and produced substantial evidence – that their activities, including those at the Backwater Bridge on November 20, 2016, were fully justified and lawful.  From our review, it does not appear that any law enforcement Defendant has taken the position that his or its actions depended upon or were justified by any alleged information provided by TigerSwan.

[7]     As a result, it does not appear that the discovery Plaintiffs have sought from TigerSwan has any relevance, and certainly no substantial relevance, to the issues genuinely in dispute. The actions of the law enforcement Defendants either were lawful and justified, or they were not. TigerSwan had nothing to do with those actions. We are aware of no evidence to the contrary. And, as noted above, even Plaintiffs' Amended Complaint fails to allege that TigerSwan had anything to do with the November 20, 2016, law enforcement action.

## II.    TIGERSWAN PROVIDED CONSULTING SERVICES TO ENERGY TRANSFER.

[8]     In September 2016, TigerSwan was hired by Energy Transfer to provide consulting services in relation to the construction of the Dakota Access Pipeline, which was subject to significant protest activity in multiple states. As explained in the deposition, TigerSwan provided those services to Energy Transfer throughout the Dakota Access Pipeline area, including Illinois, Iowa, South Dakota, Nebraska, and North Dakota.

[9]     In North Dakota, TigerSwan's work for Energy Transfer involved two basic areas. First, TigerSwan provided consulting services to Energy Transfer to enable that company to effectively employ the seven (or more) independent security firms that Energy Transfer had hired to protect Energy Transfer's employees, assets, and objective from the danger associated with the protest activity. S. Sweeney Dep. 71-74, 151-53. In that regard, TigerSwan's basic function was to ensure that all of the security companies were "on the same sheet of music" and were working in cooperation to protect Energy Transfer's employees and assets. S. Sweeney Dep. 159-60.

[10]    Second, TigerSwan operated what it termed a "fusion cell" in North Dakota. That somewhat dramatic jargon simply referred to TigerSwan's efforts to "fuse" together all information TigerSwan could gather concerning the protest activity in the area and to provide

daily reporting to Energy Transfer on that topic. S. Sweeney Dep. 30, 14-50. The "fused" information was used by Energy Transfer to schedule or direct Energy Transfer's work, protect its personnel and assets, and avoid any problematic or unpleasant interactions between Energy Transfer and the protesters.

[11] Simply stated, TigerSwan's North Dakota "fusion cell" gathered information and wrote reports that related to the security of pipeline construction, particularly in relation to the protest activity. The information could come to TigerSwan in multiple ways, but principally was derived from the observations of the seven (or more) security firms working in North Dakota and TigerSwan's exhaustive and continuous review of "open sources" such as media reporting and information protesters posted on their social media accounts. S. Sweeney Dep. 40, 60, 62.

[12] The law enforcement action at issue took place on November 20-21, 2016. It was at that time – November 20, 2016 – that Plaintiffs allege they suffered physical and/or constitutional injuries. Significantly, Plaintiffs commenced this action within a week of the event at issue. The original Complaint was filed on November 28, 2016.

### III. PLAINTIFFS DELAYED OVER FOUR YEARS BEFORE SEEKING DISCOVERY FROM TIGERSWAN.

[13] Notwithstanding the prompt commencement of this action, Plaintiffs did not seek discovery from TigerSwan in 2016. Nor did they in 2017, when TigerSwan was closing up its North Dakota operations. Nor did they in 2018, 2019, or 2020.

[14] It was not until March of 2021 – nearly four and one-half years after the events in question – that Plaintiffs first sought discovery from TigerSwan. At that point, Plaintiffs served TigerSwan with a 30(b)(6) deposition subpoena seeking examination on seven topics.

[15] By the time Plaintiffs finally sought discovery from TigerSwan, TigerSwan had returned to Energy Transfer all its documentation related to its work on the pipeline, as it was

4

contractually obligated to do under the contract's broad confidentiality provisions. In addition, by that time, all of the TigerSwan employees or contractors who worked on the pipeline project in North Dakota had left the company, often long ago, with the exception of TigerSwan's Vice-President, Shawn Sweeney, and Al Ornoski. Those individuals were present in North Dakota during the fall of 2016 in a supervisory capacity.

