## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Vanessa Dundon, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, and Frank Finan, on behalf of themselves and all similarly-situated persons,<br><br>Plaintiffs,<br><br>vs.<br><br>Kyle Kirchmeier, Morton County, City of Mandan, Jason Ziegler, Stutsman County, Chad Kaiser, and Does 1-100,<br><br>Defendants. | Civil No.: 1:16-cv-406 |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

[¶1]     THIS MATTER comes before the Court on the Converted Motion for Summary Judgment filed by the Defendants[1] on April 6, 2018.[2] Doc. No. 135. The Plaintiffs[3] filed a Response in Opposition on April 27, 2018. Doc. No. 137. In the alternative, the Plaintiffs filed a

---

[1] The term "Defendants" refers collectively to Kyle Kirchmeier, Morton County, City of Mandan, Jason Ziegler, Stutsman County, Chad Kaiser, and Does 1-100.

[2] The Motion was initially filed as a Motion to Dismiss; however, the Court converted the Motion to a Motion for Summary Judgment on September 10, 2020. Doc. No. 151. Because of the conversion, the Court will consider all briefing and documents in the record related to the original Motion to Dismiss and the supplemental briefing provided by the parties for the Converted Motion for Summary Judgment.

[3] The term "Plaintiffs" refers collectively to Vanessa Dundon, Crystal Wilson, David Demo, Guy Dullknife, III, Mariah Marie Bruce, and Frank Finan. Jade Kalikolehuaokal Wool, Israel Hoagland-Lynn, and Noah Michael Treanor were previously named Plaintiffs, but their claims against all Defendants have been dismissed with prejudice. Doc. Nos. 177, 282.

Motion to Conduct Discovery pursuant to Federal Rule of Civil Procedure 56(d). Doc. No. 139. The Defendants filed a Reply in Support of the Motion on May 18, 2018. Doc. No. 143. The Defendants filed a Supplemental Brief in Support of the Motion for Summary Judgment on June 25, 2021. Doc. No. 238. The Plaintiffs filed a Supplemental Brief in Opposition on August 11, 2021. Doc. No. 275. The Defendants filed a Supplemental Reply in Support of the Motion on August 30, 2021. Doc. No. 283. For the reasons explained below, the Defendants' Motion for Summary Judgment is **GRANTED**.

## I.   <u>PROCEDURAL HISTORY</u>

[¶2]     On November 28, 2016, the Plaintiffs filed a Complaint asserting claims against all Defendants for (1) Retaliation under the First, Fourth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; (2) Unreasonable Use of Force under the Fourth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; (3) [Unconstitutional] Policies, Customs, or Practices under the First, Fourth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; (4) [Violations Resulting from] Training, Supervision, or Discipline under the First, Fourth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983; (5) Unequal Protection of the Law under the First, Fourth, and Fourteenth Amendments to the United States Constitution; and (6) Declaratory Relief under 28 U.S.C. § 2201. Doc. No. 1.

[¶3]     That same day, the Plaintiffs also filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking:

> an emergency order enjoining Defendants from curtailing their First and Fourth Amendment rights by using highly dangerous weaponry, including Specialty Impact Munitions (SIM, also known as Kinetic Impact Projectiles or KIP), explosive "blast" grenades, other chemical agent devices, and a water cannon and water hoses in freezing temperatures, to quell protests and prayer ceremonies associated with opposition to the Dakota Access Pipeline (DAPL).

Doc. No. 14, p. 1; see also Doc. No. 2. The Plaintiffs submitted twenty (20) exhibits in support of this Motion for Temporary Restraining Order. Doc. Nos. 14-1 – 14-20. These included a Washington Post article titled, "The Latest: Sheriff defends spraying protestors with water", a press release from the Morton County Sheriff's Department titled "Protestors erect unlawful structures; should seek appropriate winter shelter", seventeen (17) declarations from individuals, including the named-Plaintiffs, and a Report by the Physicians for Human Rights titled "Lethal in Disguise: The health consequences of crowd-control weapons." Id.

[¶4]    On December 1, 2016, the Court denied the Plaintiffs' Motion for Temporary Restraining Order on the basis the Plaintiffs' counsel failed to comply with notice requirements under Federal Rule of Civil Procedure 65(b)(1) in that the Plaintiffs failed (1) to certify in writing they made efforts to give the Defendants notice, and (2) the Plaintiffs failed to provide reasons justifying why notice to the Defendants was not warranted. Doc. No. 16, p. 2. The Court noted because the matter "is clearly a fact-specific case . . . notice to the adverse parties and an opportunity for them to respond and be heard is necessary." Doc. No. 16, p. 2. The Court ordered the Defendants to file a Response to the Motion for Preliminary Injunction within fourteen (14) days after the Plaintiffs served them with the Complaint, Motion for Preliminary Injunction, its brief, and supporting documents. Doc. No. 16, p. 2.

[¶5]    The same day, the Plaintiffs filed a Motion to Reconsider the Order Denying the Temporary Restraining Order, asserting they complied with the notice requirements of Rule 65(b)(1). Doc. No. 17. They also noted they did not seek the issuance of an ex parte order. Id. On December 8, 2016, the Court denied the Plaintiffs' Motion for Reconsideration, noting "the Court finds that notice to the adverse parties and an opportunity to respond and be heard is necessary." Doc. No. 31, p. 2 (emphasis in original).

3

[¶6]     On December 22, 2016, the Defendants submitted their Response to the Motion for Preliminary Injunction. Doc. No. 42. In support of the Response in Opposition, the Defendants attached numerous exhibits, including a map of the area in question, news releases, an emergency declaration by the Morton County Commissioners, criminal complaints, correspondence between government officials, releases from the United States Army Corps of Engineers, an Executive Order by the President, and affidavits of law enforcement involved in the matter. Doc. Nos. 43-60, 61-1 – 61-11. The Plaintiffs filed their Reply Brief on January 23, 2017, attaching an additional twenty-nine (29) declarations of individuals, video clips of the November 20, 2016, incident, and information pertaining to crowd control policies. Doc. Nos. 81, 86, 91, 94. In the interim, on February 6, 2017, the Defendants filed a Motion to Dismiss the Complaint. Doc. No. 97.

[¶7]     On February 7, 2017, the Court denied the Plaintiffs' Motion for Preliminary Injunction. Doc. No. 99. The next day, the Plaintiffs filed an interlocutory appeal of the Order Denying the Motion for Preliminary Injunction. Doc. No. 102. On February 17, 2017, the Plaintiffs filed a Motion to Stay Proceedings Pending Interlocutory Appeal, which included staying the Defendants' Motion to Dismiss and their pending Response in Opposition. Doc. No. 106. On February 22, 2017, the Court granted the Motion to Stay Proceedings. Doc. No. 110. On November 14, 2017, the Eighth Circuit Court of Appeals affirmed the Court's denial of the Preliminary Injunction. Doc. Nos. 111-112.

[¶8]     The stay was lifted on January 10, 2018. Doc. No. 113. The Court ordered the Plaintiffs to respond to the Defendants' Motion to Dismiss the Complaint by February 28, 2018. Doc. No. 113. However, the Plaintiffs requested the Court first consider their Motion for Leave to Amend the Complaint filed on February 1, 2018, as it would render the Defendants' Motion to Dismiss moot if granted. The Court granted the Plaintiffs' Motion to Amend the Complaint on February

27, 2018, finding as moot the Defendants' Motion to Dismiss. Doc. No. 128. The Plaintiffs filed a First Amended Complaint the same day. See Doc. No. 129.

[¶9]     The Amended Complaint alleges claims against all Defendants for: (1) [Violations of] the First Amendment (42 U.S.C. 1983); (2) Unreasonable Use of Force (Fourth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983); (3) Unequal Protection of Law; (4) Declaratory Relief (28 U.S.C. § 2201); (5) Assault and Battery; and (6) Negligence. Doc. No. 129, ¶¶151-177. The Plaintiffs also assert additional claims of (7) [Unconstitutional] Policies, Customs, or Practices under the First, Fourth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983, and (8) [Violations Resulting from] Training, Supervision, or Discipline under the First, Fourth, and Fourteenth Amendments to the United States Constitution; 42 U.S.C. § 1983. Doc. No. 129, ¶¶141-150.

[¶10]    On April 6, 2018, the Defendants filed the initial Motion to Dismiss, which has been converted now to a Motion for Summary Judgment. Doc. No. 135. On September 17, 2020, this Court converted the Defendants' Motion to Dismiss into a Motion for Summary Judgment, deferring a ruling on the Motion to allow for limited discovery. Doc. No. 151. On September 17, 2020, the Court issued a limited discovery order outlining what discovery was permissible for each side. Doc. No. 154.

[¶11]    On October 7, 2020, the Defendants filed a Notice of Interlocutory Appeal to the Eighth Circuit Court of Appeals, arguing this Court erred by not ruling on the issue of whether the Defendants were protected by qualified immunity. Doc. No. 163. The same day, the Defendants filed a Motion to Stay Proceedings while the matter was on appeal. Doc. No. 161. On November 3, 2020, the Court granted the request to stay proceedings. Doc. No. 171. On November 25, 2020, the Eighth Circuit Court of Appeals dismissed the Defendants' appeal for lack of jurisdiction. Doc.

No. 173. This Court lifted the stay of proceedings on November 25, 2020, allowing limited discovery to move forward. Doc. No. 174. At the close of limited discovery, supplemental briefing on the Motion for Summary Judgment was filed as noted above.

## II.   FACTS

### a.   Undisputed facts

[¶12]     In 2014, Energy Transfer Partners ("ETP") put forth a proposal to construct a 1,172-mile-long pipeline, named the Dakota Access Pipeline ("DAPL"), to carry oil from the Bakken oil fields in North Dakota to Illinois. Doc. No. 129, ¶27. The DAPL was slated to cross the Missouri River in North Dakota at Lake Oahe, which sits north of the Standing Rock Sioux Tribe Reservation. Doc. No. 129, ¶27. In April of 2016, individuals, including members of the Standing Rock and Cheyenne River Sioux Tribes, began protesting the construction of the DAPL, asserting the location of the DAPL threatened tribal members' "environmental, fish and wildlife, sacred ceremonial and burial sites, and vital water supply." Doc. Nos. 129, ¶30.

[¶13]     During the course of the prolonged DAPL protest, the protesters primarily occupied three areas: the Sacred Stone Camp and the Rosebud Camp located south of the Cannonball River, and the Seven Council Fires Camp (i.e. Oceti Sakowin) located between the north bank of the Cannonball River and the south bank of the North Branch of the Cantapeta Creek, a tributary of the Cannonball River. The Sacred Stone Camp and Rosebud Camps are located in Sioux County, and the Seven Council Fires Camp is located in Morton County. The Backwater Bridge (hereinafter referred to as "the Bridge") is located on Highway 1806 and crosses the north branch of the Cantapeta Creek, north of the Seven Council Fires Camp.

[¶14]     The United States Army Corps of Engineers ("Corps") manages the land upon which all three camps were located. The Corps also manages federal lands in Morton County located along

6

the north bank of the North Branch of the Cantapeta Creek from the Backwater Bridge eastward along the north bank of the Cannonball River eastward to the Missouri River. The Corps managed land located along the north banks, as well as privately-owned property to the north, which encompassed the DAPL project route and the location from which the DAPL project planned to cross the Missouri River. The DAPL project route was located less than one-mile north of the Seven Council Fires Camp. The Corps initially granted the protesters a permit to demonstrate on Corps-managed lands where the three camps are located. Doc. No. 61-9.

[¶15]    Protestors began gathering in increasing numbers in August of 2016 when the construction of the DAPL began. Doc. No. 129, ¶31. On August 15, 2016, the Morton County Board of Commissioners issued an "Emergency Declaration Dakota Pipeline Civil Unrest," which implemented Morton County's emergency plans and processes in response to the protests. Doc. No. 61-4. This included additional manpower, resources, and other expenditures to address the protests. Doc. No. 61-4.

[¶16]    On August 19, 2016, then-Governor Jack Dalrymple ("Governor Dalrymple") issued an Executive Order regarding the protests. Doc. No. 58-2. The Order recognized citizens had the right to "peacefully and lawfully assemble and protest," but also recognized there was "illegal protesting" and "unlawful activity" threatening not only protestors, but also the general public and responders. Doc. No. 58-2. As a result, Governor Dalrymple ordered "total utilization of the North Dakota State Emergency Operations Plan (SEOP) in response to the situation in order to assist local and tribal officials, to implement appropriate law enforcement actions and future mitigation measures to maintain peace and order, and to limit hardships and impacts caused by the emergency." Doc. No. 58-2.

[¶17]     Numerous arrests of protestors were made from August of 2016 through November of 2016. The Court includes discussion of these earlier arrests because they show the prolonged encounters between law enforcement and protestors leading up to the November 20, 2016 protest. The November 20, 2016, event cannot be considered in a vacuum, as these interactions between law enforcement and protestors became more intense as each one passed. Their effect upon the minds of officers may be important in determining whether an officer acted reasonably on November 20, 2016.

[¶18]     On August 31, 2016, law enforcement responded to a call of protestors crawling on construction equipment on the west side of Highway 6 south of St. Anthony. Doc. No. 61-2, DEF10. Officers ultimately arrested two individuals who had secured themselves to construction equipment for criminal trespass and obstruction of a government function, with one of them also being charged with preventing arrest. Id. In addition, law enforcement arrested six other individuals for disorderly conduct and related charges. Id.

[¶19]     On September 3, 2016, a confrontation occurred between protestors and private security officers hired by Energy Transfer Partners. Doc. No. 61-2, DEF12. Law enforcement responded, but the crowd of protestors left the scene without further incident. Id. No arrests were ultimately made. Id. at 13. On September 7, 2016, the Morton County Sheriff's Office announced the Morton County State's Attorney had filed criminal complaints against two protestors for criminal trespass and criminal mischief on the allegation that they had entered private property on September 6, 2016 and spray-painted graffiti on Caterpiller bulldozers belonging to another person. Doc. No. 61-2, DEF15.

[¶20]     On September 8, 2016, Governor Dalrymple called upon a small number of North Dakota National Guard personnel to support law enforcement efforts with primary responsibilities

including traffic control points and administrative duties. Doc. No. 61-2, DEF16. He also placed additional Guardsmen on standby alert. Id. By this point, the North Dakota Highway Patrol and numerous county and city law enforcement had begun assisting Morton County. Doc. No. 61-2, DEF49.

[¶21]   On September 13, 2016, the Morton County Sheriff's Office, North Dakota Highway Patrol, and other law enforcement agencies responded to calls for assistance by Dakota Access Pipeline workers on the scene. Doc. No. 61-2, DEF19. Law enforcement ultimately arrested twenty-two protestors for criminal trespass, including two who were bound to equipment used in the Dakota Access Pipeline construction. Doc. No. 61-2, DEF19. On September 14, 2016, law enforcement was dispatched to another Dakota Access Pipeline construction site for a report of protestors in the worksite. Doc. No. 61-2, DEF20. Officers arrested three individuals for felony reckless endangerment for being attached to DAPL construction equipment. Doc. No. 61-2, DEF20. Officers also arrested two other individuals for conspiracy to commit reckless endangerment and other misdemeanors for their alleged involvement in assisting protestors securing themselves to the equipment. Doc. No. 61-2, DEF20. A similar call for assistance with protestors placing themselves in Dakota Access Pipeline construction sites was placed on September 14, 2016, and in total, officers arrested eight individuals for reckless endangerment and related offenses. Doc. No. 61-2, DEF20.

[¶22]   On September 27, 2016, officers responded to two separate calls of protestors assembling on Dakota Access Pipeline construction sites; however, no arrests were ultimately made. Doc. No. 61-2, DEF32. On September 28, 2016, officers arrested 21 protestors at two construction sites for various crimes such as criminal trespass, possession of stolen property, and resisting arrest. Doc. No. 61-2, DEF34. During this encounter, one protestor was alleged to have charged at the police

line on horseback. Doc. No. 61-2, DEF37. On October 3, 2016, a warrant was issued for this individual for terrorizing and reckless endangerment related to the incident. Doc. No. 61-2, DEF37.

[¶23]     By October 5, 2016, ninety-five protestors had been arrested for activity related to the DAPL protests, and the arrests continued. Doc. No. 61-2, DEF37. In addition, on October 7, 2016, the State of North Dakota made an Emergency Management Assistance Compact request to other states for additional law enforcement support in responding to the DAPL protests. Doc. No. 61-2, DEF41. On October 14, 2016, law enforcement made 14 arrests at three different protest sites. Doc. No. 61-2, DEF42. The arrests included one individual charged with reckless endangerment, criminal trespass, and inciting a riot for attaching himself to DAPL equipment. Doc. No. 61-2, DEF42. Additional arrests included ten individuals being arrested for disorderly conduct and disobedience of public safety order during riot conditions. Doc. No. 61-2, DEF42. Three additional protestors were arrested for trespass on private property. Doc. No. 61-2, DEF43. On October 14, 2016, charges against six of the protestors related to the September 3, 2016 protest were dismissed. Doc. No. 61-2, DEF44.

[¶24]     Between Saturday October 21 and Sunday October 22, law enforcement arrested 127 individuals for various crimes related to DAPL protest activities. Doc. No. 61-2, DEF50. Several protestors were arrested for trespassing on private property located on the DAPL right of way known as Cannonball Ranch. Doc. No. 61-2, DEF49. On October 23, 2016, the North Dakota Department of Transportation closed Highway 1806 due to protestors blocking the north and south bound lanes of the highway north of the protest camps, which included protestor-made roadblocks. Doc. No. 61-2, DEF48. A traffic control point was set up, and motorists were advised to use an alternative route. Doc. No. 61-2, DEF48. By October 23, 2016, several states had either already

arrived to assist Morton County or had pledged to do so. Doc. No. 61-2, DEF49. These states included Wisconsin, South Dakota, Minnesota, Wyoming, Indiana, and Nebraska. Doc. No. 61-2, DEF49.

[¶25]    On October 26, 2016, Sheriff Kirchmeier and other state and local law enforcement travelled to the protest site where the roadblocks were erected and requested protestors to vacate private property north of the Backwater Bridge and to remove protestor-created roadblocks. Doc. No. 55, ¶¶ 5-6. On October 27, 2016, after the protestors remained on the private property, law enforcement began efforts to remove the protestors and blockades from the property. Doc. No. 55, ¶¶12-21. Law enforcement personnel were able to move protestors south of the Backwater Bridge after extensive effort. Doc. No. 55, ¶21. At that point, law enforcement placed and disabled two large military surplus dump trucks across the north side of the Bridge as a barricade. Doc. No. 55, ¶21. Within 10 to 15 minutes of being placed on the Bridge, the two vehicles were set on fire, remaining on the Bridge in a burned-out condition. Doc. No. 55, ¶21. An additional vehicle and a North Dakota Department of Transportation ("NDDOT") electronic sign were also set on fire toward the north end of the Bridge. Doc. No. 54, ¶25.

[¶26]    The Mandan and Bismarck Rural Fire Departments responded to multiple fires. Doc. No. 61-2, DEF63. In total, 141 protestors were arrested, charges included conspiracy to endanger by fire/explosion, engaging in a riot, and maintaining a public nuisance, and reckless endangerment for individuals who used sleeping dragons to attach to items. Doc. No. 61-2, DEF65. In addition, one protestor was arrested for attempted murder for firing three shots at law enforcement officers. Doc. No. 61-5. She was also charged with preventing arrest, carrying a concealed firearm, and possession of marijuana. Doc. No. 61-5. This protestor later pled guilty to a federal firearm charge and a charge of civil disorder.

11

[¶27]     On October 28, 2016, the NDDOT issued a press-release entitled "ND Highway 1806 Bridge and roadway remain closed north of Cannonball due to Bridge damage." Doc. No. 59-2. The release stated:

> The North Dakota Department of Transportation (NDDOT) and North Dakota Highway Patrol will keep ND Highway 1806 and the Backwater Bridge located on ND 1806 closed north of the Cannonball River until further notice. The highway Bridge which travels over Cantapeta Creek north of Cannonball was damaged last night when protesters placed vehicles and other debris and set items on fire on the Bridge.
>
> The Bridge is unsafe for anyone to cross and will remain closed until all damage to the structure is evaluated by Bridge engineers. During the closure motorists need to use alternate routes.