[16]     Moreover, TigerSwan's former CEO James Reese – who himself was only in North Dakota twice and "had limited knowledge of day-to-day operations" and "no daily direct knowledge" of the North Dakota operations – had left the company. Hasbrouck Aff. Ex. B. John Porter, another supervisory employee present in North Dakota in the fall of 2016, also had left the company and had been, as Mr. Sweeney testified, "incommunicado" for several years. In other words, for a number of years before the subpoena was served, TigerSwan's efforts to reach Mr. Porter had been unsuccessful because it had "[n]o forwarding address, no forwarding telephone number, no communications, mail being returned, no sender at this address." S. Sweeney Dep. 132.

[17]     Simply put, during the four and one-half years that Plaintiffs delayed in seeking discovery from TigerSwan, TigerSwan no longer had possession of its documentation, employees who were present in North Dakota had left, TigerSwan had been unable to contact at least one of them, and memories had faded. As a practical matter, the passage of time that Plaintiffs allowed before seeking discovery of TigerSwan made it impossible to provide the level of detail, often about mundane, day-to-day operations and oral communications, that Plaintiffs' ultimately would request during the deposition.

### IV.   THE TOPICS FOR EXAMINATION WERE VAGUE AND BROAD.

[18]     The seven topics for examination, which have been provided to the Court, are couched in very broad, often vague, language. They do not reference any specific alleged

5

activities by TigerSwan. They do not attach or incorporate any alleged TigerSwan documentation, including that which Plaintiffs' would later use at the deposition. Given the broad, vague topics for examination, TigerSwan (through counsel) sent a written objection to Plaintiffs' counsel. Hasbrouck Aff. Ex. A.

## V. TIGERSWAN RESOLVED A CONFIDENTIALITY ISSUE TO TESTIFY WITHOUT REQUIRING LITIGATION OVER CONFIDENTIALITY.

[19] In addition to objecting to the breadth, vagueness, and scope of the topics for examination, TigerSwan also advised Plaintiffs' counsel that it was under a strict confidentiality obligation with regard to all of its information "relating to" its work for Energy Transfer. Hasbrouck Aff. Ex. A. In fact, Energy Transfer currently is suing TigerSwan in Burleigh County relating to its disclosure of documentation to the North Dakota Private Investigative and Security Board (Case No. 08-2020-CV-02788). (The North Dakota Private Investigative and Security Board released some of those documents publicly. It appears Plaintiffs' counsel has possession of those documents, as some of them were used as exhibits at the deposition.)

[20] As a result of TigerSwan's confidentiality obligations, as Plaintiffs' counsel was advised, TigerSwan needed to confer with Energy Transfer concerning whether it could provide testimony, absent a court order, without being exposed to additional allegations of breach of contract. Hasbrouck Aff. Ex. A. If TigerSwan had any intent to obstruct the process, it certainly could have objected to the subpoena on confidentiality grounds and required Plaintiffs to litigate the issue. Yet TigerSwan did not do that and took a decidedly cooperative approach.

[21] Ultimately, TigerSwan (through counsel) resolved the confidentiality issue with Energy Transfer and was able to provide the testimony, without requiring Plaintiffs to litigate the issue and without asserting a single objection at the deposition based on confidentiality.

## VI. COUNSEL CONFERRED ABOUT THE DEPOSITION.

[22]   Prior to the deposition, counsel for Plaintiffs and for TigerSwan discussed the topics for examination. Hasbrouck Aff. ¶ 3. Two significant points were discussed. First, Plaintiffs' counsel stressed that the topics were not as broad or vague as asserted by TigerSwan's counsel in his objection. Rather, Plaintiffs' counsel stated that the topics were largely confined to the dates of the law enforcement action, November 20-21, 2016 (topics 1 and 2) or to the month prior to the action and the week following the action (topics 3 through 6). Only topic 7 – which relates to TigerSwan's alleged "contribution" to protesters' social media accounts – involves a longer time frame, from September 2016 through February 2017.

[23]   TigerSwan's counsel advised Plaintiffs' counsel that TigerSwan had no access to any documentation it generated concerning its pipeline work, except for that which was publicly available. Hasbrouck Aff. ¶ 3. All the documents, as noted above, had been returned to Energy Transfer prior to service of the subpoena.