Doc. No. 59-2.

[¶28]     On October 31, 2016, NDDOT personnel visually inspected the Backwater Bridge. Doc. No. 58-1. Personnel noted concern with the third vehicle fire at the north end of the Bridge, including its location near beams. Doc. No. 58-1, p. 1. A full inspection was not completed, however, as personnel "did not feel comfortable with opening the Bridge at the time of visual inspection due to the uncertainty of the existing condition of the box beams and the inability to access the area with most intense heat which [they] presume was under the vehicle." Doc. No. 58-1, p. 1. The report indicated security of the area had been a concern, and their investigation was put on hold. Doc. No. 58-1, p. 1. The report indicated further testing would be completed once the NDDOT had access to a secure site. Doc. No. 58-1, p. 1. The report concludes by stating "[u]ntil the inspection issues outlined above are completed and necessary repairs are made, the Department cannot guarantee the safety to the traveling public." Doc. No. 58-1, p. 2.

[¶29]     On October 31, 2016, the NDDOT issued a press release titled "ND Highway 1806 Bridge to remain closed north of Cannonball." Doc. No. 59-3. This release states:

The North Dakota Department of Transportation (NDDOT) and North Dakota
Highway Patrol will keep the ND Highway 1806 Bridge closed north of Cannonball
until further notice. The highway Bridge (often referred to as Backwater Bridge)
travels over Cantapeta Creek north of Cannonball and will remain closed to traffic
for the safety of the traveling public because the structural integrity of the Bridge
may be compromised due to protesters lighting vehicles on fire on the structure.

The Bridge is unsafe for anyone to cross and will remain closed until all damage to
the structure is evaluated by Bridge engineers. The NDDOT is currently making
arrangements for a Bridge inspection but is unable to implement the process due to
ongoing incidents in the area.

The NDDOT appreciates the public's patience with the process as it may take time
to access, inspect, and make any necessary repairs to the Bridge.

During the closure motorists need to use alternate routes.

Doc. No. 59-3.

[¶30]    On November 1, 2016, the Corps requested law enforcement assistance in removing

protestors from the Corps-managed lands located north and east of the Bridge. Doc. No. 61-7. The

Corps indicated protestors were spotted on October 31, 2016, traveling by small boat up the North

Branch of Cantapeta Creek to encamp on the Corps property north of the Bridge, which was

located where DAPL was proposed to be constructed. Id. The Corps indicated it had not granted

anyone permits or permission with respect to public use of Corps-managed lands located north of

the Cantapeta Creek or north and east of the confluence of the Cantepeta Creek and Cannonball

Rivers, extending to the Missouri River. Id.  In fact, the Corps stated that because that area was

not opened for use by the public for recreational or camping purposes, it considered "these

individuals to be trespassers." Id. The Corps reiterated it was not seeking assistance to remove the

inhabitants of Sacred Stone Camp, Rosebud Camp, or Seven Councils Camp. Id.

[¶31]    On November 20, 2016, Law enforcement had already set up two rows of jersey barriers

running east-west across Highway 1806, positioned approximately 12 to 15 feet apart. Doc. No.

54, ¶35. Between the two rows of jersey barriers were three rows of concertina wire, with one row

13

lying atop two ground level rows. Id. The two burned out law enforcement vehicles on the Bridge were located next to, and south of, the jersey barriers and concertina wire barricades located on the north side of the Bridge. Id. The burned-out law enforcement trucks were chained with large log chains to the concrete Jersey barriers. Id.

[¶32]    Law enforcement officers warned protestors in the time leading up to the November 20, 2016 protest not to remove the burned-out trucks off the Bridge. In one video, law enforcement officers are heard telling a small number of protestors standing on the burned-out vehicles early in the day that law enforcement would be moving toward them to speak. See Doc. No. 93, Video titled "Tense standoff at Standing Rock after Semi Truck comes to cl-1]". Officers are seen moving from north, onto the Bridge, and then up to the wire by the vehicles. Id. One law enforcement officer asks the protestors "what's the deal with the semis?" Id. A semi-truck is seen backed up on the south side of the Bridge. Protestors are heard saying the semi was "sitting on the Bridge." Id. The Officer, referencing the two burned out trucks, states to the protestors the NDDOT was to determine when the vehicles were to be removed from the Bridge. Id. The Officer is heard saying to the protestors "those trucks don't come out of here," further noting "it makes us [law enforcement] nervous when you bring a semi out there like that." Id. One protestor is heard saying "they are not coming out today." Id. The Officer states "they start getting tugged on, they start getting pulled on, it's going to get pretty tense . . . for everyone involved." Id. One protestor responds, "we know." Id. The Officer states "the Bridge has to be inspected . . . the whole works." Id.  The officers retreat to the north side of the Bridge, while the protestors remain standing on and in the burned-out trucks. Id.

[¶33]    It is undisputed interactions between law enforcement and protestors began early in the day on November 20, 2016. Protestors used a semi-truck and large bolt cutter to cut the chain

securing one of the two burned out dump trucks located in the west most lane. See Doc. No. 91,

Video, titled "642034911" (hereinafter titled "Unicorn Riot Video"). The Unicorn Riot Video's

audio displays protestors discussing the removal of the first vehicle and the intended removal of

the second vehicle. See Doc. No. 91, "Unicorn Riot Video." A protestor is heard saying at the

beginning of the video:

> So, what's happened is three weeks now they said they were going to clear this
> Bridge. They say they have the blockade here for our safety because the Bridge is
> unsafe. If the Bridge is unsafe, the blockade should be on the south. They didn't
> uphold their end of the deal, so we are clearing the Bridge.

Doc. No. 91, "Unicorn Riot Video", at 00:01-:00:18.

[¶34]    The video then depicts protestors securing chains to the burned-out truck, pushing the

truck as it is pulled by a semi-truck, and removing it away off the south side of the Bridge. See

Doc. No. 91, "Unicorn Riot Video", at 00:17-:00:36. Less-lethal munitions are seen being

deployed against protestors, with one protestor throwing a spent chemical munition canister back

at law enforcement. Video footage taken by Plaintiff Finan shows protestors yelling "throw it

back" and cheering after this individual throws it to law enforcement's side. Doc. No. 246, Exhibit

C "Finan Frank Dep Exhibit 45."

[¶35]    It is undisputed that law enforcement officers used less-lethal munitions during the

November 20, 2016 protest. It is also undisputed that during the protest on November 20, 2016,

law enforcement issued two "Code Red" requests asking for assistance from all available law

enforcement within a 100-mile radius. Doc. No. 54, pp. 11, 12. Later, a "Signal 100," went out

requesting all available law enforcement, state-wide, to immediately come and provide assistance

to law enforcement. Doc. No. 54, p. 14.

[¶36]    On November 25, 2016, the Corps notified the Standing Rock Sioux Tribe it was closing

the Corps-managed land located north of the Cannonball River, an area encompassing the Seven

Council Fires Camp, to all public access and use, effective December 5, 2016. <u>See</u> Doc. No. 61-11.  The Corps advised anyone found on the property after December 5th would be considered trespassing and subject to prosecution.  The Corps said the decision was necessary to protect the general public from the dangerous confrontations between protesters and law enforcement officials which had occurred in the area, and to reduce the risk of harm to people in the encampments due to the harsh North Dakota winter conditions. <u>See</u> Doc. No. 61-11.  The Corps also established a free speech zone located south of the Cannonball River for use by the protesters—an area more accessible to emergency services. <u>Id.</u>

[¶37]    However, on November 28, 2016, pursuant to Executive Order 2016-08, Governor Dalrymple ordered the immediate mandatory evacuation of all persons occupying areas managed by the Corps located in Morton County due to severe winter conditions and ordered no person shall return to the evacuation area. <u>See</u> Doc. No. 61-8.  The evacuation area encompassed the Seven Council Fires Camp located immediately south of the Bridge.  Despite the Governor's order, protesters remained in the evacuation area, but eventually, protestors left all camps in 2017.

### b. **Plaintiffs' version of events**

[¶38]    Plaintiffs assert in their Amended Complaint "[t]here was no signage near the south end of the Bridge or anywhere on the Bridge indicating that the Bridge itself was designated as closed to physical access," and "at no time did defendants communicate to plaintiffs that the Bridge was closed to assembly." Doc. No. 129, ¶¶42-43. Plaintiff Dundon asserts she never saw "no trespassing on Bridge" signs at the Backwater Bridge. <u>See</u> Doc. No. 239-1, pp. 103-104, Dundon Deposition, ("I never even seen those. Like, why are they way over there? I never seen the trespassing – no trespassing on Bridge ever. And I was always up there, and I never seen that sign."). Plaintiffs Finan, Demo, and Dullknife all likewise assert they did not see the signs. <u>See</u>

Doc. No. 239-8, p. 89, Finan Deposition, ("God as my witness, I did not see that sign when I was there. I only saw it after I saw the photographs."); Doc. No. 239-4, pp. 131-132, Demo Deposition, ("Nobody ever told us that we weren't allowed to be on the Bridge, including police officers, and none of the police officers ever told any of the protesters that were on the Bridge before the 20th that they weren't allowed to be there. There were no signs on the protestors' side, and to best of knowledge, any signs that I could see stating that we weren't allowed to be on that Bridge. . . There were no signs that I saw."); Doc. No. 239-7, p. 108, Dullknife Deposition, ("I didn't see anything like that," in response to "At any point in time did you see any sign saying no trespassing on the Bridge?").

[¶39]    Plaintiffs and protestors further contend they were not audibly or physically warned by law enforcement at any time they were not supposed to be on the Bridge on November 20, 2016. See Doc. Nos. 81-2, ¶26, 81-3, ¶13, Doc. No. 81-4, ¶¶7, 18, Doc. No. 81-6, ¶6, Doc. No. 81-4, ¶7, Doc. No. 81-12, ¶11, Doc. No. 81-16, ¶7, Doc. No. 81-21, ¶¶5-6. Plaintiffs point to evidence that the long-range acoustic device (LRAD) typically used to project sound to large crowds was only tested one time that night, no specific warning followed, and it stopped working. See e.g. Doc. Nos. 81-2, ¶26; Doc. No. 275, p. 5. They further assert that while another police vehicle, the Bearcat, has sound projection, it is not as loud as the LRAD. Doc. No. 275, p. 5 (citing Doc. No. 239-15, p. 98). On this basis, protestors claimed because they did not see the signs and did not hear any warnings from law enforcement they had a right to be on the Bridge protesting on November 20, 2016.

[¶40]    In fact, Plaintiffs Dundon, Wilson, Demo, Dullknife, Bruce, and Finan all maintain they went to and on the Bridge on November 20, 2016 to protest at different times. Plaintiff Wilson maintains she went to the Bridge to peacefully gather with other protestors. Doc. No. 14-16, ¶10.

She maintains she was praying with other protestors on the Bridge for about an hour, and at that time, officers were shooting a water cannon at her and launching tear gas canisters and flash bang grenades at the crowd. Doc. No. 14-16, ¶10. She asserts she left the Bridge for a rest, returning with more clothing. Doc. No. 14-16, ¶11. She maintains when she arrived back to the Bridge, she held a piece of plastic up to shield other protestors from the water, while a tarp covered her and other protestors from the water. Doc. No. 14-16, ¶12. She states she next heard a bang and felt an impact on her chest. Doc. No. 14-16, ¶12. She grabbed a piece of aluminum sheet to protect herself and others, walking back away from the police line. Doc. No. 14-16, ¶12. Wilson next went to the medic tent where she changed clothes, put on an ice pack, and laid down. Doc. No. 14-16, ¶13. She maintains she returned to the protest, including the Bridge, to deliver blankets to individuals to keep warm, and while she was doing so, police were spraying individuals with water. Doc. No. 14-16, ¶13. She contends she "did not hear any dispersal at all the entire night [she] was on the Bridge on November 20, before or after [she] was shot, gassed, or soaked by the hoses." Doc. No. 14-16, ¶14.

[¶41]     Plaintiff Dundon contends she arrived at the Bridge on November 20, 2016 at around 7:00 or 8:00 p.m. Doc. No. 14-19, ¶4. She was one of the first people to arrive at the Bridge, and when she arrived, she witnessed other protestors removing one of the burned-out trucks from the Bridge. Doc. No. 14-19, ¶5. She states the "Army Corps had promised to remove the vehicles that had been placed there by law enforcement, but they never did so people in camp mobilized to remove the vehicles." Doc. No. 14-19, ¶5. She maintains that after the first truck was removed, she saw a woman alone on the frontlines. Doc. No. 14-19, ¶6. She told the woman to move, and at that point, she asserts she and the woman were the closest people to the line of law enforcement officers. Doc. No. 14-19, ¶6. Dundon asserts that as the woman moved to the side of the road, she

18

heard a tear gas cannon go off. Doc. No. 14-19, ¶7. She saw the tear gas canister coming straight for her face. Doc. No. 14-19, ¶7. Her experience with canisters was that they usually were shot in the air. Doc. No. 14-19, ¶7. She maintains she did not have time to move, so when she saw the tear gas canister was aflame and a foot from her face, she closed her eyes and was struck in the right eye by the canister. Doc. No. 14-19, ¶8. She fell to the ground, and when she turned to run away, she was shot in the back of the leg with a rubber bullet. Doc. No. 14-19, ¶9. She asserts the bullet caused her to fall down, and after she called for help, she was picked up by other protestors. Doc. No. 14-19, ¶10. She contends protestors were "all over the Bridge" at this point. Doc. No. 239-1, p. 192.  She was transported first to the camp and then ultimately to the Emergency Room at Sanford Hospital in Bismarck, North Dakota. Doc. No. 14-19, ¶11.

[¶42]     Dundon concedes she was present and personally observed and heard law enforcement using less-lethal munitions against protestors who were illegally trying to remove the burned-out truck. Doc. No. 239-1, p. 313.  Dundon contends there was a lot of noise on the Bridge while she was there, including from the sound of efforts made by protestors to remove the burned-out truck and from law enforcement, although she maintains she never "heard them say really get off the Bridge." Doc. No. 239-1, p. 158. She asserts that even if officers had given orders, she would not have heard them at all. Doc. No. 239-1, p. 158. She contends that protestors were wearing ear plugs, as they "all have earplugs." Doc. No. 239-1, p. 307.

[¶43]     Plaintiff Dullknife contends he came to the protest camps in mid-July of 2016. Doc. No. 14-13, ¶4. He asserts that upon arriving at the camps, he saw "how the violence and attacks from the police and security forces have gotten worse and worse." Doc. No. 14-13, ¶5. Dullknife states that he arrived at the Bridge around 10 or 11 p.m. on November 20, 2016. Doc. No. 14-13, ¶8. Dullknife maintains he witnessed one woman being shot with the water cannon after one officer

told another to spray her, even though she was kneeling and praying about 12-13 feet from the barbed wire barricade. Doc. No. 14-13, ¶8. Dullknife states he and another person put a board in front of the woman to allow her to keep praying, but the visibility was low because of "a fire on the bank of the Cannonball River that was warming people who were part of the prayer assembly." Doc. No. 14-13, ¶8. He asserts officers were shooting bean bags and other projectiles in the smoke, and he was hit in the chest, stomach, and side with beanbag rounds. Doc. No. 14-13, ¶8. Dullknife contends he observed officers haul in three trucks full of water for the water cannon, he observed law enforcement use beanbags, rubber bullets, tear gas, flash bang or concussion grenades, and he heard police officers laughing and celebrating after protestors were hit. Doc. No. 14-13, ¶10. He asserts he did not hear law enforcement officers give warnings before shooting people, as "there was a lot of commotion going on," "it was cold," and he was wet. Doc. No. 239-7, p. 105.

[¶44]    Plaintiff Demo states he came to the protestor camps in mid-August of 2016. Doc. No. 14-17, ¶3. Demo contends he went to the Bridge on November 20, 2016 at 8:30 or 9:30 p.m. Doc. No. 14-17, ¶3. Demo states he was in Bismarck prior to going to the Bridge when he learned through online livestream that law enforcement "were being aggressive, using water cannons and riot weapons against peaceful water protectors." Doc. No. 14-17, ¶7. Once he arrived at the Bridge, he maintains he was filming the events with a go pro camera. Within five minutes, he was hit with water from a water hose for thirty seconds. Doc. No. 14-17, ¶7. He maintains he was not threatening the officers in anyway. Doc. No. 14-17, ¶7. He states, "there was no warning that I would be soaked, no warning to get off the Bridge, and no warning that projectiles would be fired against me." Doc. No. 14-17, ¶7. After being sprayed with water, he claims he was hit with what looked like a rubber bullet in his right hand. Doc. No. 14-17, ¶7. He went back behind the Bridge to get first aid treatment after being shot with a rubber bullet. Doc. No. 14-17, ¶8. He then went

back to the Bridge to give his brother his camera, he drove back to Sacred Stone camp to put on dry clothes, returned to the Bridge. Doc. No. 14-17, ¶8. He stayed there until 5 a.m. Doc. No. 14-17, ¶8. Demo maintains he never heard an order to disperse while he was on the Bridge. Doc. No. 14-17, ¶9. He only heard officers tell protestors to get back from the barbed wire, which he did when requested. Doc. No. 14-17, ¶10.

[¶45]    Plaintiff Bruce contends she came to the protestors' camp in mid-October of 2016. Doc. No. 14-9, ¶2. She went to the Backwater Bridge around 6:30 p.m. on November 20, 2016. Doc. No. 14-9, ¶6. She asserts she saw law enforcement lined up across the Bridge behind the barb wire fence. Doc. No. 14-9, ¶¶7-8. When she moved to the front to pray, she was sprayed with water cannons by law enforcement. Doc. No. 14-9, ¶8. According to Plaintiff Bruce, this continued the entire time she was at the protest. Doc. No. 14-9, ¶¶9-10. She could not see without taking off her goggles because of the flood lights. Doc. No. 14-9, ¶12. She avers she had a hard time breathing because of the tear gas that was being released, which hurt her lungs and burned her nose. Doc. No. 14-9, ¶13. She claims a flashbang thrown by an officer hit her in the pelvic area when she bent over to grab a plastic container. Doc. No. 14-9, ¶14. She believes this was because she was at the front and did not move for a long period of time. Doc. No. 14-9, ¶15. She did not immediately feel pain from the flash bang, so she remained in the front for another 20-30 minutes, at which time she went to see a medic. Doc. No. 14-9, ¶17. While receiving treatment, she began to feel pain in her pelvis and abdomen, and she was transported by ambulance to Sanford Hospital in Bismarck, North Dakota. Doc. No. 14-9, ¶20.

[¶46]    Plaintiff Finan avers he came to the protestors' camp in early November of 2016 to document the events unfolding. Doc. No. 14-15, ¶2. He went to the Bridge on November 20, 2016. Doc. No. 14-15, ¶4. He notes there were law enforcement officers and "lots of military vehicles"

on the other side of the Bridge. Doc. No. 14-15, ¶6. He maintains he saw protestors being sprayed with water. Doc. No. 14-15, ¶6. However, he claims the two small campfires he saw burning in the area were "well-controlled." Doc. No. 14-15, ¶7. He saw protestors being removed from the Bridge by medics, smoke canisters being thrown by law enforcement, and he heard what sounded like gunshots. Doc. No. 14-15, ¶¶8-9. While standing on the Bridge, he was sprayed with a cloud of something that burned his eyes and made him cough, causing him to go back to the camp. Doc. No. 14-15, ¶11. He then grabbed his camera and went back to the Bridge. Doc. No. 14-15, ¶12. Once back at the Bridge, he started taking photos when he was shot in the waistline by a law enforcement officer with what he assumed to be a rubber bullet. Doc. No. 14-15, ¶14. Other protestors helped him up and into a pickup truck. Doc. No. 14-15, ¶15.