## VII. TIGERSWAN DESIGNATED A KNOWLEDGEABLE WITNESS.

[24]   To testify, TigerSwan designated its Vice-President, Shawn Sweeney. Mr. Sweeney had been on the ground in North Dakota, in a supervisory capacity, from September 10, 2016, through October 14, 2016. S. Sweeney Dep. 32, 170. To prepare for the deposition, Mr. Sweeney conferred with the company's only other current employee (or contractor) who was present in North Dakota, Al Ornoski. S. Sweeney Dep. 18-19. Mr. Ornoski was also present in North Dakota in a supervisory capacity throughout much of the fall 2016, including after Mr. Sweeney returned to TigerSwan's North Carolina headquarters. S. Sweeney Dep. 132, 178. Mr. Sweeney remained involved in the project from headquarters.

[25]   In addition, to prepare for the deposition, Mr. Sweeney had reviewed what he described as a "host" and an "abundance" of documentation. S. Sweeney Dep. 141. Those

documents included, as Mr. Sweeney testified, the publicly available documents concerning TigerSwan's work, among other things. (Plaintiffs' brief grossly mischaracterizes Mr. Sweeney's testimony by claiming he made only a "cursory review" of documents. He actually testified that he made "at least" a cursory review of the various documents. S. Sweeney Dep. 18. Those two words make a big difference).

[26]    Significantly, although Plaintiffs did not attach, incorporate, or reference any TigerSwan documentation in their subpoena, Mr. Sweeney had reviewed or was familiar with each of the seven exhibits used by Plaintiffs – the topics for examination (Exhibit 1); an email exchange among TigerSwan personnel and others regarding "Operation Baratheon" (Exhibit 2)"; TigerSwan reporting dated December 2016 (Exhibit 3, which was outside the scope of time set forth in the topics for examination); emails among TigerSwan personnel from May 2017 (Exhibit 4, which again was well outside the time scope of the topics for examination); a WhatsApp transcript from December 2016 through January 2017 (Exhibit 5, also outside the time scope); a TigerSwan organizational chart from December 2016 (Exhibit 6, again, outside the time scope); and even an article apparently published on the internet from December 2017 (Exhibit 7).

[27]    Although he was never asked about it, TigerSwan and Mr. Sweeney also had access to a detailed, 11 page, single-spaced affidavit that the company's former CEO, James Reese, which had been submitted in a proceeding brought by the North Dakota Private Investigative and Security Board. Hasbrouck Aff. Ex. B. (We presume Plaintiffs' counsel had access to the affidavit, as it has been publicly filed and even produced in discovery by Plaintiffs in a separate civil action to which TigerSwan is a party (*Thunderhawk v. County of Morton, et al.*, Civil No. 1:18-CV-00212).

## VIII. TIGERSWAN PROVIDED DIRECT TESTIMONY ON THE TOPICS NOTICED.

[28]   At the deposition, Mr. Sweeney – a qualified, knowledgeable witness – fairly answered the substance of the topics for examination and he did so directly.

[29]   Topic 1 relates to TigerSwan's role at or near the Backwater Bridge in regard to the law enforcement action of November 20-21, 2016, including any "infiltrator" activities.

[30]   TigerSwan had no role in that law enforcement action, as Mr. Sweeney explained as follows:

> Q: Topic one is identified as "TigerSwan's personnel and/or its agents' and/or contractors' role, participation, activities and/or presence at or near the Backwater Bridge and in any and all events occurring on November 20th through 21st, 2016, as referenced in the attached complaint, including covert, undercover and war infiltrator activities".
>
> With regard to topic one, what efforts did you undertake to seek out and obtain the information possessed by TigerSwan with regard to this topic?
>
> A: I didn't need to do any research on that.
>
> Q: Why did you not need to do research on that?
>
> A: Because the topic, as it is written, wants to know about our activities related to the incident between November 20 and 21st, 2016, as attached.  We had no activity with regard to Backwater Bridge.
>
> Q: So is it TigerSwan's position that they had no personnel involved in any of the events occurring on November 20th through 21st as referenced in the complaint that you've acknowledge that you have reviewed?
> A. Yes, Ma'am.  That's our position.  That was a law enforcement action.
>
> Q: Did you have any personnel or agents or contractors who were at that time undercover or infiltrating among the demonstrators at the Standing Rock protests overall?
>
> A: To the best of my knowledge and the knowledge of the company, the answer to that question is no.
>
> * * *
>
> A: That is correct, ma'am.
>
> Q: Did TigerSwan have any personnel, agents or contractors present at or near the Backwater Bridge on November 20th through 21st, 2016?