[¶47]    In addition to the six-named Plaintiffs, several other protestors filed declarations in this case explaining their experiences on November 20, 2016. The Court will not discuss all declarations but will highlight a few to give more context to the events of November 20, 2016 from the protestors' points of view. The declaration of Martyn Lenoble provides a detailed account from his perspective of the November 20, 2016, incident, with photographs. See Docket No. 81-27. Lenoble alleges he was preparing to leave Oceti Sakowin Camp on November 20, 2016, when he noticed shortly after 5:00 p.m. a semi-truck attempt to tow a burned-out truck away from the police barricade. Doc. No. 81-27, ¶4. He states:

> I did not hear any warning that the police would use rubber bullets, gas, or any other riot weapons. I heard the police on the bullhorn address one of the guys on the Bridge by name. "Don't do this Mike. We have 10 more of these trucks, and tomorrow we'll just bring another one in. Go home!" Without warning from the police, I saw the police fired their first tear gas onto the Bridge, and right beside the Bridge, which started the first fire in the brush.
>
> At approximately 5:30 PM, the semi managed to pull the burnt out truck on the left away from the rest of the barricade. By 5:45 PM, the semi managed to pull the truck that was part of the left side of the barricade all the way across the Bridge and off

to the side of the road. This is when more water protectors showed up. At first, a
slow trickle, by 6:15 PM a steady parade, growing in numbers by the minute.

Doc. No. 81-27, ¶¶10-18.

[¶48]    Lenoble further notes: "The water protectors were gathered in prayer, ceremony, and

protest on the Bridge, and there was only one way to get out—back to the south. Without warning,

the police launched tear gas all the way at the end of the Bridge, such that there was no escape,'

although he does not state he was one of those people. Doc. No. 81-27, ¶25. Lenoble said he never

saw anyone threaten or attack the police, although he acknowledged the protesters did not leave

the Bridge. See Doc. No. 81-27.

[¶49]    Phillip Weeks was a "legal observer" in the vicinity of the Backwater Bridge for six hours

on the night of November 20, 2016. See Doc. No. 81-23.  He notes that at approximately 6:22

p.m., he heard law enforcement make a warning, although it was difficult to make out, but it

warned protestors "to move south from their current position." Doc. No. 81-23, ¶7. A few minutes

later, he saw law enforcement fire a canister into the crowd of protestors. Doc. No. 81-23, ¶7. He

does not recall hearing another warning by law enforcement. Doc. No. 81-23, ¶12. He only saw a

total of maybe four water bottles and one spent smoke canister thrown from the protestor side to

the law enforcement side. Doc. No. 81-23, ¶15. As for the water cannon, he states:

> The water cannons were used throughout the night, either taking direct aim at
> protesters or arched high in the air. Thus many of the protesters who were far back
> from the "front line" were sprayed with water. At one point in the night, water
> protectors held up a tarp for the sole purpose of keeping the prayer assembly from
> being doused by the water from the cannons as they sung their prayers. . . . The use
> of the water cannons, pepper spray, and munitions by law enforcement appeared
> largely indiscriminate.

See Doc. No. 81-23, ¶¶17-18.

[¶50]    Gabriela Lopez also acted as a "legal observer" of the November 20, 2016, incident on

Backwater Bridge.  See Doc. No. 81-28.  While she was on the Bridge or near it, she witnessed

many protestors injured or cold from the water. Doc. No. 81-28, ¶7. For the three to four hours she was there, she only observed law enforcement take a few minute break from using the water cannon on protestors. Doc. No. 81-28, ¶7. She also saw law enforcement using tear gas, with what she suspected was law enforcement throwing twenty canisters at protestors in a thirty second span. Doc. No. 81-28, ¶8. She notes that some were thrown close to the barricade, and other were thrown far to the south of the Bridge, making it difficult to escape the gas. Doc. No. 81-28, ¶8. She did witness a few protestors throw the gas canisters that had been launched by law enforcement back at them. Doc. No. 81-28, ¶12. She further notes:

> At no point during the 3-4 hours I was observing, did I hear the police provide a warning to the water protectors on or around the Bridge that the police would be using tear gas, water canisters, flash bang grenades, or projectiles like rubber bullets or riot shotguns. I also do not recall ever hearing the police ordering or asking water protectors to get off the Bridge, the embankments or to back away. I do not recall any direction from the police as to how to avoid the use of their riot weapons.

Doc. No. 81-28, ¶10.

[¶51]    Dr. Niheu, a physician from Hawaii, was present and treating protestors during the November 20, 2016, protest. Doc. No. 271. Dr. Niheu attests over 300 protestors were seen for injuries. Doc. No. 271, ¶6. Of those 300 protestors, 26 were seriously injured and required ambulance transportation to nearby hospitals. Doc. No. 271, ¶6. Dr. Niheu attests these serious injuries include a woman who nearly lost her arm, a man who had a grand mal seizure, a woman shot in the eye, an elder who lost consciousness and was revived at the scene, a man with internal bleeding, a man shot in the back with les-lethal munitions near his spine, and multiple fractures. Doc. No. 271, ¶12.

### c.  Defendants' version of events

[¶52]    On October 27, 2016, law enforcement asserts their efforts to remove the blockades and protesters from private property located north of the Backwater Bridge was met with violence.  See

24

Doc. Nos. 52, pp. 3-5; 53, p. 3-6; 54, pp. 4-6; 55, pp. 6-9.  Protesters threw rocks, logs, bottles, feces, and other debris at officers and one woman pulled a weapon and fired three rounds near the police line. See Doc. Nos. 52, p. 3; 53, pp. 4-5; 54, p. 4; 55, pp. 7-8; 61-5.  Some of the protesters wore ear plugs, goggles or gas masks and wore bandanas over their face to conceal their identities. See Doc. Nos. 52, p. 4; 53, pp. 2-3; 54, p. 4; 55, p. 6.  Protesters burned heavy construction equipment used on the DAPL project, set fire to a vehicle on Highway 1806 near the North Camp, set fire on a Bridge on County Road 134, tried to set a vehicle on fire under an electrical transmission tower located along Highway 1806, and set a vehicle and an electronic highway sign on fire near the north end of the Bridge. See Doc. Nos. 52, pp. 4-5; 53, pp. 3, 5-6; 54, pp. 4-6; 55, p. 7-9.

[¶53]    As the police line proceeded south toward the Backwater Bridge, protesters threw Molotov cocktails (homemade explosives) at law enforcement. See Doc. Nos. 53, p. 6; 54, p. 6; 55, p. 9.  Protesters secured themselves to buried anchors located in structures and to vehicles located on Highway 1806 with devices called sleeping dragons. See Doc. Nos. 53, p. 4; 54, p. 5.  Another protester attempted to secure himself with a sleeping dragon to the Mine Resistant Ambush Protected ("MRAP") vehicle utilized by law enforcement officials on Highway 1806 in an attempt to immobilize it. See Doc. No. 54, p. 5.  Protesters on horseback intentionally stampeded several hundred bison toward law enforcement officers and other protesters – twice, which were diverted by the intervention of a nearby helicopter which moved the bison away from people. See Doc. Nos. 52, p. 4; 53, p. 5; 54, p. 5; 55, pp. 7-8.  Protesters also attempted to flank the police line. See Doc. Nos. 52, p. 4; 53, p. 5; 55, p. 7.

[¶54]    Officers contend protestors resisted law enforcement's commands, and it frequently took three or four law enforcement officers to restrain and cuff a single protester. See Doc. Nos. 52, p.

4; 53, p. 4; 54, p. 5; 55, p. 7.  Law enforcement officers reported seeing numerous weapons on the protesters during this incident, including a firearm, hunting knives, hatchets, large logs, large rocks, and other weapons. <u>See</u> Doc. Nos. 52, p. 4; 53, p. 4-5; 54, pp. 4-5; 55, p. 4-9.  One or more protesters drove a vehicle beneath an electric powerline tower located a short distance to the east of, and near the intersection of County Road 134 and Highway 1806, placed a rag in its gas tank, and tried to set it on fire. <u>See</u> Doc. Nos. 52, p. 5; 53, p. 6.

[¶55]     After law enforcement officials moved protesters south of the Backwater Bridge, they placed and disabled two large military surplus dump trucks across the north side of the Bridge as a barricade. <u>See</u> Doc. Nos. 53, p. 6; 54, p. 6; 55, pp. 8-9. Within roughly 10-15 minutes of these vehicles being placed on the Bridge, protesters set both vehicles on fire. <u>See</u> Doc. Nos. 52, p. 5; 53, p. 6; 54, p. 6; 55, pp. 8-9. Protesters also set a third vehicle and a North Dakota Department of Transportation ("DOT") electronic sign on fire near the north end of the Bridge. <u>See</u> Doc. Nos. 52, p. 5; 53, p. 6; 54, p. 6. Protesters gathered on the Bridge and refused commands to leave. <u>See</u> Doc. No. 54, p. 6. Law enforcement officers arrested 141 protesters on October 27, 2016—a majority for conspiracy to endanger by fire, explosion, engaging in a riot and maintaining a public nuisance. <u>See</u> Doc. No. 54, p. 6.

[¶56]     Due to the events of this previous protest, namely the fires that consumed the two-burned out trucks and caused the DOT to close the Bridge, the Defendants believed the Bridge was closed to pedestrians during the November 20, 2016 protest. For example, the City of Mandan believed the Bridge was closed and the protestors who were present upon it were trespassing. <u>See</u> Doc. No. 239, p. 200 ("From my knowledge and the City of Mandan's knowledge is the entire Bridge was a "No Trespass" because of the potential danger of structural integrity because of the burning trucks that were on there."). Sheriff Kaiser also believed the Bridge to be closed to pedestrians.

<u>See</u> Doc. No. 239-14, p. 42, 63, Kaiser Deposition, ("For me, closed is closed, so either - - either way."). Sheriff Kirchmeier believed the Bridge to be closed to pedestrians, stating it was his understanding the DOT put the no trespassing signs up and given not only the signs but other circumstances, protestors would know the Bridge was closed. Doc. No. 266-6, p. 112; <u>see also</u> Doc. No. 266-6, p. 108 ("Because of the signs and all the other activities. They were told hundreds of times to get off the Bridge. How many times do you have to be told that the Bridge was closed before they can understand that?"). Individual officers responding to the November 20, 2016 protest also provided testimony they understood the Bridge was closed, further attesting warnings were given to protestors to stay off the Bridge as early as when the burned-out truck was being removed. <u>See</u> Doc. No. 52, ¶¶44, 52, 60; Doc. No. 53, ¶¶27, 42; Doc. No. 54, ¶¶30, 40, 42, 43, 47, 73, 76, 77, 81, 82; Doc. No. 284-1, pp. 2 – 22.

[¶57]    With this knowledge, the November 20, 2016, incident started in the afternoon when, against the repeated warnings and commands of law enforcement officers located on the north side of the barricade, protesters used a large bolt cutter and a semi-truck to cut the chain securing the burned-out dump truck located in the west lane, and drug it away from the law enforcements' barricade. <u>See</u> Doc. No. 54, pp. 7-9. The protesters then returned to remove the remaining burned-out dump truck, which was secured to, and a part of, the law enforcements' barricade. <u>See</u> Doc. No. 54, pp. 7-9. The affidavits submitted by the Defendants reveal the number of protesters on the Backwater Bridge swelled at this point to several hundred. <u>See</u> Doc. No. 54, p. 9.  The Defendants contend the protesters appeared to be prepared for an assault on the roughly 20 law enforcement officers manning the barricade at that time. <u>See</u> Doc. No. 54, pp. 7-9.

[¶58]    Defendants assert the protesters organized themselves into two principal bodies – a forward staged siege group wearing rain coats, goggles, and bandanas over their faces, and bearing

27

assorted shields made of plywood, plastic, and corrugated tin/steel, along with tarps, and a larger group which remained further back south on the Backwater Bridge. See Doc. Nos. 52, p. 10-11, 15-16; 53, p. 6-10; 54, pp. 9, 11, 15.  The forward group utilized their shields and tarps to form a mobile barricade to shield themselves and other protesters from law enforcements' view and from any force which may be applied by law enforcement. See Doc. Nos. 52, p. 15; 53, p. 10; 54, pp. 11-12.  The protesters moved this mobile barricade up against the barricade to shield other protesters who were attempting to cut the chains on the remaining burned out dump truck, and protesters cutting the concertina wire in the law enforcement's barricade. See Doc. Nos. 52, pp. 10-11, 15-16; 53, p. 7-9; 54, p. 11-12, 14-17.  Law enforcement officers gave repeated warnings over a Long Range Acoustic Device ("LRAD") that protesters were trespassing and that protesters should disengage and return to the south side of the Bridge. See Doc. Nos. 52, pp. 13-15; 53, pp. 7, 10; 54, pp. 8-10, 15-17; Doc. No. 239-15, p. 151.

[¶59]   Protesters were yelling profanities and throwing and slinging large rocks, lug nuts, construction nuts, padlocks, frozen water bottles, and other objects at law enforcement officers. See Doc. Nos. 52, pp. 11-12, 14-16;53, pp. 7, 11; 54, pp. 9-10, 12-13, 17; 61-3, pp. 46-55 (photographs of items recovered following the protest).  The record reveals law enforcement officers feared for their physical safety due to the imminent threats of serious bodily injury or death they were encountering.  See Doc. Nos. 52, pp. 11-12; 53, p. 12; 54, pp. 11, 13-14, 16-17.

[¶60]   Law enforcement officers deployed hand-tossed CS gas canisters to drive protesters away from the barricade, but due to the wind blowing to the northwest, the gas crossed over the police line, and its use was discontinued. See Doc. Nos. 53, p. 9; 54, p. 11.  Protesters also threw the CS gas canisters back at law enforcement. See Doc. Nos. 53, p. 9; 54, p. 12.  Officers attempted to stop the forward siege group and protesters from throwing objects through the use of OC spray

28

and direct impact sponge and bean bag rounds, again to a limited effect due to the protesters' mobile barricade and law enforcements' barricade. See Doc. Nos. 52, p. 14; 53, pp. 8-10, 12; 54, pp. 9-11, 13-14.  Police shields were requested for the first time during the ongoing DAPL protests due to the constant barrage of objects being thrown at law enforcement. See Doc. No. 54, p. 11. Not all officers had helmets as the quarter master had run out. See Doc. No. 54, p. 12.  A second "Code Red" was issued requesting all available law enforcement officers within  a 100-mile radius to respond and assist. See Doc. No. 54, p. 12.

[¶61]    Protesters crossed the Bridge and took up positions along the east and west flanks of the police line, starting several large bonfires along the east flank and along the north shore of the Cantapeta Creek and on the Bridge. See Doc. Nos. 52, pp. 12-13; 53, pp. 6-7; 54, pp. 12-13.  One of the bonfires was built within approximately 30 feet of law enforcements' barricade and protectors in that vicinity began throwing burning logs at the police line. See Doc. No. 54, p. 13. A brush truck from the Mandan Rural Fire Department was requested to address the fires. See Doc. Nos. 52, pp. 13-14; 54, p. 14-16; 56, pp. 1-2.

[¶62]    As reinforcement officers started to arrive, and when there were approximately 70 officers on the scene to deal with approximately 800 – 1,000 protesters on or north of the Bridge, the officers formed a shield line along the barricade. See Doc. No. 54, p. 12.  The protesters threw shields across the concertina wire, and one protester climbed over law enforcements' barricade. See Doc.  Nos. 53, p. 10; 54, p. 15.  This individual was the only person arrested during the event— law enforcement was fully occupied in holding the line. See Doc. No. 54, p. 15.

[¶63]    While the siege group was working on cutting the concertina wire and the chains securing the truck to the barricade, and while other protesters continued to throw objects at law enforcement officers, a group of approximately 150 protesters gathered in the west ditch north of the Bridge

29

and proceeded west and north in an attempt to flank the police line. <u>See</u> Doc. Nos. 52, pp. 12-13; 53, pp. 11-12; 54, p. 12.  A small group of roughly 20 officers proceeded west to intercept this group.  <u>See</u> Doc. Nos. 52, pp. 12-13; 54, p. 12.

[¶64]    During this time period, law enforcement officers on the scene were also being marked by lasers and spotlights by individuals on high ground. <u>See</u> Doc. Nos. 52, pp. 12-13; 53, p. 11; 54, p. 12.  The record reveals there was concern about being targeted by snipers, consistent with previously known social media threats and intelligence regarding weapons in the possession of protesters. <u>See</u> Doc. Nos. 52, pp. 12-13; 53, p. 11; 54, p. 12.  Law enforcement officers were also concerned about being overrun by the aggressive and violent protesters, and the possible consequences of that eventuality.  <u>See</u> Doc. Nos. 52, p. 12; 53, p. 12; 54, pp. 13-14; 56, pp. 3-4; 57, pp. 4-5.  In addition to being concerned about the obvious risks to the physical safety of law enforcement officers if the scene was overrun, there was genuine concern about the potential to resort to deadly force for the protection of law enforcement and emergency responders on site, as well as the concern about the potential loss of armored vehicles, weapons, and munitions which could later be used by the protesters against law enforcement and others. <u>See</u> Doc. Nos. 52, pp. 12, 14-16; 53, p. 12; 54, pp. 13-14.  At that time, a "Signal-100" was issued, requesting the assistance of all available law enforcement, state-wide. <u>See</u> Doc. No. 54, p. 14.

[¶65]    With fire apparatus on the scene, and the methods being utilized by law enforcement proving ineffective against the protesters, permission was requested, and received from command, to utilize water to extinguish fires and hold the police line. <u>See</u> Doc. Nos. 52, pp. 13-15; 53, pp. 8-9; 54, p. 14.  Following repeated warning by law enforcement, both in relation to the ongoing trespass and commands to proceed south of the Bridge, and in relation to the intended application of water, water was ultimately deployed against protesters attempting to dismantle and penetrate

the law enforcement barricade, and those throwing objects at law enforcement officers. See Doc. Nos. 54, pp. 14-15; 56, pp. 2-3; 57, pp. 2-5.  The Defendants contend no "water cannon" was involved. See Doc. Nos. 54, p. 15; 56, p. 3; 57, p. 4.  The Defendants assert water was crucial to law enforcements' ability to prevent the penetration of law enforcements' barricade and prevent serious bodily injury or death to law enforcement and emergency responders on the scene as a result of the immediate threats presented by the protesters. See Doc. No. 54, p. 16.

## III.    STANDARD OF REVIEW

[¶66]    The Court will grant summary judgment "if the movant shows . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

[¶67]     The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. <u>Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.</u>, 418 F.3d 820, 832 (8th Cir. 2005). "A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party." <u>Moore v. Philander Smith Coll.</u>, 25 F. Supp. 3d 1095, 1099 (E.D. Ark. 2014). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Id.</u>

[¶68]     The facts are viewed in the light most favorable to the Plaintiffs, the non-movants. <u>Krosch v. JLG Indus., Inc.</u>, 590 F. Supp.2d 1169, 1173 (D.N.D. 2008).  "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 370, 380. (2007) "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Id.</u>

## IV.    <u>LEGAL DISCUSSION</u>

### <u>Federal Claims</u>

[¶69]     The Court must begin its overarching discussion of the Plaintiffs' federal claims with a discussion of qualified immunity, as the Defendants assert their actions were protected by this doctrine. "Qualified immunity shields government officials from liability unless their conduct

violates clearly established statutory or constitutional rights of which a reasonable person would know." Ferguson v. Short, 840 F.3d 508, 510 (8th Cir. 2016). "The determination of whether qualified immunity is applicable in given circumstances is one of 'objective reasonableness.'" Herts v. Smith, 345 F.3d 581, 585 (8th Cir. 2003). The issue is not "whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." Id. (citing Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002)).

[¶70]    A two-step inquiry is undertaken to determine if qualified immunity is invoked: "(1) [whether] the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) [whether] the right was clearly established at the time of the deprivation." Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). The defendants bear the burden of proof on this affirmative defense. Id. However, to defeat an asserted qualified immunity defense, the plaintiffs have the burden to show that their asserted right was clearly established at the time of the alleged violation. Quraishi v. St. Charles Cty., Missouri, 986 F.3d 831, 835 (8th Cir. 2021). The Court will examine each constitutional claim in this context, beginning with whether the deprivation of a constitutional claim was demonstrated.