A: No, ma'am, we did not.

Q: What did TigerSwan do to determine whether or not in fact it had any personnel, agents or contractors present?

A: That situation in particular was monitored very closely, not only in the Mandan area and around the area that circulates 1806, but it was also managed very carefully from our headquarters in North Carolina.

Q: What efforts did TigerSwan take in advance of this deposition to identify the existence of any personnel, agents or contractors present at the locations and time period as referenced?

A: We relied on my personal knowledge.

Q: Did TigerSwan seek to communicate with any of the personnel as previously identified who were involved in infiltration operations and reporting over the period of November 2016 into early December.

A: In preparation for this deposition, no, ma'am, we did not. I'd like to retract that. I'd like to retract that statement. That's not 100% truthful. I did confer with Al Oronski with regard to TigerSwan having personnel in that area.

Q: What did you discuss?

A: The fact that we were not in that area.

S. Sweeney Dep. 22:19-24:9; 100:20-102:8.

[31]  Topic 2 relates to the identification of any TigerSwan personnel at the location during the action referenced above. There were none, as Mr. Sweeney explained.

[32]  Topic 3 seeks information relating to TigerSwan's communications and interactions with law enforcement during the November 20-21, 2016, law enforcement action and during the period of October 22 through November 28, 2016. Mr. Sweeney testified that TigerSwan was advised by law enforcement not to be in the area of the law enforcement action and to advise Energy Transfer and others of that, which it did. S. Sweeney Dep. 103:2-105:22. Mr. Sweeney also testified generally to communications with law enforcement, which were not documented and which occurred nearly five years ago. S. Sweeney Dep. 109:5-110:16; 117:8-124:16.

10

[33] Topic 4 seeks information concerning TigerSwan's communications with or presence at the law enforcement operations center on November 20-21, 2016. Mr. Sweeney testified that TigerSwan had no presence there, although one member of a different security firm was allowed to be present at the law enforcement operations center to facilitate communication on a "one way" basis. S. Sweeney Dep. 135:18-138:9. (That person was to advise law enforcement of issues relating to Energy Transfer, but law enforcement did not provide information to private security.) (Communications are addressed above.)

[34] Topic 5 seeks information about any "role, participation, infiltration, activities [or] presence" of TigerSwan at Standing Rock protest camps "from October 22, 2016, through November 21, 2016, including the installation and use of electronic surveillance and/or cell phone towers and/or monitoring equipment." Mr. Sweeney testified that TigerSwan did not have a presence at or infiltrate the camps and did not install electronic surveillance equipment. S. Sweeney Dep. 125:11-17, 126:19-129:3, 134:5-14.

[35] Topic 6 seeks information regarding TigerSwan allegedly providing information to law enforcement or journalists concerning the protesters having "potentially dangerous material" from September 2016 through November 2016. Mr. Sweeney testified that although TigerSwan heard reports that protesters may have dangerous materials, he did not believe the information was to a level that it would have been passed to law enforcement. S. Sweeney Dep. 140.

[36] Topic 7 seeks information about TigerSwan's alleged creation or contribution to the protesters' social media accounts from September 2016 through February 2017. Mr. Sweeney testified that TigerSwan did not engage in any such activity. S. Sweeney Dep. 140:16-141:2, 184:1-10.

[37]     Mr. Sweeney, of course, noted that his answers were given to the best of his knowledge and on the information reasonably available to TigerSwan. That information, as noted above, was the collective recollection of TigerSwan's two supervisory employees who were present in North Dakota throughout the fall of 2016 and/or who continued to monitor events from North Carolina headquarters. The testimony was also based on a review of the available documentation.