   **a. EXCESSIVE FORCE**

[¶71]    The Court will begin its analysis of whether the facts, viewed in the light most favorable to the Plaintiffs, demonstrate the deprivation of the Plaintiffs' constitutional rights to be free from excessive force. Typically, an excessive force claim will proceed under the Fourth Amendment analysis. However, in limited instances, it may proceed under the Fourteenth Amendment. The claim may only proceed under the Fourth or the Fourteenth Amendment, not both.

[¶72]     "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). "In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct." Id. However, the Supreme Court has noted not "all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments." United States v. Lanier, 520 U.S. 259, 272 (1997). "Rather, if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." Id. (modified). If a claim does not fit neatly within the Fourth or Eighth Amendments, it is then that a plaintiff may turn to the Fourteenth Amendment. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 844-45 (1998) ("Graham 'preserve[s] fourteenth amendment substantive due process analysis for those instances in which a free citizen is denied his or her constitutional right . . . through means other than a law enforcement official's arrest, investigatory stop or other seizure.'"); see also id. at 844 (quoting Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996) ("[O]utside the context of a seizure . . . a person injured as a result of police misconduct may prosecute a substantive due process claim under section 1983")). The Court will begin by determining if the Plaintiffs' excessive force claim fits neatly in the Fourth Amendment.

34

### a. **Fourth Amendment**

#### i. **Seizure**

[¶73]     "An excessive force claim is governed by the Fourth Amendment's prohibition against unreasonable seizures." Thompson v. Dill, 930 F.3d 1008, 1013 (8th Cir. 2019). To establish a Fourth Amendment violation for unreasonable seizure, a plaintiff "must demonstrate both that [the state actor] seized her within the meaning of the Fourth Amendment and that the seizure was unreasonable." Thomas v. Barze, 57 F. Supp. 3d 1040, 1068 (D. Minn. 2014) (citing Andrews v. Fuoss, 417 F.3d 813, 816 (8th Cir. 2005)). "A Fourth Amendment seizure occurs when there is 'meaningful interference, however brief, with an individual's freedom of movement.'" United States v. Dolson, 673 F. Supp. 2d 842, 864–65 (D. Minn. 2009). "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Dortch, 868 F.3d 674, 677 (8th Cir. 2017). A seizure can occur through law enforcement's show of authority or in certain circumstances through law enforcement's use of physical force. See Oglesby v. Lesan, 929 F.3d 526, 532 (8th Cir. 2019) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred.") (emphasis added). The Eighth Circuit further outlined the parameters of when physical force may constitute a seizure:

> To constitute a Fourth Amendment seizure, an application of physical force must be willful because the word seizure can hardly be applied to an unknowing act. Whether physical force was intentionally applied, is determined by the officer's objective behavior, not his subjective motive. Also implicit in the term seizure is a requirement that the application of physical force restrain freedom of movement. This restraint need not actually succeed in stopping or holding the person even for an instant. But the seizure does not outlast the restraint on free movement.

Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1208 (8th Cir. 2013) (citations omitted) (alterations to original).

35

[¶74]     Defendants argue the Plaintiffs were not seized in this matter. Defendants assert the Plaintiffs were not arrested or detained at any point by law enforcement on November 20, 2016, nor were they advised by law enforcement they were not free to walk away from the confrontation between law enforcement and protestors. They further assert their intention in using less-lethal force was to cause the protestors to disperse and move away from law enforcement, not to arrest them or detain them. Defendants maintain:

> Plaintiffs admit they freely walked south off the Bridge, sometimes to change into warmer clothes or otherwise warmup before returning to the barricade and voluntarily and intentionally walking within range of the force allegedly being applied by Law Enforcement. Plaintiffs' pleading establishes they were at all times able to remove themselves from the presence of Law Enforcement and from all force applied by simply voluntarily disengaging from Law Enforcement, and proceeding south across the Bridge from where they came-which they did.
>
> . . .
>
> A citizen has no liberty interest to infringe upon the property rights of others by engaging in trespass or otherwise being present upon property without authorization or privilege. If that were not the case, a seizure would occur each time an officer prevents unauthorized access to private property, or to restricted public property, despite no attempt to apprehend.

Doc. No. 136, pp. 36, 37.

[¶75]     Plaintiffs respond the Defendants have misstated the proper analysis for determining whether an individual was seized. The Plaintiffs assert the Defendants interpretation "conflates show of force and/or show of authority with actual use of force to conclude that regardless of use of force, a person subjected to the force would need to believe he or she was not free to leave as a result of the application of force." Doc. No. 275, p. 44. Plaintiffs further assert, "[t]his seeks to imply that a person who is seized temporarily by force, without arrest or continuing restraint on liberty, has not been seized if thereafter or otherwise they are free to leave." Doc. No. 275, p. 44. In this case, Plaintiffs assert it is irrelevant whether the Defendants' intended to disperse a crowd

36

or make an arrest, what matters is the Defendants' terminated the Plaintiffs' freedom of movement when they intentionally applied force to them, using less-lethal munitions.

[¶76]     The Court is presented with the question of whether the use of force through less-lethal munitions in a large crowd-control context by law enforcement can constitute a seizure under the Fourth Amendment.  Defendants assert the Eighth Circuit has already addressed this question in Bernini v. City of St. Paul, 665 F.3d 997 (8th Cir. 2012). In Bernini, thirty-two individuals filed suit under 42 U.S.C. § 1983 against six police officers and the City of St. Paul, Minnesota. Bernini, 665 F.3d at 1000. The plaintiffs alleged the defendants violated their First and Fourth Amendment rights during a confrontation that occurred on the first day of the 2008 Republican National Convention in St. Paul, Minnesota. Id. Large groups of protestors were present throughout the day, with many groups hosting permit-approved marches. Id. at 1001. Property damage was reported throughout the day as well, with police cars being vandalized, objects thrown at cars and buses, and broken windows. Id. After the permit-approved marches ended, a senior commander with the police force closed the downtown area to "reestablish control and reestablish law enforcement presence." Id.

[¶77]     The confrontation at issue occurred on Shepard Road, which runs along the edge of downtown St. Paul, borders the Mississippi River, and provides only limited access to downtown. Id. at 1001. The senior commander learned a group of people were marching on Shepard Road, so he instructed a team of officers to position itself on intersections of Shepard Road and Jackson Street and Shepard Road and Sibley Street and others to prevent entry into downtown. Id. The team had learned the group marching were involved in unlawful acts that had occurred earlier in the day. Id. Approximately eleven officers were stationed at each intersection. Id.

[¶78]     The video recordings showed approximately one hundred protestors gathered at the intersection of Shepard Road and Jackson Street. Id. at 1001. At one point, a group of about fifteen protestors began to cross Shepard Road and move toward the officers and downtown. Id. Officers instructed the group to back up, and as the group continued to move forward, the officers deployed stinger blast balls. Id. The group retreated back to the sidewalk. Id. The court noted "[a]lthough the plaintiffs deny seeing anyone throw objects at Team 36, the officers reported that numerous objects—including rocks and bags containing feces—were propelled at them." Id. After the group retreated to the sidewalk, they began to move west toward Jackson Street. Id. Law enforcement, including backup, attempted to move the crowd away from Jackson Street and back toward where they came from. Id. The protestor group had swelled to include hundreds of people by this point, and law enforcement continued to use non-lethal munitions, including smoke, blast balls, and chemical irritants to keep the crowd from moving west. Id. at 1002.

[¶79]     The senior commander in consultation with the officer in charge at the scene made the decision to encircle the crowd, which then included over 400 individuals, in a park adjacent to Shepard Road. Id. at 1002. Once the protestors were contained in the park, law enforcement announced by loudspeaker multiple times that all persons were under arrest and must sit down while officers attempted to determine who was present at the Shepard-Jackson intersection. Id. The parties disputed whether officers made dispersal orders before encircling them in the park, and ultimately, approximately 200 people were arrested. Id. All charges were ultimately dismissed. Id. The plaintiffs, which included medics, legal observers, protestors, members of the media, concertgoers, and others, filed suit for violations of their First and Fourth Amendment rights. Id.

[¶80]     As to the question of seizure, the plaintiffs asserted officers violated the Fourth Amendment by "conducting a mass arrest when they had probable cause with respect to only a

subset of the arrestees." Id. at 1003. The Eighth Circuit concluded "the officers in this case reasonably could have concluded that the group at the Shepard–Jackson intersection had committed a crime and that the group was acting as a unit." Id. at 1004. The Court noted in finding the seizures lawful:

> Video footage shows that the group marched east on Shepard Road and then stopped at the intersection, positioning itself directly across from the line of Team 36 officers. Many members of the group had donned gas masks and other facial coverings, as though they were preparing for a confrontation with police. Flags waved from within the crowd, and several people can be heard shouting profanities and taunting the officers. A portion of the group, shielding itself behind two large signs, then began to cross the intersection toward the officers. And after the confrontation at the intersection, as the group was driven west on Shepard Road, members chanted statements in unison.
>
> From these actions, a reasonable officer could have concluded that the individuals at the intersection were acting together and that they intended to break through the police line in an attempt to access downtown St. Paul. It was reasonable, therefore, for an officer to believe that the group, as a whole, was committing one or more offenses under state law, including third degree riot and unlawful assembly.

Id.

[¶81]    While the facts of Bernini are comparable in some instances, the Court does not find it cleanly applies to this case as to the question of seizure. In Bernini, the plaintiffs did not argue the use of less-lethal force itself constituted a seizure. Instead, they were actually temporarily detained and argued the detentions were unlawful because only a subset of the protestors had actually committed a crime. The Eighth Circuit found officers were outnumbered, it would have been impractical for the officers to immediately detain individuals involved in the alleged crimes, and based on the developing situation, it was reasonable for the officers to believe the entire group was acting as a "unit" with the goal to breach the police line into downtown. Bernini, 665 F.3d at 1004. The court also noted after moving the protestors to the park, officers attempted to discern who had

been part of the unit at the intersection, releasing 200 people thereafter. <u>Bernini</u>, 665 F.3d at 1004.

It found this to be a lawful investigative detention. <u>Id.</u>

[¶82]      Here, no arrests, aside from one individual who actually breached the barricade, were

made. This case centers more on whether a seizure can occur from an indirect physical touch by

law enforcement through less-lethal force in a crowd-control context. For similar reasons, the

Court also does not find the Plaintiffs' citation to and discussion of <u>Atkinson v. City of Mountain

View, Mo.</u>, 709 F.3d 1201 (8th Cir. 2013) applicable to this.

[¶83]      In <u>Atkinson</u>, an on-duty, but plain-clothed, police officer, tackled and "bull rushed"

plaintiff at a high school football game. 709 F.3d at 1205. The plaintiff asserted that when the

defendant "barreled into him," the defendant had effectuated a seizure. <u>Id.</u> at 1207. The defendant

asserted "a police officer's use of physical force against an unwilling subject does not always

implicate the Fourth Amendment right against unreasonable seizure." <u>Id.</u>  While the district court

agreed with the defendant, the Eighth Circuit agreed with the plaintiff, finding the plaintiff had

been seized by the defendant when he applied physical force to him. <u>Id.</u> The Eighth Circuit noted

"[i]t would make little sense to ask whether a person felt 'free to leave' while an officer restrained

the person's freedom of movement through physical force because the force itself necessarily—if

only briefly— 'restrained [the person's] liberty.'" <u>Id.</u> at 1209. The Eighth Circuit ultimately found:

> a seizure occurred the moment Sanders charged into Atkinson. It is undisputed
> Sanders intentionally applied physical force against Atkinson, and the evidence
> most favorable to Atkinson shows far more than a slight physical touch—Sanders'
> "bull rush" forced Atkinson ten to fifteen feet backward into the side of a truck,
> broke three ribs, punctured one lung, and caused repeated pneumothorax. This
> violence was more than enough physical force to effect a seizure under the Fourth
> Amendment.

<u>Id.</u> at 1209.

[¶84]    The Court in denying qualified immunity to the officer noted "[o]n August 31, 2007,

Sanders had 'fair warning' that charging at a non-resisting individual without first identifying

himself as a police officer was unconstitutional in the context of an arrest." <u>Atkinson</u>, 709 F.3d at

1212. The Court further noted:

> Although Sanders contends he merely intended to retake his cell phone, not to arrest
> Atkinson, a reasonable jury could find that Sanders "objectively manifested," an
> intent to arrest Atkinson. The reported fury of Sanders' charge temporarily
> incapacitated Atkinson, and immediately thereafter Sanders ordered Mountain
> View police officers to take Atkinson into custody.

<u>Atkinson</u>, 709 F.3d at 1212, n.4 (citation omitted).

[¶85]    The Defendants argue this full reading of <u>Atkinson</u> stands for the proposition that an

officer must have an intent to secure government control over the subject. They argue "application

of physical force, without such an objective manifestation of intent, does not constitute a seizure

under the Fourth Amendment." Doc. No. 143, p. 9. The United States Supreme Court recently

agreed in the context of apprehending a suspect:

> We stress, however, that the application of the common law rule does not transform
> every physical contact between a government employee and a member of the public
> into a Fourth Amendment seizure. A seizure requires the use of force *with intent to*
> *restrain*. Accidental force will not qualify. Nor will force intentionally applied for
> some other purpose satisfy this rule. In this opinion, we consider only force used to
> apprehend. We do not accept the dissent's invitation to opine on matters not
> presented here—pepper spray, flash-bang grenades, lasers, and more.

<u>Torres v. Madrid</u>, 141 S. Ct. 989, 998 (2021).[4]

---

[4] The dissent in <u>Torres</u> discusses the use of these types of munitions but in the context of when an
officer has an objective intent to detain:

> Even within its field of operation, the majority's rule seems destined to underdeliver
> on its predicted efficiencies. The majority tells us that its new test requires an
> "objective intent to restrain." But what qualifies is far from clear. The majority
> assures us that a "tap on the shoulder to get one's attention will rarely exhibit such
> an intent." Suppose, though, the circumstances 'objectively' indicate that the tap
> was 'intended' to secure a person's attention for a minute, a quarter hour, or longer.
> Would that be enough?

[¶86]     The Eighth Circuit acknowledged the defendant in <u>Atkinson</u> had an intent to restrain the plaintiff, either by trying to control him in order to regain his cellphone or in order prevent him from escaping, as officers immediately arrested the plaintiff thereafter. Clearly <u>Atkinson</u> would fall in line with <u>Torres</u>' ruling. Nevertheless, the Court has trouble relying solely on <u>Atkinson</u>, which involved only one person, in determining whether a group of hundreds, if not over a thousand, of individuals facing off with a clearly outnumbered presence of law enforcement in a rural, open area were unreasonably seized by officers' use of less-lethal munitions to disperse, rather than detain them. Instead, the Court looks to cases addressing seizures in the crowd-control context which were handed down prior to November 20, 2016. These cases include <u>Rauen v. City of Miami</u>, No. 06-21182-CIV, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007); <u>Jennings v. City of Miami</u>, No. 07-23008-CIV, 2009 WL 413110 (S.D. Fla. Jan. 27, 2009); <u>Coles v. City of Oakland</u>, No. C-03–2962 THE (N.D. Cal. April 27, 2005; and <u>Nelson v. City of Davis</u>, 685 F.3d 867, 872 (9th Cir. 2012).

---

Then there's the question what kind of 'touching' will suffice. Imagine that, with an objective intent to detain a suspect, officers deploy pepper spray that enters a suspect's lungs as he sprints away. Does the application of the pepper spray count? Suppose that, intending to capture a fleeing suspect, officers detonate flash-bang grenades that are so loud they damage the suspect's eardrum, even though he manages to run off. Or imagine an officer shines a laser into a suspect's eyes to get him to stop, but the suspect is able to drive away with now-damaged retinas. Are these 'touchings'? What about an officer's bullet that shatters the driver's windshield, a piece of which cuts her as she speeds away? Maybe the officer didn't touch the suspect, but he set in motion a series of events that yielded a touching. Does that count? While assuring us that its new rule will prove easy to administer, the majority refuses to confront its certain complications. Lower courts and law enforcement won't have that luxury.

<u>Torres</u>, 141 S. Ct. at 1015.

[¶87]    These cases all involved confrontations between protestors and law enforcement where less-lethal munitions, such as tear gas, rubber bullets, and the like were used by law enforcement to get protestors to physical move from their location to another location. What is significant about each of the cases, and as recognized in each case, is that protestors essentially had no egress after force was used against them while they were "herded" and encircled by officers into a certain location. For example, in <u>Jennings</u>, the Court found a seizure when officers marched toward protestors, encircling them and using less-lethal munitions on the protestors to get them to move, essentially herding the protestors, into a desired location. 2009 WL 413110, at *9. The <u>Rauen</u> Court noted "It can hardly be disputed that the TAC sufficiently alleges that Plaintiffs' freedom of movement was terminated by the deliberate use of force and skirmish lines to herd and then encircle Plaintiffs in an area in which they otherwise would not have been." 2007 WL 686609, at *8. The <u>Coles</u> Court found "Defendants allegedly did far more than simply order Plaintiffs to disperse from the scene or attempt to control the crowd gathered at the scene of the demonstrations. To the contrary, Defendants allegedly left Plaintiffs with only one available path by which to leave the scene and applied physical force to ensure that Plaintiffs followed that path." No. C03–2962 THE, at 10. Likewise, in <u>Nelson v. City of Davis</u>, the court found officers had conducted a seizure when they used less-lethal force against protestors in an attempt to get them to disperse but failed to provide them a way to escape, essentially enclosing them in an area. 685 F.3d at 882-83.

[¶88]    Taking into account the circumstances of this case and the teachings of these previously discussed cases, the Court concludes no seizure occurred here. The undisputed facts show law enforcement, even at the height of protest on November 20, 2016, remained behind the blockade on the north side of the Bridge and behind the concertina wire. Law enforcement did not march toward protestors in an attempt to move them in any direction nor did they encircle and herd

Plaintiffs and protestors. Instead, they stood at the line and protestors approached them. The video evidence shows protestors pushing toward law enforcement while being subjected to less-lethal force. Aerial footage shows protestors moving on the Bridge, the sides of it, and gathering in numbers south of the Bridge.

[¶89]    The Plaintiffs assert this case is "on all fours with <u>Nelson</u> and <u>Alsaada</u>, where officers deployed force <u>without a way for crowd members to get away</u>, as the protestors were subjected to force while moving south, away from the barricade, as well as while near the barricade or standing still." The Court disagrees. The evidence in this case shows only one conclusion: officers objectively manifested an intent to move protestors away from the Bridge, get them to disperse, and control the crowd. The officers in this case applied less-lethal force not to herd Plaintiffs into a certain location in such a way that protestors were unable to get away nor did they encircle them without a way out. Instead, in this case, protestors, including all of the named-Plaintiffs were free to leave and disengage law enforcement contact. In fact, almost all of the named-Plaintiffs either remained on the Bridge voluntarily or left and returned even after less-lethal force was used against them. There simply was no seizure here.

[¶90]    For example, Plaintiff Wilson states "I went to the Bridge immediately north of Oecti Sakowin camp on Highway 1806 . . . Still police were shooting a high powered water cannon at us while I was there, and launching tear gas canisters, and flash bank [sic] grenades. <u>Next I left for a rest, and returned to the Bridge with more appropriate clothing.</u>"). <u>See</u> Doc. No. 14-16, Wilson Declaration, ¶10 (emphasis added). Demo likewise states:

> After I was hit by the rubber bullet, I went back behind the Bridge to get first aid treatment from the medics. I returned to the Bridge to give my brother Brad Demo the go pro camera and he continued filming. I drove back to Sacred Stone camp to put on dry clothes, and I returned to the Bridge to join the protest. I was able to keep myself from getting soaked while on the Bridge by using a board or tarp to protect myself. I stayed there until approximately 5am.

Doc. No. 14-17, Demo Declaration.