[38]     As a review of the testimony quoted or cited above shows, Mr. Sweeney directly and fairly answered the questions to the best of his ability and on the information reasonably available to TigerSwan. To be sure, it appears that Plaintiffs' counsel was displeased with some of the testimony and apparently believes that certain documents used at the deposition impeach some of the testimony. But the mere fact that counsel is displeased with the answers, or feels that certain documents might impeach the testimony, does not mean that TigerSwan did not present a qualified and prepared witness.

## ARGUMENT

### IX.    LEGAL STANDARDS

[39]     "Rule 30(b)(6) imposes duties on both the requesting party and the responding party. The requesting party must 'reasonably particularize the subjects of the intended inquiry so as to facilitate the responding party's selection of the most suitable deponent.'" In re Whatley v. Canadian Pac. Ry. Ltd., No. 1:16-CV-74, 2021 WL 1951003, at *4 (D.N.D. May 14, 2021) (quoting Murphy v. Kmart Corp., 255 F.R.D. D.S.D. 2009).

[40]     "A deposing party may not demand that a corporate designee be prepared to speak with encyclopedic authority." Whitt v. City of St. Louis, No. 4:18-CV-1294 RLW, 2020 WL 7122615, at *3 (E.D. Mo. Dec. 4, 2020) (citing Dwelly v. Yamaha Motor Corp., 214 F.R.D. 537, 540 (D. Minn. 2003).

[41] "[A] rule 30(b)(6) deponent is not expected to be clairvoyant, so as to divine the specific questions that could be presented." Klein v. Affiliated Group, Inc., 2019 WL 246769, at *9 (D. Min. Jan. 17, 2019).

[42] "An organization cannot be forced or required to designate a former employee as a Rule 30(b)(6) witness, even if the former employee has the most knowledge of the subject matter." Derrick T. Write, Litigation Points and Possible Strategies Former Employees: Common Problems When They Are Witness, 59 No. 3 DRI For Def. 22 (citing SRT Communications, Inc. v. Phoenix Civil Contractors, LLC, 4:14-CV 42, 2015 WL 12803621, at *3 (D.N.D. June 19, 2015)).

## X. TIGERSWAN FULFILLED ITS OBLIGATIONS UNDER THE SUBPOENA.

[43] It seems Plaintiffs' principal concern about the deposition relates to TigerSwan's plain testimony, from a witness with knowledge, that TigerSwan did not "infiltrate" the protest camps. Plaintiffs seems to argue that the exhibits used in the deposition so plainly show "infiltration" that Mr. Sweeney could deny that there was infiltration only by remaining "willfully ignorant." Plaintiffs' position is unsupported by the actual documents. But before the documents are addressed, we must address the broader issue of Mr. Sweeney's qualifications and Plaintiffs' complaints about use of the word "infiltration."

[44] Concerning Mr. Sweeney's qualifications, he was well suited to testify about the topics noticed for examination. This was not a situation where a company designated a witness without personal knowledge and there is a question as to whether the witness was adequately prepared. Instead, Mr. Sweeney was personally involved in the events at issue, both as a supervisor in North Dakota in the fall of 2016 and as an officer of the company overseeing events from North Carolina headquarters. He supplemented his personal knowledge by

reviewing the available documentation and conferring with Mr. Ornoski, who was on the ground in North Dakota even after Mr. Sweeney had returned to TigerSwan's headquarters.

[45]     Plaintiffs' complaints about Mr. Sweeney's alleged lack of preparedness are entirely misplaced.  As Mr. Sweeney said concerning topic 1, "I didn't need to do any research on that"  S. Sweeney Dep. 23:9-10.  He knew TigerSwan was not involved in the law enforcement action based on his involvement in providing services to Energy Transfer.

[46]     Concerning use of the word "infiltration," this was not a situation – contrary to the tenor of Plaintiffs' brief – where a witness refused to provide factual information by using sematics as a shield.  Mr. Sweeney merely made the point that he did not consider any interactions between TigerSwan or any security personnel and protesters to be infiltration.  S. Sweeney Dep. 24-25.  He regarded "infiltration" as "sneaking in to another, so an opposing force's camp area of operations, whatever," and not as a situation where security might speak with a protester in a public or freely accessible area.  Id.  The latter he regarded as "information gathering."  Mr. Sweeney freely admitted to interactions between TigerSwan (or independent security) personnel and protesters "on the streets of Bismarck, on the streets of Mandan, in various public locations…it's a conversation between two people on the street."  S. Sweeney Dep. 73, 114.  Mr. Sweeney made a fair point and it did not stand in the way of providing factual information.