[¶91]    Plaintiff Bruce attests even after officers using water on her for a time on the Bridge, she

continued to remain there:

> On that day, around 6:30PM (CT), I went to the Bridge immediately north of Oceti
> Sakowin camp on Highway 1806 . . . I moved to the front in prayer . . . Throughout
> the entire time that I was peacefully protesting at the frontline at the Bridge, Police
> officers were shooting me with the water cannons. I bent down to grab a lid to a
> plastic container to use as a shield and while I was bending over a Police Officer
> shot me with a flash bang. . . I remained in the front for another 20-30 minutes but
> the tear gas was so over powering that I left the front line to get seen by the medics
> near the front line."

Doc. No. 14-9, Bruce Declaration.

[¶92]    Plaintiff Finan also described being subjected to less-lethal munition and then returning

to them:

> On Sunday, November 20, 2016 in the evening, I went to the Bridge immediately
> north of Oceti Sakowin camp on Highway 1806 . . . I was standing on the Bridge
> with other water protectors when I got sprayed with a cloud of something that
> burned my eyes very badly and made me cough. It was so bad that I had to run
> away and go back to the camp to get away from the gas. I got my camera and then
> went back to the Bridge because I wanted to document what law enforcement were
> doing at the Bridge. When I went back to the Bridge, I began taking photos. I was
> holding up my camera and taking photos when I was shot by law enforcement. I
> could not see how close the officer was who shot me, because there was a bright
> light coming from the law enforcement, and because I was focused on taking
> photos.

Doc. No. 14-15, Finan Declaration.

[¶93]    Other protestors likewise either stayed on the Bridge voluntarily or left it and returned.

See Doc. No. 14-7, Treanor Declaration, ¶5 ("I was standing on the front of the Bridge and I was

praying for about a half hour but then Police Officers began shooting me with water hoses, rubber

bullets and pellet guns. I stayed in the same spot for at least (2) hours getting shot by Police Officers

sporadically but consistently"); Doc. No. 14-8, Hoagland-Lynn Declaration, ¶¶6-7 ("After about

thirty minutes, I walked closer to the front line on the south side of the Bridge and the right side of the road looking toward the line of police officers. I was getting sprayed by water cannons as I stood there. I left the Bridge to look for my girlfriend and warm my cold hands and then walked back to the Bridge by the front lines.").

[¶94]     The Court recognizes that allegations were made by some protestors, not named-Plaintiffs, that officers were launching tear gas canisters so far south of the Bridge such that protestors were disoriented and could not move right away., i.e. arguing they were not free to leave. The Court also recognizes some protestors allege they were physically injured in such a way that they required assistance to leave. However, based on the totality of the circumstances facing officers and given that the evidence, offered by Plaintiffs themselves, shows protestors, including almost all named-Plaintiffs, moved freely upon and off the Bridge or in the area after force was used against them, protestors rushing *toward* officers in the face of force, and protestors even returning to the area after force was used upon them, the Court finds no seizure occurred here.

[¶95]     Furthermore, based on these facts, officers would be entitled to qualified immunity on the question of a seizure. The law was not clearly established on November 20, 2016 such that a reasonable officer would have known using less-lethal munitions in a crowd of hundreds, if not a thousand, protestors, in a rural area of North Dakota would constitute a seizure, especially when the officers remained in place, did not encircle or herd protestors in a certain area, and provided a means for egress, i.e. anywhere south of the Bridge. The officers here did not have fair warning, as the limited cases discussed above prior to November 20, 2016 related to this issue do not fit here and no other case was on point at the time of the protest. In addition, recent decisions, including one out of the Eighth Circuit, highlight how this question of seizure, even today, is unsettled. For example, in <u>Alsaada v. City of Columbus</u>, the Ohio court recognized "[w]hether a

constitutionally cognizable seizure by control can occur in protest scenarios is a murkier landscape," further noting the question it was required to answer was "Was there a seizure by control when the police used less-lethal force, including pepper spray, tear gas, and physical force, to disperse—rather than detain—activists, protestors, and congregants?" No. 2:20-CV-3431, 2021 WL 1725554, *34 (S.D. Ohio Apr. 30, 2021), modified sub nom. Alsaada v. City of Columbus, Ohio, No. 2:20-CV-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021). The court recognized that courts were split on the answer to the question, with some courts answering in the affirmative and other courts in the negative.[5] Id. In addition, the Eighth Circuit in Quraishi v. St. Charles Cty., Missouri, recently reiterated this, finding officers entitled to qualified immunity for the use of tear-gas on reporters at a 2014 event:

> Anderson argues that the tear-gassing was not a seizure under the Fourth Amendment, and he did not violate clearly established law. This court will address the second point. See Smith[v. Kansas City, Missouri Police Dept., 586 F.3d 576, 580 (8th Cir. 2009)].

> Neither the district court nor the reporters cite authority that gave "fair warning" to Anderson that deploying one canister of tear-gas was a seizure. See Sisney[v. Reisch, 674 F.3d 839 (8th Cir. 2012)].

> The district court relied on inapposite law. True, use of pepper spray to arrest an unarmed, compliant suspect can be excessive force. Peterson [v. Kopp, 754 F.3d 594 (8th Cir. 2014)]. Peterson is distinguishable, because it focused on the officer's behavior after the individual was already seized. This court did not consider whether the use of chemical agents *alone* is a seizure. Id. at 597, 600-01. See, e.g., Ziglar v. Abbasi, —— U.S. ——, 137 S. Ct. 1843, 1866, 198 L.Ed.2d 290 (2017) ("The dispositive question is whether the violative nature of the *particular* conduct is clearly established." (internal quotation marks and citation omitted)). Here, the issue is whether deploying tear gas is a seizure.

> The reporters cite Supreme Court cases to argue they were restrained because they could not stay in their chosen location. Brendlin[v. California, 551 U.S. 249 (2007).]; Brower v. Cnty. of Inyo, 489 U.S. 593, 598-99, 109 S.Ct. 1378, 103

---

[5] The court referenced this very Court as answering that question in the negative in its order denying preliminary injunction. However, the Court notes its previous order only foreshadowed the possibility that a seizure would not be found and provided little to no discussion.

L.Ed.2d 628 (1989). But these cases did not give fair warning. <u>Brendlin</u> held that, during traffic stops, passengers are seized. <u>Brendlin</u>, 551 U.S. at 257, 127 S.Ct. 2400. <u>Brower</u> held that setting up a roadblock that stops a fleeing suspect is a seizure. <u>Brower</u>, 489 U.S. at 598-99, 109 S.Ct. 1378. <u>Brendlin</u> and <u>Brower</u> are inapposite because both involve police action that terminated or restricted freedom of movement. <u>See Brendlin</u>, 551 U.S. at 257, 127 S.Ct. 2400; <u>Brower</u>, 489 U.S. at 598-99, 109 S.Ct. 1378. Here, the reporters' freedom to move was not terminated or restricted. <u>See Johnson</u> [v. City of Ferguson, Missouri,, 926 F.3d 504 (8th Cir. 2019)] (no seizure where plaintiff was not "ordered to stop and remain in place" and "was able to leave the scene"). They were dispersed.

The reporters cite no "precedent," "controlling authority" or "robust consensus of cases of persuasive authority" to show it was clearly established that tear-gassing was a seizure. <u>See</u> [District of Columbia v.]<u>Wesby</u>, [138 S.Ct. 577 (2018)] (internal citations and quotations omitted). <u>See generally Johnson</u>, 926 F.3d at 509 (Melloy, J., dissenting) (noting the Sixth Circuit's holding that person is seized when they are not free to stay in place, but also the Second Circuit's holdings that an order to leave can become a seizure depending on whether there was physical contact).

When Anderson deployed the tear-gas, it was not clearly established that his acts were a seizure. The district court should have granted qualified immunity to Anderson on the Fourth Amendment claim.

986 F.3d 831, 840 (8th Cir. 2021).

[¶96]   No seizure occurred here. In addition, the defendants would be entitled to qualified immunity, as the law was not clearly established at the time of the protest that their actions constituted a seizure.

### ii.  **Reasonableness Standard**

[¶97]   "When evaluating a Fourth Amendment excessive force claim under § 1983, [a court] consider[s] 'whether the amount of force used was objectively reasonable under the particular circumstances.'" <u>Kohorst v. Smith</u>, 968 F.3d 871, 876 (8th Cir. 2020) (citation omitted). The Court evaluates "the reasonableness of the force used from the perspective of a reasonable officer on the scene, not with the benefit of hindsight." <u>Id</u>. "This evaluation entails careful consideration of the case's particular facts and circumstances, including: '(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3)

48

whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Id. (citing

Graham, 490 U.S. at 396). The court may "also consider the result of the use of force." Id.

[¶98]     The "reasonableness inquiry in an excessive force case is an objective one and looks only

to whether the official's actions were objectively reasonable in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation." Buckley v. Hennepin

Cty., 9 F.4th 757, 762 (8th Cir. 2021). "The reasonableness of an officer's use of force must take

into account that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation." Masters v. City of Indep., Missouri, 998 F.3d 827, 836 (8th

Cir. 2021)." "An officer's evil intentions will not make a Fourth Amendment violation out of an

objectively reasonable use of force; nor will an officer's good intentions make an objectively

unreasonable use of force constitutional." Graham, 490 U.S. at 397.

## A.  Severity of the Crimes at Issue

[¶99]     The Court must first address whether it was objectively reasonable for officers to believe

the Plaintiffs and protestors were committing any crimes at the time force was used against them.

The Court will begin with the question of whether Defendants had a reasonable belief that

Plaintiffs were trespassing in areas where force was used against them. See Habiger v. City of

Fargo, 1996, 80 F.3d 289, certiorari denied 117 S.Ct. 518, 519 U.S. 1011 ("'The severity of the

crime' as factor justifying use of force does not necessarily encompass whether there was actual

probable cause to arrest the defendant for that alleged crime; touchstone is objective

reasonableness, and the force used to effect a good faith, though false, arrest is not necessarily

more likely to be unreasonable than a good faith, though legal, arrest."); see also Krueger v. Fuhr,

991 F.2d 435, 439 (8th Cir. 1993) ("An erroneous perception or belief does not violate the Fourth

Amendment if such perception or belief is objectively reasonable. We have already concluded that Fuhr's belief that he was facing an armed and dangerous suspect was objectively reasonable. Therefore, even assuming that Plaintiffs were able to establish that Krueger was unarmed at the time of the shooting, that fact would not preclude entry of judgment for Officer Fuhr.").

[¶100]   The Plaintiffs and other protestors assert they did not see the "No Trespassing on Bridge/No Trespassing" signs during the protest and did not know they were trespassing when they were on the Bridge. For those that acknowledged their presence, they stated they thought they could walk on the Bridge up to the barricade but not on the Bridge past it, which was closed off by the concertina wire. In their view, no adequate legal notice was given that they were trespassing on the Bridge on November 20, 2016. Plaintiffs maintain they were allowed to go about freely on the Bridge up to the barricade from October 28, 2016 to November 20, 2016, without being arrested, so they assumed they could be on the Bridge. However, they admit officers would tell them things like "go back to camp" or "go back south," when they were previously on the Bridge. They further contend that Defendant Kaiser acknowledged no attempts were made to arrest anyone for trespass on November 20, 2016. Defendants, on the other hand, assert they believed any unauthorized person positioned upon the Bridge was trespassing during the protest, because of the No Trespassing on Bridge/No Trespassing signs, the history surrounding the closure of the Bridge, including DOT releases, and the warnings they gave Plaintiffs to vacate the Bridge during the protest, both personally and through amplified means.

[¶101]   The Plaintiffs argue the DOT releases do not state the Bridge was closed to pedestrian access, only the travelling public. It is true the DOT releases use the words "motorists" and "traveling public," and in one release, it states the Bridge "will remain closed to traffic for the safety of the traveling public." Doc. No. 59-3. However, most importantly, each of the releases

also states "the Bridge is unsafe for <u>anyone</u> to cross." <u>Id.</u> (emphasis added). The releases discuss the fact that the structural integrity of the Bridge was a concern. Even if an ambiguity exists, it is hard to envision a situation where an officer, or even a reasonable juror for that matter, would think it was safe for a pedestrian to be on the Bridge when engineers were concerned about the safety of the Bridge's structure. Additionally, Sheriff Kirchmeier testified in his deposition he believed it was the DOT that put the "No Trespassing on Bridge/No Trespassing" signs up, as law enforcement did not make those signs. It is clear from the record the DOT closed the Bridge. The officers were just enforcing that closure. Nonetheless, the Court finds the releases, combined with other evidence that cannot be reasonably refuted, including evidence provided by Plaintiffs themselves, would reasonably lead an officer to believe only authorized personnel were to be allowed on the Bridge during the November 20, 2016, protest and that the protestors were trespassing.

[¶102]   It is undisputed that all named-Plaintiffs were staying at the camps prior to the November 20, 2016, protest. It is also undisputed prior to the November 20, 2016 protest, two "No Trespassing" signs were located in the vicinity of the Bridge. The Plaintiffs admit these facts in their Amended Complaint. <u>See</u> Doc. No. 129, ¶50 ("Two, 'No Trespassing' signs, facing south, were placed behind the concertina wire, north of the Bridge, on the sides of the road."). A review of the evidence, including video and photographic evidence, some of which was offered by the Plaintiffs or taken from the protestors' view, show "No Trespassing on Bridge" signs were located to the west and east of the Bridge in the early hours of the protest when the burned-out truck was being removed from the Bridge and during the height of the November 20, 2016 protest after dark.

[¶103]   Photographs taken during the daylight hours of November 20, 2016 when the semi-truck is backed up to the burned-out truck show two set of no trespassing signs on the west and east of

the Bridge. Doc. No. 239-11, p. 1. The pictures depict a large white sign with black lettering that reads "No Trespassing on Bridge," with a smaller sign under it stating "No Trespassing" in red lettering on both the west and east sides of the Bridge. Doc. No. 239-11, p. 1. This photograph depicts a small number of protestors working to remove the first burned-out truck, with other protestors walking behind and onto the Bridge. Doc. No. 239-11, p. 1. A video produced by Plaintiff Finan during the daylight hours around the time of the first truck's removal clearly shows the east side "No Trespassing on Bridge/No Trespassing" signs with a fire burning in the grass near them. Doc. No. 239-12, Exhibit L, Video "Finan Depo Exhibit 43." A second video taken by Plaintiff Finan shows the signs visible from his standpoint farther south of the Bridge when protestors are seen dragging the burned-out vehicle off the Bridge. Doc. No. 239-12, Exhibit L, Video "Finan Depo Exhibit 44."

[¶104]   Photographs taken later in the evening also show the signs. One photograph shows a similar scene with both signs visible, taken later in the evening with lights illuminating the area. Doc. No. 239-11, p. 2. A fire is seen burning behind the east set of signs, with protestors taking pictures of the burned-out truck situation unfolding. Doc. No. 239-11, p. 3. In a photograph taken by Plaintiff Finan from atop the Bridge deck during later hours of the protest, after the sun has gone down, a large "No Trespassing on Bridge" sign is illuminated. Doc. No. 239-13. In another video, a protestor is directly in front of the "No Trespassing on Bridge/No Trespassing" sign set, with officers standing in the background. Doc. No. 239-12, Exhibit L, Video "161120_JonathanKlett_BarricadeBridgeWater_2268.MOV." In yet another video, the large white "No Trespassing on Bridge/No Trespassing" sign set is visible with a growing number of protestors stationed in front of it. Doc. No. 239-12, Exhibit L, Video "161120_PVT_MartinKrafft_0003.MP4." It also shows a very large, illuminated light shining on

the protestors and law enforcement. Id. Another video, taken from law enforcements' view, show protestors lined up directly in front of one set of the "No Trespassing on Bridge/No Trespassing" signs, cutting the concertina wire, and throwing a piece of it onto the signs. Doc. No. 93, Video, "IMG-0181." After the protestor is seen flailing the wire around and throwing it onto the signs, officers used less-lethal force to get the crowd moved back, with officers removing the piece of wire from the signs before backing up. Id. Video footage also shows at some point one of the "No Trespassing" sign sets taken down and sitting next to a law enforcement vehicle, the reason for its removal or the time of the removal being unknown. Doc. No. 285, Ex. 7.

[¶105]    Aside from the obvious visual evidence showing the presence of the No Trespassing on Bridge/No trespassing signs, audio footage also confirms warnings were given to the protestors to vacate the Bridge. In one video, an officer is clearly heard stating, amplified "I will give you one last warning: vacate the Bridge immediately . . . you're gonna be trespassing." Doc. No. 100, Video, RAW CLIP 1 STANDING ROCK POLICE ATTACK NOV202016.mp4."' Doc. No. 239-12, Exhibit L, Video, "161120-PVT_Bridge_WaterCanonTeargasRubberBullets.mp4" at :07:10. One third-party protestor even acknowledged officers stated announcements like "you're trespassing and "you're not supposed to be on the Bridge." Doc. No. 81-24, ¶22.  Other audio portrays officers telling protestors to get back from the concertina wire and barricade at different points. See Doc. No. 239-12, Exhibit L, Video, Bates 1770, 1856, 1879, 1882, 1944, 2035. In addition, some of the Plaintiffs and protestors admit that prior to November 20, 2016, they had been given warnings from officers when they were on the Bridge to "go back home" and "go back south." Officers also individually attested they gave warnings to protestors that they were trespassing, including one officer who was in charge of the amplified announcements that night.[6]

---

[6] The issuance of warnings and their adequacy will be more fully discussed below.

[¶106]    The culmination of this evidence supports a finding that officers reasonably believed the Plaintiffs were trespassing and that they were on notice they were trespassing. The Court understands the mayhem that erupted on November 20, 2016. However, the video and photographic evidence undisputedly show two large "No Trespassing on Bridge/No Trespassing" sets of signs on both sides of the Bridge, illuminated during both the early and late hours of the protest. In fact, one of the videos was taken by Plaintiff Finan himself only feet away from the sign, documenting the small fire right behind it. In another picture taken by Plaintiff Finan, in the dark hours of the protest when he was on the Bridge itself, show the sign illuminated. No reasonable juror could find Plaintiff Finan did not know he would be trespassing if he was on the Bridge. Even taken in the light most favorable to the Plaintiffs, photographs and videos, provided by both sides, show the two sets of signs both visible in the daylight and visible in the night. The DOT releases state the Bridge was not safe for anyone to cross. Furthermore, officers attest they gave warnings to the Plaintiffs they were trespassing from the start of the protest to the end. The videos show officers giving at least one amplified order to vacate the Bridge and discussing trespassing.

[¶107]    The Court is reminded it must look at this situation from the perspective of a reasonable officer on the scene. Kohorst, 968 F.3d at 876. With that as a backdrop, the Court concludes it was objectively reasonable for officers to believe Plaintiffs, all of whom admit to being on the Bridge, had committed or were committing the crime of trespass when force was used upon them. In fact, the evidence leads the Court to conclude the Plaintiffs and protestors were in fact trespassing when they were on the Bridge and in other locations from which officers told them to vacate. However, trespassing was not the only crime the officers believed, and the objective evidence supports, was being committed during the protest.

54

[¶108]   Pursuant to N.D.C.C. § 24-03-05, which governs removing barricades, it a class A misdemeanor for any person to open, remove, or deface any barricade placed by the North Dakota Department of Transportation. The Plaintiffs admit they knew the burned-out trucks formed part of law enforcement's barricade on the Bridge. In fact, in video evidence offered, protestors were warned only weeks earlier by law enforcement not to remove the trucks, as the North Dakota Department of Transportation was responsible for deciding when the trucks came off the Bridge. The Unicorn Riot Video taken on November 20, 2016, exemplifies the protestors blatant disregard for this fact when they drove a semi onto the Bridge and removed one of the burned-out trucks, ignoring officers' commands to stop the removal. Dundon admits to being present while the first truck was removed and admits law enforcement used less-lethal force in an attempt to stop protestors from the removal. Officers reasonably could have believed they were justified in using force to prevent the removal of the property, and for reasons more fully discussed below, officers were justified in not feeling safe crossing the barrier at that time to make arrests. See N.D.C.C. § 12.1-05-06 ("Force is justified if it is used to prevent or terminate an unlawful entry or other trespass in or upon premises, or to prevent an unlawful carrying away or damaging of property.").