    A.     **Exhibit 2.**

[47]     Exhibit 2 consists of November 5, 2016, email communications among TigerSwan personnel (and others) relating to a proposed "Operation Baratheon."  The document proposes that a "Joel McCollough" (who worked for a time for TigerSwan in Iowa) would

"travel to Standing Rock with one to three Iowa-based protesters to gather information." The proposed operation, according to the document, was to occur on November 6-9, 2016.

[48]   Significantly, the email communication, on the first page of Exhibit 2, notes that the proposed operation would be distributed to get the "final word" as to whether it was a "GO/NO GO."

[49]   As Mr. Sweeney testified, the proposed operation was definitely a "no go." Mr. Sweeney specifically testified the proposed operation "was a pipe dream, if you will, that was cooked up [by] somebody having what they refer to as a great idea and…that activity never occurred." S. Sweeney Dep. 127-28. TigerSwan's former CEO, James Reese, provided the same information in his affidavit. Mr. Reese testified that "[t]his was a PROPOSED operation that was **not approved** by TigerSwan HQ in North Carolina. This was a briefing that went up the chain of command for approval and was denied." Hasbrouck Aff. Ex. B.

[50]   That certain activities which might be considered infiltration were proposed by certain contractors, and that TigerSwan definitively denied the proposal, does not even remotely suggest that Mr. Sweeney was not an appropriate and prepared witness. To the contrary, it shows that Mr. Sweeney was in a position to understand the actual facts of TigerSwan's role and activity. As he testified, "I say that [the activity never occurred] because certainly I would have been briefed on that back at the higher headquarters in North Carolina, and I would have put a stop to that." S. Sweeney Dep. 128.

B.     **Exhibits 3, 4 and 5.**

[51]     The same basic point applies to Exhibits 3, 4, and 5, which Plaintiffs' counsel evidently claims show "infiltration."[1] Moreover, with regard to whether TigerSwan was adequately prepared to testify – the only issue before the Court – those documents have no relevance. Those exhibits are all dated after the relevant timeframe set forth in the topics of examination.

[52]     Exhibit 3 is a "daily" report of TigerSwan dated December 8, 2016. Exhibit 4 involves an email discussion of May 28, 2017. Exhibit 5 is the transcript of a WhatsApp chat from December 8, 2016, through December 17, 2017. The topics for examination did not request that TigerSwan designate a witness to present any testimony concerning alleged "infiltration" except during the periods of November 20-21, 2016 (topic one) and October 22 through November 21, 2016 (topic five). Therefore, nothing in those documents, to the extent they reference something that might be considered "infiltration" or TigerSwan being present at protest camps, would suggest that Mr. Sweeney was not adequately prepared to testify to the topics noticed for examination, in light of the explicit date limitations set forth.

[53]     In addition, to the extent Plaintiffs sought specific information about any of the alleged events referenced in those documents, they ought to have referenced or attached them to

---

[1] As they are outside the scope of the topics for examination, we will only briefly address the substance of the exhibits. Exhibit 3, in part, reports on a conversation between a protester and an unidentified individual. That in no way suggests "infiltration" of a North Dakota protest camp. Moreover, the document is not limited to North Dakota and, as Mr. Sweeney testified, a photograph counsel suggested proved North Dakota "infiltration" actually was of "another security company, not TigerSwan . . . and did not take place in or around Standing Rock. This took place in Iowa." S. Sweeney Dep. 57, 147. Exhibit 4 is nothing but a vague email exchange which likely does not involve a TigerSwan employee. See Hasbrouck Aff. Ex. B. Exhibit 5 is also vague and in it the supposed "infiltrator" Joel McCollough uses his personal Gmail account, suggesting that he was not working for TigerSwan at the time, which was testified to by Mr. Reese. Id.

16

their topics for examination. Nothing in the vague, general topics for examination gave any reasonably particularized notice that Plaintiffs would ask about the details of them. As noted above, Rule 30(b)(6) does not expect a witness "to be clairvoyant so as to divine the specific questions that could be presented."