[¶109]   Defendants also assert they believed Plaintiffs and protestors were engaged in a riot in violation of N.D.C.C. § 12.1-25-01(2). Defendants additionally maintain, and Plaintiffs admit, at least one law enforcement officer was injured, which could support a reasonable belief on law enforcement's side that at least one protestor had assaulted a law enforcement officer in violation of North Dakota law. In fact, protestors admit items, such as live canisters, were thrown at law enforcement officers throughout the night, and the video evidence confirms that fact. In addition, protestors admit, and the video evidence shows, fires were ignited throughout the night in violation of North Dakota law. Fire personnel were called to the scene to put out the fires. The setting of

fires in violation of law warranted the use of water to contain the fire and prevent the spread. Video evidence shows protestors purposefully placing themselves in the stream of water. While some of these crimes on their face appear to be non-violent misdemeanors, the culmination of all potential criminal activity clearly set the stage for a purely chaotic, dangerous, and unprecedented encounter between law enforcement and protestors.

[¶110]   The Court must still consider many other circumstances prevalent in this case, including threat to officers or others, whether protestors were resisting lawful orders, which takes into account potential warnings, and other unique factors. See Montoya v. City of Flandreau, 669 F.3d 867, 871 (8th Cir. 2012) ("Force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.").

## B.  Threat

[¶111]   It is clear and cannot be reasonably disputed that tensions between law enforcement and protestors began rising as early as August of 2016. In fact, in August of 2016, the Morton County Board of Commissioners issued an Emergency Declaration, implementing its emergency plans as to additional manpower, resources, and other expenditures to address the protests. Doc. No. 61-4. On August 19, 2016, Governor Dalrymple issued an Executive Order ordering "total utilization of the North Dakota State Emergency Operations Plan" to assist with the protest response efforts. Doc. No. 58-2.

[¶112]   Over the course of a few short months, peaceful protests may have occurred, but law enforcement also responded to numerous incidents where protestors were ultimately arrested, including the October 27, 2016 confrontation between officers and protestors, which was clearly

chaotic and dangerous.[7] Plaintiffs assert, and it is not necessarily disputed, that law enforcement began responding to these encounters over the months of August to November of 2016 more assertively, including with more manpower, vehicles, and presence. The growing manpower came from multiple sources, including from the then-Governor Dalrymple's activation of the North Dakota National Guard on September 8, 2016, the North Dakota Highway Patrol and numerous county and city law enforcement joining Morton County to assist throughout the months, and the State of North Dakota's Emergency Management Assistance Company request to other states to assist with responding to the DAPL protests on October 7, 2016, with officers from Wisconsin, South Dakota, Minnesota, Wyoming, Indiana, and Nebraska joining. Doc. Nos. 61-2, p. 16, 61-2, p. 49, 61-2, p. 41. These officers did not all respond to the November 20, 2016 protest, but rather responded at different times over the course of months. Despite the growing manpower numbers on the law enforcement side, aerial footage of the November 20, 2016 protest shows law enforcement were outnumbered by protestors from the start, which supports why law enforcement placed the two code reds and Signal 100 requesting all available officers in the state to respond to the incident.

[¶113]   It is also evident the removal of the first burned-out truck by protestors set the stage for the chaotic November 20, 2016 protest. Video evidence confirms officers had warned protestors they were not to remove the burned-out truck from the Bridge only weeks earlier, emphasizing it was the Department of Transportation who made the final call of when the trucks were removed, not law enforcement. Despite this admonition, during the early evening hours of November 20, 2016, the protestors backed up a semi on the Bridge, cut the chains securing the first burned-out

---

[7] The Court recognizes that some of these arrests and corresponding charges were ultimately dismissed. The Court only makes reference to them in relation to the possible effect they had upon a reasonable officers' view of the situation.

truck to the barricade and removed the vehicle from the Bridge, despite officers' use of less-lethal munitions to try to get them to stop. After the removal, the backed-up semi remained close to the Bridge.

[¶114]    Plaintiffs openly admit that throughout the entire protest law enforcement stayed behind the barricade at all times. Plaintiffs assert they were not trespassing when they were on the Bridge; however, this Court has already determined a reasonable officer could conclude they were trespassing and committing other violations of state law. While Plaintiffs assert officers could have just come and arrested people if they thought they were trespassing, the events of that night as depicted in the videos, photographs, and Plaintiffs' own admissions, support a reasonable officer's view that the protest had become dangerous for all involved and how that was not likely a reasonable option for officers. See also Bernini, 665 F.3d at 1004 (citing Carr v. District of Columbia, 587 F.3d 401, 408 (D.C. Cir. 2009) ("The D.C. Circuit has addressed the practical dilemma faced by officers responsible for reacting to large group activity, and recognized that a requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot.").

[¶115]    Plaintiffs assert even if they were trespassing or committing other misdemeanors, protestors did not engage in threatening behavior toward officers or the public the entire protest. They admit "a few items" were thrown at officers, such as water bottles and spent tear gas canisters, but they argue this did not rise to the level of a threat. However, indisputable video footage shows protestors throwing burning projectiles (at least ten instances) and other items back at law enforcement from the beginning of the protest that night and throughout it. Doc. No. 92-1, item 4 at meter 1:41:50, 1:59:37, 2:59:40, 3:05:00, 3:07:25. Officers assert police shields were requested on that night for the first time during the ongoing DAPL protests due to the constant

barrage of objects being thrown at law enforcement. See Doc. No. 54, p. 11. Plaintiffs concede

that one officer received injuries. However, the perceived threat does not just come from items

being thrown at law enforcement officers during the protest; it comes from a culmination of actions

taken by the protestors.

[¶116]    Protestors also started, and reignited, numerous fires on the south and north sides of the

north branch of the Cantepeta Creek and on the Bridge itself, which presented the need for water

in the first place. See Doc. Nos. 56, 57. Plaintiffs do not dispute that protestors started fires on the

Bridge and in the surrounding areas. Doc. No. 81-24, ¶19 ("I saw fires built by the water

protector—maybe 3 to 5 controlled bonfires on the mud flat and on the Bridge. I saw people using

these fires to dry off their wet clothes and get warm."). Officers assert one of the bonfires was built

within approximately 30 feet of law enforcements' barricade and protectors in that vicinity began

throwing burning logs at the police line. See Docket No. 54, p. 13. While the protestors assert they

started the fires to stay warm, it was not legal for them to do so, and only contributed to the further

actions needing to be taken by law enforcement. By starting illegal fires, protestors made the

situation more dangerous for themselves and nearby law enforcement. And contrary to protestors'

claim, the fires were not well-maintained bonfires. The fires were dangerous, uncontrolled blazes

left to engulf in the dry prairie and presented obvious danger to spread without water suppression.

[¶117]    Officers also contend they were forced to respond to a group of 100-150 protestors

gathering to the west side of the barricade. The officers believed the protestors were going to flank

the line, which required them to divert attention to that side of the barricade. One protestor admits

protestors were gathering on the mud flat on the northwest side, "maybe trying to spread out the

police line." Doc. No. 81-24, ¶10.

[¶118]    The video evidence shows protestors blatantly ignoring officers' commands to stop the removal of the burned-out trucks that formed part of the barricade separating the two sides, which the protestors had no authority or right to remove, and continuing to do so even after officers used force in an attempt to stop it. Video footage also shows a protestor cutting concertina wire, flailing it around and then throwing it on the No Trespassing on Bridge sign set. Additionally, instead of retreating from the scene to deescalate the tension, protestors, including named-Plaintiffs, either refused to vacate or left the Bridge and *returned to the scene* in growing numbers in the area law enforcement were using the less-lethal force. In fact, video evidence shows a group of protestors holding shields and doing pushes *toward* the barricade. It is undisputed one protester climbed over law enforcements' barricade and was arrested. Perhaps the most telling of the perceived threat is the fact the officers issued two "code reds" and one "Signal-100," requesting the assistance of every available law enforcement officer in the state – a first in North Dakota history. These requests cannot be taken lightly. Additionally, coming into this protest, law enforcement officers clearly were on heightened alert, considering only a month prior at another major protest a woman was arrested for shooting a weapon toward law enforcement. The record supports law enforcement officers' reasonable perspective that an imminent threat to their safety, the safety of the public, and even the safety of the protestors existed. See Doc. Nos. 52, pp. 11-12; 53, p. 12; 54, pp. 11, 13-14, 16-17.

## C.  Resisting & Warnings

[¶119]    The Plaintiffs claim a genuine dispute of material fact exists as to whether officers gave warnings and an ability to retreat prior to the use of force on them. Plaintiffs maintain they along with numerous others, "never heard warnings or announcements to get off the Bridge, that they were trespassing, or that if they did not leave the area they would be subjected to gas, water, and

shot with less lethal munitions." Doc. No. 275, p. 27. Defendants assert they gave hundreds of warnings throughout the protest to vacate the Bridge and to disperse. In their view, "[i]t wasn't that Plaintiffs did not receive warnings from law enforcement to remove themselves from the locations where force was applied against them – Plaintiffs simply disregarded the warnings with full knowledge of the possible consequences of doing so." Doc. No. 283, p. 7. In addition, the Defendants argue the Plaintiffs admit to observing officers use less-lethal force and water on other protestors in the same areas where force was later used against them and as a result this shows Plaintiffs were warned not to be present where force was being utilized. Doc. No. 238, p. 8.

[¶120]    The Eighth Circuit has addressed warnings in the context of when officers use force, primarily deadly force and the use of tasers specifically. <u>Loch v. City of Litchfield</u>, 689 F.3d 961, 967 (8th Cir. 2012) ("Before employing deadly force, an officer should give "some warning" when it is "feasible" to do so."); <u>Procknow v. Curry</u>, 826 F.3d 1009, 1014 (8th Cir. 2016) ("Timing, warnings, and the physical capacity of a suspect are among the many factors relevant to determining whether use of a taser amounts to excessive force in a particular situation."). When it comes to less-than-deadly force, especially in the crowd-control context, courts have found warnings should be given if feasible and if the use of force may result in serious injury. <u>See</u> <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1284 (9th Cir. 2001). However, the giving of a warning or the failure to do so is only a factor to be considered in applying the <u>Graham</u> balancing test and is not determinative of whether force was objectively reasonable on its own. <u>Id.</u>

[¶121]    Additionally, warnings need only be given if feasible. <u>Jones v. Pierce Cty.</u>, No. C13-5280 RBL, 2014 WL 4409608, at *5 (W.D. Wash. Sept. 8, 2014) ("[T]he law does not require warnings in all situations. Officers are required to give a warning only when feasible. Because the feasibility of a warning is based on the circumstances, the decision to give a warning necessarily must be

made by the officer on the scene."); see also Perkinson v. White, No. 5:13-CT-3004-FL, 2015 WL 333012, at *4 (E.D.N.C. Jan. 26, 2015) ("[It] is not per se excessive force when a police officer fails to warn a suspect before deploying pepper spray."). Courts have also found there are times when giving a warning is futile. White v. City of Topeka, 489 F. Supp. 3d 1209, 1229 (D. Kan. 2020) ("Also, a reasonable jury could agree with the officers' argument that it would have been futile for the officers to warn Mr. White because he hadn't complied with their earlier orders.").

[¶122]    Again, when determining if force was objectively reasonable, the Court must look at the situation from the lens of a reasonable officer on the scene. Kohorst, 968 F.3d at 876. The question here is not whether Plaintiffs actually heard the warnings, but rather, whether a reasonable officer on the scene should give a warning if feasible and knew or had reason to believe the Plaintiffs heard their warnings. For example, in Nelson, even though officers attested they had given warnings to the crowd, the Ninth Circuit gave the warnings little weight due to the fact the undisputed evidence showed officers issued warnings without amplification into a crowd of over 1000 people at a distance of 45 to 150 feet. 685 F.3d at 882; see also Lowry v. City of San Diego, 858 F.3d 1248, 1259 (9th Cir. 2017) ("All three officers testified that Sergeant Nulton issued a warning and repeated it before entering the suite with Bak. Although Lowry did not hear the warnings, the officers did not know and had no reason to know that someone would be in a nonresidential building late at night and sleeping so deeply that she would be unable to hear a warning or to be awakened by the officers' calls.").[8] The Eighth Circuit reiterated this in BurBridge v. City of St. Louis, Missouri:

---

[8] The dissent in an earlier Lowry v. City of San Diego case points out the standard for warnings is from the officer's view:

> The majority explicitly states that the fact that Lowry did not hear the warnings diminishes the weight it is willing to give to the fact that the officer gave warnings.

> The fact that neither Drew nor Jennifer heard the dispersal order, and that both requested to leave the area before arrests began, does not change the Court's qualified immunity determination. No evidence suggests that any of the Defendant officers were aware the BurBridges had asked to leave or hadn't heard the dispersal order. Assuming, *arguendo*, that no *actual* probable cause existed to arrest the BurBridges because they did not hear the dispersal order or because they had asked to leave, the officers still had *arguable probable cause* because—without knowledge of those facts—their mistaken belief that they had probable cause was objectively reasonable.

430 F. Supp. 3d 595, 611 (E.D. Mo. 2019), aff'd, 2 F.4th 774 (8th Cir. 2021).

[¶123]     The Plaintiffs assert officers failed to give orders to disperse and failed to give warnings prior to the use of force being used upon them. The Plaintiffs contend only one announcement was made at 6:23 p.m., prior to most of the protestors arriving at the Bridge, and it did not tell people to leave the area, only to "stay off the Bridge and to remain south of the river shoreline." Doc. No. 129, ¶49. Plaintiffs contend from at least 7:00 p.m. on no amplified orders were given to protesters and none of the named-Plaintiffs heard an order or warning prior to force being used on them. For the protestors who did hear a command from law enforcement, the Plaintiffs argue officers failed to give the protestors the ability to comply prior to using force. In addition, Plaintiffs assert officers had the opportunity and means to give orders but chose not to. Again, the question is not whether

---

That is not an evaluation based on the perspective of a reasonable officer on the scene.

. . .

All three officers stated that a warning was given. This factor weighs strongly in favor of the City. *See* Nelson v. City of Davis, 685 F.3d 867, 882 (9th Cir.2012) (quoting Deorle v. Rutherford, 272 F.3d 1272, 1284 (9th Cir.2001) ("'[T]he giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.'")). As noted above, the majority's observation that Lowry did not hear the warning is irrelevant from the perspective of a reasonable officer on the scene. The officers had no way to anticipate the unlikely circumstance that someone would be asleep in a nonresidential building late at night and therefore unable to hear a warning.

Lowry v. City of San Diego, 818 F.3d 840, 857 (9th Cir. 2016), on reh'g en banc, 858 F.3d 1248 (9th Cir. 2017).

Plaintiffs <u>actually</u> heard the announcements and orders but rather whether a reasonable officer in this situation gave a warning if feasible and gave it in such a way that he or she knew or had reason to know the individual did not hear the warning. The Court also considers whether a warning would have been feasible or futile. To determine this, the Court must look at the context of the situation in which the warnings were given.

[¶124]    Officers responding to the scene attested warnings were "constantly" being given either by officers personally, or through amplified means such as the Bearcat Public Announcement ("PA") system, or the LRAD system. Lieutenant Ternes testified in his deposition that on November 20, 2016, he personally heard Sergeant Lindelow make announcements using the LRAD:

> Q. Now, you described earlier that Sergeant Lindelow told the people with the semi
> to stop moving the burned-out truck and get off the Bridge; is that right?
> A. That's correct.
> Q. Did you hear Sergeant Lindelow make some subsequent announcements?
> A. Yes.
> Q. Was he using the LRAD?
> A. Yes. The PA on the LRAD, yes.
> Q. So he was sometimes using the PA and sometimes using the LRAD?
> A. No. He was using the PA on the LRAD. It's a function[.]"

<u>See</u> Doc. No. 239-15, p. 151. A protestor who was at the scene while the first truck was being removed attested he did hear officers state on the bullhorn "Don't do this Mike. We have 10 more of these trucks, and tomorrow we'll just bring another one in. Go Home!" Doc. No. 81-27.

[¶125]    Lieutenant Ternes attested he heard Sergeant Lindelow make amplified announcements at the entire crowd on the Bridge at times, indicating to them they needed to move to the south side of the Bridge. Doc. No. 239-15, pp. 154-155. Lieutenant Ternes also testified he believed the LRAD was working that night but that it was used in the early hours of the protest and the announcements then started coming from the PA on the Bearcat instead at some point:

> Q. But you're saying that – that there was an announcement like you've described that was made more than once that night?
> A. Yes.
> Q. Using the LRAD?
> A. Using the LRAD for some time. I – I've been told this – I – I absolutely don't have this in my report – but that sometime during the later hours of the night, way later hours of the night that it went to the PA on the Bearcat. But that's also amplified. So – But the LRAD early.
> Q. Was – as far as you know, was the LRAD working okay that night?
> A. Yes.

See Doc. No. 239-15, p. 153. Lieutenant Ternes attested the announcement of, "You're trespassing; move to the south side of the Bridge," was given to protestors "over and over again." Doc. No. 239-15, p. 154. He further stated "[i]t was audible to me where I was, and it was amplified. So if there is – if there was a -- a change from the LRAD to the amplified PA of the Bearcat, I heard that from somewhere, but I do not have personal knowledge of whether or not that switched over to a different PA system. I know that it was an amplified system regardless." Doc. No. 239-15, p. 154. Lieutenant Ternes testified he took over making the announcements after Sergeant Lindelow, and he used the PA system on the Bearcat. Doc. No. 239-15, p. 156.

[¶126]   The video evidence in this case captures some of these amplified announcements, including a test of the LRAD and a warning to vacate the Bridge. The video evidence also displays a number of officers giving specific commands to individuals to back away from the barricade. The video evidence portrays a chaotic situation for both law enforcement and protestors. The video evidence shows there was praying, singing, yelling, shouting, announcements, the sound of water and other munitions being detonated, and overall commotion. As noted by one protestor:

> I do not recall any warning announcements. At some points the police would say, "move off the side of the Bridge;" Once, I heard them say "we are now going to test the LRAD" and they did for a second. That was the only time I heard it. I did not hear, or at least I do not recall hearing, any announcement about them using other less lethal weapons. However, it was hard to hear. There was a lot noise and commotion. There were also people singing and praying. If they did. announce anything, I could not hear it. I only heard them announce things like "you're

trespassing," "you're not supposed to be on the Bridge," and "move to the south
side." There were no announcements that were warnings that I can recall.

Doc. No. 81-24, ¶22 (emphasis added).

[¶127]    The record shows officers, particularly Lieutenant Ternes and Sergeant Lindelow, used
amplified means in an attempt to reach protestors. To Lieutenant Ternes it didn't matter if they
were using the Bearcat or the LRAD, they were both amplified systems used to reach crowds. This
case is unlike Nelson where the undisputed evidence showed officers had no means to amplify
their warnings and directives and should have known their commands wouldn't reach the party-
goers. A reasonable officer in this situation would recognize the auditory commotion echoing on
both sides and would give warnings to protestors in amplified means. The record reveals officers
did give amplified warnings and had no reason to believe the protestors could not hear them.

[¶128]    Regardless, the Court also tends to agree with the Defendants that additional warnings
may have been futile anyway in this specific situation. Plaintiffs and protestors admit to observing
officers use less-lethal force against others and despite this, continued to place themselves in close
proximity to the barricade, sometimes for hours and even returning to the area, despite the use of
force. Plaintiffs contend the air was full of smoke near the barricade, there were shots being fired
and explosives heard, and fire hoses used on those close to the barricade. The Court agrees "No
reasonable person would observe such alleged use of force by law enforcement standing behind a
barricade with armored vehicles and believe their presence was authorized or lawful, regardless of
whether any additional warnings were provided by Law enforcement." Doc. No. 238, p. 41.

[¶129]    Sheriff Kaiser attested he did not know whether everyone in the crowd could hear the
announcements. Doc. No. 239-14, p. 44. He also testified that he did not recall specifically
individuals in the crowd move in reaction to the announcements. Doc. No. 239, p. 46. However,
Plaintiff Dundon testified in her deposition that protestors, including her, were wearing ear plugs

at the time the group of protestors removed the first burned-out truck from the barricade. She also testified she couldn't hear anything because there was noise coming from both the protestors removing the truck and from law enforcement's side. She further testified that even if officers were giving warnings, she would not have been able to hear them with all the noise. Doc. No. 239-1, p. 159. The video evidence also shows protestors doing pushes *toward* the barricade, remaining on the Bridge, or leaving the Bridge and coming back, even in light of munitions being used against them.