[54]   Plaintiffs also complain about the specificity of Mr. Sweeney's description of communications between TigerSwan and law enforcement. As Mr. Sweeney explained, TigerSwan and law enforcement had numerous informal communications throughout the fall of 2016, and law enforcement also was invited to and often present at TigerSwan's daily briefing in the evenings. The specific communications were not documented. TigerSwan cannot be faulted for providing generalized information about oral communications which took place nearly five years ago, particularly in light of Plaintiffs' failure to previously seek discovery from TigerSwan despite filing this lawsuit just a week after the events in questions.

[55]   In summary, TigerSwan produced in Mr. Sweeney a qualified and knowledgeable witness who testified to the information reasonably available to TigerSwan. That included Mr. Sweeney's substantial personal knowledge, as supplemented by consulting with the only other current TigerSwan employee who was present (Mr. Ornoski) and by reviewing the available documentation. Accordingly, the motion should be denied.

## XI.   PLAINTIFFS ARE NOT ENTITLED TO THE VAGUE AND UNAUTHORIZED RELIEF REQUESTED.

[56]   Beyond failing to make a case on the merits, Plaintiffs' request for relief is wholly unwarranted, even if any merit were found with their position. In that regard, despite deposing TigerSwan for nearly five hours, Plaintiffs' request an entirely new deposition, at TigerSwan's expense, and assert that TigerSwan must be ordered to "thoroughly prepare."

[57] Plaintiffs do not request or even suggest what TigerSwan ought to do to meet their standard of "thorough preparation." As noted above, "A deposing party may not demand that a corporate designee be prepared to speak with encyclopedic authority." We believe that Plaintiffs offer no specifics because there are no specific steps TigerSwan could take which would be "reasonable."

[58] In a request that effectively acknowledges that TigerSwan did what was reasonable (reviewed the available documentation), Plaintiffs also ask that the Court order Energy Transfer to provide TigerSwan with the documentation TigerSwan returned to Energy Transfer, prior to the subpoena (as it was contractually obligated to do). Suffice it to say that we are aware of no procedure, rule, or authority that would authorize such relief against a third-party (Energy Transfer) who is not before the Court.

[59] Plaintiffs were fully aware that TigerSwan had returned its documentation to Energy Transfer prior to the deposition and that the company could access only the documentation that was publicly available, as that information was explicitly provided to Plaintiffs' counsel by the undersigned. Hasbrouck Aff. ¶ 3. Plaintiff elected to move forward with the deposition, questioned TigerSwan for five hours, and got TigerSwan's testimony. They should not be allowed to seek additional documents and then re-depose TigerSwan.

[60] Since Plaintiffs have failed to establish that TigerSwan did not fulfill its obligations under the subpoena, Plaintiffs request that TigerSwan pay the fees and costs associated with this motion has no merit. In addition, both during the telephone conference with the Court on June 29, 2021, and in a follow-up email, the undersigned sought a specific and reasonable proposal from Plaintiffs that might avert this discovery motion. Hasbrouck Aff. Ex. C. None was offered. Plaintiffs failed to tell the undersigned – as they have failed to tell this

Court – what specific steps they propose TigerSwan engage in to respond to the topics for examination.  They have made a cooperative resolution impossible and have brought the resulting fees on themselves (and, unfairly, TigerSwan).

[61]    It appears Plaintiffs are not genuinely seeking information, but are attempting to create the impression that information is being withheld from them both by the law enforcement Defendants and by TigerSwan.  We ask the Court to put an end to that.

## CONCLUSION

[62]    TigerSwan respectfully requests that the Court deny Plaintiffs' motion to compel and grant TigerSwan the attorneys' fees and costs it has incurred in responding to this motion.

Dated:  July 7, 2021

*/s/ Benjamin J. Hasbrouck*
Benjamin J. Hasbrouck #01360
Aubrey J. Zuger #06281
FREDRIKSON & BYRON, P.A.
51 Broadway, Suite 400
Fargo, ND 58102-4991
Telephone:  (701) 237-8200
azuger@fredlaw.com
bhasbrouck@fredlaw.com

Attorneys for TigerSwan LLC

73296300 v1