[¶130]    In this case, the record displays auditory commotion, but it also includes officer attestations that they gave amplified warnings and announcements through the commotion in an attempt to reach protestors. Again, the perspective is from a reasonable officer on scene. Officers gave warnings, amplified, as feasible. If protestors did not see or hear these obvious warnings, no trespassing signs were conspicuously visible and illuminated during the protest and commotion. No other reasonable method could have reached protestors in this particular situation.

### D.  Force

[¶131]    The Plaintiffs contend the type and amount of force deployed by officers was objectively unreasonable, especially the use of water. The Plaintiffs contend officers used dangerous weapons upon individuals causing grave injuries and also indiscriminately used weapons against all protestors assembled. The Plaintiffs contend law enforcement shot tear gas canisters and rubber bullets indiscriminately in a way that did not just target those on the Bridge; they assert officers launched these munitions in a way that impacted even those not on the Bridge to the south. They also assert more than one legal observer witnessed law enforcement launch "as many as 20 chemical agent canisters launched in the span of 30 seconds." Doc. No. 81-28, ¶8. The Plaintiffs assert officers used unprovoked force on individuals who they maintain were not threatening

police. However, they have failed to identify any of the officers in these specific instances and the videos are only snippets which fail to provide the broader context of what was occurring around them and throughout the protests.

[¶132]   Plaintiffs further assert law enforcement did not use a continuum of force, starting with the least impactful munitions and moving to more impactful as the protest went on. They assert there was no de-escalation from 5:00 p.m. when the protest started until the protest ended. In addition, Plaintiffs assert officers continued to use force on individuals who were moving away from the barricade, referring to Plaintiff Dundon who was hit in the eye as she asserts she tried to run away from the force.

[¶133]   The Plaintiffs also maintain the resulting injuries were severe as a result of the force. For example, Plaintiff Dundon asserts she suffered severe and permanent damage to her eye, Plaintiff Demo maintains his compound fracture required reconstructive surgery, and other Plaintiffs and protestors suffered bruises, bleeding, fractured bones, the near-loss of an arm, internal bleeding, and hypothermia. According to Plaintiffs medical personnel treated at least 300 protestors. Doc. No. 271. Dr. Niheu, M.D. personally assisted in the medical treatment of protestors on November 20, 2016. Dr. Niheu asserts at least 26 severely injured people had to be evacuated by ambulance to three area hospitals. Doc. No. 271, ¶6.

[¶134]   It is undisputed this protest lasted over the course of approximately ten hours. It is undisputed officers used less-lethal force at the very beginning of the protest when protestors removed the burned-out truck off the Bridge with a semi against law enforcement orders. Plaintiffs admit this use of force did not stop protestors from removing the truck. It also did not stop protestors from continuing to pool in numbers on the Bridge, the sides of it, and in numbers behind it. Almost all Plaintiffs also admit they returned to the Bridge after tear gas, rubber bullets, water,

and other munitions had already been used on them in an effort to get them to disperse or leave the scene. The aerial footage and videos provided in this case show protestors pushing toward the barricade even in the face of law enforcement officers using less-lethal munitions. Officers had issued two code reds and a Signal 100 seeking immediate assistance from officers in not only the area but the entire state. The undisputed evidence leads only to one conclusion that no reasonable juror could find the use of tear gas, rubber bullets, OC spray, and the like, was objectively unreasonable in this particular circumstance.

[¶135]     As for the use of water specifically, Plaintiffs contend officers sprayed water directly at protestors who were praying, singing, talking, and not doing anything threatening toward law enforcement officers. They also contend officers were spraying water in the air in such a way that protestors south of the Bridge were being sprayed with water. They assert this happened almost continuously throughout the night, a night in which the temperature was in the low teens and twenties. Plaintiffs' expert, who was not personally present at the protest but reviewed videos and evidence after, asserted the use of water would not be considered appropriate. Doc. No. 270, p. 12.

[¶136]     Defendants contend aerial footage and protestor declarations establish there was a substantial time delay between when the first burned-out truck was removed and the use of water. One protestor admits officers utilized tear gas and rubber bullets on the rapidly growing crowd for approximately an hour and half before water was first deployed. Doc. No. 81-27, ¶20. One officer contends prior to the use of water, the OC spray and gas, along with less-lethal direct impact rounds were not effective against protestors' response. Doc. No. 53, ¶32. Plaintiffs themselves admit they either stayed on the Bridge or left and returned even after other forms of force were used against them. The same rang true for the use of water by other protestors.

[¶137]    One officer also recognized the use of spray and gas were not effective because of the wind, causing the agents to blow back at them. Plaintiff Dundon concedes the wind created problems for law enforcement officers because after they launched munitions such as tear gas the wind would blow it back onto them. See Doc. No. 239-1, p. 309-310 ("I've seen them literally launch stuff off and then smoke themselves out. Like it happened a few times. They would set the tear gas off, and it was so windy, the wind would literally blow it right back on them, and they would end up tear gassing themselves. . . they did this many times."). Officers then moved to water as the next available means of keeping protestors off the Bridge and away from the barricade. Doc. No. 53, ¶32.

[¶138]    The Court has reviewed the video footage, affidavits of Plaintiffs and protestors, affidavits of law enforcement, and affidavits of fire professionals, among other pieces of evidence related to the use of water specifically by law enforcement and fire professionals in the crowd control context. The Court, and the parties admittedly, were unable to locate a single case where it was found to be unconstitutional for officers to use water as a means of crowd-control in a situation involving threatening behavior, destruction and removal of government property, previous failed attempts at dispersal with other forms of less-lethal munitions, and a clearly outnumbered law enforcement, among other factors. This itself protects law enforcement under qualified immunity from their actions related to the use of water.

[¶139]    Based on the totality of the circumstances in this specific case, the Court finds the undisputed and irrefutable evidence in this case could only lead a reasonable juror to conclude the officers' conduct in this case was objectively reasonable. Nonetheless, the Plaintiffs' Fourth Amendment claim ultimately fails under the second prong of qualified immunity, as the law was

not clearly established in November 20, 2016 to put a reasonable officer on notice that the actions they took during the protest were violations of the Plaintiffs' constitutional rights.

### iii. Even assuming a Fourth Amendment violation occurred, the Defendants are entitled to Qualified Immunity

[¶140]   "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." Graham v. Barnette, 5 F.4th 872, 887 (8th Cir. 2021), reh'g denied (Aug. 20, 2021). "This generally requires a plaintiff to 'point to existing circuit precedent that involves sufficiently 'similar facts' to 'squarely govern' the officers' conduct in the specific circumstances at issue, or, in the absence of binding precedent, to present 'a robust consensus of cases of persuasive authority' constituting settled law." Id. (citing De La Rosa v. White, 852 F.3d 740, 745 (8th Cir. 2017). Boudoin v. Harsson, 962 F.3d 1034, 1040 (8th Cir. 2020) (alterations to original)). "The plaintiff has the burden to prove that a right was clearly established at the time of the alleged violation. Id. (citing Wilson v. Lamp, 901 F.3d 981, 986 (8th Cir. 2018)).

[¶141]   "For the purposes of step two, "clearly established" means "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. While qualified immunity "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White v. Pauly, 137 S. Ct. 548, 551 (2017) (citations omitted). "We . . . look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit." Meloy v. Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning so long as the unlawfulness is apparent." Dean v. Searcey, 893 F.3d 504, 518 (8th Cir. 2018), cert. denied, 139 S. Ct. 1291, 203 L. Ed. 2d 414 (2019).

71

[¶142]    This Court is required to evaluate the Defendants defense of qualified immunity from the perspective of a reasonable police officer based on facts available to the officer at the time of the alleged constitutional violation. Gladden v. Richbourg, 759 F.3d 960, 964 (8th Cir. 2014). If "based on those facts, the officer reasonably failed to comprehend that he was violating a person's clearly established constitutional rights, he is entitled to qualified immunity from suit." Id.

[¶143]    Protests have been occurring in the United States since long before the November 20, 2016 protest. However, this protest was utterly unique. Thousands of protestors, including the named-Plaintiffs, came from all over the United States to join their cause of protesting against the Dakota Access Pipeline. Protestors set up camps, staying for extended periods of time. Aerial footage of the protest on November 20, 2016 shows hundreds of, if not a thousand, protestors standing on the Bridge, lining the sides of it, and pooling in numbers behind it. The aerial footage also shows over the hours of the protest a growing, but unequaled, police presence. While the Plaintiffs assert law enforcement were not outnumbered, the video footage and evidence show otherwise. This protest took place in a rural area of North Dakota. It did not take place in an area able to be easily physically cordoned off, such as a busy street in a major city. It included miles of hills and prairie.

[¶144]    Furthermore, how protestors and law enforcement were stationed is also unique. It is undisputed that on November 20, 2016, a barricade was set up across the Backwater Bridge, which included two burned-out trucks. Plaintiffs openly admit that throughout the entire protest law enforcement stayed behind the barricade at all times. Plaintiffs assert they were not trespassing when they were on the Bridge; however, this Court has already determined the Plaintiffs had no lawful right to be on the Bridge at the time in question and at minimum, an officer would have reasonably believed the Plaintiffs were on notice their presence was unlawful based upon the

posted "No Trespassing on Bridge/No Trespassing" signs, DOT information, and warnings. While Plaintiffs assert officers could have just come and arrested people if they thought they were trespassing, one need only look at the video evidence of events of that night to observe how dangerous the protest had become for all involved and how that was not likely a reasonable option for officers. See also Bernini, 665 F.3d at 1004 (citing Carr v. District of Columbia, 587 F.3d 401, 408 (D.C.Cir.2009) ("The D.C. Circuit has addressed the practical dilemma faced by officers responsible for reacting to large group activity, and recognized that a requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot.").

[¶145]    Plaintiffs assert protestors did not engage in threatening behavior toward officers or the public. They admit "a few items" were thrown at officers, such as water bottles and spent tear gas canisters, but they argue this did not rise to the level of a threat. However, video footage shows protestors throwing burning projectiles and other items back at law enforcement from the beginning of the protest and throughout it. Doc. No. 92-1, item 4 at meter 1:41:50, 1:59:37, 2:59:40, 3:05:00, 3:07:25). Officers assert police shields were requested for the first time during the ongoing DAPL protests due to the constant barrage of objects being thrown at law enforcement. See Docket No. 54, p. 11.  Protestors also started, and reignited, numerous fires on the south and north sides of the north branch of the Cantepeta Creek and on the Bridge itself, which presented the need for water in the first place. See Doc. Nos. 56, 57.

[¶146]    The video evidence shows protestors blatantly ignoring officers' commands to stop the removal of the burned-out trucks that formed part of the barricade separating the two sides, which the protestors had no authority or right to remove, and continuing to do so even after officers used force in an attempt to stop it. Video footage also shows a protestor cutting concertina wire.

Additionally, instead of retreating from the scene to deescalate the tension, protestors, including named-Plaintiffs, either refused to vacate or left the Bridge and *returned to the scene* in growing numbers in the area law enforcement were using the less-lethal force. In fact, video evidence shows a group of protestors holding shields and doing pushes *toward* the barricade. It is undisputed one protester climbed over law enforcements' barricade and was the only person arrested. See Docket No. 54, p. 15.

[¶147]   The record reveals law enforcement officers feared for their physical safety due to the imminent threats of serious bodily injury or death they were encountering.  See Docket Nos. 52, pp. 11-12; 53, p. 12; 54, pp. 11, 13-14, 16-17. It is undisputed two code reds and a "Signal-100" was issued by law enforcement, requesting the assistance of all available law enforcement, state-wide. See Docket No. 54, p. 14.  These requests cannot be taken lightly and only lend credence to the fact that chaos was ensuing. Furthermore, the undisputed evidence in the record shows that over the course of months, tensions between protestors and law enforcement were growing. In fact, only a month prior, a similarly chaotic encounter developed, with one protestor shooting three times at law enforcement, ultimately being convicted of a firearms charge. This protest surely only intensified fears on both sides. The resulting situation on November 20, 2016 was unprecedented not only for a small state like North Dakota, but also on a national level. The Court has determined the cases cited by Plaintiffs do not show it was clearly established at the time of the protest that a reasonable officer would have known they were violating the constitutional rights of the Plaintiffs and protestors by using less-lethal force. The Court will discuss the cases cited by Plaintiffs and Defendants and why they are not applicable here.

[¶148]   The Plaintiffs' citations to cases involving one officer and one defendant or a small number of each do not possess "similar facts to squarely govern the officers' conduct in the specific

74

circumstances at issue[.]" Id. In many of these cases offered by Plaintiffs, an officer is presented with a situation involving the use of force against a single individual in a somewhat controlled area. See Montoya v. City of Flandreau, 669 F.3d 867 (8th Cir. 2012); Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009); Deorle v. Rutherford, 272 F.3d 1272 (9th Cir. 2001); Small v. McCrystal, 708 F.3d 997 (8th Cir. 2013); Ellison v. Lesher, 796 F.3d 910 (8th Cir. 2015). What reasonable officer may believe to be lawful in these smaller situations does not instruct how a reasonable officer may view his or her actions involving a large-scale protest with hundreds, if not over a thousand, protestors in a rural, uncontrolled area. Bernini, 665 F.3d at 1003 ("What is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons."). Nonetheless, even if the Court considered the takeaway from these cases that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public," the undisputed and irrefutable facts of this case show officers reasonably believed there was more than an immediate threat to the security of the officers, public, and even protestors, as discussed above. Therefore, they are inapplicable here.

[¶149]   As for the few cases involving protests occurring before November 20, 2016 to which the Plaintiffs cite, those too are inapplicable. While Fogarty v. Gallegos, 523 F.3d 1147 (10th Cir. 2008), centered around the arrest of a single individual in a large group of protestors, the Court denied qualified immunity because the Court found the evidence supported a finding that he and other protestors did not pose an intermediate threat to officers or the public, and officers' main objective was to disperse the crowd and avoid disruption to local businesses, not quelling an immediate threat. Id. at 1160. Again, those facts are not present here. The evidence in this case shows officers reasonably believed they were in a defensive position of an immediate threat.

[¶150]    Furthermore, while the Plaintiffs cite to <u>Nelson v. City of Davis</u>, 685 F.3d 867 (9th Cir. 2012) for the proposition that "cases dating back to 2001 have established that a failure to fully or immediately comply with an officer's orders does not justify the application of a non-trivial amount of force," the circumstances of this case include more than just protestors' failure to comply with an order. Here, officers reasonably believed an immediate threat to their safety and others was present as they issued two code red requests and a Signal 100 that night. <u>Nelson</u> also involved a situation where the court found the protestors did not pose any visible threat to officers. 685 F.3d at 883 ("It is clear . . . the governmental interest in applying force to Nelson or any member of his group, party-goers posing no visible threat and demonstrating no unwillingness to comply with the officers' orders, was minimal at best."). If anything, these cases put officers on notice that the use of force *was* justified in a large protest context where they had a reasonable belief that injury to themselves or others would occur.

[¶151]    Plaintiffs and Defendants also cite to a handful of cases decided after November 20, 2016, which the Court will not consider for purposes of this analysis here. The qualified immunity standard requires the Court to look at "[whether] the right was clearly established <u>at the time of the deprivation</u>." <u>Jones v. McNeese</u>, 675 F.3d 1158, 1161 (8th Cir. 2012) (emphasis added).

[¶152]    Defendants rely again heavily on <u>Bernini</u>. In Bernini, the court also addressed whether the officers' use of force in moving the crowd was objectively reasonable. The Eighth Circuit noted there was no evidence in the record that any of the defendants directly used force against any of the plaintiffs. <u>Id.</u> at 1006. Instead, the plaintiffs focused on the actions of a lead sergeant who testified he deployed various non-lethal munitions and when he did so, his actions implicitly allowed officers under him to do the same. <u>Id.</u>  The Eighth Circuit found the lead sergeant was entitled to qualified immunity. <u>Id.</u> The following facts supported the Circuit's conclusion:

In our view, the use of force was reasonable under the Fourth Amendment. At a minimum, it was not objectively unreasonable for Henry to authorize the force deployed in light of clearly established law. The circumstances led officers reasonably to believe that a growing crowd intended to penetrate a police line and access downtown St. Paul. Henry's use and authorization to use non-lethal munitions to direct the crowd away from the intersection and toward a park where the crowd could be controlled did not violate clearly established rights.

The plaintiffs contend that it was unreasonable for the officers to continue to use force as the crowd moved west on Shepard Road, because the crowd was "complying with the movement of the officers and posed no threat to the officers." The video footage reveals, however, that some people would not leave the roadway and that some turned east and faced the officers. It was reasonable for the officers to deploy non-lethal munitions to keep all members of the crowd moving west.

Some plaintiffs assert that they were directly targeted by officers—one, for example, testified that an officer sprayed a chemical irritant on his face, neck, ears, and back. But there is no evidence that Henry authorized this type of force against a compliant individual. His implicit authorization occurred at the intersection and involved force deployed against a noncompliant crowd. The plaintiffs have not identified any defendant who used gratuitous force. The evidence, therefore, does not support the conclusion that Henry or any other defendant violated clearly established rights under the Fourth Amendment. The district court properly granted summary judgment on this claim.

Id. at 1006.

[¶153]   The Court agrees with Defendants that Bernini and this case possess many similarities.

In both instances, officers used less-lethal force to keep individuals away from or out of a specific

area. Both situations involved officers calling for backup, with the officers in this case calling for

not only those available in the area but also any and every available officer in the state. Both

situations involved both complying and non-complying protestors. However, the Court also

recognizes that Bernini and this case have differences, with this case possessing an *even more*

*intense* situation. This case did not involve moving protestors in a controlled area. Instead, as noted

above, the events of November 20, 2016, took place in rural North Dakota, with hundreds, if not

a thousand, protestors. This protest also constituted a continuum of tense occurrences between law

enforcement and protestors stemming for months whereas Bernini involved one occurrence.

77

Despite the differences, the Court concludes <u>Bernini</u> does govern here. If officers were found to have constitutionally used force in an even less intense crowd-control situation such as <u>Bernini</u>, then clearly a reasonable officer in this situation would not have been on notice their actions were unconstitutional.

[¶154]    If <u>Bernini</u> was inapplicable, however, then there would not be any existing precedent that places the "statutory or constitutional question <u>beyond debate</u>." <u>White v. Pauly</u>, 137 S. Ct. 548, 551 (2017) (citations omitted) (emphasis added). There does not appear to be any other "precedent," "controlling authority," or a "robust consensus of cases of persuasive authority" fitting this situation. <u>Quraishi v. St. Charles Cty., Missouri</u>, 986 F.3d 831, 835 (8th Cir. 2021). Nor is there the ""rare 'obvious case' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." <u>Id.</u> Therefore, even if the Plaintiffs would have provided sufficient evidence for a reasonable jury to find officers' use of force was unconstitutional on November 20, 2016, the law was not clearly established at that time such that a reasonable officer would have known they were acting in a manner which deprived the Plaintiffs and protestors of their right to be free from excessive force. The Defendants are entitled to qualified immunity on the Fourth Amendment excessive force claim.

### b.  **FOURTEENTH AMENDMENT**

[¶155]    If the Plaintiffs' excessive force claim does not fit neatly within the Fourth Amendment, they may bring it through the Fourteenth Amendment. The Supreme Court has grounded the standard to be applied in Fourteenth Amendment excessive force cases as those applications of force that "shock the conscience." <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 844-45 (1998). "The touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise

of power without any reasonable justification in the service of a legitimate governmental objective." Id. at 845-46. (alterations). "While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, 'poin[t] the way.'" Id. "Whether conduct shocks the conscience is a question of law." Id. Conscience shocking conduct only includes "the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." Id. (citing White v. Smith, 696 F.3d 740, 757–58 (8th Cir. 2012)). "[T]he alleged substantive due process violations must involve conduct 'so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.'" Truong, 829 F.3d at 631.

[¶156]     For largely the same reasons as noted above, the Court finds the undisputed evidence could only lead a reasonable juror to determine the officers' actions in this case do not shock the conscience. The Court has already concluded it was reasonable for officers to believe Plaintiffs were committing or had committed violations of state law and were unlawfully positioned in areas where officers used both warnings and force to get them to move. Based upon this record, the Court finds the evidence can only lead to the conclusion that Plaintiffs were in fact trespassing. The undisputed evidence also shows that instead of retreating from the situation, almost all-named Plaintiffs either stayed on the Bridge or returned to it, which clearly escalated the situation in a reasonable officer's mind. Video footage shows protestors charging forward *toward* the barricade, cutting concertina wire, yelling profanities at officers, throwing items, including live canisters, removing parts of the barricade, including the removal of the burned-out truck, which they had no authority or right to do. The most telling of the entire situation is the fact that officers issued two code red requests and a Signal 100, requesting the assistance of every available officer in the state.

This has never been done in North Dakota history. Despite the growing police presence, the aerial footage still shows officers outnumbered by protestors, who continued to flood the area for hours. The undisputed evidence shows the actions of officers may not have been perfect, but a reasonable jury could not find they shock the conscience. Additionally, if the law was not clearly established at the time of the protest that the Defendants were in violation of the Fourth Amendment, clearly it was not established for the Fourteenth. See Gonzales v. Passino, 222 F. Supp. 2d 1277, 1280 (D.N.M. 2002) ("The level of egregiousness needed to establish a violation of substantive due process is much higher than will suffice to prove excessive force during a seizure."). The Defendants are entitled to qualified immunity on the Plaintiffs' Fourteenth Amendment claim.

### c. **EQUAL PROTECTION**

[¶157]   "The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from denying 'to any person within its jurisdiction the equal protection of the laws.'" Walker v. Hartford Life & Accident Ins. Co., 831 F.3d 968, 976 (8th Cir. 2016) (citing U.S. Const. amend. XIV, § 1). "The purpose of the equal protection clause ... is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." Id. (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352 (1918)). The Equal Protection Clause requires states to treat similarly situated persons alike, but a state may treat dissimilarly situated persons dissimilarly without violating the Equal Protection Clause. Ganley v. Minneapolis Park & Recreation Bd., 491 F.3d 743, 747 (8th Cir. 2007).

[¶158]   "To prove an equal protection claim, a plaintiff must show (1) that he or she was singled out and treated differently from persons similarly situated, and (2) that the plaintiff was singled out on the basis of a prohibited characteristic, such as race." Dahlsten v. Lee, 531 F. Supp. 2d 1029, 1043 (N.D. Iowa 2008) (citing Ellebracht v. Police Bd. of Metro. Police Dep't of St. Louis,

137 F.3d 563, 566 (8th Cir.1998)). "A plaintiff bears the burden of proving that he is similarly situated to those whom he compares himself to 'in all relevant respects.'" <u>Id.</u> (citing <u>Carter v. Arkansas,</u> 392 F.3d 965, 968 (8th Cir.2004)). A plaintiff's failure to demonstrate that he or she is "similarly situated to those who allegedly receive favorable treatment" precludes the viability of an equal-protection claim because the Equal Protection Clause does not preclude dissimilar treatment of dissimilarly situated entities. <u>Klinger v. Dep't of Corr.,</u> 31 F.3d 727, 731 (8th Cir. 1994). Accordingly, the threshold inquiry is whether the Plaintiffs are similarly situated to any person allegedly receiving favorable treatment by law enforcement the night of the protest.

[¶159]   The Plaintiffs maintain law enforcement indiscriminately applied force to essentially everyone located in close proximity to the barricade, i.e. everyone similarly situated to Plaintiffs. The Plaintiffs admit as much in their Amended Complaint. <u>See</u> Doc. No. 129, ¶54 ("Defendants and other law enforcement officers unleashed a barrage of freezing water, chemical agents, SIM, and explosive grenades directed toward the entire crowd, for many hours, throughout the night and into the early morning."); <u>see also</u> <u>id.</u> at ¶55 ("Defendants indiscriminately shot, launched, and sprayed their weapons on all person who were present in the general area of the Backwater Bridge.").

[¶160]   It appears Plaintiffs attempt to argue that if another person not associated with the Plaintiffs or protestors was suspected of trespass, officers would not have responded by shooting chemical agents, munitions, and water cannons. This is purely hypothetical. "[A]n equal protection violation cannot be founded on theoretical possibilities." <u>Walker v. Nelson</u>, 863 F. Supp. 1059, 1065 (D. Neb. 1994), <u>aff'd in part</u>, 70 F.3d 1276 (8th Cir. 1995). Plaintiffs have failed to put forth or point to evidence in the record of dissimilar treatment of similarly situated individuals.

[¶161]    Nonetheless, Plaintiffs also failed to show officers used force against them *because of* any of their alleged protected classes, such as race, religion, or political views or because of their exercise of constitutional rights. "The mere fact of different treatment is not enough to warrant application of the equal protection clause. Those invoking constitutional protection must show they were discriminated against." Mastrian v. Schoen, 725 F.2d 1164, 1166 (8th Cir. 1984); see also Stamm v. Cty. of Cheyenne, Nebraska, 326 F. Supp. 3d 832, 859 (D. Neb. 2018) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.").

[¶162]    For example, Plaintiffs argue Defendants used force against them for their political beliefs against fossil fuel, their religious beliefs regarding the need to protect and honor water, and their status as Indigenous persons or those who associate with them. They argue they were peaceful and not committing any crime, and that officers used force on individuals who were praying or otherwise exercising their rights to associate. While it is undisputed officers used force on individuals who may have been praying, it was not *because* they were praying that force was used. The same is true for those Plaintiffs asserting they were targeted because of their race. In fact, Plaintiffs admit, and the video footage shows, they and other protestors were wearing goggles, bearing shields, and otherwise wearing clothing that would make it hard for an officer to determine if a person was a member of a protected class.

[¶163]    Given the entire situation presented, which was no less than chaos, the evidence shows officers using force on numerous protestors stationed on the Bridge in an attempt to remove them, as they were trespassing on a Bridge the DOT deemed "unsafe for anyone to cross." All Plaintiffs admit to being present on the Bridge when force was used against them. They also admit hundreds of protestors were present that night and that officers had been using less-lethal force against others

before they arrived. In addition, the video evidence also shows officers using force against protestors who were cutting concertina wire and refusing to obey commands to back away from the barricade, among other instances, including when protestors removed the first burned-out truck against law enforcement warnings not to do so. Law enforcement had legitimate and compelling reasons for using force that had nothing to do with Plaintiffs' protected or unprotected classes. The evidence clearly shows force was not used because the Plaintiffs were Indigenous or disliked fossil fuels. As a result, the Court will not apply strict scrutiny to the actions of law enforcement and instead only looks to whether the actions meet rational basis. See Stevenson v. Blytheville Sch. Dist. #5, 800 F.3d 955 (8th Cir. 2015) (Equal protection claim will be reviewed under strict scrutiny only if it can be proved that action was motivated by racial purpose or object, or if it is unexplainable on grounds other than race.).

[¶164]   Clearly, here, law enforcement had legitimate, even compelling, interests in removing protestors from an area which had been deemed unsafe that they were unlawfully congregating in and also continuously returning to, and further had a legitimate interest in attempting to restore order to a rapidly evolving disordered situation. The actions of law enforcement here relate to a legitimate end. See Walker v. Hartford Life & Accident Ins. Co., 831 F.3d 968 (8th Cir. 2016) ("Under rational-basis review for an equal protection violation, the court will uphold the [] classification so long as it bears a rational relation to some legitimate end, and an equal protection challenge will fail if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."). The Court finds the undisputed evidence forecloses the possibility that a reasonable juror could find in their favor. As a result, the Defendants are entitled to summary judgment on the Equal Protection claim.

d.  **FIRST AMENDMENT RETALIATION**

[¶165]    "It is well-settled that 'as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . on the basis of his constitutionally protected speech.' Osborne v. Grussing, 477 F.3d 1002, 1005 (8th Cir. 2007). To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that he engaged in a protected activity, (2) that the defendants responded with adverse action that would "chill a person of ordinary firmness from continuing in the activity," and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity." L.L. Nelson Enterprises, Inc. v. Cty. of St. Louis, Mo., 673 F.3d 799, 807–08 (8th Cir. 2012).

[¶166]    "The ordinary-firmness test is well established in the case law and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." Garcia v. City of Trenton, 348 F.3d 726, 728 (8th Cir. 2003). "The test is an objective one, not subjective." Id. "The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done." Id. "When applying the ordinary firmness test, courts should be 'mindful' that the 'effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.'" Taylor v. Haugaard, 360 F. Supp. 3d 923, 931 (D.S.D. 2019).

[¶167]    Plaintiffs must additionally prove causation. "To prevail in an action for First Amendment retaliation, 'plaintiff must show a causal connection between a defendant's retaliatory animus and [plaintiff's] subsequent injury.'" Baribeau v. City of Minneapolis, 596 F.3d 465, 481 (8th Cir. 2010). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in" the decision[.]" Id. "Furthermore, the plaintiff must show that the retaliatory

84

motive was a but-for cause of the harm; that is, that the plaintiff was "singled out" for adverse treatment because of his exercise of constitutional rights." Kilpatrick v. King, 499 F.3d 759, 767 (8th Cir. 2007).

[¶168]   The parties largely disagree as to whether the Plaintiffs were engaged in a protected activity when force was used against them and whether officers used force *because* the Plaintiffs were allegedly engaged in a protected activity. The Defendants assert the Plaintiffs' unlawful activity, namely trespassing, precludes a finding they were engaged in a protected activity. Defendants assert Plaintiffs and other protestors had no constitutional right to express their views on the closed Bridge or any location where force was applied by Law Enforcement on November 20, 2016. The Plaintiffs counter there "is no evidence that any of the Plaintiffs engaged in any unlawful or threatening activity during the events in issue." Doc. No. 275, p. 22. The Plaintiffs continue to argue the Backwater Bridge was not closed to pedestrians, the two "No Trespassing on Bridge/No Trespassing" signs were not legal notice and did not provide notice to protestors that the Bridge was closed, there was no other notice that the Bridge was closed to pedestrians, the Bridge was located on unceded treaty lands, and it is genuinely disputed whether officers gave adequate announcements to give Plaintiffs notice that they were not allowed on the Bridge. See Doc. No. 275, pp. 22-30.

[¶169]   The Court has already discussed at length above the public notices from the DOT, the video and photographic evidence of the "No Trespassing on Bridge/No Trespassing" signs, and other evidence related to the question of whether the Bridge was open to pedestrians. While the Court addressed this evidence above in the context of what a reasonable officer may perceive in the context of an excessive force claim, the Court reaches a similar result here. Based upon the same evidence, the undisputed evidence shows the area where the Plaintiffs allege they were

engaged in First Amendment activity was closed to pedestrians due to the condition the Bridge was in from the burned-out trucks. As a result, the Plaintiffs had no right to exercise their First Amendment rights in the area in question. "The First Amendment does not entitle a citizen to trespass, block traffic, or create hazards for others." Frye v. Police Dep't of Kansas City, Missouri, 260 F. Supp. 2d 796, 799 (W.D. Mo. 2003), aff'd sub nom. Frye v. Kansas City Missouri Police Dep't, 375 F.3d 785 (8th Cir. 2004); see also Wood v. Moss, 572 U.S. 744, 745 (2014) ("The fundamental right to speak, however, does not leave people at liberty to publicize their views whenever and however and wherever they please.").

[¶170]    Even if the Plaintiffs were able to adduce evidence to show a genuine dispute that they were engaged in a lawful protected activity and the officers' actions would chill a person of ordinary  firmness from continuing in the activity, the Plaintiffs' claim ultimately fails because they have failed to provide evidence to create a genuine dispute that officers' actions in using force was in retaliation for exercising these rights. The Plaintiffs assert there is ample evidence to create a genuine dispute of material fact as to whether the Defendants had a retaliatory animus. The Court disagrees. The overwhelming undisputed evidence in the record could only lead a reasonable jury to conclude officers' use of force was unrelated to the Plaintiffs' exercise of any right and was related instead to a legitimate, government interest.

[¶171]    Just as in Bernini, a reasonable officer could have concluded the Plaintiffs were engaged in unlawful conduct and this was not protected activity under the First Amendment. See Bernini, 665 F.3d at 1007 ("Although the protestors at the Shepard–Jackson intersection were engaged in protected speech, members of the unit moved toward the police in a threatening manner and began to block traffic along a major roadway. A reasonable officer could conclude that this conduct violated Minnesota law and was not protected speech."). Much of the Plaintiffs' discussion centers

on a situation where Plaintiffs and protestors were not violent or threatening and not committing any crimes; a situation the undisputed evidence shows is not present here. The evidence shows officers' using force against individuals on the Bridge – a place officers reasonably believed protestors, including all named-Plaintiffs, were not lawfully allowed to be, despite the posting of signs, warnings to vacate, and DOT releases. It further shows despite using force in attempt to remove protestors from the situation, protestors, including some of the named-Plaintiffs, *returned to* the Bridge, refusing to vacate the Bridge, and even doing pushes *toward* the barricade despite being subjected to less-lethal force. Additionally, while Plaintiffs assert only a few items were thrown at law enforcement and protestors were not threatening law enforcement, video footage shows at least 10 instances of protestors throwing live munitions back at law enforcement officers, protestors cutting the concertina wire, and removing the burned-out dump-truck off the Bridge with a semi and attempting to remove the second, among other instances. Law enforcement officers issued two code-red alerts and a Signal 100 for immediate assistance – a first in North Dakota history. This situation presented similarly in <u>Bernini</u>, and the district court in <u>Bernini</u>, which was affirmed, noted:

> Plaintiffs admit that the crowd threw some rocks and at least one bag of feces. Moreover, the police at the intersection of Jackson and Shepard put in an urgent call for back-up, showing that they feared that the protest was turning violent. Plaintiffs have failed to establish that the police were retaliating against them on the basis of their speech, and they have therefore not established any violation of their constitutional rights. Defendants are entitled to qualified immunity on this claim as well.

<u>Bernini v. City of St. Paul</u>, No. CIV. 09-2312 PAM/JJG, 2010 WL 4386888, at *5 (D. Minn. Oct. 28, 2010), <u>aff'd,</u> 665 F.3d 997 (8th Cir. 2012).

[¶172]    The undisputed evidence forecloses any genuine dispute of material fact that officers' motivation to use force was due in part to the Plaintiffs' exercise of their First Amendment Rights.

Because Plaintiffs have failed to establish any violation of their constitutional rights under this claim, the Defendants are entitled to summary judgment and qualified immunity.

### e. **MONELL CLAIMS**

[¶173]   Plaintiffs also assert a <u>Monell</u> claim against the municipal Defendants. "A municipality may be liable under § 1983 when an official municipal policy or custom caused a violation of a plaintiff's substantive due process rights." <u>Russell v. Hennepin Cty</u>., 420 F.3d 841, 846 (8th Cir. 2005). "Municipal officials who have final policymaking authority may, by their actions, subject the government to Section 1983 liability.'" <u>Id.</u> (citing <u>Angarita v. St. Louis County</u>, 981 F.2d 1537, 1546 (8th Cir.1992)). "Before a municipality can be held liable, however, <u>there must be an unconstitutional act by a municipal employee</u>." <u>Id.</u> (emphasis added).

[¶174]   Plaintiffs also assert a Monell claim against Sheriffs Kaiser and Kirchmeier for failure to train, supervise, or discipline. "To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." <u>Jackson v. Nixon</u>, 747 F.3d 537, 543 (8th Cir. 2014). "While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' <u>caused the constitutional violation at issue</u>." <u>Id.</u> (emphasis added). "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." <u>Id.</u>

[¶175]   Because the Court has concluded no constitutional claims survive summary judgment, the Plaintiffs' <u>Monell</u> claims suffer the same fate. Defendants are therefore entitled to summary judgment on the <u>Monell</u> claims.

**STATE LAW CLAIMS**

[¶176]    The Plaintiffs lodge assault and battery claims against the Defendants arguing,

> Defendants willfully or recklessly caused each of the plaintiffs to suffer offensive
> harmful contact, serious bodily injury, and/or to have immediate apprehension of
> offensive harmful contact, severe bodily harm or bodily restraint, by shooting them
> with munitions, spraying them with high pressure water, and/or launching and/or
> hurling chemical agent devices and grenades at them, or by causing the force to be
> used against them.

Doc. No. 129, ¶170. They further contend the acts of the Defendants were unreasonable,

constituted excessive uses of force, and they did not consent to the force against them and were

injured by the same. Doc. No. 129, ¶¶172, 172.

[¶177]    The Plaintiffs also put forth a negligence claim against all Defendants, stating:

> Defendants, and/or each of them, individually and/or while acting in concert with
> one another, owed plaintiffs the duty to use reasonable care to avoid causing
> foreseeable injury and damage to plaintiffs during the events described in this
> Complaint The above-described acts and omissions of defendants breached the duty
> of care defendants owed to plaintiffs.

> In doing the acts and/or omissions as alleged herein, defendants and/or each of
> them, breached said duty to use reasonable care and said breach of duty caused,
> and/or contributed to the cause, of plaintiffs' injuries and damages as alleged in this
> Complaint.

Doc. No. 129, ¶¶175-176.

[¶178]    Battery under North Dakota law occurs when an individual "(a) acts intending to cause a

harmful or offensive contact with the person of the other or a third person, or an imminent

apprehension of such a contact, and (b) an offensive contact with the person of the other directly

or indirectly results." <u>Wishnatsky v. Huey</u>, 584 N.W.2d 859, 861 (N.D. Ct. App. 1998). Similarly,

under North Dakota law, a defendant commits assault if "he willfully causes bodily restraint or

harm to another human being or places another human being in immediate apprehension of bodily

restraint or harm." <u>Binstock v. Fort Yates Pub. Sch. Dist. No. 4</u>, 463 N.W.2d 837, 840 (N.D. 1990). In either case, the act must be unjustifiable to constitute battery or assault. <u>Id.</u>

[¶179]   Pursuant to N.D.C.C. § 12.1-05-07.2, "[a]n individual who uses force as permitted under this chapter is immune from civil liability for the use of the force to the individual against whom force was used" unless the force was used against a law enforcement officer. "A person is justified in using force upon another person to defend himself against danger of imminent unlawful bodily injury[.] N.D.C.C. § 12.1.-05-07.2. Force is also justified when used upon another person to defend anyone else so long as the person using force would have been justified in defending himself and the person using force has not forfeited the right to self-defense by provocation or otherwise. N.D.C.C. § 12.1-05-04. "Force is justified if it is used to prevent or terminate an unlawful entry or other trespass in or upon premises, or to prevent an unlawful carrying away or damaging of property." N.D.C.C. § 12.1-05-06. However, a person cannot use "more force than is necessary and appropriate under the circumstances." N.D.C.C. § 12.1-05-07.

[¶180]   The Court has already determined the actions of officers in this case were objectively reasonable and they are entitled to qualified immunity on the Plaintiffs' federal claims.[9] For the same reasons as heavily discussed in the excessive force claims, there exists no genuine dispute of material fact to cut against a finding that officers here were clearly justified in using force to protect property, themselves, and others, and used reasonable care in doing so. <u>See</u> <u>Raiche v. Pietroski</u>, 623 F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, our determination of the reasonableness of the force used under § 1983 controls our determination of the reasonableness of the force used under the

---

[9] Because all federal claims have been dismissed, the Court likewise dismisses Plaintiffs' Declaratory Relief claim.

common law assault and battery claims."). Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs' state law claims.

## **CONCLUSION**

[¶181]    Based upon the findings above, the Defendants' Motion for Summary Judgment [Doc. No. 135] is **GRANTED**.

[¶182]    **IT IS SO ORDERED.**

DATED December 29, 2021.

Daniel M. Traynor, District Judge
United States District Court